**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
**SIERRA BOUCHER, LILY ENGEBRECHT,**
**NATASSIA TUHOVAK, HANNAH WHELAN,**
**and, CASSIDY WOOD,**

      **PLAINTIFFS,**    **CASE NO. 1:22-CV-00381-CCR**


   **-against-**

**TRUSTEES OF CANISIUS COLLEGE,**

      **DEFENDANTS.**
------------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**
**<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56</u>**


Respectfully submitted by:

Daniela Nanau
Law Office of Daniela Nanau P.C.
89-03 Rutledge Avenue
Glendale, New York 11385
Telephone: (888) 404-4975
E-Mail: dn@danielananau.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

Table of Authorities    iv-vi

Preliminary Statement    1

Summary of Disputed and Undisputed Material Facts    1

A. Canisius Ignores Student Complaint Regarding Dr. Noonan in 2011    1

B. Canisius Fails to Respond to Dr. Hoffman's Complaints about Dr. Noonan in 2014    2

C. Canisius Dean Laughs in Response to Dr. Loughead Complaints in 2014 or 2015    3

D. Canisius Does Nothing to Respond Dr. Waldau Complaint in 2016    4

E. Canisius Fails to Respond to Complaints by Dr. Russell and Dr. Suchak in 2017-18    5

F. Student Complaints to ABEC Chair in 2018 Are Reported to Title IX in January 2019    6

G. Canisius Requires Students to Attend Meetings and Provide Written Complaints Before Dr. Noonan Removed, Which Allows Sexual Harassment to Continue    8

H. Canisius Retaliates Against Plaintiffs For Engaging in Protected Activity    11

Summary Judgment Standard    15

Argument    16

I. Reasonable Jury Can Find that Canisius Had "Official Policy" of Deliberate Indifference to Complaints Regarding Dr. Noonan's Sexual Harassment For Years    16

A. Title IX Pre-Harassment Standard    16

B. Application    17

II. Reasonable Jury Can Find that Canisius' Response to Plaintiffs' Complaints in 2019 Demonstrates Deliberate Indifference Because Sexual Harassment Continued    22

A. Title IX Hostile School Environment Standard    22

B. Application: Reasonable Jury Can Find Canisius' Untimely Response to Plaintiffs' 2019 Complaints Demonstrates Deliberate Indifference    23

III. Reasonable Jury Can Find that Canisius Retaliated Against Plaintiffs    27

A. Title IX Retaliation Standard    28

# TABLE OF CONTENTS

**Page**

B. Application: Reasonable Jury Can Conclude That Canisius Punished Plaintiffs For Complaining About Dr. Noonan's Sexual Harassment                                29

IV. Plaintiffs Can Demonstrate a *Prima Facie* Case of Breach of Contract          33

V. *Cummings* Does Not Bar All Damages and Other Remedies for Title IX Violations          34

Conclusion          35

# **TABLE OF AUTHORITIES**

**Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . 15

*Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.,*
    2009 WL 230708 (D. Conn. Jan. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023),
    *cert. denied,* 144 S. Ct. 1346 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006) . . . . . . . 28

*Byrne v. Yale Univ., Inc.,* 450 F. Supp. 3d 105 (D. Conn. 2020)  . . . . . . . . . . . . . . . 32

*Carabello v. New York City Dep't of Educ.,* 928 F. Supp. 2d 627 (E.D.N.Y. 2013) . . 22

*Cummings v. Premier Rehab Keller*, P.L.L.C., 142 S. Ct. 1562 (2022) . . . . . . . . . . . 34

*Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629 (1999) . . . . . . . . . . . . . . . . . . .16, 23, 25

*Davis-Garett v. Urban Outfitters, Inc.,* 921 F.3d 30 (2d Cir. 2019) . . . . . . . . . . . . . .16

*Doe A. v. Green* 298 F. Supp. 2d 1025 (D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . .25, 26

*Doe v. E. Irondequoit Cent. Sch. Dist.,* 2018 WL 2100605 (W.D.N.Y. May 7, 2018) . .22

**Doe v. Hobart & William Smith Colleges,**
    2024 WL 4271258 (W.D.N.Y. Sept. 24, 2024) . . . . . . . . . . . . . . . . . . . . . . . . .26

*Doe v. Sarah Lawrence Coll.,* 453 F. Supp. 3d 653 (S.D.N.Y. 2020) . . . . . . . . . . . . . 31

*Doe v. Syracuse Univ.,* 2023 WL 7391653 (2d Cir. Nov. 8, 2023) . . . . . . . . . . . . . . . 27

*Ellis v. Univ. of Rochester,* 2024 WL 493504 (W.D.N.Y. Feb. 8, 2024) . . . . . . . . . . .27

*Facchetti v. Bridgewater Coll.,* 175 F. Supp. 3d 627 (W.D. Va. 2016) . . . . . . . . . . . . 27

*Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712 (2d Cir. 2010) . . . . . . . . . 28

*Gordon v. Niagara Wheatfield Cent. Sch. Dist.,* 2023 WL 6520216
    (W.D.N.Y. Aug. 22, 2023*), report and recommendation adopted,*
    2023 WL 6227616 (W.D.N.Y. Sept. 26, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167 (2005) . . . . . . . . . . . . . . . . . . . . 28

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166 (2d Cir. 2005) . . . . . . . . . . . . . . . 28

*Marino v. State Univ. of New York at Buffalo,*
    2024 WL 3541679 (W.D.N.Y. June 21, 2024) . . . . . . . . . . . . . . . . . . . . . . . . 22

*McGrath v. Dominican Coll. of Blauvelt, New York,*
    672 F. Supp. 2d 477 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Morin v. Fordham Univ.,* 2022 WL 4586042 (S.D.N.Y. Sept. 28, 2022) . . . . . . . . . 26

*Novio v. New York Acad. of Art,* 286 F. Supp. 3d 566 (S.D.N.Y. 2017) . . . . . . . . . .31

*Olsson v. Bd. of Higher Educ.,* 49 N.Y.2d 408 (1980) . . . . . . . . . . . . . . . . . . . . . . . .33

*Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81 (2d Cir. 2011) *passim*

*Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir. 2004) . . . . . . . . . . . . 4

*Posso v. Niagara Univ.,* 518 F. Supp. 3d 688 (W.D.N.Y. 2021) . . . . . . . . . . . . . . . . 21

*Romero v. City of New York*, 839 F.Supp.2d 588 (E.D.N.Y. March 16, 2012) . . . . . .25

*Roskin-Frazee v. Columbia Univ.,* 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018) . . . 22

*SB on behalf of AB v. Newark Cent. Sch. Dist.,*
    2022 WL 541773 (W.D.N.Y. Feb. 23, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Schiebel v. Schoharie Cent. Sch. Dist.,* 120 F.4th 1082 (2d Cir. 2024) . . . . . . . . . . . .16

*Shalom v. Hunter Coll. of City Univ. of New York,* 645 F. App'x 60 (2d Cir. 2016) . .32

*Simpson v. Univ. of Colorado Boulder,* 500 F.3d 1170 (10th Cir. 2007) . . . . . . . . . . 16, 17, 20

*Soule v. Connecticut Ass'n of Sch., Inc.,* 90 F.4th 34 (2d Cir. 2023) . . . . . . . . . . . . . . 35

*Summa v. Hofstra Univ.,* 708 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F.Supp.2d 387 (E.D.N.Y.2005) . . . . . . . . 23, 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Tubbs v. Stony Brook Univ.,* 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) . . . . . . . . . 16, 22

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007) . . . . 20, 21

*Wyler v. Connecticut State Univ. Sys.,* 100 F. Supp. 3d 182 (D. Conn. 2015) . . . . . . . 20

*Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 28

*Zamora v. N. Salem Cent. Sch. Dist.,* 414 F. Supp. 2d 418 (S.D.N.Y. 2006) . . . . . . . . 21

Plaintiffs Sierra Boucher, Lily Engebrecht, Natassia Tuhovak, Hannah Whelan and Cassidy Wood respectfully submit this Memorandum of Law in opposition to the Motion for Summary Judgment brought by Defendant Trustees of Canisius College. Docket No. 33.[1]

## PRELIMINARY STATEMENT

Starting in 2011, Canisius had actual notice that Dr. Michael Noonan, a tenured faculty member in the Animal Behavior and Environmental Conservation (ABEC) Department, subjected students to sexual harassment, and did nothing to remedy the situation for eight (8) years. The College ignored numerous complaints raised by women students, and faculty members, about Dr. Noonan's sexual harassment until Plaintiffs and others threatened to go to the press in 2019, and only then was Dr. Noonan removed. A reasonable jury can conclude that Canisius had an "official policy" of deliberate indifference by failing to remedy Dr. Noonan's known misconduct for years, and that Canisius continued to demonstrate deliberate indifference to Plaintiffs' complaints in 2019 by failing to timely remedy the situation, which enabled the sexually harassment to continue. A reasonable jury can also find that after Dr. Noonan's removal, Canisius retaliated against Plaintiffs to punish them for engaging in protected activity. For all the reasons provided here, Plaintiffs respectfully request that the Court deny Defendant's Summary Judgment motion.

## SUMMARY OF DISPUTED AND UNDISPUTED FACTS

A.    **Canisius Ignores Student Complaint Regarding Dr. Noonan in 2011**

Student A[2] transferred to Canisius to become an ABEC major after discussing her professional goals with Dr. Noonan, which included obtaining a PhD. *See* Pl. 56.1[3] ¶119. Student A reported to one male and one female senior Canisius official, who she believes were both deans,

---

[1] Defendant's Memorandum of Law will be referred to as "Def. Mem." *See* Docket No. 33-68.
[2] Pursuant to the Court's Protective Order, dated June 28, 2024, Plaintiffs will refer to non-party students as Student and assigned to them a letter to distinguish them, such as "Student A."
[3] Plaintiffs' 56.1 Statement of Disputed and Undisputed Materials Facts is referred to as "Pl. 56.1."

several instances of Dr. Noonan's sexual harassment in 2011. *Id.,* ¶¶121-22. Student A reported that Dr. Noonan simulated sex while interacting with another student on the bus during a trip. *Id.* Dr. Noonan "stood there in like a clear sexual position" and Student A testified "[i]t was just unreal[.]" *Id.,* ¶121. Student A also informed the deans that on the first day Social Organization of Mammals class, Dr. Noonan "talk[ed] about kissing his students and how that was totally fine and how he would take them on trips and all the fun things that they would do[.]" *Id.,* ¶122.

Terri Mangione, Canisius' former Title IX Coordinator, corroborates Student A's testimony in an e-mail sent to Linda Walleshauser,[4] dated February 12, 2019, in which Mangione confirmed that Student A alleged in her 2016 lawsuit[5] that "Dr. Noonan inappropriately touched another student." Pl. 56.1 ¶158. Student A's lawsuit settled in 2019, and she is unaware of any discipline imposed on Dr. Noonan by Canisius in connection with her claims. *Id.* ¶¶119, 159.

**B.    Canisius Fails to Respond to Dr. Hoffman's Complaints about Dr. Noonan in 2014**

In 2014, Dr. Christy Hoffman, former ABEC Department faculty, complained about Dr. Noonan's inappropriate touching to Debra Winslow-Schaber, Canisius' Human Resources (HR) Director, and another HR employee. *See* Pl. 56.1 ¶¶89, 90, 155. At that time, Dr. Hoffman reported that "Dr. Noonan had a habit of hugging me, which I did not care for, and I was concerned that the behavior would escalate and that he would try to touch me more while I was pregnant[.]" *Id.,* ¶90. Winslow-Schaber told Dr. Hoffman, in response to her complaint, that "some people just hug others to show their happiness for them," and then asked Dr. Hoffman "if I had ever asked Dr. Noonan not to hug me," which Dr. Hoffman found "unhelpful because her comments demonstrated to me that she was not going to help me[.]" *See id.* ¶92. Dr. Hoffman testified that "I did not do

---

[4] Walleshauser was Canisius' Title IX Coordinator in 2019 when Plaintiffs complained as a group. *See* Pl. 56.1 ¶9.
[5] Student A testified she initiated litigation in 2016 against Canisius in New York State court because Dr. Noonan falsely informed campus security that she was an "animal rights terrorist" from outside the College, which caused her to be violently removed by security from a lecture that Dr. Noonan originally invited her to attend. *See id.*¶157.

anything else . . .  because I was concerned that [Dr. Noonan] would retaliate against me [and] compromise my ability to become a tenured professor." *Id.,* ¶156. Walleshauser informed Dr. Hoffman in 2019 that Winslow-Schaber did not document her complaints in 2014. *Id.*

**C.    Canisius Dean Laughs in Response to Dr. Loughead Complaints in 2014 or 2015**

Dr. Tanya Loughead, a tenured professor, testified that Dr. Noonan subjected her to discriminatory harassment in 2009 or 2010, including screaming, throwing pens and pencils at her head, kicking her off a school committee, and threatening interference in her tenure process. *See* Pl. 56.1 ¶90. Dr. Loughead testified that this discriminatory mistreatment occurred when she tried to discuss with Dr. Noonan an alternative to his requirement that students in his Social Organization of Mammals class kill rats they had trained for a semester, which she raised at the request of Student A. *Id.,*¶101. Dr. Loughead reported Dr. Noonan's discriminatory harassment to her supervisor, Dr. George Boger, Chair of the Philosophy Department, and Dr. Boger told Dr. Loughead, "That sounds like something [Dr. Noonan] would do." *Id.*

Several weeks after Dr. Noonan harassed Dr. Loughead as described above, Dr. Boger reported to Dr. Loughead that "[c]ampus security has contacted me and told me that you are a possible terrorist and that you are a threat because you are an animal rights activist[.]" *See* Pl. 56.1 ¶101. Dr. Loughead testified both she and Dr. Boger agreed Dr. Noonan likely made the false report, but she did not want to complain to Canisius because she was not yet tenured, and did not want to risk retaliation, since Dr. Noonan was the most powerful professor on campus. *See id.*

Dr. Loughead testified that during a Faculty Senate meeting in 2014 or 2015, when Dr. Noonan presided as Chair, he rudely interrupted a presentation by Sister Pat, who ran an internship program for Canisius students, and verbally abused her. *See* Pl. 56.1 ¶103. Dr. Loughead testified that the next day, she went to Dr. Patricia Erikson, then-Dean of the College of Arts and Sciences,

to report Dr. Noonan's harassment of Sister Pat, and the verbal and physical abuse she was subjected by him in 2009 or 2010. Pl. 56.1 ¶104. In response, Dean Erickson laughed, claimed to have a huge pile of complaints about Dr. Noonan, and said: "Nothing is going to happen to him. He's too powerful[6]," which left Dr. Loughead "flabbergasted." *Id.* ¶¶160-61. Dr. Loughead believes Dr. Noonan mistreated her because she is a woman who tried to "question his authority"; she observed him only "lose his cool" and be "particularly sadistic with women[.]" *Id.* ¶¶99, 105.

**D.    Canisius Does Nothing to Respond Dr. Waldau Complaint Regarding Noonan in 2016**

Dr. Paul Waldau, an attorney and educator, worked at Canisius as the senior faculty for the Master of Science in Anthrozoology [program], starting in 2011." *See* Pl. 56.1 ¶173. Mary Fiorella, who worked as the ABEC administrative assistant, informed Dr. Waldau that Student B, who he observed[7] being "very uncomfortable and upset," complained that Dr. Noonan asked her to show him her scar from recent heart surgery on her breast. *Id.,* ¶174. Dr. Waldau reported the incident to Mangione, Canisius' Title IX Coordinator, during a telephone call on February 12, 2016. *See id.,* ¶175. Dr. Waldau "distinctly recall[ed] making the report to Ms. Mangione about Dr. Noonan's mistreatment" of Student B because "I wanted to ring his bell and call attention to the way he interacted with women at Canisius," although Mangione did not ask him to submit anything in writing, and he did not make any further inquiries. *Id.*, ¶¶176-77. Dr. Noonan's discriminatory misconduct continued, and in April 2015, Dr. Waldau confronted him regarding his inappropriate hugging of

---

[6] Dr. Loughead's testimony regarding Dr. Noonan's "power" at Canisius is corroborated by Dr. Matthew Mitchell, a former tenured faculty member, and Colleen O'Hara, a former long-time administrative assistant in the Biology Department, who both testified that Dr. Noonan's sexual harassment of Canisius women made him "infamous" on campus, which was condoned by President John Hurley and other administrators because the ABEC Department attracted many students and was very profitable for the College. *See* Pl. 56.1 ¶¶ 166-172.

[7] Contrary to the suggestion raised by Defendant's citation to *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir. 2004) (Def. Mem. at 16-17), Dr. Waldau's Declaration does not contain factual allegations based "upon information and belief." Moreover, what Fiorella told Dr. Waldau about Dr. Noonan's harassment of Student B, which prompted him to make a complaint to the Title IX coordinator, is subject to the state of mind exception to the hearsay rule, which allows statements informing a person's state of mind as evidence. *See* F.R.E. 803(3).

women faculty in the ABEC Department, including Dr. Hoffman and Dr. Malini Suchak, who told Dr. Noonan that they did not want to be hugged by him or engage in group hugs. *See id.*

**E.    Canisius Fails to Respond to Complaints by Dr. Russell and Dr. Suchak in 2017-18**

Dr. Jeffrey Russell and Dr. Suchak, two ABEC faculty members, complained in 2017 and 2018 to Dr. Beth Gill, then-Dean of the College of Arts and Sciences, and Dr. Margaret McCarthy, who at all relevant times was the Vice President of Academic Affairs, "regarding Dr. Noonan and the quality of student experience on trips after hearing concerns from the students." *See* Canisius 432. Walleshauser's notes from 2019 demonstrate that Dr. Suchak and Dr. Russell reported to her that they complained in 2017-18 about Dr. Noonan "displaying favoritism in selecting students for the trips[.]"*Id.* Dr. Russell also complained about Dr. Noonan's fitness requirements for his trips that were used to exclude students from his trips. *See* Pl. 56.1 ¶93.

Dr. Suchak testified that she used the same notes during her meetings with Dr. Gill and Dr. McCarthy. *See* Canisius 3063-3066; Pl. 56.1 ¶93. Dr. Suchak's notes corroborate that her concerns in 2017-18 related to the questionable educational value of Dr. Noonan's trips, and the fact that he took the same students on repeated "extravagant" trips. *See* 3064-65 ("CAC students do travel, although the term 'field study' is not used here in the traditional way"; "students . .  assigned particular web/video projects, which are scripted or heavily edited by [Dr. Noonan]"; "we see the same several students taking the trips again and again ("for e.g., 2 seniors have been on a total of 4 trips, total[ing] tens of thousands of dollars"). Dr. Suchak and Dr. Russell testified that Canisius did nothing to investigate or remedy their complaints. *Id.,*¶180.

Testimony from Student C, a Canisius graduate, corroborates that Dr. Noonan used of fitness requirements to exclude LGBTQ students, like her, from trips and that ABEC faculty knew about the issue and did not report the situation to Title IX. *See* Pl. 56.1 ¶181-83. Student C was an "out"

queer student and "Dr. Noonan told me once directly, 'I don't think this trip is for you,' to discourage me from applying, mentioning a strenuous physical test, which he said I would have to take and that I would be the only student who needs to take the physical test[.]" *See* Pl. 56.1 ¶182. Student C testified that she discussed Dr. Noonan's inappropriate treatment with Dr. Russell, who "took me under his wing," "because Dr. Russell . . . told me he had been subjected to mistreatment by Dr. Noonan" as an undergraduate at Canisius, but "[n]o ABEC faculty member ever encouraged me to go to the Title IX office to complain [.]" *See id.,* ¶183.

**F. Student Complaints to ABEC Chair in 2018 Are Reported to Title IX in January 2019**

Canisius incorrectly claims the College was first made aware of student complaints regarding Dr. Noonan's discriminatory misconduct on February 7, 2019 from Tuhovak. *See* Def. Mem. at 1-2. However, a calendar record corroborates that Tuhovak went to Dr. Susan Margulis, ABEC Chair, for the first time to complain about Dr. Noonan in March 2018. *See* Pl. Ex. DD; Pl. 56.1 ¶¶106, 201. Tuhovak specifically reported Dr. Noonan's "harassment" to Dr. Margulis, and provided detail regarding getting "screamed at," "verbally abused every day on the research team," and "being made an example of a . . . type of student that other research students wouldn't want to be" by Dr. Noonan. *Id.,* ¶107. Tuhovak told Dr. Margulis she was "having panic attacks every day" because she felt "trapped, I can't leave his research team, there's no possibility for me to get into like graduate school or law school without . . . his recommendation letter," and he was mistreating her because she "pushed back[8]" against his efforts to monopolize her time, refusing to be "submissive and quiet." *Id.* ¶¶107-08. Dr. Margulis responded to Tuhovak by saying: "What do

---

[8] Dr. Suchak kept a log of Dr. Noonan's harassment during her first year teaching at Canisius, which contained 25 separate instances, to have "a running record of interactions that showed that [Dr. Noonan] was behaving in an overbearing and inappropriate way towards me." *See* Pl. 56.1 ¶¶185-6. Dr. Suchak only reported Dr. Noonan's sexual harassment to Canisius in February 2019 because she read the sexual harassment policy as requiring affirmative sexual misconduct that occurred in secret, and what she experienced from Dr. Noonan was " a power move" because "I pushed back against him and it was a way that he was able to assert power over me." *Id.,* ¶187.

you want me to do about it? You know he's difficult to work with. . . .either you can stay on the team and be miserable and get your recommendation letter or you can leave." Pl. 56.1 ¶109.

It is undisputed that Dr. Margulis did not report Tuhovak's March 2018 complaint to Canisius until January 27, 2019, when she provided to Walleshauser a one-page summary of prior student complaints regarding Dr. Noonan's discriminatory misconduct. *See* Pl. Ex. EE; Pl. 56.1 ¶202. In addition to Tuhovak's March 2018 complaint, Dr. Margulis' summary describes numerous complaints regarding Dr. Noonan's sexual harassment that she failed to report to Title IX prior to January 2019, despite Dr. Margulis acknowledging that she is a mandatory reporter under the Canisius Title IX policy. *See* Pl. EE; Pl. 56.1 ¶189.

Specifically, Dr. Margulis' summary memorializes *inter alia* that she was aware of Dr. Suchak and Dr. Russell's complaints to Dr. Gill "2 or so years ago"; Dr. Waldau's complaint on behalf of Student B when Dr. Noonan "ask[ed] to see a student's scar"; and Student C's experience "not [being] selected for the trip"  because she was "a trans student." *See* Pl. Ex EE.

Dr. Margulis' summary also memorializes that Student D complained to her in the Fall of 2018 about Dr. Noonan and "things going on in Sex Evolution and Behavior" including an "anonymous survey about sexual partners," "exclus[ion] of LGBTQ students from classroom activities," and the use class time to "show[] pictures of men and ask[] students to rate them[.]" *See* Pl. 56.1 ¶113. Student D testified she told Dr. Margulis about Dr. Noonan's sex survey and inappropriate questions "that focused on our own sexual experiences," including "whether I had ever been sexually assaulted." *Id.,* ¶115. Student D reported to "Dr. Margulis about inappropriate comments during class, which included Dr. Noonan's declaration that 'Rape should be expected in humans!'" *Id.* "Dr. Margulis told me that she would 'file' my complaint" but Student D "never heard back from Dr. Margulis" or anyone else at Canisius in response. *Id.*, ¶118.

Dr. Margulis prepared the summary of student complaints regarding Dr. Noonan's sexual harassment after Student E complained to her about Dr. Noonan's serious discriminatory misconduct on the Project Tiger trip to India on or about January 25, 2019, during which he was "hostile to the students" and "made > student cry." *See* Pl. 56.1 ¶195; Pl. Ex. EE.

## G.    Canisius Requires Students to Attend Meetings and Provide Written Complaints Before Dr. Noonan Removed, Which Allows Sexual Harassment to Continue

By late January 2019, Canisius had actual notice of Plaintiffs' complaints regarding Dr Noonan's sexual harassment. On January 25, 2019, Student F, one of Dr. Noonan's research students, met with Dr. Hogan at the direction of another professor to discuss verbal abuse and other mistreatment by Dr. Noonan. *See* Pl. 56.1, ¶¶19-20; Pl. Ex. H at Canisius 569. At that time, Student F informed Dr. Hogan that Tuhovak, another student on Dr. Noonan's research team, had been subjected to the same kind of harassment. *Id.,* ¶¶19-20. On January 28, 2019, Walleshauser met with Dr. Margulis and Dr. Hogan to discuss student complaints regarding Dr. Noonan's sexual harassment. *Id.,* ¶10. Walleshauser's notes from the January 28, 2019 meeting evidence her awareness of ten student complaints ("8 students" "2 bias reports[9]") regarding Dr. Noonan's "touching," "verbal abuse," and student allegations of being "groomed[.]" *See id.,* ¶81; Pl. Ex Q. On January 29, 2019, Dr. Hogan met with Dr. Peter Schaber, Dean of the College of Arts and Sciences, and Dr. Margulis to discuss the student complaints, and Dean Schaber believed they should merely "have a discussion" with Dr. Noonan, which Dr. Hogan objected to, saying she wanted to "make sure that Linda [Walleshauser] was involved in the situation before we went

---

[9] At her deposition, Walleshauser could not explain how the two student complaints she alleged were submitted anonymously through Canisius' "bias reporting system" in 2019 where, verbatim, student comments about Dr. Noonan's sexual harassment, including detailed information about him being a "perv" "creepy and weird," which had been submitted by students who took his Sex and Evolution Class in the Fall of 2018. *See* Pl. 56.1, ¶¶130-31. This evidence undermines Canisius' claims that only Dr. Noonan had access to student comments for his classes and that Defendant's administrators were unaware of these student complaints in 2018. *See* Def. Mem. at 17.

further to see how it should be resolved." *See* Pl. 56.1, ¶28. E-mails exchanged by Dr. McCarthy, VP of Academic Affairs, and President John Hurley, demonstrate they knew about the student complaints regarding Dr. Noonan in the first week of February 2019. *Id.,* ¶¶27-28.

Even though Canisius' top administrators had actual knowledge of the student complaints regarding Dr. Noonan's sexual harassment, they waited for weeks to act. Canisius' Sexual Misconduct policy did not require students to report complaints to the Title IX coordinator, or require the submission of written complaints. *See* Pl. 56.1 ¶¶ 201-02.  Yet Walleshauser required Plaintiffs and the other student complainants to meet with her on February 11, 2019, and then again in one-on-one meetings, to discuss their written submissions. *Id.,* ¶¶12-15.

Before meeting with Walleshauser, on February 5, 2019, Tuhovak and Student F met with Dr. Hogan and described Dr. Noonan's "harassment and the ways where he was screaming at us." Pl. 56.1 ¶ 261. Tuhovak also described other instances of "sexual harassment," such as how Dr. Noonan liked to engage in "girl talk" during which he would ask students "sexual questions";  his sexual jokes about ejaculation when using pipettes in the lab; requiring students to "stretch his leg"; and, Dr. Noonan's insistence on threading microphones through students' shirts while filming. *Id.,* ¶262. During their one-on-one meeting, Tuhovak described for Walleshauser how she was forced to stretch Dr. Noonan's leg, and he "would make this moaning sound" that made her uncomfortable, in addition to other instances of sexual harassment. Tuhovak testified she ultimately did not submit a written complaint because Walleshauser was "very rushed" and "asking questions that really seemed to put blame and insinuate blame on me." *Id.,* ¶¶26; 263.

During the student group meeting on February 11, 2019, Whelan testified the students complainants focused on "the most dangerous instance as students we were in with [Dr. Noonan] on [the India] trip." Pl. 56.1 ¶14. Whelan described for Walleshauser how Dr. Noonan attempted

to manufacture a medical emergency and repeatedly insisted on inserting suppositories into her

anus and that of Student G, which Whelan described as part of a "greater pattern of him grooming

us" to "sexually exploit us." *Id.,*¶¶15, 202. Whelan specifically described for Walleshauser how

Dr. Noonan sexualized his alleged offer of medical help by soliciting unnecessary information

about her history of anal sex. *Id.,*¶15. Whelan testified that she made it clear to Walleshauser the

suppository situation was one of a "list of complaints[.]" *See id.*, ¶14.

In written submissions and one-on-one sessions with Walleshauser, Plaintiffs put Canisius

on notice of additional sexual harassment by Dr. Noonan including:

- frequent unwanted hugs and touching of their bra straps, arms, and hair;
- regular sessions of "girl talk" during which Dr. Noonan discussed his own sex life, which involved dating/having a sexual relationship with a Canisius graduate student who he brought on various student trips, flirting with her and touching her in front of students;
- lacking boundaries by pressing Plaintiffs and other students for information about their own sex lives, including whether or not they would date older men;
- unwanted comments to specific Plaintiffs about their bodies, including being "flat-chested," or numerous discussions about whether or not one Plaintiff should wear a bra;
- taking pictures of Plaintiffs and other students without permission, including when they were in compromised positions, such as when Tuhovak's tankini flew up while she was diving into the ocean, exposing her breasts;
- demands that Plaintiffs and other students assist him with his "medical issues" by "stretching" his leg during which he would groan;
- requiring students on trips to meet at the end of the day in their pajamas;
- controlling behavior with comments like "I own your bodies" and requirement that students present him with their outfit choices prior to filming; and,
- disparaging comments about the #MeToo Movement and women who complain about sexual predators like Bill Cosby being "too sensitive."

*See* Pl. 56.1, ¶¶15, 202-268.

Instead of immediately removing Dr. Noonan from campus, Walleshauser interviewed

several ABEC faculty whose past complaints about Dr. Noonan's sexual harassment were ignored

by Canisius, including Dr. Hoffman, Dr. Suchak and Dr. Russell. *See* Pl. 56.1, ¶¶79, 89-93. E-

mails demonstrate that on February 19, 2019, weeks after they first learned of Plaintiffs'

complaints regarding Dr. Noonan's sexual harassment, President Hurley and Dr. McCarthy were still debating whether to put Dr. Noonan on paid leave or something "less severe." *Id.,* ¶29.

Canisius' delay caused Plaintiffs to be subjected to additional sexual harassment by Dr. Noonan. In late January or early February 2019, when Canisius had actual notice of Plaintiffs' complaints, the College did nothing to stop Dr. Noonan from requiring the Project Tiger students, including Boucher, Engebrecht, Whelan and Wood to travel with him Canada to interview "an artist who has nothing to do with tiger conservation," during which he harassed them by claiming Plaintiffs were questioning his authority and "trying to overthrow him." Pl. 56.1, ¶207. Wood testified she and the other students were "angry," "stressed" and "fearful" throughout the trip because they did not know if Dr. Noonan was aware of their complaints to Canisius *Id.,* ¶228.

Tuhovak continued working with Dr. Noonan in his research lab and was subjected to sexual harassment, both after her March 2018 complaint to Dr. Margulis, and her complaints in early February 2019 to Dr. Hogan and Walleshauser. *See* Pl. 56.1, ¶266. Dr. Hogan confirmed that Tuhovak complained to her that "HR should have contacted students prior to [the] first meeting [on February 21, 2019] with Mike [Noonan] to let them know they should not be in the lab." *Id.,* ¶269. Tuhovak testified she feared "the worst" about encountering Dr. Noonan after he was informed of the complaints raised by her and other students about his sexual harassment, because of "how volatile he was with us." *Id.,* ¶267.

**H.    Canisius Retaliates Against Plaintiffs For Engaging in Protected Activity**

On February 12, 2019, Dr. Hogan e-mailed Dr. McCarthy, Dean Schaber and Walleshauser with a list of accommodations requested by Plaintiffs and the other students who came forward with complaints about Dr. Noonan sexual harassment, which included *inter alia* a no-contact order and access to video footage to allow Project Tiger students to "continue to work on the film." *See*

Pl. 56.1, ¶270. Dr. Hogan testified that Plaintiffs and other student complainants also expressed concern about getting letters of recommendation if Dr. Noonan left Canisius and specifically requested accommodation on this issue. *Id.,* ¶271. Dr. Hogan's notes confirm her "plan of action" included "protect[ing] current students" and "letter[s] of recommendation." *Id.,* ¶272.

Despite being aware of Plaintiffs' request for accommodation, Walleshauser admitted that she never discussed accommodations with Plaintiffs and the other student complainants, including "specific accommodations that could be made available to them," and instead provided them with "general information and said if they needed support, to advise us." *See* Pl. 56.1, ¶273. Walleshauser further testified that issues related to Project Tiger, recommendation letters and the academic "back up plan" for Plaintiffs were designated for Dr. Margulis, Dean Schaber and Dr. McCarthy to resolve and she was not involved. *Id.,* ¶274. For that reason, Walleshauser was "not sure" at her deposition even if the Project Tiger film was ever completed by Plaintiffs. *Id.*

Although Canisius had possession of the film footage for the Project Tiger documentary, Dr. Margulis purposefully withheld it from the students, including Boucher, Engebrecht, Wood and Whelan, claiming at first that a "legal issue" prevented them from using the footage, and requiring them instead to make a podcast to get credit for the class. *See* Pl. 56.1, ¶¶ 69, 213, 229, 249. Dr. Margulis e-mailed Dr. McCarthy on March 6, 2019: "I am uncomfortable with them using any of the video (even if the college does technically own it) and feel [podcasts] would be a better way to go." *Id.*, ¶68. In denying Plaintiffs access to the Project Tiger footage throughout the Spring of 2019, Wood testified that Canisius demonstrated its disregard for her and the other students who "had spent hundreds, again, collectively thousands of hours working on the film [but] [w]e were told we can't be told anything for legal reasons regarding the film[.]" *Id.*, ¶229. Boucher noted that even though Dr. Margulis did not have the skills to make a documentary, she could have recruited

other professors to help, including a professor in the Digital Media Arts Department who Boucher unsuccessfully approached for assistance in 2019. *Id.*, ¶67.

Canisius withheld the film footage from Plaintiffs throughout the Spring semester, during which time the College engaged in negotiations with Dr. Noonan regarding a separation agreement, which he executed on May 31, 2019. *See* Pl. 56.1, ¶84; Pl. Ex. Z The separation agreement permitted Dr. Noonan "access to video editing equipment so that he may complete certain unfinished film projects, including a project known as 'Project Tiger,'" which had to be returned "on or about September 1, 2019." *See* Pl. Ex. Z at Canisius 4961. The separation agreement also provided that Dr. Noonan's termination of employment would be deemed a "retirement" and he would be paid $133,2164.50, *see* Canisius 4956-57, even though Dr. McCarthy admitted she was unaware of any litigation threat from Dr. Noonan. *See id.,* ¶84.

In allowing Dr. Noonan to take video editing software from campus for the entire summer in 2019, Boucher, the only remaining Project Tiger student with video editing skills, was unable to work on the project during that time. *See* Pl. 56.1, ¶88. Engebrecht testified that getting the documentary footage after the semester was over "was just too late." *Id.*, ¶93. Similarly, Whelan testified that "Canisius failed us" by requiring the students to make a pod cast for the Project Tiger class, only to make the documentary footage available to them after the semester was over, when they would receive no credit and had no funding to make the film. *Id.*, ¶211.

Plaintiffs testified that ABEC faculty treated them in a "hostile" manner after Dr. Noonan's removal, which made them afraid to ask for any other accommodations or recommendation letters. *See* Pl. 56.1 ¶208. Whelan testified that the ABEC faculty exhibited an "attitude of 'why did you guys report him,' 'this is an inconvenience for us and now we have so much more work to do,'" and she did not feel comfortable asking for any academic accommodations or recommendation

letters for graduate school. *Id.* As a result, Whelan testified she spent her last year at Canisius focusing on environmental studies, but she did not have enough time to develop a relationship with another professor who could have helped her develop a plan for graduate school. *Id., ¶¶*209-210.

Similarly, Tuhovak testified "there was just like a general air following the [] Title IX investigation. . . of frustration with the students who came forward and how much extra work all of the other Canisius professors had on their plates now that Noonan was gone[.]" Pl. 56.1 ¶58. Tuhovak met once with Dr. Hoffman, who expressed dissatisfaction with Tuhovak's research project and seemed frustrated that she had to help Tuhovak and Dr. Noonan's research students complete their projects. *Id.* As a result, Tuhovak no longer wanted to work on the project, but was reluctant to request an academic accommodation to be excused from completing her research. *Id.* Tuhovak was reluctant to request that accommodation because she had been denied a paper deadline extension by her political science professor in the Spring of 2019, even though she informed him of her involvement in a Title IX investigation, and received a lower grade. *Id.* ¶265.

Boucher testified that after Dr. Noonan's removal, Dr. Margulis treated her "really coldly" and "I really struggled to feel like I could build relationships with people in the ABEC Department." *See* Pl. 56.1 ¶257. Boucher testified that she ultimately did not apply to a science-related PhD program in part because of the quality of the letters of recommendation from ABEC faculty she did receive. *Id.* Moreover, two years after Dr. Noonan's removal, the first opportunity she had to interact with Dr. Margulis again after Project Tiger, Dr. Margulis refused to grant Boucher an accommodation that would have counted a 3-credit ABEC class toward Boucher's ABEC degree, and instead required her to take 18 credits during her final semester to be able to graduate on time, which cost Boucher additional tuition money and time. *Id.*, ¶258.

Engebrecht testified that Canisius' decision to prevent the completion of the Project Tiger documentary in 2019 affected the viability of her chances of getting into graduate school, and by the time she completed her studies at the College in 2020, she "gave up on grad school," even though going to graduate school to become a scientist had always been her goal. *See* Pl. 56.1 ¶142.

Wood testified regarding the hostile attitude of the ABEC faculty after Dr. Noonan's removal when she stated that Plaintiffs "knew that our professors were talking about us, but never once did anyone say 'I'm so sorry you're going through this[.]'" *See* Pl. 56.1 ¶232. Wood further testified that no one from Canisius explained to Plaintiffs they "could access the campus counseling or anything like that if we needed it" or any other accommodations *Id.*, ¶¶231-32. Wood testified that the ABEC faculty's retaliatory treatment of Plaintiffs after they complained, and the failure to ensure they could have access to the Project Tiger footage, made her weary to ask for more than a one-day extension during her remaining time at Canisius. *Id.*, ¶232.

In contrast, Canisius administrators were concerned that Dr. Noonan "clearly would be devastat[ed] to be removed from the college" so they made "sure he has access to counseling if need be," even after his removal from campus while on paid leave. *See* Pl. 56.1 ¶275.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be denied where, as here, there are genuine issues of material fact "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether there are genuine issues of material fact, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Id.* at 545. In reviewing "all of the evidence in the record," the court "may not make credibility determinations or weigh the evidence," and it

"must draw all reasonable inferences in favor of the nonmoving party," here, the Plaintiffs. *Davis-Garett v. Urban Outfitters, Inc.,* 921 F.3d 30, 46 (2d Cir. 2019).

## ARGUMENT

I.    **Reasonable Jury Can Find that Canisius Had "Official Policy" of Deliberate Indifference to Complaints Regarding Dr. Noonan's Sexual Harassment For Years**

A.    <u>Title IX Pre-Harassment Standard</u>

For an educational facility to be liable under Title IX, the plaintiff must establish that a school official with "authority to address the alleged discrimination and to institute corrective measures" had "actual knowledge" of the discrimination and failed to adequately respond. *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81, 89 (2d Cir. 2011). A school fails to adequately respond if it provides no response or a response that "amount[s] to deliberate indifference to discrimination." *Id.* The school's response to sex discrimination must be "clearly unreasonable" in light of known circumstances. *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 648 (1999). The Second Circuit recently opined that "a person who was subjected to sexual harassment or other gender-related misconduct within a federal funding recipient's program may demonstrate a Title IX violation under either an official action theory or a deliberate indifference theory." *Schiebel v. Schoharie Cent. Sch. Dist.,* 120 F.4th 1082, 1094 (2d Cir. 2024).

In the case at bar, Plaintiffs bring pre-harassment claims under an official action theory. District courts in this circuit have found persuasive the analysis of pre-harassment claims in *Simpson v. Univ. of Colorado Boulder,* 500 F.3d 1170, 1178 (10th Cir. 2007). *See, e.g., Tubbs v. Stony Brook Univ.,* 2016 WL 8650463, at *8 (S.D.N.Y. Mar. 4, 2016). In *Simpson*, cited in Def. Mem. at 14, the university failed to address numerous instances of sexual assault and harassment in the years prior to the plaintiffs' rapes, which occurred in the context of a football recruitment program. 500 F.3d at 1181–83. The university had known that two recruits had previously

assaulted a high-school girl at an off-campus party hosted by a football player. *Id.* at 1181. However, after a meeting with the District Attorney's office "to work to prevent these...kinds of events from occurring," "none of the eventual recruiting or policy changes…addressed either sexual contact between recruits and females[.]" *Id.* at 1182. The abusive culture persisted. For example, the father of a female player on the predominantly male team reported to the head coach and athletic director "about multiple instances of sexual harassment," which the coaching staff allowed. *Id.* at 1183. When the player made more complaints, the head coach and athletic director "retaliated against her by preventing her from staying" on the team, and the head coach discouraged another student from pressing charges. *Id.*

The Tenth Circuit observed that in light of the university's knowledge of the foregoing, the "central question" in the context of summary judgment was whether there was evidence from which a reasonable jury could conclude there was an "obvious" risk that a future Title IX violation would occur. 500 F.3d at 1180–81. The Circuit held the evidence could support a jury finding that the head coach had (1) "general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts"; (2) knew that such assaults had "indeed occurred"; (3) nevertheless "maintained an unsupervised [] program" to show high-school recruits a "good time"; and (4) knew, "both because of incidents reported to him and because of his own unsupportive attitude, that there had been no change in atmosphere" since the earlier assaults. Based on this evidence, "[a] jury could infer that the head coach could reasonably be said to have been deliberately indifferent[.]" *Id.* at 1184–85.

**B.    Application**

Canisius' argument, that "over the course of a 40-year career in academia," Dr. Noonan "often was at odds with colleagues, and occasionally with students," but the evidence of "those

disagreements do not come close" to making out a pre-harassment Title IX claim, is misplaced. *See* Def. Mem. at 14. In addition to inapplicable caselaw, Canisius relies on an incomplete factual narrative that "seeks to minimize the knowledge of, or notice given to, responsible university officials" regarding Dr. Noonan's sexual harassment. *See Brown v. Arizona*, 82 F.4th 863, 880 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 1346 (2024); *cf.* Def. Mem. at 14-20.

Plaintiffs' evidence, taken as a whole, demonstrates that prior to 2019, senior Canisius administrators had actual knowledge of numerous complaints from women students and faculty regarding Dr. Noonan's sexual harassment, and failed at every turn to document those complaints, investigate, and hold Dr. Noonan accountable. *Infra* at 2-8. This inaction permitted him to continue to sexually harass others, including Plaintiffs, which is evidence from which a reasonable jury can conclude there was an "obvious" risk that a future Title IX violation would occur, and Canisius' failure to remedy eight years' worth of prior complaints amounted to an official policy of deliberate indifference. *See Simpson*, 500 F.3d at 1884-85.

There is ample evidence from which a jury can conclude that Canisius had an official policy of deliberate indifference to complaints about Dr. Noonan's sexual harassment of students. As demonstrated *infra* at 2-8, the College had actual notice of Dr. Noonan's sexual harassment of Canisius women, starting with Student A's complaint in 2011, when she reported to two deans that Dr. Noonan simulated having sex with one student, and discussed kissing students on the first day of class. *See infra* at 2. An e-mail from Mangione, Canisius' Title IX coordinator, demonstrates the College had actual knowledge of that misconduct, and there is no evidence that anything was done in response, even after Student A initiated litigation in 2016. *See id.* Moreover, Magione's failure to document, investigate or remedy Dr. Waldau's complaint in 2016 about Dr. Noonan's sexual harassment of Student B, which involved a request to see a surgery scar on her breast (*see*

*infra* at 4-5), demonstrates that a reasonable jury can conclude Canisius' failure to respond to Student A's complaints was not an aberration, but official policy.

There is ample evidence from which a jury can conclude that Canisius' official policy of deliberate indifference to complaints about Dr. Noonan's sexual harassment included those raised by women faculty. This is demonstrated by evidence of Dr. Hoffman's complaints about Dr. Noonan's inappropriate touching in 2014, which the HR Director refused to remedy, and failed to document. *See infra* at 2-3. Similarly, in 2014 or 2015, when Dr. Loughead complained to Dean Erickson about verbal abuse and other sex harassment she and Sister Pat were subjected by Dr. Noonan, the Dean demonstrated Canisius' official policy of deliberate indifference by laughing and saying "[n]othing would happen" because Dr. Noonan was "too powerful." *See infra* at 4.

A reasonable jury can conclude that Canisius continued to maintain its official policy of deliberate indifference to complaints about Dr. Noonan's sexual harassment in 2017 and 2018 by failing to investigate and remedy student complaints brought to the attention of Dean Gill and Dr. McCarthy by Dr. Suchak and Dr. Russell regarding the quality of the educational experience on those trips, including Dr. Noonan taking the same students on numerous, extravagant trips. *See infra* at 5-6. A reasonable jury can conclude that Dr. Margulis continued to perpetuate Canisius' official policy of deliberate indifference by failing to timely report complaints she received in 2018 from Tuhovak regarding Dr. Noonan's verbal abuse, and Student D who complained about Dr. Noonan's discriminatory misconduct in the Sex, Evolution class, which included use of a "sex survey" to gather information regarding students' sex lives, including whether they had been sexually assaulted, and his comments that "rape is natural." *See infra* at 6-8.

Like the head coach in *Simpson*, a reasonable jury can conclude, based on the totality of Plaintiffs' evidence, that prior to 2019, Canisius senior administrators had "general knowledge of

the serious risk of sexual harassment" posed by Dr. Noonan; (2) they knew that such harassment had "indeed occurred"; (3) they nevertheless "maintained an unsupervised environment" for Dr. Noonan; and (4) they knew, "both because of incidents reported and because of they own unsupportive attitude, that there had been no change" in his behavior, which demonstrates that a reasonable jury could find the College had an official policy of deliberate indifference to Dr. Noonan's sexual harassment. *See* 500 F.3d at 1184-85; *cf. Wyler v. Connecticut State Univ. Sys.,* 100 F. Supp. 3d 182, 190 (D. Conn. 2015) (granting summary judgment on the plaintiff's pre-assault claim, which was supported only by testimony from one individual describing "unconfirmed rumors, intimations and [the individual's] own suspicions") (Def. Mem. at 13-14).

Plaintiffs' evidence demonstrating how Canisius senior administrators systematically failed to document, investigate, and hold Dr. Noonan accountable for his discriminatory misconduct prior to 2019 is also similar to the University's deliberate indifference in *Brown v. Arizona*, 82 F.4th 863, 884 (9th Cir. 2023), where the Ninth Circuit reversed summary judgment. The *Brown* Court found that the plaintiff had proffered sufficient evidence demonstrating that numerous university officials with "authority to address" student-on-student harassment and "to institute corrective measures," had "actual knowledge" of one football player's sexual violence against two students, which occurred years before he sexually assaulted the plaintiff, but university officials only reported some of his prior mistreatment of the two students to Title IX, and failed to report the sexual assaults, which was held to be "clearly unreasonable in light of the known circumstances," demonstrating the University's "deliberate indifference" to the danger the harasser posed to other women students at the University. *See* 82 F.4th at 883–84; *accord Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296-97 (11th Cir. 2007) (cited in Def. Mem. at 14) (reversing motion to dismiss, holding that prior to the plaintiff's assault, the university

allegedly knew facts about the perpetrator's history of sexual harassment at other colleges, which demonstrated deliberate indifference to the increased the risk he would harass another student).

Canisius' insistence that complaints regarding Dr. Noonan's sexual harassment before 2019 were not sufficiently "severe, pervasive and objectively offensive" to put the College on notice of the "heightened risk" Dr. Noonan posed is also misplaced. *See* Def. Mem. at 19-20. This argument was rejected by Judge Vilardo in *Posso v. Niagara Univ.,* 518 F. Supp. 3d 688, 700 (W.D.N.Y. 2021). In that case, the university argued that "it did not have actual knowledge of the risk of sexual assault by a male swimmer" through "lesser harassment" (i.e. gender-related misconduct that is not sexual assault), and the District Court disagreed:

> [A]ll the alleged behavior falls under the definition of "sexual harassment" prohibited under Title IX,[]; therefore, all were the sorts of behavior that Niagara was obliged to guard against, *see Doe v. School Bd. of Broward Cnty*, 604 F.3d 1248, 1258 (11th Cir. 2010). So the plaintiffs indeed have alleged "lesser harassment" that provided actual notice that something more might well occur.

*Posso,* 518 F. Supp. 3d at 700–01 (Def. Mem. at 13-14); *Williams*, 477 F.3d at 1290, 1294 (finding complaint sufficient to withstand motion to dismiss where the plaintiff alleged the university recruited an athlete and failed to sufficiently monitor his behavior despite knowing his history of lesser sexual harassment). In *Zamora v. N. Salem Cent. Sch. Dist.,* (Def. Mem. at 13) the district court denied summary judgment, holding that "actual knowledge of a teacher's propensity or proclivity to sexually harass children may constitute actual knowledge, for purposes of a subsequent victim's Title IX claim," and the decision is devoid of any discussion that prior conduct must be the "same or similar" as Canisius contends. 414 F. Supp. 2d 418, 434-25 (S.D.N.Y. 2006).

Aside from *Simpson* and *Williams*, none of the cases cited by Canisius similar to the case at bar. In *Carabello v. New York City Dep't of Educ.,* the district court granted the defendants' summary judgment motion on the pre-assault claim because there was no "actual knowledge" of

"heightened risk" where the teacher-harasser previously only exhibited "insubordinate" behavior. *See* 928 F. Supp. 2d 627, 639 (E.D.N.Y. 2013) (Def. Mem. at 14). Similarly, in *Marino v. State Univ. of New York at Buffalo,* 2024 WL 3541679, at *7 (W.D.N.Y. June 21, 2024), the court granted dismissal of the pre-assault claim where the plaintiff alleged no facts demonstrating the university's "actual knowledge of a heightened risk of sexual assault" posed by the student who sexually assaulted the plaintiff, holding that the university's "general aware[ness]" of the problem of sexual assault on campus did not have enough specificity to state a plausible claim. *See* Def. Mem. at 12-13. The same pleading deficiencies led to the dismissal of the plaintiff's pre-assault claims in *Roskin-Frazee v. Columbia Univ.,* 2018 WL 6523721, at *5 (S.D.N.Y. Nov. 26, 2018) and *Doe v. E. Irondequoit Cent. Sch. Dist.,* 2018 WL 2100605, at *20 (W.D.N.Y. May 7, 2018) (cited in Def. Mem. at 13); *cf. JD1 v. Canisius Coll.,* 2022 WL 2308902, at *11 (W.D.N.Y. June 27, 2022) (denying motion to dismiss pre-assault claims) and *Tubbs v. Stony Brook Univ.,* 2016 WL 8650463, at *9 (denying motion to dismiss pre-assault claim) (cited in Def. Mem. at 13). One case does not involve pre-assault claims at all. *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.,* 2009 WL 230708, at *8 (D. Conn. Jan. 30, 2009) (Def. Mem. at 15).

Accordingly, Plaintiffs have demonstrated sufficient evidence from which a reasonable jury could find that, prior to Plaintiffs' complaints as a group in 2019, Canisius had an official policy of deliberate indifference to complaints about Dr. Noonan's sexual harassment in violation of Title IX, and summary judgment on Plaintiffs' pre-harassment claims should be denied.

## II.    Reasonable Jury Can Find that Canisius' Response to Plaintiffs' Complaints in 2019 Demonstrates Deliberate Indifference Because Sexual Harassment Continued

### A.    Title IX Hostile School Environment Standard

Title IX permits a plaintiff to recover damages when she is subjected to a hostile environment that constitutes discrimination on the basis of sex, and deprives the plaintiff of the

benefits of an educational program receiving federal funds. *See Davis*, 526 U.S. at 633. The "plaintiff must show that [s]he subjectively perceived the environment to be hostile or abusive, and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment." *Papelino*, 633 F.3d at 89. For a school to be held liable, a plaintiff must demonstrate deliberate indifference, which requires "actual knowledge of the sexual harassment" and a response that is "clearly unreasonable," or remedial action only after a "lengthy and unjustified delay." *Davis,* 526 U.S. at 648; *McGrath v. Dominican Coll. of Blauvelt, New York,* 672 F. Supp. 2d 477, 486–87 (S.D.N.Y. 2009). Deliberate indifference must "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it," *Davis,* 526 U.S. at 645, and requires that "the measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F.Supp.2d 387, 398 (E.D.N.Y.2005).

**B.**     **Application:** **Reasonable Jury Can Find Canisius' Untimely Response to Plaintiffs' 2019 Complaints Demonstrates Deliberate Indifference**

The issue for the Court to resolve is whether Canisius acted with deliberate indifference to Plaintiffs' complaints about Dr. Noonan's sexual harassment in 2019. Canisius does not dispute it had actual knowledge of Dr. Noonan's sexual harassment, that the discriminatory misconduct was based on Plaintiffs' gender, and that it was "so severe, pervasive and offensive" that it effectively denied Plaintiffs access to an educational opportunity. *See* Def. Mem. at 7-20. Rather, Canisius argues its response to Plaintiffs' complaints was not "clearly unreasonable," which is based on a self-serving narrative that fails to acknowledge what Canisius knew about Dr. Noonan's sexual harassment prior to February 7, 2019, which is when Defendant's narrative begins. *Id.* at 2.

Yet Canisius own documents demonstrate that on January 28, 2019, Walleshauser, the Title IX Coordinator, met with Dr. Margulis and Dr. Hogan to discuss student complaints about Dr. Noonan's sexual harassment reported prior to and during January 2019. *See infra* at 8 and fn. 8. Walleshauser's notes from that meeting evidence her awareness of ten student complaints regarding Dr. Noonan's "touching," "verbal abuse," and student allegations of being "groomed" by Dr. Noonan, who was referred to as a "perv," "creepy," and "weird." *Id.* Nevertheless, in a meeting on January 29, 2019, Dean Schaber told Dr. Hogan and Dr. Margulis that they should just "have a discussion" with Dr. Noonan. *Infra* at 9. Moreover, before removing Dr. Noonan and placing him on paid leave on February 21, 2019, Canisius required Plaintiffs and other complaining students to meet with Walleshauser twice and to submit written complaints, and Walleshauser inexplicably expanded her investigation to include ABEC faculty who raised complaints about Dr. Noonan's discriminatory misconduct years before, none of which was required by Canisius' Sexual Misconduct policy. *Infra* at 9-10.

In the intervening weeks between January 28, 2019 and February 21, 2019, Dr. Noonan continued to harass Plaintiffs. It is undisputed that Dr. Noonan required the Project Tiger students including Boucher, Engebrecht, Wood, and Whelan, to travel with him to Canada in late January or early February 2019, during which he harassed them for allegedly questioning his authority, claiming they were going to "overthrow" him. *Infra* at 9-10. After Tuhovak and Student F met with Dr. Hogan on February 5, 2019 to report Dr. Noonan's sexual harassment, Tuhovak was still required to go to Dr. Noonan's research lab to work, even though she expressed fear of encountering Dr. Noonan after he learned of her complaints, and what his reaction would be "because of how volatile he was with us" to Walleshauser and Dr. Hogan many times. *Infra* at 11.

This evidence undermines Canisius' self-serving claim that "the motion Record is devoid of further harassment or hostility after plaintiffs' reports[.]" *See* Def. Mem. at 10. A reasonable jury can conclude that Plaintiff's timeline demonstrates deliberate indifference caused by remedial action taken only after a "lengthy and unjustified delay." *Davis,* 526 U.S. at 648. As a result of Canisius' "lengthy and unjustified delay" in removing Dr. Noonan from his teaching duties, a reasonable jury could conclude that the College's deliberate indifference resulted in *inter alia* Dr. Noonan being permitted to continue harassing Plaintiffs.

These facts are comparable to *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F. Supp. 2d 387 (E.D.N.Y. 2005), cited in Def. Mem. at 9. In *Tesoriero,* the district court denied summary judgment on the plaintiffs' Title IX claims, holding that a reasonable jury could find that the school district responded with deliberate indifference to complaints raised by the plaintiffs' parents and a teacher regarding another teacher's inappropriate sexual conduct with the plaintiffs, which included giving them gifts and efforts to see the plaintiffs during non-school hours. *Id.* at 391-94. The district court held that a reasonable jury could find deliberate indifference where the assistant principal had actual notice of the complaints and did nothing beyond issue a verbal counseling to the teacher, which allowed the discriminatory harassment to continue. *Id.* at 398-99; *cf. Romero v. City of New York*, 839 F.Supp.2d 588, 611 (E.D.N.Y. March 16, 2012) (cited by Def. Mem. at 9) (granting summary judgment on the plaintiff's Title IX claims where the undisputed record demonstrated that the principal had actual notice of a sexual relationship between a student and high school teacher, and the teacher was removed the same day).

Another comparable case is *Doe A. v. Green* 298 F. Supp. 2d 1025 (D. Nev. 2004). In that case, after receiving complaints regarding a teacher's sexual harassment of a student, the principal "counseled [the teacher] to remain professional at all times," and told the victimized student's

father that he would "monitor the situation and take care of the problem." *Id.* at 1029. However, the plaintiffs demonstrated that the principal subsequently failed to monitor the teacher, or follow-up with the student to check if "inappropriate interactions" with the teacher occurred, and the harassment continued. *Id.* Considering the facts in the light most favorable to the plaintiffs, the *Doe* Court had "little trouble" concluding that "a reasonable jury could find the Defendants' conduct constituted deliberate indifference." *Id.* at 1036; *SB on behalf of AB v. Newark Cent. Sch. Dist.,* 2022 WL 541773, at *7 (W.D.N.Y. Feb. 23, 2022) (denying dismissal of Title IX claims, holding facts pled established teacher-harasser "engaged in a pattern of inappropriate behavior around students beginning as early as 2014," six years before arrest for disseminating child pornography, and school district had actual notice of his "propensity to [] engage in inappropriate conduct, and did not [] supervise him" could establish deliberately indifference).

The facts of this case are quite different from those cited by Canisius[10], such as *Morin v. Fordham Univ.,* 2022 WL 4586042 at *8 (S.D.N.Y. Sept. 28, 2022) (Def. Mem at 8), where the district court granted the university's motion to dismiss because it placed a professor who masturbated during a Zoom session in front of the plaintiff on leave without pay four days after the incident, and four months later he was fired. Similarly, in *Doe v. Syracuse Univ.,* cited in Def. Mem. at 10, the Second Circuit affirmed dismissal on the plaintiff's Title IX claims where the allegations did not demonstrate deliberate indifference as a matter of law because it was alleged that immediately after the plaintiffs' sexual assault, the university reached out to the plaintiff about filing a complaint, and when she ultimately decided not to, the university initiated its own

---

[10] Canisius citation to *Doe v. Hobart & William Smith Colleges,* 2021 U.S. Dist. LEXIS 38298 (W.D.N.Y. Jan. 25, 2021) is incorrect. *See* Def. Mem. at 9, 10. There is no decision in that litigation reported in January 2021. The decision regarding the defendants' summary judgment motion was reported at *Doe v. Hobart & William Smith Colleges,* 2024 WL 4271258, at *17 (W.D.N.Y. Sept. 24, 2024). Further, *Doe* is inapplicable because it is an erroneous outcome case brought by a male student who claimed that the Title IX process and discipline he was subjected to by the university amounted to gender discrimination, which the district court rejected, holding that the plaintiff "relies on a speculative narrative about gender bias, but he lacks evidence to back up those claims [.]"

independent investigation and took corrective action. *See* 2023 WL 7391653, at *3 (2d Cir. Nov. 8, 2023); *see also Ellis v. Univ. of Rochester,* 2024 WL 493504, at *41 (W.D.N.Y. Feb. 8, 2024) (cited in Def. Mem. at 9, 11) (in *pro* se case, denying summary judgment where the plaintiff failed to demonstrate deliberate indifference with evidence of actual prior notice of sexual misconduct by the professor, or that the sexual misconduct continued after the plaintiff reported it); *Facchetti v. Bridgewater Coll.,* 175 F. Supp. 3d 627, 637 (W.D. Va. 2016) (granting motion to dismiss where the university subjected the student who assaulted the plaintiff "quickly" to an investigation, a hearing, and disciplinary action) (cited in Def. Mem. at 11).

In contrast, a reasonable jury can conclude that evidence of Canisius' deliberate indifference includes its wholesale failure to hold Dr. Noonan accountable for his sexual harassment of Canisius women. *See infra* at 11-13. Deliberate indifference is further demonstrated by the fact that Canisius put Dr. Noonan on paid leave during Walleshauser's semester-long investigation, permitted Dr. Noonan to resign, paid him $133,000 pursuant to a separation agreement, and allowed him to take video editing equipment, that would have otherwise been available to Plaintiffs to make the Project Tiger documentary during the summer of 2019. *Id.*

Accordingly, Plaintiffs have demonstrated sufficient evidence from which a reasonable jury could find that Canisius exhibited deliberate indifference to Plaintiffs' complaints in 2019 in violation of Title IX, and summary judgment on Plaintiffs' post-assault claims should be denied.

**III.    Reasonable Jury Can Find that Canisius Retaliated Against Plaintiffs**

Canisius attempts to defend against Plaintiffs' retaliation claims by claiming it "moved mountains for plaintiffs" by *inter alia* having other professors take on Dr. Noonan's responsibilities after he was removed. *See* Def. Mem. at 20-21. In doing so, Canisius attempts to distract attention away from evidence that ABEC faculty engaged in intentional conduct to

undermine Plaintiffs' ability to complete their course work, as intended, after Dr. Noonan's removal, and to dissuade them from seeking out other accommodations and recommendation letters, which are adverse actions that would dissuade a reasonable person from complaining.

## A.     Title IX Retaliation Standard

Retaliation against individuals because they complain of sex discrimination is "intentional conduct that violates the clear terms of [Title IX]." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 183 (2005). A plaintiff claiming retaliation under Title IX must establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *Papelino,* 633 F.3d at 91. To establish a *prima facie* case of retaliation, a plaintiff must show that a reasonable person would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable person from making a complaint. *Burlington Northern & Santa Fe Railway Company v. White,* 548 U.S. 53, 68 (2006). If the plaintiff makes out a *prima facie* case of retaliation, the defendant may rebut the "presumption of retaliation" by "articulat[ing] a legitimate, non-retaliatory reason for the adverse [] action." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such an explanation, "the presumption of retaliation dissipates," and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).

The Second Circuit has said that "there are no bright-line rules" with respect to what constitutes an adverse action. *Jute*, 420 F.3d at 178. "Affirmative efforts to punish a complaining [student] are at the heart of any retaliation claim." *Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712, 721 (2d Cir. 2010).

**B.     Application: Reasonable Jury Can Conclude That Canisius Punished Plaintiffs For Complaining About Dr. Noonan's Sexual Harassment**

Contrary to Canisius' view, there is ample evidence of adverse actions taken against Plaintiffs and of the College's retaliatory animus, which they were subjected to after complaining about Dr. Noonan's sexual harassment in early 2019. *Cf.* Def. Mem. at 22. As described *infra* at 11-15, Plaintiffs and the other student complainants requested accommodation after coming forward with their complaints in the form of *inter alia* assistance helping them secure the Project Tiger footage and recommendation letters. However, the evidence demonstrates that ABEC faculty treated Plaintiffs in a "hostile" manner after Dr. Noonan's removal, undermining their course work, and discouraging them from asking for recommendation letters or further accommodation.

It is undisputed that Canisius withheld the Project Tiger film footage from Boucher, Engebrecht, Whelan and Wood throughout the Spring of 2019, while it was negotiating Dr. Noonan's separation agreement, and then permitted him to use the footage and video equipment to work on his own version of the documentary during the summer of 2019. *Infra* at 12-13. By the time Canisius released the footage to Plaintiffs in July 2019, the Spring 2019 semester was long over, and as Engebrecht testified, it "was just too late." *Id*. Similarly, Whelan testified that "Canisius failed us" by making the documentary footage available to them only after the semester was over, when they had no more resources to make the film. *Id*.

Walleshauser did not educate Plaintiffs to request accommodation, or do anything to supervise how professors responded to their accommodation requests. *See infra* at 12. As a result, Tuhovak requested accommodation in the form of an extension for a political science paper, which was denied, and she was given a lower grade, even though the professor was aware of her involvement in a Title IX complaint. *Id.* That discouraged Tuhovak from requesting other accommodations, such as permission to discontinue her research project after Dr. Noonan's

removal, which she no longer wanted to work on because once Dr. Hoffman expressed frustration with her and the additional burden of guiding Dr. Noonan's other research students. *Id.* at 14.

Plaintiffs described how ABEC faculty treated them in a "hostile" and "cold" manner after Dr. Noonan's removal, which made them afraid to ask for any additional accommodations or recommendation letters. *Infra* 13-15. Whelan testified that the ABEC faculty exhibited an "attitude of 'why did you guys report him,' 'this is an inconvenience for us and now we have so much more work to do,'" and she did not feel comfortable asking for any academic accommodations or recommendation letters for graduate school. *Id*. at 14. Tuhovak testified "there was just like a general air following the [] Title IX investigation. . . of frustration with the students who came forward and how much extra work all of the other Canisius professors had on their plates now that Noonan was gone[.]" *Id.* Boucher testified that the retaliatory atmosphere in the ABEC Department affected her relationship with the faculty going forward and the quality of the recommendation letters she received. *Id.*at 14-15. Similarly, Engebrecht and Wood testified that the retaliatory atmosphere in the ABEC Department and Canisius' decision to deny them access to the Project Tiger footage discouraged them from asking for other academic accommodations or pursuing recommendation letters from ABEC faculty. *Id.* As a result, Engebrecht, who always had a goal of going to graduate school, "gave up" on that dream. *Infra* at 15.

Walleshauser's admitted failure to ensure that ABEC faculty appropriately responded to Plaintiffs' accommodation requests, and the behavior of the ABEC faculty who were "hostile" and "cold" to Plaintiffs, which dissuaded them from pursuing additional accommodations and recommendation letters, is evidence from which a reasonable jury may infer retaliatory animus. The facts of this case are similar to *Doe v. Sarah Lawrence Coll.,* where the district court denied dismissal of the plaintiff's Title IX retaliation claim, holding that the plaintiff sufficiently alleged

that her requests for accommodation after she was sexually assaulted were ignored, and the university's subsequent decision to place her on medical leave and remove her from campus raised the inference that such actions were motivated by retaliatory animus following her report of the sexual assault. 453 F. Supp. 3d 653, 668 (S.D.N.Y. 2020). Similarly, in *Novio v. New York Acad. of Art,* the district court denied dismissal of the Title IX retaliation claim where the plaintiff alleged that after she complained about sexual harassment by a teacher, the academy failed to inform her of networking and other alumni events, and refused to provide recommendations and other assistance with her work search, which raised the inference of retaliatory animus caused by the sexual harassment complaint. 286 F. Supp. 3d 566, 578–79 (S.D.N.Y. 2017).

Moreover, a reasonable jury could find that  the "but-for" reason behind Canisius' decision to withhold the Project Tiger footage from Boucher, Engebrecht, Whelan and Wood throughout the Spring of 2019 was retaliation, and not a good faith belief that the footage could not be used for "legal" reasons as Dr. Margulis vaguely suggested to them, *see infra* at 12, or because Dr. Margulis did not have the skills to help them, as Canisius argues. *See* Def. Mem. at 23. It is undisputed that the College made the footage available to Plaintiffs after the semester was over, when they no longer had a class and the attendant resources to make the documentary. This change in Canisius' position is similar to the facts of *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* where the Circuit reversed summary judgment on the plaintiffs' retaliation claims, holding that the university's refusal to certify that Papelino was a graduate to a state authority was undermined by the fact that the university had previously provided an unqualified certification of him to another governmental agency before the plaintiff complained, was sufficient evidence from which a reasonably jury could find the university retaliated against him for complaining about sexual harassment. *See* 633 F.3d at 91-93.  Like in *Papelino*, a reasonable jury can infer that Canisius'

provision of the Project Tiger footage to Plaintiffs only after the Spring 2019 semester was over, and they no longer had access to resources to make the film, was motivated by retaliatory animus because they complained about Dr. Noonan's sexual harassment. That Canisius afforded Dr. Noonan video equipment to make the film during the summer of 2019, thereby depriving Plaintiffs of the use of those resources, only strengthens the inference of retaliatory motive.

The two cases cited by Canisius are distinguishable. In *Shalom v. Hunter Coll. of City Univ. of New York,* the Second Circuit affirmed summary judgment on the plaintiff's Title IX retaliation claim because causality could not be inferred where the plaintiff received a failing grade five months after her first sexual harassment complaint, and her leave-of-absence request was denied one year after later. *See* 645 F. App'x 60, 62–63 (2d Cir. 2016) (Def. Mem. at 23). In contrast, causality can be inferred here by a reasonable jury because Canisius immediately retaliated against Plaintiffs by *inter alia* undermining their ability to complete the Project Tiger film, and in Tuhovak's case, by failing to accommodate her request for a paper extension. Moreover, Plaintiffs can establish a causal connection between their protected activity and Dr. Margulis' decision to deny Boucher's request for an accommodation in 2021, which resulted in Boucher taking 18 credits and additional expense to be able to graduate on time, because that was the first opportunity for Dr. Margulis to retaliate against Boucher after the Spring of 2019. *See Summa v. Hofstra Univ.,* 708 F.3d 115, 128 (2d Cir. 2013) (holding that "first moment in time when the football coaching staff could have retaliated" against the plaintiff, which occurred months after she complained about a hostile work environment, can support a finding of causation).

Canisius also cites to *Byrne v. Yale Univ., Inc.,* 450 F. Supp. 3d 105 (D. Conn. 2020), a tenure denial case brought by a former faculty member, which is inapplicable to the facts of this case. *See* Def. Mem. at 23-24. Here, the Plaintiffs are not seeking "excessive intervention" by the

Court as Defendant self-servingly suggests, but rather to hold Canisius accountable for the intentional retaliatory misconduct they were subjected to after they complained about Dr. Noonan's sexual harassment, which interfered with their educational opportunities at the College, and from which a reasonable jury can conclude a reasonable person would be dissuaded from complaining about sexual harassment.

Accordingly, Plaintiffs have demonstrated sufficient evidence from which a reasonable jury could find that Canisius retaliated against Plaintiffs after they complained about Dr. Noonan's sexual harassment in 2019 in violation of Title IX, and summary judgment on Plaintiffs' retaliation claims should be denied.

## IV.    Plaintiffs Can Demonstrate a *Prima Facie* Case of Breach of Contract

Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must afford him an education and award him a degree. *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d at 93. Implicit in the contract is the requirement that the institution "act in good faith in its dealing with its students." *Olsson v. Bd. of Higher Educ.,* 49 N.Y.2d 408, 413–14 (1980).

On this record, a reasonable jury can conclude there is substantial evidence of Canisius' bad faith, which is sufficient to sustain Plaintiffs' breach of contract claims. A reasonable jury could find that Canisius maintained an "official policy" of deliberate inference to complaints about Dr. Noonan's sexual harassment for many years, and that policy was driven by the College's bad faith use of Dr. Noonan and the ABEC Department to increase enrollment. Dr. Loughead testified Dean Erickson refused to respond to complaints about Dr. Noonan's misconduct, even though she had a pile of complaints, because he was "too powerful." *See* Pl. 56.1 ¶160. Dr. Loughead and Dr.

Mitchell testified that Dr. Noonan's power was related to the fact that the ABEC Department "was the fasted growing major on our campus," and because of that, "Dr. Noonan enjoyed access to funding and other privileges that no other faculty member at Canisius." *See* Pl. 56.1 ¶¶162, 167.

A reasonable jury could also find that Canisius maintained an "official policy" of deliberate inference to complaints about Dr. Noonan's sexual harassment, and allowed him to continue teaching and taking trips with students, even though senior administrators like Dr. McCarthy, Vice President of Academic Affairs, knew from ABEC professors like Dr. Russell and Dr. Suchak that Dr. Noonan's teaching and trips were of questionable educational value, *see* Pl. 56.1 ¶93. Canisius administrators were also on notice of Dr. Noonan's sexual misconduct in class from *inter alia* student comments that demonstrated his misconduct affected their learning: "Dr. Noonan is not the kind of man I want to be spending my money on to be teaching me." *See id*., ¶18. Indeed, Tuhovak testified that the education she received at Canisius was "very poor" since "Dr. Noonan really focused more on . . . ways to sexually harass students . . . for his own titila[tion]" and not on teaching his students." *See id*., ¶ 268.

Accordingly, like the Second Circuit in *Papelino*, the Court here should conclude that genuine issues exist for trial with respect to whether Canisius breached its implied duty of good faith to Plaintiffs by *inter alia* failing to investigate complaints of sexual harassment regarding Dr. Noonan, thereby permitting him to remain teaching long after the College had actual knowledge of his discriminatory misconduct, because it prioritized higher enrollment numbers over the quality of the education afforded to students like Plaintiffs. *See* 633 F.3d at 94.

## V.    *Cummings* Does Not Bar All Damages and Other Remedies for Title IX Violations

Canisius contends that, in light of the Supreme Court's decision in *Cummings v. Premier Rehab Keller*, P.L.L.C., 142 S. Ct. 1562 (2022), Plaintiffs have no cognizable emotional damages

claims. *See* Def. Mem. at 24. While the Second Circuit has not yet considered this issue, it recently noted that successful Title IX litigants are entitled to monetary damages as a form of redress, including "compensatory damages" "which are definitionally intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Soule v. Connecticut Ass'n of Sch., Inc.,* 90 F.4th 34, 47 (2d Cir. 2023). Moreover, in the case cited by Defendant, *Gordon v. Niagara Wheatfield Cent. Sch. Dist.,* the district court denied dismissal of the plaintiff's Title IX claims on the basis of futility, observing that "[w]hile the holding in *Cummings* may preclude a plaintiff [] from recovering emotional distress and punitive damages, it does not serve as a complete bar to . . . remedies including "compensatory damages; a request for declaratory relief in the form of a statement acknowledging that defendant violated Title IX; attorneys' fees and costs; and nominal damages." *See* 2023 WL 6520216, at *7 (W.D.N.Y. Aug. 22, 2023*), report and recommendation adopted,* 2023 WL 6227616 (W.D.N.Y. Sept. 26, 2023). Accordingly, to the extent Canisius' position is that Plaintiffs do not have remedies if they are successful at trial in proving the Title IX violations discussed herein, that position is not supported by caselaw in this Circuit and should be rejected by the Court.

## **CONCLUSION**

For all of the reasons stated herein, Plaintiffs' respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety with prejudice.

Dated: February 6, 2025

Respectfully submitted,

LAW OFFICE OF DANIELA NANAU, P.C.

DANIELA NANAU

35