

# Plaintiffs' Exhibit BB

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

SIERRA BOUCHER, LILY ENGEBRECHT, NATASSIA TUHOVAK, HANNAH WHELAN, and, CASSIDY WOOD,

PLAINTIFFS, CASE NO. 1:22-CV-00381-CCR

-against-

TRUSTEES OF CANISIUS COLLEGE,

DEFENDANTS.

--------------------------------------------------------X

**DECLARATION OF DR. CHRISTY L. HOFFMAN PURSUANT TO 28 U.S.C. § 1746 UNDER PENALTY OF PERJURY**

1. I am over the age of eighteen, suffer from no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify.

2. I understand I am making the statements in this Declaration under oath. This Declaration is true and accurate to the best of my knowledge.

3. I worked as a Professor within the Animal Behavior, Ecology, and Conservation (ABEC) department at Canisius College from 2012 until 2022.

4. In 2017, I took on the additional role of Program Director for the Anthrozoology Master's of Science Program at Canisius.

5. In 2018, I received tenure and became an Associate Professor within the ABEC department at Canisius.

6. I interacted with Dr. Michael Noonan from 2012 until he retired in 2019.

7. Dr. Noonan served as the Chair of the ABEC department for a number of years when I first arrived at Canisius and was Chair of the Faculty Senate from approximately 2013 until 2015, although I do not recall exactly when he served as Chair of the Faculty Senate.

8. From 2012 until 2014, I had to walk past Dr. Noonan's office whenever I needed to access or exit my office, and I saw him daily, usually several times per day.

9. Dr. Noonan developed a practice of hugging me, which I found very problematic.

10. I observed Dr. Noonan regularly hug another professor in the ABEC department, despite her objections to this behavior.

11. I witnessed this professor tell Dr. Noonan not to hug her, and then he would chase her around in an effort to hug her, like it was a game.

12. When I became pregnant in 2014, I became concerned that Dr. Noonan's habit of hugging me without permission would lead to him touching me more, something that I did not want to occur.

13. I was concerned about this because he had stated a couple times in my presence that pregnant women must accept that people will touch them.

14. I witnessed him touch a pregnant colleague's stomach during my first year as a faculty member, and that colleague had told me how uncomfortable his behavior had made her feel.

15. In the Fall of 2014, I scheduled a meeting with Jennifer Skowron, who worked in the Human Resources Department at Canisius College, to discuss maternity leave, on a Thursday morning at 10 a.m.

16. I intentionally scheduled that meeting for a day and time when I knew Dr. Noonan had a class so that I could be certain that he would not see me entering or exiting the Human Resources office.

17. During that meeting, I told Skowron that Dr. Noonan had a habit of hugging me, which I did not care for, and I was concerned that the behavior would escalate and that he would try to touch me more while I was pregnant.

18. When I described Dr. Noonan's misconduct to Skowron, I did not use the words "sexual harassment," because if I had made an accusation of sexual harassment against him, my understanding was that the complaint would have had to be taken up by the Faculty Senate, which Dr. Noonan chaired at that time.

19. Skowron walked me across the hall to the office of Deborah Winslow-Schaber, who at that time served as the Director of Human Resources at Canisius College.

20. I told Winslow-Schaber that Dr. Noonan had a habit of hugging me, which I did not care for, and I was concerned that the behavior would escalate and he would try to touch me more during my pregnancy, which I did not want.

21. Winslow-Schaber told me that "some people just hug others to show their happiness for them" and asked me if I had ever asked Dr. Noonan not to hug me.

22. I found Winslow-Schaber's response to my complaint about Dr. Noonan's misconduct to be unhelpful because her comments demonstrated to me that she was not going to help me remedy the problem.

23. I did not do anything else about Dr. Noonan's habit of hugging me because I was concerned that he would retaliate against me, or that by taking my complaint further, I would compromise my ability to become a tenured professor.

24. At some point in 2014 or 2015, my colleague, Dr. Paul Waldau, confronted Dr. Noonan for being a bully to both faculty and graduate students, but Dr. Noonan's misconduct continued.

25. Shortly after this confrontation, Dr. Noonan did step down as program director of the Anthrozoology Master's program, and Dr. Waldau became the program director.

26. In 2014, Dr. Noonan served as Chair of the ABEC department and the Faculty Senate, and was a very powerful person on the Canisius College campus.

27. Dr. Noonan would let others know that he was aware of his own position of power at Canisius, and he stated multiple times that he had the college president's ear and so wielded a lot of power.

28. During ABEC department faculty meetings during my first year on faculty, if Dr. Noonan held a vote on an initiative that he believed a majority of the faculty would not support, he would invite Sara Morris, at the time the Co-Chair of the Biology Department (and presently the Vice President of Academic Affairs), to our meeting because she consistently voted in favor of Dr. Noonan's initiatives even though she was not a member of the ABEC department.

29. Dr. Noonan also would brag openly about getting staff members with whom he did not get along fired.

30. I specifically recall Dr. Noonan proclaiming in the department's office suite that he had gotten Debra Park fired from her position as Associate Vice President for Marketing Communication at Canisius and pointing out that she came from a prominent Buffalo family.

31. During discussions with faculty in the ABEC department about tenure, Dr. Noonan made it clear to us that our ability to obtain tenure was directly connected to pleasing him.

32. In 2012, he tried to stop me from attending a meeting about faculty annual reports and promotion requirements, saying that I should not waste my time going to such meetings and that I just needed to keep him happy in order to achieve tenure.

33. In addition, I recall Dr. Noonan telling me that he did not have to comply with any of the requirements that faculty generally had to meet, such as submitting his class syllabi, and providing an annual report regarding his teaching and research to the Dean of the Faculty.

34. As ABEC Department Chair, Dr. Noonan controlled the budget for all department-related activities, and if I wanted to do any field trips or if I needed funding for my research students, I would have to go to him for the funds so I tried to maintain a professional relationship with him.

35. However, my relationship with Dr. Noonan suffered from strain because I would, on occasion, disagree with him.

36. For example, I became concerned with the way research rats for the ABEC department were housed in very small cages, and felt it was a waste to use the rats in my Research Methods course because we needed them for only about six hours of teaching each semester.

37. I suggested to Dr. Noonan that we could use my dogs to teach labs on studying animal cognition, and then we would not need to have the rats.

38. I also thought the idea was a good one because we could avoid the cost of keeping the rats in our laboratory, and that is why I brought it to Dr. Noonan's attention.

39. In response, Dr. Noonan yelled at me and accused me of putting "my ethical concerns above opportunities for our students."

40. After that discussion, Dr. Noonan refused to acknowledge or talk to me for one week.

41. The following week, I noticed a student had been allowed to register for my class even though no seats remained at the time the student registered, and I had to discuss the issue with Dr. Noonan in his capacity as ABEC department Chair.

42. I asked Dr. Noonan if he had permitted the overloading of my class because of our disagreement about the lab rats.

43. At the time, Dr. Noonan was the only person other than myself who had the authority to overload students into my class, and previously, I had asked him to consult with me before doing so.

44. Dr. Noonan pretended to be surprised by my accusation, telling me: "How dare you think I would be vindictive and retributive. If you think I would do that, then you have a problem!"

45. However, Dr. Noonan continued to exclude me and subject me to the silent treatment until he needed my assistance with a departmental matter.

46. As soon as I walked into work one morning, Dr. Noonan grabbed my arm and dragged me to the main area of the ABEC department space to discuss an issue of contention between him and the ABEC faculty: the transfer student policy.

47. ABEC department faculty advocated for the adoption of a policy that would have prevented transfer students from taking certain classes in our department, which Dr. Noonan initially supported but then he changed his mind.

48. I reminded Dr. Noonan about all the arguments that had been raised in support of the policy, which made him very upset, and he began to interact with me like I was being a stubborn and difficult person, when I was merely reiterating the good ideas of some of my colleagues.

49. As Dr. Noonan and I were discussing the issue, I came up with an alternative idea to solve the problem, and he said, "See what good ideas we can come up with when we put our heads together!," and then he hugged me.

50. I froze when Dr. Noonan hugged me, and after he hugged me, I proceeded to walk down the hall to my office.

51. Dr. Noonan followed me down the hall and said, "I think you need another hug!" as I moved away from him, but I was cornered at the end of the hallway and could not avoid the second hug.

52. In 2013, I attended a trip to Rocky Mountain National Park in Colorado with Dr. Noonan, another faculty member, and approximately forty Canisius students.

53. At the time, the federal government was shut down and the national park that we intended to visit was closed.

54. My colleague and I raised concerns to Dr. Noonan about going forward with the trip even though the place we were going to was not open.

55. We asked him what his backup plan was, and Dr. Noonan told us that he would take the students to the national park, even if it was not open to the public.

56. Dr. Noonan said that we all could walk into the park from the site where we were staying and that my colleague and I had veto power over own choices but not over his choice or the students' choice to enter the park illegally.

57. When my colleague and I objected, Dr. Noonan became irate because we questioned his plan of illegally entering federal property, and he asked us, "Are you questioning my judgment?" and told us we could opt out of going on the trip.

58. I did not want to opt out of the trip because I felt it important to be present in case any students became injured or ill and needed assistance during the trip.

59. When preparing for the trip, he told my colleague and me that he sometimes did things on trips that he would not recommend other faculty members do.

60. He told us we should assume his intentions were good, and he discouraged us from questioning his behavior.

61. Enroute to Colorado, the federal government shut-down ended and the park we planned to visit opened again, which enabled us to avoid another confrontation.

62. At the end of 2014, the ABEC department moved to a different floor that afforded us more space, gave Dr. Noonan an office that was on the periphery of the department and could only be accessed via his lab, and our interactions were very minimal going forward.

63. After we moved to the new floor, a faculty vote replaced Dr. Noonan as Chair of the ABEC department and his presence within the department became much less pronounced because he stayed in his own office most of the time and rarely attended faculty meetings.

64. No student at Canisius ever came to me to discuss any misconduct they were subjected to by Dr. Noonan.

65. However, when I became aware in 2019 that a number of students complained about Dr. Noonan's behavior, I went to Linda Walleshauser, who was then the Canisius Title IX officer, and told her that I had complained to Winslow-Schaber in 2014 about Dr. Noonan hugging me despite my objections to him doing so.

66. Skowron recalled our meeting, confirmed she still had the meeting appointment on her Outlook calendar, and told Walleshauser that it occurred at 10 a.m. on a Thursday morning in the Fall of 2014.

67. Walleshauser told me that Winslow-Schaber did not make a record of my complaint about Dr. Noonan's hugging me without my consent or about my concerns about how he would treat me during my pregnancy.

68. This Declaration is true and accurate to the best of my knowledge.

Dated: September 22, 2023

DR. CHRISTY HOFFMAN