**Plaintiffs' Exhibit MM**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SIERRA BOUCHER, LILY ENGEBRECHT,
NATASSIA TUHOVAK, HANNAH WHELAN,
and, CASSIDY WOOD,

                           PLAINTIFFS,              CASE NO. 1:22-CV-00381-CCR

-against-

TRUSTEES OF CANISIUS COLLEGE,

                         DEFENDANTS.
-----------------------------------------------------------X

## DECLARATION OF DR. MATTHEW MITCHELL
## PURSUANT TO 28 U.S.C. § 1746 UNDER PENALTY OF PERJURY

1. I am over the age of eighteen, suffer from no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify.

2. I understand I am making the statements in this Declaration under oath. This Declaration is true and accurate to the best of my knowledge.

3. I am a former employee of Canisius College, where I worked as a professor in the Religious Studies and Theology Department, for thirteen years, beginning in 2008

4. I was tenured and promoted to Associate Professor in 2011.

5. I was promoted to Full Professor in 2020, and was named Outstanding Scholar in the School of Arts and Sciences for that year.

6. During my tenure at Canisius, I served on the Faculty Senate as well as 5 separate College-wide Committees, Subcommittees, and Task Forces.

7. I was also Secretary of the Faculty Senate from 2009-2012.

8. I attended Faculty Senate Meetings from 2009-2014

P0001980

9. My service on the Canisius Faculty Senate overlapped with the time period when Dr. Michael Noonan served as the Vice Chair, and then Chair, during the 2012-2014 time period.

10. Dr. Noonan's time as Chair of the Faculty Senate stands out in my memory because he ran on a promise to bring a "no confidence" vote against then-Canisius President John Hurley, but then developed a very strong alliance with Hurley, and together they attempted to extinguish faculty discussion and opposition to Hurley's often costly and mis-guided efforts to boot enrollment numbers at Canisius.

11. For example, despite numerous concerns being raised, Hurley championed a pet marketing campaign that ran over budget and resulted in widespread backlash, as documented by the Canisius student newspaper opinion piece on April 13, 2013, entitled "Please Stop Embarrassing Us, Canisius."

12. During the 2012-2013 time period, the Canisius faculty, particularly those like me who served on the Faculty Senate, were concerned about Hurley's failed efforts to boost enrollment, particularly in light of his very limited experience in college administration, the fact he had no PhD degree, had never been an educator of any kind, and was defensive about his lack of experience and knowledge.

13. The College was also at this time undertaking steps in its MSCHE reaccreditation process.

14. Dr. Noonan's compete reversal, and his new-found support of President Hurley, was a significant development for Canisius faculty-administration relations.

15. Dr. Noonan chaired the Animal Behavior and Environmental Conservation (ABEC) program, a major that attracted many students to Canisius and was viewed as one of the "flagship" programs of the College.

P0001981

16. As a result of ABEC's enrollment success, Dr. Noonan enjoyed an esteemed position on the Canisius campus.

17. During a meeting of my Department, a senior faculty member stated that Noonan was "a very powerful figure" on campus.

18. Dr. Noonan used his position as Chair of the Faculty Senate to excuse the Canisius administration's increasing lack of transparency regarding budgeting and faculty employment matters, which diminished the ability of the faculty to engage with President Hurley and the Board of Trustees regarding the College's educational programming and its future.

19. The most upsetting aspect of Dr. Noonan's service as Chair of the Faculty Senate is that he constantly promoted his efforts to help President Hurley more control the faculty as efforts to promote greater shared governance of the College by the faculty and administration.

20. The contentious dynamic between President Hurley and the faculty, his presumption that others at Canisius engage with him with "animosity," has been well-documented, including in the attached opinion piece that was printed in the Canisius student newspaper in on April 25, 2014, entitled "Spare Me The Attitude."

21. I received both written and verbal communications from faculty at this time expressing concern about Dr. Noonan's close relationship with Hurley, and whether "inside deals" were being negotiated.

22. Dr. Noonan was subsequently asked in a Senate Meeting about his relationship with President Hurley, and the seemliness of the Senate Chair meeting privately and off the record with the President so frequently.

P0001982

23. Even after Dr. Noonan stopped serving on the Faculty Senate, President Hurley and Canisius administrators continued to afford him public accolades and an almost unlimited budget for his research and student trips.

24. In 2012 Dr. Hurley had announced what was supposedly a College-wide policy of budget restrictions and controls on travel funding.

25. Dr. Noonan enjoyed access to funding and other privileges that no other faculty member at Canisius enjoyed that I am aware of, despite the fact that dropping enrollment affected every department at the College.

26. In 2017, with a different Chair, the Senate passed a resolution stating in the "strongest possible terms" its "increasing lack of confidence" in the President and his Senior Leadership Team's management of the college. The statement specifically pointed to Hurley's failures in marketing and his having "wasted enormous resources" over several years.

27. Indeed, in 2020, Canisius fired me and several other tenured faculty members, asserting that the COVID-19 pandemic created exigent circumstances that permitted our dismissal without going through the processes required by the Faculty Handbook.

28. To my knowledge, Canisius did not urge Dr. Noonan to retire in 2017 when a number of older faculty members were presented with buy-out packages for budgetary reasons.

29. During my time at Canisius, I also noticed that Dr. Noonan often appeared in photographs on the College's social media sites and in Canisius alumni publications, and the pictures were always of Dr. Noonan surrounded and embracing a large group of women students.

30. These photographs of Dr. Noonan with his women students always stood out to me as strange in that they depicted interactions between a professor and his students that was very different from the way I and my Department colleagues interacted with our students.

4

31. As a faculty member at Canisius, I never sought out hugs from my students, and never touched any student unless we were shaking hands.

32. I do believe that President Hurley and others in Canisius' administration knew that Dr. Noonan's conduct with certain women students crossed the line, and I believe they looked the other way because of ABEC's enrollment success and Dr. Noonan's assistance to President Hurley during Noonan's tenure as Faculty Senate Chair.

33. This Declaration is true and accurate to the best of my knowledge.

Dated: October 10, 2024

*[signature]*

DR. MATTHEW MITCHELL

5

P0001984

# Spare Me the Attitude



**By A. M. Ryan,**
Intern

Waiting for President John J. Hurley to begin November's "faculty forum" — a talkback MC'd by Hurley and Faculty Senate Chair Dr. Michael Noonan on the subject of the Board of Trustees retreat, which eight elected professors had attended a month earlier, I, Opinion Editor Kevin J. Dilley and I sat in the last row of chairs set up in Regis South, what we thought would be an unobtrusive berth. The forum was about 10 minutes behind schedule. Faculty filled the room, while a cohort of administrators filled up a few rows to our right. Hurley, we could tell, was willing, working something out in his mind. At the front of the room, he approached seven of the eight faculty members who had attended the retreat, and who would later speak before the assembly. His frown was about six degrees more severe than his customary grimace.

"I thought this was going to be a closed meeting," he said. In fact, the faculty organizers had planned a closed meeting - "closed" meaning exclusive to the faculty.

**"Aura Personalis is the strong nuclear force that holds private educational institutions together."**

Hurley's pre-emptive strike, a meeting to counter the meeting. Sure enough, Vice Presidents Dr. Terri Mangione and Marco Benedetti were all sitting to my right with their colleagues from the administration. It seemed the source of my president's displeasure was — regrettably — us.

Dr. Matthew W. Mitchell, one of the "Gang of Eight" — began to defend our presence there. But Hurley cut him off.

"Spare me," he said.

"There's a presumption of animosity that's not –"

"Spare me," the president snapped back, his words carrying to where we sat, in the room's last row. "Do you want to ask Mike Noonan?"

"I think Mike Noonan would be fine," said Mitchell, palms open, gesturing nonaggression.

Hurley turned on his heel and walked toward Dr. Noonan, who stood near the podium. But before he reached him, Hurley pulled a parade right turn sharp as a Grenadier Guard, and started the meeting at 3:40 p.m. He had called an audible.

It seemed he had mastered his emotions.

Four years into Regis Hurley, we can begin to assess his strengths and weaknesses, what legacy he will leave. Perhaps some will think it premature, but we are, after all, journalists – and furthermore, Dr. Matthew Hertz's biannual emails notifying us of the opportunity to evaluate our professors has reminded me that we are not afforded that same opportunity to evaluate our president.

I'll wager that out a single undergraduate student can list the succession of Canisius College presidents, ordered or unordered. Their faces we might recognize, as they hang in Old Main's east floor, but for that most part they are entombed in Dr. Charles Brady's *The Net Finished Years: Canisius College 1870-1970*.

A few stand out for rather unfortunate reasons. I'm thinking of the Very Rev. Henry Behrens, S.J., president from 1872-1876, whose anguine, canine portrait seems to have been painted after the good Jesuit had been laid in his coffin. Then there's the Very Rev. James McGinley, S.J., president from 1959-1966, and known primarily for envisioning the stark worst example of architecture in the greater Buffalo area, Churchill Tower (or McGinley's "Last Erection").

Among Hurley's immediate predecessors, I've noticed Rev. Vincent M. Cooke, S.J., president from 1993-2010, enjoys a loyal following among the facilities workers, who remember him for putting an emphasis on the physical plant, the look and upkeep of the college.

His vision for a "Comprehensive University of the..." [unclear]

of Buffalo could watch the school celebrate its talent pool through the building's all glass panes.

His Frankin Park Initiative, refurbishing and retaining college-owned homes to house corporate & underappreciated. It's been a great success and will continue, pending funding (ex. in fact, [?]Re trustees the opportunity for students and alumni to volunteer as laborers, working on the next batch of houses over the summer). He's made two good hires in Mangione and Benedict, open, approachable, and understanding vice presidents with a student-centered attitude. Likewise, Hurley's choices to bring parents along for the tour...

But then, there are the intangibles. The reputations, and relationships become the marks at Canisius College. Maybe it was the Inauguration Weekend that welded together, but this year I became more attuned to a collective malaise at the college, and I'm convinced it goes much deeper than grumbles about budget cuts.

Employees here are afraid for their jobs, from top to bottom - and worse, they're afraid to talk about that fear, as evidenced by the number of people who shared this very sentiment in private conversations, "off the record."

Everyone's frustrated by the budget cuts, but I think we all understand the college's financial situation, and will put up with just about any pressure. But students and employees both seem befuddled by how decisions are made at the college; they complain of decisions coming down from on high, that individuals aren't trusted to make choices. Governance at Canisius is an inscrutable web of overlapping committees and councils, little assessment rubrics, everyone whipped into a frothing frenzy by last year's bush-back Barpay report and this year's laughable spectre of the Middle States accreditation. Meanwhile, adjuncts, administrators, maintenance workers, and even tenure-track professors are starting to feel impermanent, not because of the budget scare, but because of the way they're treated.

Much of this is because we continue to misread the very pervasive (first recounted in a jesuit context in 1951, in a letter from Superior General Jean-Baptiste Janssens). It has nothing to do with *mens sana in corpore sano* — it means care for individuals. The *cura personalis* "buck" stops with the Superior General, with the rector, or in our case with the college president.

There's no disputing the notion, too. Cura personalis is the strong nuclear force that holds private educational institutions together. It's the reason Catholic educators take home small salaries, give up their right to unionize, take those 101 sections and tackle administrative work, too; it's the reason EJC Jour-

**"John Hurley will be able to look out on all that he's accomplished... He should be proud."**

don LaBarber can convince his staff to work 30 hours a week, never sure when (or if) their next paycheck is coming. Employees of a Catholic, Jesuit college will put up with frustration and hardship because they're cared for as individuals, because they're part of an institution with a mission and klude in which they believe. But at Canisius we are afraid.

That's not to say that any of this is Hurley's "fault." But he does have to rise to the job. One of my disappointments is that President Hurley has not...

...been able to articulate who we are. Hiring, firing, and making cuts all over Archbold are not a joy for the bean-flickers at the Middle States Association are important, but a president's most important job is articulating a vision and convincing his team to believe in it. (He also needs to convince prospective freshmen why we're worth $40,000.) When I asked him last May, he was speechless. He failed again at convocation. His remarks at the recent Scholarship Brunch, or Dr. Peter Galie might say "did not offend" - but it was unispired.

Maybe if he was on campus more often, he'd have a ready answer. I know the job requires travel, and I appreciate, too, that President Hurley goes to most varsity basketball games. But that doesn't cut it.

John might scoff at that last line, if he's read this far. He's scoffed at me before, so I know what it sounds like. But I've lost count of the number of graduating seniors who've said that they don't know what their president looks like.

Then again, all those who've never seen him don't know how abrasive, condescending, and cold he can be. Some kindly middle school teacher or maybe a parent told all of us, at some point, that it takes more muscles to frown than to smile - but no one told John Hurley. His scowls are almost like a precocious child grown into a sullen teenager, he insists on playing romantic games. Fist-puffs pumps, accidentally quoting *Pontius Pilate* and calling students a "transient population" with no place in college governance, all because he's on edge.

I wouldn't scrutinize President Hurley for losing his patience. A patient president, after all, might do more harm than good at this juncture in the history of American higher education. But I keep thinking back to third November meeting, his little flare-up. His rudeness toward a colleague was startling, but I'm more concerned that in cutting off Dr. Mitchell, he missed his point. Hurley likes to quote St. Ignatius, who urges us to be "more eager to put a good interpreta-

tion on a neighbor's statement than to condemn it." But Hurley doesn't follow this advice often enough in all of my dealings with him, and in his dealings with others that I've observed, he presumes animosity, acts as if he is surrounded by adversaries. Put another way, Hurley gets poor marks for attitude.

When I sat down with President John J. Hurley last April for an interview following Griffin Editor Emeritus Nick Veronica's controversial Swan Song editorial concerning the college's rebranding campaign, the president was inordinately poised. "I had no one," I took all my notebook, that if the paper continued down this path, "it's going to be a long run."

It was a silly thing to say, and in saying it he proved himself to be far detached from the student experience. "The years fly by for all of us. With the new sun shining our meeting in April 2012 feels like last week, closer even than the Canisius February and snowstorm March that just ended, which seems as distant as a dream. Those years after entering as a freshman I pass like Bud Carraway, who in the *Great Gatsby* says, "It was one o'clock -- almost immediately afterward. I looked at my watch and found it was ten."

I can only assume, then, that Hurley was talking to himself.

John Hurley isn't going to transform over the summer into a person with charisma or an easy "bedside manner." But he can start by walking across Main St. to Lyons hall, and ascending all three flights of stairs to the fourth floor. As he reaches the top, to his left he'll see a series of prints advertising the Buffalo Philharmonic's concerts at Canisius. They are pictures of Fr. Demski. To one the president stands with students and musicians on the back of a banner in another he sits with students in the pew of a rowing shell, leaning hard into the oars, on the Buffalo river. In all of them he wasn't his unforgettable smile, big, intelligent, and a little bit goofy.

From the fourth floor of Lyons John Hurley will be able to look out on all that he's accomplished, his entire domain. He will be proud. He should be proud.

Perhaps then he will walk back across the street, find himself in the once-a-week crush of students moving, talking, texting, reading.

The times ahead will challenge us. I'm thinking of Mark Chapter 4, when Christ's disciples are on a boat on the Sea of Galilee. "And there arose a great storm of wind, and the waves beat into the ship, so that it was now full. And he was in the hinder part of the ship, asleep on a pillow."

The waves are rising, but too often it seems like John is taking a nap in Babylon.

We're ready to follow him if he's ready to lead.

ryan70@canisius.edu

# Is the IAR Overrated?

**By William Ryan**

Reporters are en vov. Parents are grateful for the improvements in their children's social skills. It claims to do cutting-edge research on autism. Since 1999, it has received 28 total grants that total $8,447,796. It has a foothold in the schools and ran a promising clinical trial as a part of research at Dodge Elementary. In the fall of 2013, Canisius College Magazine's Audrey Browka commended it in her article "Overcoming Autism." The article claimed "The IAR offers the best chance [to live a better quality of life]." It is the Institute for Autism Research at Canisius College, and it carries out its operations on children seven-12 years old. In reality, it does not offer the best chance at a better quality of life or provide the best model for how to deal with autism. What is the point of a college

housing a program that only deals with young children?

The IAR is not without merit. The IAR program called *sumerMAX* has worked; those who received the program showed improvement in both targeted social skills and broader social skills, while those who did not participate did not show as much improvement. In rigorous testing it is no joke with 70-minute "treatment cycles." On top of these cycles, autistics receive individualized notes with feedback specific to them. The IAR does provide many autistics with the support they need in schools, because school can be particularly difficult for those on the autism spectrum. These programs provide research opportunities for psychology majors at Canisius. They can even continue on after undergraduate work. In short, the IAR does what it sets out to do: reduce autistic expression.

For its merits, the IAR is

no nirvana. In her view of the IAR, Browka did not research autistic organizations - that is, organizations that have on seek the participation of autistics - for comparison. Groups such as the Stay Project seek to leverage autistic traits for tech work. Contrast this with the IAR's views to minimize autistic traits. In a TV interview, Dr. Marcus Thomeer contrasted autistics' narrow interests with the conversational skills they were trying to teach kids; Thomeer assumes that autistics cannot build social skills within their natural inclinations, such as narrow interests. If you compare Thomeer's view with the Koegel Autism Center's study "Improving Social Engagement and Initiations Between Children With Autism Spectrum Disorder and Their Peers in Inclusive Settings" in the Journal of Positive Behavior Interventions from 2012, courtesy of UC-Santa Barbara, you find two completely

different ideas about the social skills of autistics.

The study found that autistics could forge strong friendships within their narrow interests. In the adult world, their narrow interests becomes a channel for leadership. The reality of utilizing their autistic traits as an outlet is not that different from the way that typically developing individuals seek activities attuned to their skill set. Look at someone such as Peyton Manning. His documentary mentioned his obsession for accomplishment; football was the narrow interest he has to channel these traits. He knows every-thing, every nook and cranny of football. Ah, sounds kind of autistic. Just like the autistic people in the University of California, Santa Barbara study from 2012, Manning succeeded because he had an outlet that fit his traits and narrow interest. Dr. Thomeer is quoted in Canisius College Magazine as saying, "We need these kids to have

an opportunity ... to find meaningful work as adults" with no explication. Thomeer sounded more like a politician than a researcher.

The IAR's methods may be different, but it continues to view autism as something deserving of "treatment." It does not seek to utilize autistic traits productively. It does not educate parents on the concept of neurodiversity, the core of autism. If people want to report on groundbreaking research, investigate the Academic Autism Spectrum Partnership in Research and Education. Lastly, while the IAR may have implemented its program in school districts, it would be better off teaching schools about how to utilize the strengths of autistics in the classroom than teaching autistics to stifle their nature and be more like their neurotypical classmates.

evansw@canisius.edu

P0001985