WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SIERRA BOUCHER, LILY ENGEBRECHT,
NATASSIA TUHOVAK, HANNAH WHELAN,
and, CASSIDY WOOD,

                **PLAINTIFFS,**          **CASE NO. 1:22-CV-00381-CCR**

      -against-

**TRUSTEES OF CANISIUS COLLEGE,**

                **DEFENDANTS.**
-------------------------------------------------------------------X

## PLAINTIFFS' STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS SUBMITTED PURSUANT TO W.D.N.Y. LOCAL RULE 56(a)(2) IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

       Plaintiffs Sierra Boucher, Lily Engebrecht, Natassia Tuhovak, Hannah Whelan, and Cassidy Wood (collectively "Plaintiffs"), by and through undersigned counsel, respectfully submit this Statement of Disputed and Undisputed Facts, in Opposition to the Motion for Summary Judgment from Defendant Trustees of Canisius College, pursuant to Rule 56(a)(2) of the Local Civil Rules for the Western District of New York.

**I.**      **Plaintiffs' Responses to Defendant's Statement of Alleged Undisputed Material Facts[1]**

**1.**      **Undisputed**.

**2.**      **Disputed in part**. Dr. Noonan was initially a member of Canisius' faculty in the Psychiatry Department. *See* Pl. Ex. A, Hogan Dep., 7/22-8/2. Dr. Elizabeth Hogan, who served as Chair of the Biology Department in 2018-19, testified that Dr. Noonan had "disagreements" with his colleagues in the Psychiatry Department, which required mediation, and then he left that Department and became a faculty member in the Biology Department. *See id.*, 8/3-14; 5/19-6/15.

Dr. Tanya Loughead, a tenured professor in the Philosophy Department who has worked at Canisius for nineteen (19) years and who served on the Faculty Senate when Dr. Noonan served as Chair, testified that John Hurley, Canisius' then-President, gave Dr. Noonan start-up money to start the Animal Behavior and Ecological Conservation (ABEC) Department in 2009 even though

---

[1] Plaintiffs will not respond to the headings in Defendant's Rule 56 Statement because they are not alleged statements of fact but object to the headings as misleading and factually inaccurate.

Dr. Noonan's specialization was not in animal behavior or ecological conservation. *See* Pl. Ex. B, Loughead Dep., 5/10-23; 24/10-17; 32/17-34/5; 47/1-10.

**3.** **Disputed in part**. Boucher testified that she was unaware of any Latin honors bestowed upon her by Canisius because "I felt kind of just ready to get out of there, very done with Canisius" and "I didn't attend graduation and I -- I honestly don't remember if I got any academic honors." *See* Pl. Ex. C, Boucher Dep., 35/9-17.

**4.** **Disputed in part**. Dr. Susan Margulis was Engebrecht's original advisor, but Dr. Margulis "advised me incorrectly with what classes I needed to take" and I just felt like she didn't care about helping me" and Engebrecht switched advisors to Dr. Suchak. *See* Pl. Ex. D, Engebrecht Dep., 173/2-15. Engebrecht testified Dr. Noonan was also her advisor, who, she was "under the impression" "was going to get me into a grad school program." *See id.,* 174/4-17.

**5.** **Undisputed**.

**6.** **Disputed in part**. Tuhovak testified that she received counseling at Canisius during her freshman year "briefly" and met with a counselor at the student center for only several sessions. *See* Pl. Ex. E, Tuhovak Dep., 222/11-17.

**7.** **Undisputed**.

**8.** **Undisputed**.

**9.** **Disputed in part**. Wood testified that "I went to the counseling center once my freshman year . . . I was going through like a rough breakup and wanted to talk to someone. . . . I went back for a follow-up the following week and the man I talked to, whose name I can't even remember, he completely forgot me." *See* Pl. Ex. F, Wood Dep., 238/14-239/8.

**10.** **Disputed in part**. Tuhovak's e-mail on February 7, 2019 is not the first time Linda Walleshauser, Canisius' Title IX coordinator, became aware of student complaints regarding Dr. Noonan's sexual harassment, including Tuhovak's complaints, as Defendant suggests. Walleshauser testified that on January 28, 2019, she met Dr. Hogan and Dr. Margulis to discuss multiple students who raised complaints about Dr. Noonan's discriminatory misconduct, including Tuhovak's complaints. *See* Pl. Ex. G, Walleshauser Dep., 14/4-15/3; 17/7-14.

Tuhovak complained to Dr. Margulis about Dr. Noonan's verbal abuse and other discriminatory misconduct in March 2018. *See* Plaintiffs' Additional Facts *infra* at ¶¶196-99. Additionally, Dr. Hogan's notes from a meeting with Student F on January 25, 2019 demonstrate that Student F complained about Dr. Noonan's verbal abuse and informed Dr. Hogan that Tuhovak was subjected

to the same discriminatory mistreatment. *See infra* Pl. 56.1, ¶¶19-20; *see also* Pl. Ex. H, Dr. Hogan's notes, at Canisius 572. Dr. Hogan's notes further indicate that she met with Tuhovak to discuss her complaints regarding Dr. Noonan's discriminatory conduct, which Dr. Hogan later "discussed with Linda" Walleshauser. *See id.* In Tuhovak's February 7, 2019 e-mail to Walleshauser, she specifically references Dr. Hogan's involvement when she writes: "Dr. Hogan and I met last week and she has recommended that I set up a meeting with you." *See* Pl. Ex. I, Canisius 1566.

**11.**  **Undisputed.**

**12.**  **Disputed in part.** Walleshauser does not state "all were welcome" in the e-mail exchanges with Tuhovak beginning on February 7, 2019 as Walleshauser self-servingly alleges in her Declaration. *See* Pl. Ex. I, at Canisius 1565-66; *cf.* Walleshauser Declaration, ¶7. Moreover, Walleshauser already had prior notice of the nature of the student complaints regarding Dr. Noonan's discriminatory misconduct from Dr. Margulis and Dr. Hogan. *See* Pl. 56.1, ¶10, 19-20, which are incorporated herein.

**13.**  **Disputed.** Engebrecht testified that at least nine students met with Walleshauser on February 11, 2019 to discuss Dr. Noonan's sexual harassment and other gender-related discriminatory misconduct, including all five Plaintiffs. *See* Pl. Ex. D, Engebrecht Dep., 128/14-130/2; *cf.* Walleshauser Dec., ¶13.

**14.**  **Disputed in part.** Tuhovak testified that the initial meeting with Walleshauser on February 11, 2019 was "pretty short" since the students were given an opportunity to only express "very general concerns because Linda [Walleshauser] was saying I want to talk with you all individually before I get any more details." *See* Pl. Ex. E, Tuhovak Dep., 160/21-161/18. Similarly, Wood recalled that the initial meeting with Walleshauser lasted for "[l]ess than 30 minutes" and during the meeting, Walleshauser's demeanor was "pretty impassive, apathetic." *See* Pl. Ex. F, Wood Dep., 161/21-163/10; *cf.* Walleshauser Dec., ¶9.

Whelan testified that during the initial meeting with Walleshauser on February 11, 2019, she read from prepared remarks on behalf of the group, and that most of the information focused on "the most dangerous instance as students we were in with [Dr. Noonan] on [the India] trip." *See* Pl. Ex. J, Whelan Dep., 207/6-208/13; Pl. Ex. K Whelan's complaint, Canisius 1594-1596.

Whelan focused on the most shocking of Dr. Noonan's harassment on the India trip to "really grab Ms. Walleshauser's attention and really try to right off the bat get the school to listen to our concerns and understand like the severity of them." *See* Pl. Ex. J, Whelan Dep.,207/17-208/6. However, Whelan testified that she made clear to Walleshauser that the "list of complaints we have is quite literally enormous[.]" *See id.,* 208/7-13.

**15.  Disputed.**  The record undermines Walleshauser's self-serving Declaration testimony regarding the nature and the breadth of the sexual harassment and other discriminatory misconduct reported by Plaintiffs and other student complainants to Canisius in January and February 2019. *Cf.* Walleshauser Dec., ¶10.  This evidence consists of testimony from each of the five Plaintiffs regarding the information that they reported to Walleshauser during two separate meetings, Whelan's written statement prepared for the February 11, 2019 meeting (Pl. Ex. K), and additional written complaints from Boucher, Wood, and Engebrecht. *See* Pl. 56.1 Exs. TT, UU and VV; ¶¶ 202-268, which are incorporated as if fully as set forth herein.

As noted *infra* at Plaintiffs' Response to Fact No. 14, at the February 11, 2019 meeting with Walleshauser, Whelan focused on Dr. Noonan's most severe misconduct in India. In the statement Whelan read to Walleshauser, she described how Dr. Noonan sexualized his alleged offer of medical help by soliciting information about her history of anal sex in an effort to explain exactly how he used the alleged medical emergency to sexually harass her:

> He then told us about the enema and how it is a long tube which can be uncomfortable, especially if we had never had anything up our butts before. He then looked at me and said "I don't know if you've ever had anything put in your butt."
>
> And then stopped and waited, insisting I respond.  . . . He said multiple times, "we'll keep it professional, I'll only have to see that little bit of butt."

*See* Pl. Ex. K, Canisius 1595.

However, Plaintiffs described many other instances of Dr. Noonan's sexual harassment in the one-one-one meetings with Walleshauser and in written complaints, that included *inter alia*:

- frequent unwanted hugs and touching of their bra straps, arms, and hair;
- regular sessions of "girl talk" during which Dr. Noonan discussed his own sex life, which involved dating/having a sexual relationship with a Canisius graduate student who he brought on various student trips, flirting with her and touching her in front of students;
- lacking boundaries by pressing Plaintiffs and other students for information about their own sex lives, including whether or not they would date older men;
- unwanted comments to specific Plaintiffs about their bodies, including being "flat-chested," or numerous discussions about whether or not one Plaintiff should wear a bra;
- taking pictures of Plaintiffs and other students without permission, including when they were in compromised positions, such as when Tuhovak's tankini flew up while she was diving into the ocean, exposing her breasts;
- demands that Plaintiffs and other students assist him with his "medical issues" by "stretching" his leg during which he would groan;
- requiring students on trips to meet at the end of the day in their pajamas;

- controlling behavior with comments like "I own your bodies" and requirement that students present him with their outfit choices prior to filming; and,
- disparaging comments about the #MeToo Movement and women who complain about sexual predators like Bill Cosby being "too sensitive."

*See also* Pl. 56.1 ¶¶ 202-268, which are incorporated fully as set forth herein.

**16.** **Disputed.** Eight Canisius women students, including Boucher, Engebrecht, Whelan and Wood applied for and were selected by Dr. Noonan for a three-credit course that consisted of independent study and travel to various places, including India, to observe and document tiger conservation efforts, and to produce a documentary called "Project Tiger" in collaboration with Dr. Noonan that would reflect their travels and research. *See* Pl. Ex. F, Wood Dep.,119/17-21; 124/14-130/19; *see also* Pl. Rx. C, Boucher Dep., 205/11-210/13 (describing her role on the Project Tiger documentary as "editor" who shot approximately half the footage for the film).

Dr. Suchak, an ABEC Department faculty member, testified that Dr. Noonan's trips were a form of Canisius-sponsored "eco-tourism" that did not reflect what is commonly viewed as "field work." *See infra* Plaintiffs' Response to Fact. No. 93. In 2017-18, Dr. Suchak complained to Canisius senior administrators about the questionable educational value and high cost of Dr. Noonan's trips, and his tendency to bring the same students on numerous trips while excluding others, including LGBTQ students, as discussed herein at Plaintiffs' Response to Fact Nos. 93-98; *see also* Plaintiffs' Additional Facts, ¶¶ 180-83.

**17.** **Disputed in part.** Boucher testified that she and the other students on the India trip could not communicate with anyone about Dr. Noonan's sexual harassment and other discriminatory misconduct because they did not have working cell phones in India and access to no computers with internet access during the entire trip. *See* Pl. Ex. C, Boucher Dep., 162/18-163/9.

Similarly, Wood testified that at the second location they stayed at, when Dr. Noonan's discriminatory misconduct intensified, "[t]here wasn't a way to really communicate what was going on at that point to anyone." *See* Pl. Ex. F, Wood Dep., 140/12-141/4. Wood testified that "[w]e didn't have connectivity" to communicate, even with her family. *Id.,* 140/12-19.

Whelan testified that because there were no chaperones on the India the trip, Plaintiffs and the other students believed it was best to focus on protecting themselves and each other from Dr. Noonan while in India, and to process the shock of Dr. Noonan's severe discriminatory misconduct on that trip before reaching out to anyone with their complaints. *See* Pl. Ex. J, Whelan Dep., 190/7-191/1; 195/13-196/7.

**18.** **Disputed.** It is true that Walleshauser testified that several students reported their complaints regarding Dr. Noonan's sexual harassment using an alleged anonymous reporting tool, which she

did receive. *See* Pl. Ex. G, Walleshauser 60/2-64/10 However, at her deposition, Walleshauser could not explain why the anonymous student complaints allegedly sent via Canisius' reporting tool in February 2019, which appeared in her investigative report, were, verbatim, student comments from Dr. Noonan's Fall 2018 class Sex and Evolution. *See* Walleshauser 62/22-64/10; *cf.* Pl. Ex. L, Canisius 1749-50 *with* Pl. Ex. M, Canisius 6939 where the student complaint appears, in which Dr. Noonan is called a "perv" and "weird and creepy" and the student states: "Dr. Noonan is not the kind of man I want to be spending my money on to be teaching me." *See* Plaintiffs' Additional Fact Nos. 128-130.

19. **Disputed.** Dr. Hogan testified that Dr. Hauser, another professor in the Biology Department, reported to her on January 16, 2019 that he observed Dr. Noonan verbally abuse one of their shared research students, Student F. *See* Pl. Ex. A, Hogan Dep., 31/16-32/5. Dr. Hogan instructed Dr. Hauser to have the student "make an appointment to see me so we could discuss the situation." *See id.,* 31/6-15.

20. **Disputed.** Dr. Hogan's notes evidence a meeting she with Student F on January 25, 2019. *See* Pl. Ex. H, Canisius 569. Dr. Hogan testified that Student F "described conversations that she had with Dr. Noonan that left her in tears," "that it was a very stressful situation and she thought it was best to cut ties with [Dr. Noonan] . . . [and]she felt her best option was to walk away from the [research] project." *See* Pl. Ex. A, Hogan Dep., 33/5-34/9. Dr. Hogan further testified that Student F told her that she was reconsidering going to graduate school to become a veterinarian because of the stress caused by Dr. Noonan's verbal abuse. *See id.,* 35/10-21.Student F also reported to Dr. Hogan that she feared Dr. Noonan would retaliate against her if she "terminated her research project with him" by not writing a recommendation letter for her and by using his "many contacts at vet school . . . to influence the process." *See id.,* 40/8-21.

On January 25, 2019, Student told Dr. Hogan that Tuhovak, another Dr. Noonan research student, was also being verbally abused by him. *See* Pl. Ex. H, Canisius 572.

21. **Disputed in part.** Dr. Hogan testified that she was required, as a mandatory reporter, to advise the Title IX coordinator, Walleshauser, of Student F's complaint and Dr. Hogan also informed Student F that she could also report her complaint to the Title IX coordinator directly or anonymously. *See* Pl. Ex. A, Hogan Dep., 47/8-48/5. Dr. Hogan further testified that she called Walleshauser "to discuss the situation" and she "[j]ust repeated the information that the student conveyed to" Walleshauser. *See id.,* 54/7-55/2.

22. **Undisputed.**

**23.** **Undisputed.**

**24**. **Disputed.** Boucher testified that Walleshauser focused on scheduling one-on-one sessions with the students during the group meeting on February 11, 2019 and requested that everyone submit a written statement before hand, although Boucher noted that there was a "lack of instruction from Ms. Walleshauser as to what was relevant, what sort of situations we should bring up to her" in the written submission. *See* Pl. Ex. C, Boucher Dep., 193/12-195/12.

**25.** **Disputed.** As noted *infra* in Plaintiffs' Response to Fact No. 24, which is incorporated herein, Walleshauser provided no guidance to Plaintiffs on February 11, 2019 regarding what information to include in their written statements. As a result, Whelan, who prepared written remarks to deliver to Walleshauser during the February 11, 2019 meeting, and sent a copy of those remarks to Walleshauser during the meeting, did not submit another statement containing all of the information she had regarding Dr. Noonan's discriminatory misconduct. *See* Whelan Dep., 204/20--208/13; *see also* Pl. Ex. K.

Canisius' allegation that Tuhovak was the only student who did not submit a written complaint is further undermined by Walleshauser's testimony that a student who attended the India trip, Student G, provided a statement regarding Dr. Noonan's discriminatory conduct, by telephone, on March 20, 2019 and Walleshauser could not confirm if she memorialized that phone call in writing. *See* Pl. Ex. G, Walleshauser Dep., 104/5-107/2; *cf.* Walleshauser Dec., ¶13.

**26.** **Disputed in part.** Tuhovak testified that she attempted to complete a written statement for Walleshauser but "I remember being in the library and starting to draft it and then I kept on getting all of these text messages from the Project Tiger girls" about their problematic individual meetings with Walleshauser. *See* Pl. Ex. E, Tuhovak Dep., 183/19-184/23. Tuhovak described her one-on-one meeting with Walleshauser as feeling "very rushed"; I think I met with her a total of 15 minutes and during that time, she was asking questions that really seemed to put blame and insinuate blame on me." *See id.,* 178/3-17.

Tuhovak testified that her experience and the similar experience of the Project Tiger students being interviewed by Walleshauser made her "scared [that] this was just going to -- this investigation was not going to go anywhere . . . I felt really exhausted and it felt like I was already struggling enough in school. . . I couldn't -- I couldn't handle having to like write about all of this traumatic stuff happening to me and . . begging the administration to take my -- my concerns seriously and take my experience seriously." *See* Pl. Ex. E, Tuhovak Dep., 183/19-184/23.

**27.** **Disputed.** An e-mail from Dr. Margaret McCarthy, Canisius' Vice President of Academic Affairs, dated February 12, 2019, to John Hurley, Canisius' President, demonstrates that they were aware of complaints by students, including Plaintiffs, regarding Dr. Noonan's discriminatory misconduct <u>before</u> February 11, 2019. On that day, Dr. McCarthy wrote to Hurley: "Last week, I mentioned rising issues regarding Mike Noonan. Yesterday, Linda [Margulis], Pete [Schaber], Liz Hogan and I met. There are now 8 students who have met with Linda. She is managing the investigation." *See* Pl. Ex. N, Canisius 1611.

At her deposition, Walleshauser never testified that she provided Hurley with an update on February 11, 2019; she testified that she provided Hurley with a copy of her full investigative report, which included an initial summary dated February 21, 2019, and another summary of Walleshauser's conversations with Dr. Noonan dated March 13, 2019. *See* Pl. Ex. G, Walleshauser Dep., 78/8-79/18; *cf.* Walleshauser Dec., ¶14.

**28.   Disputed in part.** As demonstrated in Pl. Ex. N, at Canisius 1611, Dr. McCarthy reported to President Hurley that she met with Walleshauser, Dr. Hogan, Dr. Margulis and Dean Schaber on February 11, 2019. However, the record demonstrates this was not the first meeting of Canisius administrators regarding student complaints, including those raised by Plaintiffs, about Dr. Noonan's discriminatory misconduct. *See infra* at Plaintiffs' Responses to Fact Nos. 10, 19-20.

Dr. Hogan testified that she met with Dean Schaber and Dr. Margulis on January 29, 2019 to discuss student complaints, including those raised by Plaintiffs, about Dr. Noonan's discriminatory misconduct, and that Dean Schaber believed either Dr. Hogan or Dr. Margulis should merely "have a discussion" with Dr. Noonan about the student complaints. Pl. Ex. A, Hogan Dep., 56/3-57/15. Dr. Hogan testified that she had already advised Walleshauser of on student complaint regarding Dr. Noonan and she wanted to "make sure that Linda [Walleshauser] was involved in the situation before we went further to see how it should be resolved." *Id.,* 57/16-58/2; *cf.* Walleshauser Dec., ¶ 28.

**29.   Disputed.** It is undisputed that Dr. Noonan was informed of the allegations of discriminatory misconduct raised against him raised by Plaintiffs and others students on February 21, 2019 and told at that time that he was suspended with pay. *See* Pl. Ex. G, Walleshauser Dep., 70/10-71/11; 76/2-6. However, the record demonstrates that on February 19, 2019, President Hurley and Dr. McCarthy were still debating how to approach Dr. Noonan about the student complaints and whether to put him on leave. *See* Pl. Ex. O, Plaintiffs Ex. 72. President Hurley wrote to McCarthy:

> Peg, on the basis of what we've heard, does the conduct rise to the level of a termination or would we think about a severe reprimand, some intensive sexual harassment training or something else? l ask because if it doesn't rise to the level of a termination, the interim suspension to complete the investigation may be too severe.

McCarthy wrote back that she is "very concerned about the students and I have put myself in the place of their parents. What would I, as a parent, expect of this college? Would I be comfortable allowing my daughter to continue to be taught/ mentored, etc. by Mike [Noonan]? My answer to that is no." *See* Pl. Ex. O, Plaintiffs Ex. 72. Nevertheless, Dr. McCarthy stated that she believed that "suspension with pay while the investigation continues is the best path. We must afford Mike the opportunity to respond, fairly and without judgement. I continue to recall al the positive work he has done." *See id.; cf.* Walleshauser Dec., ¶29 (where Walleshauser claims Canisius' decision to remove Dr. Noonan was made on February 14, 2019).

**30.   Undisputed.**

**31.** **Disputed in part.** On February 15, 2019, Walleshauser responded to an initial e-mail from Whelan who asked two things: 1) the date on which Dr. Noonan would be informed of the complaints raised against him by Plaintiffs and other students; and 2) whether Canisius was aware that Dr. Noonan went on another trip with students. *See* Pl. Ex. P, Canisius 355.

Whelan testified that after Walleshauser responded to her e-mail, claiming that Dr. Noonan was on a trip "but not with students," she remained concerned about whether Dr. Noonan was permitted back on campus if he decided to return early from the trip, and requested a meeting with Walleshauser, which Walleshauser rebuffed, stating: "It will be best to wait to meet again until the investigation is completed[.]" Pl. Ex. P, Canisius 353; Pl. Ex. J, Whelan Dep., 245/6-248/10.

**32.** **Disputed.** Dr. Margulis testified that she was tasked with making decisions regarding coverage of Dr. Noonan's classes after Dr. Noonan was removed from campus, which occurred on February 21, 2019. *See* Pl. Ex. Q, Margulis Dep., 107/23-108/19; Pl. Ex. G, Walleshauser Dep.,76/2-6; *cf.* Walleshauser Dec., ¶22.

**33.** **Disputed.** Dr. Margulis testified that she and Dr. Suchak agreed to share responsibility for the Social Organization lab after Dr. Noonan's removal from campus, which occurred on February 21, 2019. Pl. Ex. Q, Margulis Dep., 107/23-108/19; *cf.* Walleshauser Dec., ¶22.

**34.** **Disputed in part.** Although the Canisius College calendar, which is cited to by Defendant, demonstrates that there were no classes held on February 18 and February 19, 2019, there is no evidence that Dr. Noonan was banned from the campus on those dates or instructed not to communicate with any students at that time. On the contrary, Walleshauser testified that Dr. Noonan was removed and banned from campus as of February 21, 2019. *See* Pl. Ex. G, Walleshauser Dep., 70/10-71/11; 76/2-6.

**35.** **Undisputed.**

**36.** **Undisputed.**

**37.** **Disputed in part.** Undisputed in that the quoted language is the first paragraph of an e-mail from Whelan to Walleshauser, dated February 15, 2019, which is the third e-mail in the e-mail chain contained in Defendant's Ex. 49 at Canisius 354. However, in the second paragraph of the same e-mail, which Defendant does not quote, Whelan requested a meeting with Walleshauser, which Walleshauser rebuffed, stating: "It will be best to wait to meet again until the investigation is completed[.]" *See* Pl. Ex. P, Canisius 353; Pl. Ex. J, Whelan Dep., 245/6-248/10.

**38.** **Disputed in part.** Def. Ex. 50, which is cited by Canisius in its entirety, is not merely Whelan's text containing a picture of her e-mails with Walleshauser on February 15, 2019 as Defendant suggests. Def. Ex. 50 contains an eleven page text stream involving Plaintiffs and other students who came forward to complain about Dr. Noonan's discriminatory misconduct in 2019. Texts between Whelan and other students corroborates Whelan's claim in the e-mail to Walleshauser that she heard from other students that Dr. Noonan was on a student trip when she e-mailed Walleshauser on February 15, 2019 with her concerns. *See* Def. Ex. 50 at 11 (P 1056). The text stream also memorializes Walleshauser's failure to make good on her promise to provide

the students with notice of the date on which Dr. Noonan would be made aware of their complaints before the meeting occurred, which made Plaintiffs and the other students who came forward feel "out of the loop and unprotected." *See id.* at 6 (P 1051).

**39.** **Undisputed.**

**40.** **Undisputed.**

**41.** **Undisputed.**

**42.** **Undisputed.**

**43.** **Undisputed.**

**44.** **Disputed in part.** Canisius' alleged investigation after February 21, 2019 focused on memorializing the complaints about Dr. Noonan's discriminatory misconduct that were previously reported to the College by Dr. Hoffman in 2014 and Dr. Russell and Dr. Suchak in 2017-2018, and on providing Dr. Noonan was an opportunity to respond to those allegations for the first time. *See* Walleshauser "Dr. Noonan Investigation Timeline," Def. Ex. 63 at Canisius 490. Aside from taking Student G's statement by phone, Walleshauser's alleged investigation ended by March 17, 2019, when she was "[a]dvised by Dr. Noonan that he has retained legal counsel." *See id.*

**45.** **Undisputed.**

**46.** **Undisputed.**

**47.** **Disputed in part.** Undisputed that Dr. Hogan invited students to meet with her or Dr. Margulis to discuss how to proceed with their work in light of Dr. Noonan's departure. *See* Def. Ex. 52, at Canisius 373.

However, Dr. Hogan testified that she only met with one student, Boucher, who scheduled an appointment on February 22, 2019 to discuss how Boucher "was concerned about not hearing anything from Canisius about what was going on with the investigation" and the outcome of the Project Tiger documentary. *See* Pl. Ex. A, Hogan Dep., 123/4-126/23. Dr. Hogan testified that she told Boucher at that meeting that "Dr. Margulis being more familiar with the project would try to come up with some sort of plan to complete [the documentary]." *See id.,* 126/13-23.

**48.** **Undisputed.**

**49.** **Undisputed.**

**50.** **Undisputed.**

**51.** **Disputed.** Boucher testified that after she complained to Walleshauser about Dr. Noonan's discriminatory misconduct on February 11, 2019, she "was working with [Dr. Noonan] almost

every day in his lab until he -- I think there was a period of time before he was actually removed from campus" on February 21, 2019. *See* Pl. Ex. C, Boucher Dep., 197/18-198/6.

Boucher testified that after they returned from the India trip, Dr. Noonan complained to her that he "was losing the girls" but she does not recall if that occurred before or after their complaints to Walleshauser on February 11, 2019. *See* Pl. Ex. C, Boucher Dep., 199/22-200/7. Boucher also testified she could not recall if she and the other Project Tiger students traveled to Canada to interview an artist for their documentary before or after they reported Dr. Noonan to Walleshauser on February 11, 2019, although she testified she was certain the trip to Canada occurred after the India trip. *See id.,* 114/2-19

52.   **Disputed in part.** Lily testified that after she reported Dr. Noonan's discrimination misconduct to Walleshauser on February 11, 2019, Engebrecht saw Dr. Noonan's office open and believed he was on campus, which caused her to have a panic attack and Dr. Suchak sent her home. *See* Pl. Ex. D, Engebrecht Dep., 140/15-23; *see also* Complaint, ¶¶ 177-180.

53.   **Disputed in part.** Tuhovak testified that after she and the other students met twice with Walleshauser, she was very fearful because no one at Canisius explained to Plaintiffs and the other students who came forward in January and February 2019 "what was going to happen [] after they talked to Dr. Noonan [about the student complaints]." "Was he going to be on campus, was he going to stay on campus, did we have to go in the research lab with him every single day after he -- he found out? It was really unclear." *See* Pl. Ex. E, Tuhovak Dep., 182/6-21. "And I just felt even more scared then because . . . [a]ll I knew is that they were going to have a meeting with Dr. Noonan and I didn't know what was going to happen from there." *See id.,* 181/15-20.

For that reason, Tuhovak and the other student complainant asked Dr. Hogan to convey to Canisius senior administrators that they wanted certain accommodations including a no-contact order in place to protect them from Dr. Noonan, which was conveyed by Dr. Hogan in an e-mail to Walleshauser, Dr. McCarthy and Dean Schaber on February 12, 2019. *See* Pl. Ex. R.

54.   **Disputed in part.** Whelan testified that she could not recall if she interacted with Dr. Noonan after February 21, 2019, stating "I may have gone on a trip with him. Again, I cannot remember if that was before or after reporting" Dr. Noonan to Walleshauser that she and the other Project Tiger students were required to travel with Dr. Noonan to Canada to see an artist. *See* Pl. Ex. J, Whelan Dep., 239/19-240/11.

55.   **Undisputed.**

56.   **Undisputed.**

57.   **Undisputed.**

58.   **Disputed in part.** Tuhovak testified that she met with Dr. Hoffman once to discuss the presentation of the research project she was developing as a member of Dr. Noonan's research team because Dr. Hoffman expressed dissatisfaction with Tuhovak's work and seemed frustrated

by the fact that she had to help Dr. Noonan's research students, which was a sentiment that was expressed by other ABEC Department faculty. *See* Pl. Ex. E, Tuhovak Dep., 203/10-205/16.

Tuhovak testified that for prior presentations, Dr. Noonan just told me what to write, dictated it for me, and I wrote it down." However, when she discussed her presentation with Dr. Hoffman, Tuhovak testified that Dr. Hoffman asked her "if there's been any studies on this already that have been done and I remember telling her no" and Dr. Hoffman [was] silent and looking at me incredulously[.]" After that interaction, Tuhovak testified that:

> I didn't feel comfortable going up to talk to her because, number one, the way that she kind of reacted to me when I was talking to her and then, number two, there was just like a general air following the [] Title IX investigation with Noonan . . .of frustration with the students who came forward and how much extra work all of the other Canisius professors had on their plates now that Noonan was gone and it -- it just felt as if the way that they were talking about it was this frustration of like we were to blame.

*See id.,* 204/13-205/16. As a result, Tuhovak no longer wanted to work on the project, but was reluctant to request an academic accommodation to be excused from completing her research. *See id.,* 214/5-12.

59.    **Disputed.** Boucher testified that after Dr. Noonan's removal from Canisius, Dr. Margulis refused to afford her an accommodation, in the form of counting as credit toward her ABEC degree an anthrozoology class that had been taught by an ABEC professor, which Boucher stated she registered for during the Title IX investigation regarding Dr. Noonan, when she did not have an ABEC advisor other than Dr. Noonan. *See* Pl. Ex. C, Boucher Dep., 56/4-23; 243/21-245/76. As a result, Boucher had to take three additional credits during her final semester, for a total of eighteen credits, in order to graduate from Canisius on time, which she described as having cost her additional tuition money and "a lot more work for me to do that I was really hoping I didn't have to do." *See id.*, 249/3-252/2.

60.    **Disputed in part.** Wood testified that no one at Canisius ever told her she could ask for accommodations and what kind of accommodations were available to her after she came forward to complain about Dr Noonan's discriminatory misconduct. *See* Pl. Ex. F, Wood Dep., 230/14-232/3. Wood testified that the one-day extension she requested from Dr. Workman was the only extension she asked for because "[a]fter that I didn't feel particularly welcome to ask for others, so that was the only extension I asked for." *See id.*, 229/15-22.

61.    **Disputed.** Tuhovak testified that she only met with Dr. Hoffman research her research project, which she worked on as part of Dr. Noonan's research team, and felt uncomfortable asking Dr. Hoffman for any help after that meeting because of "like a general air following the [] Title IX investigation with Noonan . . .of frustration with the students who came forward and how much extra work all of the other Canisius professors had on their plates now that Noonan was gone and it -- it just felt as if the way that they were talking about it was this frustration of like we were to blame. *See* Pl. Ex. E, Tuhovak Dep., 204/13-205/16. *See also* Plaintiffs' Response to Fact No. 58, which is incorporated fully herein.

**62.** **Undisputed.**

**63.** **Undisputed.**

**64.** **Disputed in part.** The e-mail from Dr. Sarah Morris that Defendant's cite is dated April 13, 2019. However, in an e-mail from Dr. Margulis to the same student group regarding the same trip on March 15, 2019, she informed them that Canisius had not yet made a decision as to whether Dr. Noonan would go on the trip, and added Dr. Morris as a "second leader":

> I am emailing you because you are signed up for the California trip over easter break, which is sure to be an amazing time! Because we are still uncertain if Dr. Noonan will be able to participate, we are adding a second leader to the trip: Dr. Sara Morris.

*See* Pl. Ex. S, Canisius 2146.

**65.** **Undisputed.**

**66.** **Disputed.** Boucher, Whelan and Wood all testified that Dr. Margulis was the only professor who engaged with them about the Project Tiger project and Dr. Russell never attended a meeting regarding Protect Tiger and never made himself available to help in any way with the Project Tiger documentary or class. *See* Pl. Ex. J, Whelan Dep.,254/2-255/13; Pl. Ex. C, Boucher Dep., 210/18-21; Pl. Ex. F, Wood Dep., 194/6-12.

**67.** **Disputed in part.** Boucher testified that Dr. Margulis did not have the skills needed to make a documentary, "but she certainly knew other people in the college who did." *See* Pl. Ex. C, Boucher Dep., 238/19-23. There is no evidence in the record that Dr. Margulis contacted any professor in the Digital Media Arts Department at Canisius to help the Project Tiger students. However, Boucher testified that in 2019 she e-mailed Jamie O'Neil, a professor in the Digital Media Arts Department for assistance editing the film, but "without coordination from Margulis to ask him to help [Boucher]," and O'Neil never responded to Boucher's request for assistance. *See id.*, 238/19-239/17.

**68.** **Disputed.** On March 6, 2019, Dr. Margulis sent an e-mail to Dr. McCarthy in the wake of Dr. Noonan's removal regarding the Project Tiger documentary. *See* Pl. Ex. T, Canisius 1992. Regarding the Project Tiger video footage, Dr. Margulis wrote: "I am uncomfortable with them using any of the video (even if the college does technically own it) and feel [podcasts] would be a better way to go." *See id.*

**69.** **Disputed.** Boucher testified that Dr. Margulis informed the Project Tiger students "that there was some sort of legal trouble that wasn't described to us in any specificity as to why we could not have the film at that time." Pl. Ex. C, Boucher Dep., 213/9-19.

**70.** **Disputed.** Boucher's resume does not contain any information about the Project Tiger podcast; it refers to a podcast she made while at Canisius for the 500 Women Scientists Buffalo Pod. *See* Def. Ex. 36. Similarly, Wood testified that she mentioned her "podcast work" "in passing on different resumes." *See* Pl. Ex. F, Wood Dep., 215/12-19.

**71.** <u>**Undisputed.**</u>

**72.** <u>**Disputed in part.**</u> Boucher testified that she recalled making a podcast for the 500 Women Scientists Buffalo Pod while at Canisius, and that she performed podcast work for Dr. Russell and Dr. Margulis after Project Tiger, but she did not recall being paid for that work. *See* Pl. Ex. C, Boucher Dep., 217/22-218/19.

**73.** <u>**Disputed.**</u> The transcripts for Boucher, Engebrecht, Whelan and Wood all demonstrate that there is an "I" next to ABEC 490 for the Spring of 2019, which, according to the key attached to each transcript, means that their work for that class is deemed "Incomplete." *See* Def. Ex. 41.

**74.** <u>**Disputed.**</u> See Plaintiffs' Response to Fact No. 73. Additionally, as Engebrecht testified, she "didn't care about the credits for the course," because "[w]e wanted the film" because she believed making the documentary would "help me get into graduate school . . . because it showcased my ability to talk to really professional wildlife biologists and all of the work that I put into that." *See* Pl. Ex. D, Engebrecht Dep., 163/19-164/19.

**75.** <u>**Undisputed.**</u>

**76.** <u>**Disputed.**</u> See Plaintiffs' Response to Fact No. 73.

**77.** <u>**Undisputed.**</u>

**78.** <u>**Disputed in part.**</u> Canisius cites to the last three pages of Def. Ex. 57, falsely suggesting that the notes are narratives provided by the named individual employees. However, at his deposition, Dr. Russell testified that he did not prepare the notes attributed to him in Def. Ex. 57. *See* Pl. Ex. U, Russell Dep., 39/6-40/4; Pl. Ex. V. Dr. Suchak specifically testified that she believed that the notes attributed to her in Def. Ex. 57 were prepared by Walleshauser, particularly in light of the fact that her name is misspelled in the document. *See* Pl. Ex. W, Suchak Dep., 73/16-75/17; *see also* Def. Ex. 57 at 431.

**79.** <u>**Disputed in part.**</u> The "additional allegations" that Walleshauser discussed with Dr. Noonan on March 13, 2019 were raised by Dr. Hoffman in 2014 and by Dr. Suchak and Dr. Russell in 2017 and 2018. *See infra* Plaintiffs' Responses to Fact Nos. 89-93, which are incorporated herein.

**80.** <u>**Undisputed.**</u>

**81.** <u>**Undisputed.**</u>

**82.** <u>**Undisputed.**</u>

**83.** <u>**Disputed in part.**</u> After Whelan requested a meeting with Walleshauser on February 15, 2019, which was refused (*see* Plaintiffs' Responses to Fact Nos. 31, 37-38, which are incorporated as if fully set forth herein), Wood requested another meeting on behalf of Plaintiffs and the other

students who complained about Dr. Noonan's sexual harassment on April 15, 2019, which was ultimately held on April 26, 2019. *See* Pl. Ex. X, Canisius 514-15.

Thereafter, Walleshauser sent Plaintiffs and the other students who complained about Dr. Noonan's sexual harassment the same update for months. *See* Def. Ex. 60.

**84.** **Disputed in part.** Dr. McCarthy testified that the decision to terminate Dr. Noonan's employment with Canisius was conveyed to him by his attorney in the context of discussions regarding a separation payment that Canisius made to Dr. Noonan in the amount of $133,264.50 and the negotiation of a separation agreement. *See* Pl. Ex. Y, McCarthy Dep., 99/11-23; *see also* Pl. Ex. Z (Noonan Separation Agreement).

The separation agreement also permitted Dr. Noonan "access to a video editing equipment so that he may complete certain unfinished film projects, including a project known as 'Project Tiger,'" which had to be returned "on or about September 1, 2019." Pl. Ex. Z, *See* Canisius 4961.

Dr. McCarthy admitted that she was unaware of any threat of litigation from Dr. Noonan. *See* Pl. Ex. Y, McCarthy Dep., 103/10-105/16.

**85.** **Undisputed.**

**86.** **Undisputed.**

**87.** **Disputed.** Boucher testified that her e-mail to Walleshauser on June 22, 2019 did not "accurately reflect[] the feelings that we were having at the time" regarding Canisius' handling of the Title IX complaints about Dr. Noonan's sexual harassment:

> [S]o when we began having difficulties with the Title IX office, when we weren't getting responses from them, when we weren't being communicated to about, you know, specifics regarding the case or the accommodations that we could ask for, my response to that because of the way that I was conditioned by Noonan, was to double down on the niceties.
>
> And in this interaction specifically talking about the film, I really wanted that film. I really, really wanted to be able to work on that project and I was hoping if I keep being nice -- you know, at 20 years old this was my belief – if I keep being nice, hopefully I'll get the result that I want.

*See* Pl. Ex. C, Boucher Dep., 228/2-229/2.

**88.** **Disputed in part.** Boucher was the only one of all the Project India students to access the film footage, which was actually first made available to her in July 2019 because she was the only student with video editing skills and none of the other students had that "capability." *See* Pl. Ex. C, Boucher Dep., 233/3-13; 234/3-14.

However, Canisius cannot dispute that Boucher did not have access to the video editing equipment she would have needed until September 2019, because it is undisputed that Canisius gave that

video editing equipment to Dr. Noonan to use for the duration of the summer in 2019 as reported by Dr. Margulis in an e-mail to Walleshauser, dated July 1, 2019. *See* Pl. Ex. AA, Canisius 549.

89.     **Disputed.** Canisius cites to the last three pages of Def. Ex. 57, falsely suggesting that the notes are narratives provided by the named individual employees. At his deposition, Dr. Russell testified that he did not prepare the notes attributed to him in Def. Ex. 57. *See* Pl. Ex. U, Russell Dep., 39/6-40/4; Pl. Ex. V. Dr. Suchak specifically testified that she believed that the notes attributed to her in Def. Ex. 57 were prepared by Walleshauser, particularly in light of the fact that her name is misspelled in the document. *See* Pl. Ex. W, Suchak Dep., 73/16-75/17; *see also* Def. Ex. 57 at 431.

Dr. Christy Hoffman, a former ABEC faculty member, testified that after she heard that Plaintiffs and other students came forward to complain about Dr. Noonan's discriminatory misconduct in 2019, she went to Walleshauser to describe complaints about Dr. Noonan's inappropriate touching to Debra Winslow-Schaber, the former Canisius Human Resources Director, in 2014. *See* Declaration of Dr. Christy Hoffman, dated September 23, 2023, attached as Pl. Ex. BB, ¶¶3, 65.

90.     **Disputed.** Dr. Hoffman did not merely claim that she met with Jennifer Skowron. Dr. Hoffman testified that when she went to Walleshauser in 2019, Skowron, an employee in the Canisius Human Resources Department with whom she met about her complaint about Dr. Noonan's discriminatory misconduct in 2014, and who confirmed "she still had the meeting appointment on her Outlook calendar, and told Walleshauser that it occurred at 10 a.m. on a Thursday morning in the Fall of 2014. *See* Pl. Ex. BB, Hoffman Dec., ¶66.

Dr. Hoffman further testified that she reported to both Winslow-Schaber and Skowron that "Dr. Noonan a habit of hugging me, which I did not care for, and I was concerned that the behavior would escalate and that he would try to touch me more while I was pregnant[.]"
*See* Pl. Ex. BB, Hoffman Dec., ¶¶ 17, 20.

Def. Ex. 57 at 430 corroborates Dr. Hoffman's testimony regarding the nature of her complaints about Dr. Noonan to Winslow-Schaber and Skowron in 2014: " I was pregnant and . . . relayed my concerns to Deborah [Winslow-Schaber] [who responded by] saying that [Dr. Noonan] sometimes hugged me and that made me uncomfortable and he had stated that pregnant women have to accept people touching their bellies."

91.     **Disputed in part.** Dr. Hoffman testified that she complained to Winslow-Schaber and Skowron that Dr. Noonan's unwanted and inappropriate touching of her would increase because, as she testified, "I witnessed him touch a pregnant colleague's stomach during my first year as a faculty member, and that colleague had told me how uncomfortable his behavior had made her feel" and Dr. Noonan had stated in her presence " a couple times …that pregnant women must accept that people will touch them." *See* Pl. Ex. BB, Hoffman Dec., ¶¶ 13-14, 17, 20.

92.     **Disputed.** Dr. Hoffman testified that Winslow-Schaber told her, in response to her complaint about Dr. Noonan's inappropriate touching, that "some people just hug others to show their happiness for them," and then asked Dr. Hoffman "if I had ever asked Dr. Noonan not to hug me,"

which Dr. Hoffman found "unhelpful because [Winslow-Schaber's] comments demonstrated to me that she was not going to help me remedy the problem." *See* Pl. Ex. BB, Hoffman Dec., ¶22.

**93.** **Disputed.** Dr. Russell and Dr. Suchak informed Walleshauser in 2019 about complaints they raised to Dr. Beth Gill, then-Dean of the College of Arts and Sciences, and Dr. McCarthy, in October 2017 "regarding Dr. Noonan and the quality of student experience on trips after hearing concerns from the students." *See* Def. Ex. 57 at 432. Walleshauser's notes demonstrate that Dr. Suchak and Dr. Russell "felt [Dr. Noonan] was displaying favoritism in selecting students for the trips[.]"*Id.*

Dr. Suchak testified that she also complained to Dr. Gill and Dr. McCarthy about the low educational value of Dr. Noonan's trips, which she described as "eco-tourism" and not field research. *See* Pl. Ex. W, Suchak Dep. 42/13-43/11; 49/7-14. Dr. Suchak also testified that Dr. Russell complained to Dr. Gill about Dr. Noonan's fitness requirements for his CAC trips that were disproportionate to physical demands of students on the trips, and used by Dr. Noonan as a way to exclude some students from his trips. *Id.,* 40/4-41-41/22.

Dr. Suchak testified that she used the same notes during her meetings with both Dr. Gill and Dr. McCarthy, which were produced during discovery. *See* Pl. Ex. CC, Suchak Notes, Canisius 3063-3066; Pl. Ex. W, Suchak Dep., 38/3-40/13.

Dr. Suchak's notes corroborate her testimony that she raised concerns with Dr. Gill and Dr. McCarthy in 2017-18 related to the questionable educational value of Dr. Noonan's trips. *See* Pl. Ex. CC at 3064-65 ("CAC students do travel, although the term 'field study' is not used here in the traditional way"; "students do not have autonomy in the course materials [and] are assigned particular web/video projects, which are scripted or heavily edited by [Dr. Noonan]"). Dr. Suchak's notes also memorialize her concern that Dr. Noonan repeatedly took the same students on his trips, which cost Canisius large sums. *See* 3064-65 ("we see the same several students taking the trips again and again (for e.g., 2 seniors have been on a total of 4 trips, total[ing] tens of thousands of dollars" and the trips were described as "extravagant" and a "ridiculous amount of money").

Walleshauser's notes corroborate that Dr. Russell complained in 2017 to Canisius senior administrators about Dr. Noonan's "student issues" and Dr. Noonan's "misuse of funds [in the] Fall of 2017 [to] purchase tree climbing equipment, beaver trap." *See* Def. Ex. 57 at 431. Dr. Russell testified that he in 2017 he reported his concerns regarding Dr. Noonan's successful effort to pressure him to give Dr. Noonan his money from Canisius, which was supposed to cover Dr. Russell's own research lab. *See* Pl. Ex. U, Dr. Russell Dep., 42/16-43/13; 45/7-16.

**94.** **Disputed.** *See* Plaintiffs' Response to Fact No. 93, which is incorporated as if fully set forth herein.

**95.** **Undisputed.**

**96.** **Disputed.** *See* Plaintiffs' Response to Fact No. 93, which is incorporated as if fully set forth herein.

**97.** **Disputed.** Dr. Suchak testified that Dr. McCarthy's reactions to her concerns about Dr. Noonan's student trips raised in April 2018 was the comment: "oh, that's concerning," and nothing more. *See* Pl. Ex. W, Suchak 50/1-18.

In contrast, Dr. McCarthy denied that she ever met with Dr. Suchak about her concerns regarding Dr. Noonan and only heard about them from Dr. Gill. *See* Pl. Ex. Y, McCarthy Dep., 17/1-18/21. Dr. McCarthy stated that she believed Dr. Suchak was concerned about Dr. Noonan "misappropriating funds from the Institute For the Study of Human-Animal Relations (ISHAR)." *See id.,* 17/16/18/8. Dr. McCarthy claimed at her deposition that she asked Canisius' comptroller to "review the account," and to "ask[] for receipts," *see id.,* 18/9-21, although Canisius has never produced any e-mails or other documents to corroborate Dr. McCarthy's claims.

Moreover, as discussed in Plaintiffs' Response to Def. Fact No. 93, Dr. Suchak complained about Dr. Noonan's misuse of Canisius funds for trips that had limited, if any, educational value and benefitted only a few select students, which Dr. McCarthy's alleged monitoring of the ISHAR account did not address.

**98.** **Disputed in part.** As discussed *infra* at Plaintiffs' Response to Fact Nos. 93 and 98, which are incorporated herein, Dr. Suchak complained about Dr. Noonan's misuse of Canisius funds for trips that had limited, if any, educational value and benefitted only a few select students, which Dr. McCarthy's alleged monitoring of the ISHAR account did not address, and Canisius has never produced any e-mails or other documents to corroborate Dr. McCarthy's claims that she responded to Dr. Suchak's concerns from 2017 in any way.

**99.** **Disputed.** Dr. Tanya Loughead, a tenured professor who has worked in the Philosophy Department at Canisius for nineteen (19) years, testified that Dr. Noonan subjected her to discriminatory mistreatment, which included screaming at her, throwing a bunch of pens and pencils at her head, kicking her off a school committee, and threatening her with interference in her tenure process. *See* Pl. Ex. B, Loughead Dep., 5/10-23; 19/12-22/5; 22/6-23/20.

Dr. Loughead testified that Dr. Noonan's mistreatment of her was discriminatory in nature because she is a woman who tried to question his authority by attempting to address a student complaint from Student A regarding Dr. Noonan's requirement that students strangle and kill the rats they trained in his class, Social Organization of Mammals. *See* Pl. Ex. B, Loughead Dep., 22/6-23/20.

**100.** **Undisputed.**

**101.** **Disputed in part.** Dr. Loughead testified that she reported Dr. Noonan's discriminatory mistreatment to Dr. George Boger, the Chair of the Philosophy Department, and that it occurred when she tried to discuss with him an alternative to having students kill their own rats at the request of a Student A. *See* Pl. Ex. B, Loughead Dep., 27/22-28/16. Dr. Loughead testified that Dr. Boger was not surprised by Dr. Noonan's "sadistic behavior," and he said, "That sounds like something [Dr. Noonan] would do." *Id.,* 30/19-31/5.

Two to three weeks after Dr. Noonan's discriminatory mistreatment of Dr. Loughead relating to the rats in the animal behavior class, Dr. Boger reported to Dr. Loughead that: "Campus security

has contacted me and told me that you are a possible terrorist and that you are a threat because you are an animal rights activist and a terrorist and that he believes you should be on the FBI watch list and that campus security has been notified about you perhaps being on the FBI watch list." Pl. Ex. B, Loughead Dep.,28/17-29/15. Dr. Loughead testified that both she and Dr. Boger agreed Dr. Noonan likely made the false report about her to Canisius security. *See id.,* 29/16-31/5.

Dr. Boger told Dr. Loughead to report Dr. Noonan's misconduct to Canisius administrators but she was not tenured at that time, and did not want to take that risk because Dr. Noonan was the most powerful professor on campus. *See* Pl. Ex. B, Dr. Loughead Dep., 31/6-23. Dr. Loughead testified as follows:

> I was aware that Dr. Noonan is a very powerful professor on campus, maybe the most powerful professor on campus, and that if me as a young woman professor questioned his authority, the person who would suffer would be me, not him.

Pl. Ex. B at 31/15-23.

**102.    Undisputed.**

**103.    Disputed.** Dr. Loughead testified that during a Faculty Senate meeting when Dr. Noonan presided as Chair, he rudely interrupted a presentation by Sister Pat and then proceeded to verbally abuse her. Sister Pat had been invited by the Faculty Senate "to talk about service learning, opportunities she was offering, nothing controversial," and in response, for thirty minutes, Dr. Noonan "was so angry and pacing and yelling." *See* Pl. Ex. B, Loughead Dep., 25/8-26/21.

Dr. Loughead testified that "I didn't understand why, because the content of what [Sister Pat] was saying did not threaten [Dr. Noonan] in any way. After witnessing Dr. Noonan's verbal abuse that continued for half an hour, Dr. Loughead and several others on the Faculty Senate told Dr. Noonan repeatedly "Let's end this conversation. Let's move on. Let's -- let's wrap this up[,]" because Sister Pat was "flustered and close to tears." *See id.*

**104.    Disputed.** Dr. Loughead testified that she called Dr. Patricia Erikson, Canisius' then-Dean of the College of Arts and Sciences, the day after Dr. Noonan's verbal abuse of Sister Pat during the Faculty Senate meeting in 2014 or 2015. *See* Pl. Ex. B,  Loughead Dep., 27/9-10; 36/16-36/7.

During that meeting, Dr. Loughead testified that she complained to Dean Erikson about Dr. Noonan's "rude and sadistic" behavior toward Sister Pat at the Faculty Senate meeting and Dr. Noonan's discriminatory mistreatment of her when she went to discuss with him Morgan Dunbar's objection to Dr. Noonan's requirement for the Social Organization of Mammals class that the students kill their own rats. *See id.,* 39/5-21.

**105.    Disputed.** Dr. Loughead testified that Dr. Noonan was a "bully" who "showed his bullying behavior to everyone who was junior to him" and he was "mean to anyone he had power over[.]" *See* Pl. Ex. B, Loughead Dep., 25/2-13; 41/14-23. Dr. Loughead further testified that she observed Dr. Noonan "really lose his cool" and be "particularly sadistic with women*." Id.,* 42/1-17.

**106.** __Disputed in part.__ Tuhovak scheduled a meeting with Dr. Margulis to discuss "concerns" she had with Dr. Noonan's discriminatory mistreatment of her as a member of his research team. *See* Pl. Ex. DD, Canisius 1106; Pl. Ex. E, Tuhovak Dep. 125/21-126/7; 126/14-129/15.

**107.** __Disputed.__ Tuhovak reported Dr. Noonan's "harassment" to Dr. Margulis, and provided specific detail regarding her getting "screamed at," "verbally abused every day on the research team," and "being made an example of a . . . type of student that other research students wouldn't want to be by Dr. Noonan. *See* Pl. Ex. E, Tuhovak Dep., 122/9-19.

Tuhovak told Dr. Margulis: "I feel like I'm trapped, I can't leave his research team, there's no possibility for me to get into like graduate school or law school without . . . his recommendation letter or . . . some other research team or research project that I could do outside of Noonan" and she believed he was mistreating her because she "pushed back" against his efforts to monopolize her time and she was not "submissive and quiet." *See id.,* 123/8-14; 126/14-128/2.

Tuhovak went to Dr. Margulis about her concerns regarding Dr. Noonan's discriminatory mistreatment because she was "struggling" and hoped that Dr. Margulis would allow Tuhovak to join Dr. Margulis' research team to protect her from Dr. Noonan, which is what Tuhovak's friends suggested would happen but did not. *See id.*, 121/19-122/8.

**108.** __Disputed.__ Tuhovak testified that she told Dr. Margulis that "I was not doing well mentally, I was having panic attacks going into the research lab every day, was just like waiting for Dr. Noonan to scream at me. I would frequently go and sob in the back stairwell of health science because I knew no one would be over there." *See* Pl. Ex. E, Tuhovak Dep., 122/20-123/3. Tuhovak also testified that she specifically told Dr. Margulis that she "was really passionate" about her research project and wanted to finish it but felt that she could not take Dr. Noonan's discriminatory harassment for much longer. *See id.,* 127/15-128/2.

**109.** __Disputed in part.__ Tuhovak testified that Dr. Margulis' response to her complaints about Dr. Noonan's discriminatory misconduct was as follows: "she just looked at me and said, "What do you want me to do about it? You know he's difficult to work with, that's just the way he is. . . .either you can stay on the team and be miserable and get your recommendation letter or you can leave." *See* Pl. Ex. E,  Tuhovak Dep., 123/4-15. Tuhovak further testified that Dr. Margulis' negative reaction to her complaint about Dr. Noonan's discriminatory mistreatment in 2018 made her feel "like it was this blame placed on me of I should have known better even though I would have never entered his research team if I knew everything that was going to happen from the moment, you know, I started taking his class . . . I would have never gone on the team and I did not know the full extent of how difficult he was to work with." *See id.,* 128/3-14.

**110.** __Disputed in part.__ Tuhovak testified that she could not "remember the exact words" that she used to report Dr. Noonan's discriminatory misconduct to Dr. Margulis in March of 2018, but she believed she used the words "verbal harassment." *See* Pl. Ex. E, Tuhovak Dep., 128/16-23. Tuhovak further testified that she did not use the word "sex discrimination" because "at that time" she did not make the connection that the verbal abuse was part of the way Dr. Noonan subjected Tuhovak to illegal sex discrimination. *See id.,* 129/1-6.

**111.** __Disputed.__ Tuhovak testified that Dr. Margulis should have reported her concerns about Dr. Noonan's discriminatory misconduct to the Title IX office because the fact that the verbal abuse was sex discrimination "should have been obvious" to Dr. Margulis. *See* Tuhovak Dep., 129/1-15. Dr. Margulis' inclusion of Tuhovak's 2018 complaint in her January 27, 2019 summary of student complaints for Walleshauser demonstrates that Tuhovak's complaints in 2019 were complaints regarding Dr. Noonan's sex discrimination "should have been obvious" to Dr. Margulis. For more information regarding Dr. Margulis' summary of student complaints submitted to Walleshauser in 2019, *see* Plaintiffs' Additional Fact Nos. ¶¶ 189-200.

**112.** __Disputed.__ Dr. Margulis' alleged "advice" to Tuhovak was to "stay on [Dr. Noonan's research] team and be miserable and get your recommendation letter or you can leave." *See* Pl. Ex. E, Tuhovak Dep., 123/4-15. After this meeting, Tuhovak believed she had no choice but to stay on Dr. Noonan's research team and "put my head down and try to distance myself as much as possible from Dr. Noonan and hope that he didn't continue to yell at me and harass me[.]" *Id.,* 130/22-131/11.

**113.** __Disputed.__ In Dr. Margulis' summary of student complaints that she submitted to Walleshauser on January 27, 2019, *see* Pl. Ex. EE, demonstrates that she met with a student in "Fall 18" who "came to talk to me about things going on in Sex Evolution and Behavior" including Dr. Noonan's "anonymous survey about sexual partners;" his "exclus[ion] of LGBTQ students from classroom activities;" and Dr. Noonan's use of class time to "show[] pictures of men and ask[] students to rate them[.]" *See* Pl. Ex. EE, at Canisius 1934. For more information regarding Dr. Margulis' summary of student complaints submitted to Walleshauser in 2019, *see* Plaintiffs' Additional Fact Nos. ¶¶ 189-200.

**114.** __Disputed.__ In the Declaration she submitted in this litigation, Student D, a Canisius graduate who earned a dual degree in Biology and ABEC, testified that she complained about the content of Dr. Noonan's student sex survey for the Sexual Evolution and Behavior class, and how uncomfortable it made her feel, to Dr. Daniel Haeusser, a professor in the Biology Department, and to Dr. Sara Tulin, a lab professor, and they encouraged her to report the situation to Dr. Margulis, who was the Chairperson of the ABEC program. *See* Pl. Ex. FF, Declaration of Student D, dated July 26, 2023, ¶¶3, 11-12.

**115.** __Disputed.__ Student D testified that she told Dr. Margulis about the Dr. Noonan's student sex survey for the Sexual Evolution and Behavior class and the inappropriate questions "that focused on our own sexual experiences, which did not have anything to do with the subject matter of the class that was supposed to be about animals"; "questions on the survey solicited information about my age, gender, sexual identity and 'body count,' or the number of people I had sex with"; and, "other survey questions were more intrusive and solicited information about whether I had ever been sexually assaulted." *See* Pl. Ex. FF, ¶¶6-9.

Student D testified that she told "Dr. Margulis about Dr. Noonan's inappropriate comments during class, which included Dr. Noonan's declaration that 'Rape should be expected in humans!' and 'Forced copulation is ecologically beneficial!'"; "that Dr. Noonan discussed paternity in humans and stated that 'it makes sense that men don't want to stick around and raise children

biologically'"; and, "that Dr. Noonan's comments normalizing rape and paternal abandonment were as disturbing as the sex survey." *See* Pl. Ex. FF, ¶¶15-17.

With regard to one session of the Sexual Evolution and Behavior class, Student D also told Dr. Margulis that "Dr. Noonan put up images of men on the white board and wanted the class to comment on which men we found most attractive, which had absolutely nothing to do with what we should have been learning." *See* Pl. Ex. FF, ¶21.

**116.** **Disputed.** Student D testified that although Dr. Noonan claimed the sex survey would be anonymous, he "compiled the results from the survey and shared them with the class, which he did not tell us he would do at the time he distributed the survey"; that "because of the small class size, it was easy to figure out who responded to certain questions as they had, which resulted in the 'outing' of several gay members of the class"; and, Student D "found Dr. Noonan's obvious disregard for student privacy about our sex lives to be very disconcerting." Pl. Ex. FF, ¶¶18-20.

**117.** **Undisputed.**

**118.** **Disputed.** Student D testified that "Dr. Margulis told me that 'not enough reports' had been made regarding Dr. Noonan's sexual misconduct and that she was 'working hard' to get enough reports made." Student D testified that "Dr. Margulis never asked me to write down any of the information about Dr. Noonan's sex-related misconduct that I had shared with her during that meeting," that "Dr. Margulis told me that she would 'file' my complaint and I trusted that she would make sure my complaint would reach the appropriate administrators of the College," but that "I never heard back from Dr. Margulis, nor did I ever hear from anyone in the administration of Canisius College about my complaint regarding Dr. Noonan's sexual misconduct in the Sexual Evolution and Behavior class  that I took during the Fall of 2018." *See* Pl. Ex. FF, ¶¶ 25-29.

**119.** **Disputed.** Student A is not a "former" student; she received her undergraduate degree in 2020 after settling a lawsuit in 2019 against Canisius regarding discriminatory harassment she was subjected to by Dr. Noonan, which culminated in her violent removal from campus by security at Dr. Noonan direction from an event that Dr. Noonan invited her to attend. *See* Pl. Ex, JJ, Student A Dep., 32/2-38/23; 43/2-45/23.

Student A transferred to Canisius to become an ABEC major after discussing her professional goals with Dr. Noonan, which included obtaining a PhD with a focus on animal behavior. *See* Pl. Ex, JJ, Student A Dep., 7/7-8/13. Dr. Noonan promised Student A that she could study animals at Canisius without experimenting on them. *See id.*, 6/4-7/6; 8/14-23.

Student A testified that because of Dr. Noonan's discriminatory mistreatment of her after she complained about his requirement that students kill the rats they trained throughout the semester for his Social Organization of Mammals class, a practice that ended after Canisius' student paper ran a story about this practice with Student A's help, she never took another ABEC class again and switched her major to philosophy. *See id.*, 24/7-26/17; 28/20-29/14.

**120.** **Undisputed.**

**121.** **Disputed.** Student A testified that Dr. Noonan simulated sex while interacting with another student on the bus during the trip to the Pittsburgh zoo. *See* Pl. Ex, JJ, Student A Dep., 14/16-15/12. Student A described the incident as follows: "[S]he was . . . laying down with her legs in the aisle and he walked over to her and . . . took her legs and he put them up over her head. Like I can't -- I was just like shocked, and he stood there in like a clear sexual position. It was just unreal and I don't think she like allowed him to do that for very long, maybe like five or ten seconds. But I mean, that was shocking to me." *Id.*

**122.** **Disputed in part**. Student A testified that in 2011 she told one male and one female senior Canisius official, who she believes were both deans, about several instances of Dr. Noonan's sexual misconduct. *See* Pl. Ex. JJ,11/4-15; 26/18-29/19.Dunbar testified that she reported to the two deans information regarding Dr. Noonan's simulation of sex with her friend on the bus to the Pittsburgh zoo. *Id.*, 26/18-27/16. Dunbar also testified she informed the deans that on her first day of the Social Organization of Mammals class, Dr. Noonan started "talking about kissing his students and how that was totally fine and how he would take them on trips and all the fun things that they would do," and she noted "it was just very strange to me. Like that was right off -- that was like day one." *See id.*, 11/4-15; 27/17-28/19.

**123.** **Disputed in part.** Student A testified that during her time in Dr. Noonan's Social Organization of Mammals class, she complained to Dr. Noonan about an experiment with rats in which 8 male and 8 female rats were put in one cage, and some rats attacked others, which caused the "acute[] suffering" of some animals. *See* Pl. Ex. JJ, Student A Dep., 16/13-18/15.

Specifically, Student A testified she witnessed "babies [] eaten alive" and "blood and guts" on the cages. *See* Pl. Ex. JJ, Student A Dep., 17/1-15. After she complained about the experiment, and told Dr. Noonan that she wanted to help the hurt animals, Dr. Noonan suggested that he would "just take them out in front of me and break their necks, which I of course said, no, no, don't do that." *Id.,* 17/1-18/15.

**124.** **Disputed in part.** Student A testified that she complained to Dr. Margulis about "the rat torture" and Dr. Margulis "couldn't do anything about it" because she was "so meek" and "intimated by [Dr. Noonan.]" *See* Pl. Ex. JJ, Student A Dep., 23/13-24/6.

Student A also testified that after she reached out to the Canisius student newspaper, "[t]hey did an article where they interviewed me, they tried to interview Noonan about the rat torture and I believe that was published in one of the newspapers. . . .so I mean everybody on the campus became aware after that[.] [Y]ou know, . . . because of the amount of pressure I put on him, he did discontinue that experiment after 30 years of doing it every other semester. He just, he stopped doing it." *See* Pl. Ex. JJ, Student A Dep., 24/7-26/17.

**125.** **Disputed in part.** The quoted deposition testimony is from Dr. Suchak, who is currently a tenured faculty member of Canisius' ABEC program, and who obtained her bachelor's degree in biology from Canisius. *See* Pl. Ex W, Suchak Dep., 24/3-22; 87/5-90/11; 90/23-91/10. According to Dr. Suchak's biography on the current Canisius website, she is a biologist who teaches animal behavior; she is not a neuroscientist. *See* https://www.canisius.edu/academics/our-schools/college-arts-sciences/faculty-and-staff/malini-suchak (last visited February 6, 2025).

Dr. Suchak testified that she believed Dr. Noonan used "cervical dislocation" to kills rats in "neuroscience experiments," which Dr. Suchak stated she never witnessed but nevertheless claimed occurred before her time as an "undergraduate [at Canisius] . . . which would have been in the '90s[.]" *See* Pl. Ex. E, Suchak Dep., 69/19-70/21; 71/12-14. Accordingly, Dr. Suchak has no personal knowledge of Dr. Noonan's methods for disposing of the rats when the experiments were done.

**126.** **Disputed in part.** Plaintiffs incorporate their response to Fact No. 125 as if fully incorporated herein. As stated there, Dr. Suchak is not a neuroscientist, testified that she never witnessed Dr. Noonan's experiments with rats, and therefore has no personal knowledge of his methods for disposing of the rats when the experiments were done at Canisius.

**127.** **Disputed.** Dr. Hogan, who at all relevant times was the Chair of the Biology Department and had supervisory authority over Dr. Noonan in that capacity, testified that every member of the faculty is required to "submit an annual report documenting their scholarship, their teaching and any service" to the Faculty Evaluation Committee in the Biology Department and the Dean of the School of Arts and Science. *See* Pl. Ex. A, Hogan Dep., 9/10-10/11.

Dr. Hogan testified that the annual report from each faculty member had "three sections." In the first section on "teaching," faculty members like Dr. Noonan were "supposed to summarize any changes that you made to the courses that you taught during that process, comment on any student feedback and also comment on any changes that you plan to instill the next time you teach the class based on feedback. *See* Pl. Ex. A, Hogan Dep., 16/16-17/13. Similarly, Walleshauser testified that each "department chair" receives a copy of student comments for each class taught in their department at the end of each semester. *See* Pl. Ex G, Walleshauser Dep., 61/13-62/7.

Therefore, Dr. Hogan and Walleshauser's testimony conflicts with the self-serving testimony of Lauren Young, *see* Docket No. 33-66, who testified that student comments were available only for Noonan's personal review. *See id.*, ¶¶ 7-8, 11-12.

Additionally, Young was never identified by Canisius during discovery as a witness with information relevant to this lawsuit. *See, e.g.,* Def. Rule 26 Disclosures attached as Pl. Ex. HH.

**128.** **Undisputed.**

**129.** **Disputed.** As documented in Plaintiffs' Response to Fact No. 127, Dr. Hogan testified that faculty were required to discuss in their annual reports to the Faculty Evaluation Committee in the Biology Department and the Dean, and Walleshauser testified that the chair of each department had access to student comments from each class taught in their department.

**130.** **Disputed.** *See* Plaintiffs' Response to Fact Nos. 127 and 129, which are incorporated herein. Walleshauser testified that several students reported their complaints regarding Dr. Noonan's discriminatory harassment using an alleged anonymous reporting tool, which she did receive. *See* Pl. Ex. G, Walleshauser 60/2-64/10 However, at her deposition, Walleshauser could not explain why the anonymous student complaints allegedly sent via Canisius' reporting tool in

February 2019, were, verbatim, student comments from Dr. Noonan's Fall 2018 classes. *See id.,* 62/22-64/10; *cf.* Pl. Ex. L, Canisius 1749-50 *with* Pl. Ex. M, Canisius 6939 where the student complains about the Dr. Noonan's discriminatory misconduct in class, calling him a "perv" and "weird and creepy."

> Dr. Noonan is not the kind of man I want to be spending my money on to be teaching me. I will never take another class of his again. I would have been a great candidate for his social org class but will not be wasting my money on a pervy professor that I feel uncomfortable around. His actions are hurting my education because I cannot take classes that he teaches due to his sexual comments. Professors are supposed to be respectful to their students and he is the total opposite.
>
> Here are just a few of the comments he has made over the semester, directing calling students out in front of the whole class. I will refer to a female student as Jane and a male as John in the examples.
> - "Jane, would you trade sex for a steak dinner?"
> - "Jane, if John came to your dorm room with flowers, ready to get it on, would you let him" . . .
>
> For a full 40 minutes, Dr. Noonan put up pictures of makes on the projector and made the females rate them . . . Biggest waste of my time, this exercise may have been beneficial on a small scale, but Noonan made it weird and creepy, dwelling on it for almost the whole class period. Even making comments that he learned a lot about our preferences in males. I heard multiple people in his class say how uncomfortable they feel and how unprofessional he acts. . . . Overall Noonan is a perv, I'm surprised he is still a professor here.

*See* Pl. Ex. L, Canisius 1749-50.

**131.** __Disputed.__ Many of the student comments in Pl. Ex. M relate to Dr. Noonan's discriminatory misconduct in class, and his targeting of certain students, including women and LGTBQ students, for harassment, including the quoted comment by Canisius, which is reproduced below in full:

> I will never take another class with Dr. Noonan. I struggle every day to even go to this class due to the sexual harassment experienced in this class. He is degrading to his female and male students and makes the most inappropriate comments.

*See* Pl. Ex. M at 6937.

Other students who commented in Pl. Ex. M complained as follows:

> [K]eeping students passed the class period[,] touching students on a regular basis without their permission[,] personally attacking students when he is in a bad mood[,] calling certain students his "favorite daughters[.]"

*See* Pl. Ex. M at 6936.

The professor sexually harassing students. . . . Oversimplification of topics in the animal world that the Instructor attempts to relate to humans. While I understand the point the Instructor is trying to make, it can be uncomfortable, oversimplified, and sometimes insensitive. . . . A class discussion surrounding the topic of sexual assault in the human world given by a man to a class dominated by females was uncomfortable and could have been potentially triggering to many students. I did not understand the significance such a heavy subject had on a class discussion when there were no questions on the exam that required such length discussion of an incredibly sensitive and delicate subject.

*See* Pl. Ex. M at 6935.

**132.** **Disputed in part.** Def. Ex. 42 at 2429 demonstrates that Dr. Margulis agreed in 2021 to submit one letter of recommendation via a link on her behalf of an internship. Similarly, Dr. Margulis agreed in the e-mail labeled Canisius 2407 to be a reference for an internship Boucher was applying for.

**133.** **Disputed in part.** Dr. Foster wrote one recommendation letter for Boucher that was submitted nine times to graduate admissions programs, internship coordinators, and one fellowship. *See* Def. Ex. 43.

**134.** **Disputed in part.** Dr. Suchak wrote one recommendation letter for Boucher that was submitted to five graduate admissions programs. *See* Def. Ex. 25.

**135.** **Undisputed.**

**136.** **Disputed in part.** *See infra* Plaintiffs' Response to Fact No. 59, which is incorporated herein, and demonstrates that after Dr. Noonan's removal from Canisius, Dr. Margulis refused to afford Boucher an accommodation, in the form of counting as credit toward her ABEC degree an anthrozoology class that had been taught by an ABEC professor, which Boucher stated she registered for during the Title IX investigation regarding Dr. Noonan, when she did not have an ABEC advisor other than Dr. Noonan. *See* Pl. Ex. C, Boucher Dep., 56/4-23; 243/21-245/76. As a result of, Boucher had to take three additional credits during her final semester, for a total of eighteen credits to graduate on time, which she described as having cost her additional tuition money and "a lot more work for me to do that I was really hoping I didn't have to do." *See id.*, 249/3-252/2.

**137.** **Undisputed.**

**138.** **Disputed in part.** Dr. Russell testified that he and Engebrecht "had a meeting" once and he "gave her some recommendations for citations and things to read." *See* Pl. Ex. U, Russell Dep., 107/3-11.

**139.** **Undisputed.**

**140.** **Undisputed.**

**141.** **Undisputed.**

**142.** **Disputed in part.** Engebrecht testified that when she first attended Canisius, I"I thought about going to grad school . . . that was my main goal." *See* Pl. Ex. D, Engebrecht Dep., 28/12-16. However, after her experience being subjected to Dr. Noonan's discriminatory harassment, and Canisius' retaliatory treatment, which prevented completion of the Project Tiger documentary, Engebrecht testified that "I gave up on grad school" and "I just don't know what to pursue anymore, I feel very lost." *See id.,* 28/12-21; 179/17-21.

**143.** **Disputed in part.** Engebrecht clarified at her deposition that while she valued her relationships with certain professors and mentors at Canisius, her experience at the College was marked by disappointment "in Canisius's administration with [her] Title IX case and the sexual assault cases [involving the track team] that happened." *See* Pl. Ex. D, Engebrecht Dep., 201/1-203/22.

**144.** **Undisputed.**

**145.** **Undisputed.**

**146.** **Undisputed.**

**147.** **Undisputed.**

**148.** **Disputed in part.** Whelan testified that after she complained about Dr. Noonan's discriminatory misconduct, she felt it was "hostile in the ABEC Department" because the faculty exhibited an "attitude of why did you guys report him, this is an inconvenience for us and now we have so much more work to do," and for that reason, she focused her senior year on environmental studies. *See* Pl. Ex. J, Whelan Dep., 184/4-185/10.

**149.** **Disputed in part.** *See* Plaintiffs' Response to Fact No. 60, which is incorporated herein. Wood testified that the one-day extension she requested from Dr. Workman was the only extension she asked for because "[a]fter that I didn't feel particularly welcome to ask for others, so that was the only extension I asked for." *See* Pl. Ex. F, Wood Dep., 229/15-22.

**150.** **Disputed in part.** Wood was already working with Dr. Russell as his research assistant on what he referred to as "our immigrant project" referenced in the e-mail at Pl. Ex. II, at Canisius 3034. Dr. Russell suggested that Wood apply for the CEEP program because that project was "slow [] getting off the ground [and]this might help speed up that process a bit." *See* Canisius 3034.

**151**. **Undisputed.**

**152.** **Disputed in part.** Dr. Russell provided Wood with "comments and suggestions" regarding a lesson plan she developed as part of an application for a job because Dr. Russell's expertise is conservation education. *See* Pl. Ex. F, Wood Dep., 236/6-237/23.

**153.** **Undisputed.**

**154.** **Undisputed.**

**II.** **Plaintiffs' Statement of Additional Material Facts Submitted Pursuant to W.D.N.Y. Local Rule 56(a)(2)**

**Dr. Hoffman's 2014 Complaints Regarding Dr. Noonan's Inappropriate Touching**

**155.** Dr. Hoffman testified she went to Walleshauser to discuss her prior complaints raised about Dr. Noonan's inappropriate touching in 2014 after she heard that Plaintiffs and other students complained about Dr. Noonan's discriminatory misconduct, Walleshauser informed Dr. Hoffman that Debra Winslow-Schaber, the former head of Canisius Human Resources, did not document her complaints about "Dr. Noonan hugging me without my consent and how he would treat me during my pregnancy." *See* Pl. Ex. BB, Hoffman Dec., ¶67.

**156.** Dr. Hoffman found Winslow-Schaber's response to her complaints about Dr. Noonan's inappropriate touching "unhelpful" because it "demonstrated to me that she was not going to help me remedy the problem." *See* Pl. Ex. BB, Hoffman Dec., ¶22. Dr. Hoffman further testified that "I did not do anything else about Dr. Noonan's habit of hugging me because I was concerned that he would retaliate against me, or that by taking my complaint further, I would compromise my ability to become a tenured professor." *See id.,* ¶23.

**Student A 2011 Complaints Regarding Dr. Noonan's sexual harassment and 2016 lawsuit**

**157.** Student A testified she initiated against litigation in New York State court in 2016 because Dr. Noonan falsely informed Canisius security that she was an animal rights terrorist from outside the College, which caused Canisius security to violently remove her from a lecture because he objected to her participation even though Noonan had invited her to attend. *See* Pl. Ex. JJ, Student A Dep., 32/2-42/16.

**158.** Terri Mangione, a former Title IX Coordinator at Canisius, informed Walleshauser in an e-mail, dated February 12, 2019, that Student A alleged in her 2016 lawsuit that "Dr. Noonan inappropriately touched another student." *See* Pl. Ex. KK; Pl. Ex. G, Walleshauser Dep., 46/15-47/23. As noted *infra* in Plaintiffs' Response to Fact No. 122, Student A testified that she complained to two deans in 2011 about Dr. Noonan simulated having sex with a student while on a trip to the Pittsburgh Zoo and Dr. Noonan commenting about kissing his students on trips during the first day of a class called Social Organization of Mammals.

**159.** Student A testified that during discovery she provided Canisius with information to support her allegations regarding Dr. Noonan's discriminatory misconduct, as alleged in her lawsuit in 2016, and she is not aware of any discipline imposed on Dr. Noonan by Canisius. *See* Pl. Ex. JJ, Student A Dep., 44/23-46/9.

**Dr. Loughead's Complaints Regarding Dr. Noonan's Physical and Verbal Abuse in 2014-2015**

**160.** For additional detailed information regarding Dr. Noonan's verbal and physical discriminatory harassment of Dr. Loughead, *see* Plaintiffs' Response to Fact Nos. 99-105.
Dr. Loughead testified that in 2014 or 2015, in response to her complaints about Dr. Noonan's harassment of Sister Pat, and the verbal and physical harassment she was subjected to by him in 2009 or 2019, Dean Erickson laughed, claimed to have a huge pile of complaints regarding Dr. Noonan's misconduct, and said nothing would happen because Dr. Noonan was too powerful:

> [Dr. Erickson]laughed, and she said, "We all know what Dr. Noonan is like, and you are not the first person to make a report against him." And I remember that she put her hands on her desk and went something like this, and she said, "There are complaints against this man this high. Nothing is going to happen to him. He's too powerful."

*See* Pl. Ex. B, Loughead Dep., 39/22-40/8.

**161.** Dr. Loughead testified that she was "flabbergasted that the college would be aware of his behavior and not do something about it[.]" *See* Pl. Ex. B, Loughead Dep., 40/19-41/5.

**162.** Dr. Loughead testified that Dr. Noonan's power on campus was related to the fact that at that time the ABEC Department "was the fasted growing major on our campus," and as a result, Dr. Noonan "pretty much got what he wanted from the president and the vice-president, and we all saw it." *See* Pl. Ex. B, Loughead Dep. 32/1-16.

**163.** Dr. Loughead further testified that Dr. Noonan's power on campus was highlighted by the fact that Canisius senior administrators permitted Dr. Noonan to start the ABEC Department, and provided him significant funds even though "[t]hat's not the area of his expertise . . . they allowed him, frankly without qualifications really, to start this new major and this new program and to be the chair of it. And they gave him a lot of startup money to start this new program, and not a lot of us in a small college get money to start a new program." Pl. Ex. B, Loughead Dep., 32/17-33/8.

**164.** Dr. Loughead testified that Dr. Noonan received money for trips from Canisius senior administration that was more than what other professors would get from the college for their projects. *See* Pl. Ex. B, Loughead Dep., 34/1-5.

**165.** Dr. Loughead testified that Dr. Noonan "was a terrible Faculty Senate Chair" who did not do his job, which was to represent "the will of the faculty" to Canisius senior administrators, and instead sold the faculty "short in order to stay on President Hurley's good side and to continue to get funding from [Hurley]" for himself." *See* Pl. Ex. B, Loughead Dep., 24/10-25/7; 46/1-47/10.

**Additional Testimony Regarding Dr. Noonan's Position of Power at Canisius**

**166.** Dr. Loughead's testimony regarding Dr. Noonan's position of power at Canisius is corroborated by testimony from Colleen O'Hara, who worked as the administrative assistant for the Canisius Biology Department from 2002 until 2020, *see* Declaration of Colleen O'Hara, Pl. Ex. LL, and the Declaration of Dr. Matthew Mitchell, a former tenured professor who worked in

the Religion and Theological Studies Department and served on the faculty Senate when Dr. Noonan was Chair. *See* Declaration of Dr. Matthew Mitchell, dated October 10, 2024, Pl. Ex. MM.

**167.** Dr. Mitchell testified that "Dr. Noonan enjoyed access to funding and other privileges that no other faculty member at Canisius enjoyed that I am aware of, despite the fact that dropping enrollment affected every department at the College." *See* Pl. Ex. MM, Mitchell Dec., ¶18.

**168.** Dr. Mitchell testified that while at Canisius, he "noticed that Dr. Noonan often appeared in photographs on the College's social media sites and in Canisius alumni publications, and the pictures were always of Dr. Noonan surrounded and embracing a large group of women students," and that the "photographs of Dr. Noonan with his women students always stood out to me as strange in that they depicted interactions between a professor and his students that was very different from the way I and my Department colleagues interacted with our students," which never involved seeking out hugs or otherwise touching students. *See* Pl. Ex. MM, Mitchell Dec., ¶¶29-31.

**169.** Dr. Mitchell testified that he believes "that President Hurley and others in Canisius' administration knew that Dr. Noonan's conduct with certain women students crossed the line, and . . . looked the other way because of ABEC's enrollment success and Dr. Noonan's assistance to President Hurley during Noonan's tenure as Faculty Senate Chair." *See* Pl. Ex. MM, Mitchell Dec., ¶32.

**170.** Similarly, Colleen O'Hara testified "Dr. Noonan was 'infamous' on campus for engaging in conduct that crossed the line" and "his behavior was condoned by Canisius leaders like President John Hurley" who "regularly praised Dr. Noonan because the ABEC program attracted many students, which made it a very profitable major for the College." Pl. Ex. LL, O'Hara Dec., ¶13.

**171.** O'Hara testified that because she worked and earned her Master's Degree at Canisius, "[s]tudents would complain to me about Dr. Noonan because I was taking classes along side with them and I believe they often viewed me as a peer," and that "[m]any ABEC students told me that they believed their professional future depended on maintaining a good relationship with Dr. Noonan even though he treated them badly, such as by yelling at them, by questioning their intelligence, or by harassing them with sexual comments." Pl. Ex. LL, O'Hara Dec., ¶¶4, 19, 23.

**172.** O'Hara testified that she encouraged students to report Dr. Noonan's sexual harassment to the Chair of the Biology Department but "none of the students felt anyone in a leadership role at Canisius would believe them or do anything to make the situation better." Pl. Ex. LL, O'Hara Dec., ¶ 25.

**Dr. Waldau's Complaint Regarding Dr. Noonan's Sexual Comment to Student in 2016**

**173.** Dr. Paul Waldau, who is an attorney and an educator working at the intersection of animal studies, law, ethics, religion, and cultural studies, worked at Canisius as the senior faculty for the Master of Science in Anthrozoology, starting in 2011. *See* Pl. Ex. NN, Declaration of Dr. Paul Waldau, Dated August 8, 2023, ¶¶ 3-9.

**174.** In a Declaration submitted in this litigation, Dr. Waldau testified that Mary Fiorella, who worked as the ABEC program administrative assistant for many years, informed him "that a student [Student B] was asked by Dr. Noonan to show him her scar from recent heart surgery," and Dr. Waldau, himself, observed that "the student was very uncomfortable and upset" by Dr. Noonan's sexual misconduct. *See* Pl. Ex. NN, Waldau Dec., ¶¶ 22-23.

**175.** Dr. Waldau testified that he subsequently reported Dr. Noonan's sexual misconduct with Student B to Terri Mangione, who was then Canisius' Title IX Coordinator, during a telephone call on February 12, 2016. *See* Pl. Ex. NN, Waldau Dec., ¶¶ 27-30.

**176.** Dr. Waldau testified that Mangione told him, "you're doing the right thing" by making the verbal Title IX report, in which he specifically identified Dr Noonan by name, but the complaint was never reduced to writing because no one ever asked Dr. Waldau to submit a written record of any kind. *See* Pl. Ex. NN, Waldau Dec., ¶¶31, 33.

**177.** Dr. Waldau testified that he "distinctly recall[ed] making the report to Ms. Mangione about Dr. Noonan's mistreatment" of Student B because "I wanted to ring his bell and call attention to the way he interacted with women at Canisius," although he is unaware of any action that Canisius took in response to his report to Mangione because "I did not think it was my place to inquire any further about the matter." *See* Pl. Ex. NN, Waldau Dec., ¶¶35; 37.

**178.** Dr. Waldau's declaration demonstrates that in April 2015, he had a confrontation with Dr. Noonan regarding Dr. Noonan's inappropriate and unwanted hugging of women faculty members in the ABEC Department, including Dr. Christy Hoffman and Dr. Malini Suchak, who expressed to Dr. Noonan that they did not want to be hugged by him or engage in group hugs with him. *See* Waldau Dec., ¶¶ 13, 14, 18.

**179.** In April 2015, Dr. Waldau testified that he told Dr. Noonan that the "conversations in the hall I had with other faculty colleagues had focused on his troubling failure to observe someone's wishes about being forced to join a group hug or to be hugged by him[.]" Pl. Ex. NN, Waldau Dec., ¶¶ 18-21.

**Complaints by Dr. Russell and Dr. Suchak in 2017-18 Regarding Quality Dr. Noonan's Trips, Tendency to Bring Same Students, and Use of Fitness Requirements to Exclude LGBTQ Students**

**180.** For additional information regarding complaints about Dr. Noonan raised by Dr. Russell and Dr. Suchak in 2017-18, *see* Plaintiffs' Responses to Fact Nos. 93-98. Walleshauser's notes from her meeting with Dr. Suchak on February 12, 2019 confirms Dr. Suchak's testimony that she first reported to Dr. Gill in 2017 her concerns regarding the "quality of [the] student experience on [Dr. Noonan's] trips," which included "[f]ilming students"; "[f]avoritism in selecting students," which "many students expressed concern [about]," and that Dr. Suchak also complained to Mangione, the Title IX Coordinator, regarding Dr. Noonan's "fitness test[s]" to exclude certain students from trips, with "[n]o follow up that [Dr. Suchak] was aware" of. *See* Pl. Ex. OO, Canisius 342.

Both Dr. Suchak and Dr. Russell testified that Canisius did nothing to investigate or remedy their complaints about the quality of Dr. Noonan's student trips, his repeated selection of the same students for the trips, and his use of fitness tests to exclude LGBTQ students. *See* Pl. Ex. U, Russell Dep., 47/8-15; Pl. Ex. W, Suchak Dep., 49/7-50/23.

**181.** Testimony from Student C, a Canisius graduate, corroborates the complaints raised by Dr. Suchak and Dr. Russell regarding Dr. Noonan's use of fitness requirements to exclude students from his trips. *See* Declaration of Student C, dated October 11, 2024, attached as Pl. Ex. PP.

**182.** Student C testified that she was an "out" queer student in the ABEC Department when she attended Canisius from 2014 to 2019. *See* Pl. Ex. PP, Student C Dec., ¶¶ 2-5. Student C testified that "Dr. Noonan required students to engage in intense physical fitness tests for some trips [and] for one trip to the Algonquin Provincial Park in Canada, Dr. Noonan told me once directly, "I don't think this trip is for you," to discourage me from applying, mentioning a strenuous physical test, which he said I would have to take and that I would be the only student who needs to take the physical test, even though it was not a prerequisite listed before signup." *See id.*, ¶¶ 2-5.

**183.** J Student C testified that she discussed Dr. Noonan's inappropriate treatment with Dr. Russel, who is gay and "took me under his wing," "because Dr. Russel had been one of Dr. Noonan's students as an undergraduate student and told me he had been subjected to mistreatment by Dr. Noonan as a student, himself." *See* Pl. Ex. PP, Student C Dec., ¶¶ 26-27. Student C also testified that "[n]o ABEC faculty member even encouraged me to go to the Title IX office to complain about Dr. Noonan's treatment of me, [including his inappropriate] class comments, and his refusal to select me for trips and the Buffalo Zoo work-study through CAC. *See id.*, ¶28.

**Dr. Suchak Testified Canisius Title IX Policy Unclear and Prevented Her From Complaining About Dr. Noonan's Sexual Harassment Before 2019**

**184.** Dr. Suchak testified that she studied under Dr. Noonan as an undergraduate student at Canisius, which she attended from 2003 to 2007. *See* Pl. Ex. W, Suchak Dep., 24/7-25/3.

**185.** Dr. Suchak testified kept a diary of the discriminatory harassment she was subjected to by Dr. Noonan in her first year working as a faculty member in the ABEC Department, which is a two-page single spaced document featuring twenty-five (25) different instances of harassment. *See* Pl. Ex. W, Suchak Dep., 16/3-17/12; 24/7-25/3.

**186.** Dr. Suchak testified that she kept the harassment log because she wanted "a running record of interactions that showed that [Dr. Noonan] was behaving in an overbearing and inappropriate way towards me." *See* Pl. Ex. W, Suchak Dep., 17/2-12.

**187.** Dr. Suchak testified that she did not report Dr. Noonan's discriminatory mistreatment of her as a faculty member to Canisius until February 2019 because she read the sexual harassment policy as requiring affirmative sexual misconduct that occurred in secret, and what she experienced from Dr. Noonan was " a power move" because "I pushed back against him and it was a way that he was able to assert power over me." *See* Pl. Ex. W, Suchak Dep., 78/1-16.

**Dr. Margulis Admitted She Failed to Follow Canisius Title IX Policy and Did Not Timely Report Student Complaints Regarding Dr. Noonan's Sexual Harassment until January 2019**

188.    At her deposition, Dr. Margulis acknowledged that she is a mandatory reporter under the Canisius Title IX policy. *See* Pl. QQ (Canisius Sexual Misconduct Policy); Pl. Ex. GG, Margulis Dep., 26/19-27/5; 30/22-31/6.

189.    Before the meeting with Dr. Hogan and Walleshauser on January 28, 2019, Dr. Margulis, who at all relevant times was the Chair of the ABEC Department, e-mailed to Walleshauser a document entitled "DR. SUE MARGULIS – Notes on issues with M[ichael]N[oonan] (1/27/19)", which describes numerous complaints regarding Dr. Noonan's sexual harassment from students, which she never reported to Canisius' Title IX coordinator prior to that time. *See* Pl. Ex. EE; Pl. Ex. GG, Margulis Dep., 31/10-15; 64/1-18.

190.    At her deposition, Dr. Margulis confirmed that the student complaint memorialized under the point starting with "Fall 18" in her memorandum for Walleshauser reflected complaints raised to her by Student D. *See* Pl. Ex. GG, Margulis Dep., 65/17-66/5.

191.    With regard to Student D complaint regarding Dr. Noonan's comments in the Sex and Evolution class that "rape is natural," Dr. Margulis refused to say that such comments were inappropriate and insisted that his comments were "not inaccurate" two times during the course of her depositions. *See* Pl. Ex. GG, Margulis Dep., 44/23-46/14.

192.    Dr. Margulis further opined that Dr. Noonan's teaching style was problematic only for "some people" and "not to everyone." *See* Pl. Ex. GG, Margulis Dep.,46/4-14.

193.    Dr. Margulis also refused to answer under oath whether it was her "position that rape is natural, that [this] statement could be unobjectionable to some people?" *See* Pl. Ex. GG, Margulis Dep., 46/16-47/12.

194.    Dr. Margulis testified that she was prompted to write her memorandum for Walleshauser after Student E, a Project Tiger student who reported Dr. Noonan's discriminatory harassment of the students who went on the India trip, which Margulis memorialized as follows:

> January '19: "Project tiger' trip to India. Note that 6 students were only asked to pay $2000 for this trip and 2 students (film crew) $1000 each. That is, students contributed $14,000 for a trip whose total cost approached $50,000.
>
> These students are to some extent "indebted" now (Noonan "owns" them) so whatever additional work or time he asks for, they are obligated to provide. His behavior in India was concerning (based on conversation with 1 student).
>
> He was agitated and hostile to the students, and to the local staff. He expressed concern about his own health (sometimes indicating he felt faint) and generally did not eat during the trip. "the wildlife was great but Noonan was difficult" is something I've heard from several students. He apparently made >1 student cry.

**195.**    Dr. Margulis admitted that she met with Tuhovak in March 2018 to discuss Tuhovak's complaints regarding Dr. Noonan's verbal abuse and other discriminatory harassment as a member of his research team but did not memorialize that conversation except with a calendar entry noting that Tuhovak came to her with "concerns." *See* Pl. Ex. GG, Margulis Dep., 38/13-40/21; Pl. Ex. EE.

**196.**    Dr. Margulis admitted that she incorrectly reported to Walleshauser in her memorandum that Tuhovak raised her complaints about Dr. Noonan's verbal abuse and other discriminatory harassment in March 2018, and not in January 2019 as it appears in her January 27, 2019 summary. *See* Pl. Ex. GG, Margulis Dep., 69/12-21; *cf.* Pl. Ex. EE.

**197.**    Dr. Margulis admitted that her response to Tuhovak's complaints about Dr. Noonan's harassment and discriminatory abuse was to leave his research time. *See* Pl. Ex. GG, Margulis Dep., 70/10-71/11.

**198.**    Dr. Margulis claimed that Tuhovak's "[r]esearch was not very important given her career path," but then admitted that she never discussed with Tuhovak what Tuhovak's opinion was and whether Tuhovak "didn't want to complete the research." *See* Pl. Ex. GG, Margulis Dep., 70/4-71/19.

**199.**    Dr. Margulis confirmed she met again with Walleshauser on February 12, 2019 to inform her that Plaintiffs and the other students with whom Walleshauser met on February 11, 2019 were "going to the news" to complain about Dr. Noonan's discriminatory misconduct. *See* Pl. RR; *See* Pl. Ex. GG, Margulis Dep., Margulis Dep., 94/5-96/2.

**Canisius' Sexual Misconduct Policy Does Not Require Complainants to Report Complaints to Title IX Coordinator or Provide Written Complaint; Policy Enables Canisius to Investigate Complaints Without Student Authorization**

**200.**    Deborah Owens, who is the current Canisius Title IX Coordinator, testified that Canisius' Title IX Policy in effect from May 8, 2017 to 2020, when it was modified, did not require a student to agree to an investigation of an alleged harasser for the College to take action, and that the decision whether to investigate a complaint about sexual harassment was to be driven by the "Title IX coordinator" who "would review [the complaint] and make an assessment of any risk of harm to the individual who chose not to report and/or to the broader college community and would take steps necessary to address those risks." *See* Pl. Ex. SS, Owens Dep., 36/8-39/17; *see also* Canisius Sexual Misconduct, Domestic Violence, Dating Violence and Stalking Policy, Pl. Ex. QQ, at Canisius 16.

**201.**    Canisius' Sexual Misconduct policy does not require a complainant to report sexual harassment complaints to the Title IX coordinator and does not require a complainant to provide the College with a written complaint:

The college urges persons who believe they have been victims of Sexual or Gender-Based Misconduct to address their situation by reporting to the College or to local law enforcement. Individuals are strongly encouraged to speak with someone on campus or off campus, regardless of their choices to report or not to report the alleged violation to the college or law enforcement, so as to ensure they receive all necessary support. Persons who believe they have been victims of Sexual or Gender-Based Misconduct have the right to make a report to campus security, local law enforcement, and/or state police, or choose not to report; to report the incident to Canisius or not to report; and to receive assistance and resources from the college. Retaliation against an individual who brings a good faith report, participates in an investigation, or pursues a criminal charge is prohibited, and will not be tolerated by the college.

See Canisius Sexual Misconduct, Domestic Violence, Dating Violence and Stalking Policy, Pl. Ex. QQ, at Canisius 16.

**Whelan's Testimony Regarding Dr. Noonan's Sexual Harassment and Canisius' Response**

**202.**  Whelan testified that she did not believe that Dr. Noonan's interest in her being constipated in India related to his concern for her well-being. Rather, Whelan testified that Dr. Noonan was "obsessed with the idea that I was constipated," which was part of a "greater pattern of him grooming us and getting us to trust him . . . so that then he could then get us close enough to sexually exploit us as students." *See* Pl. Ex. J, Whelan Dep., 117/1-121/2.

**203.**  Whelan testified that she informed Walleshauser on February 11, 2019 that when Dr. Noonan became "obsessed with the idea that I was constipated," a "red flag went off immediately" in her mind because Wood had informed her before the Project Tiger India trip that Dr. Noonan had tried to convince another student with constipation to allow him to inert a suppository into her anus on a trip to Uganda in 2018. *See* Pl. Ex. J, Whelan Dep., 210/13-211/7; Pl. Ex. K at Canisius 314.

**204.**  Whelan testified regarding additional sexual harassment she and others were subjected to by Dr. Noonan, which included making comments like "I own your bodies"; making comments about Plaintiffs' breast sizes, including they some were "flat-chested" or "we had too much cleavage"; touching Plaintiffs' bra straps and encouraging them to wear specific undergarments; requiring students to meet at the end of the day during trips in their pajamas; asking Engebrecht if she was pregnant; discussing whether he should be able to date younger women; and, asking students, including Whelan and the other Plaintiffs, about their relationships and sex lives. *See* Pl. Ex. J, Whelan Dep., 138/3-139/8; 165/12-167/9 230/1- 233/22.

**205.**  Whelan testified that after the trip to India, Dr. Noonan insisted that the Project Tiger students travel with him to Canada to interview a wildlife artist who did nothing relating to tiger conservation and it was just another example of Dr. Noonan monopolizing their time, which occurred either shortly before or after the February 11, 2019 meeting with Walleshauser. *See* Pl. Ex. J, Whelan Dep., 126/15-128/2.

**206.**  Whelan testified that during the trip to Canada with Dr. Noonan in February 2019, the Project Tiger students questioned the value of the trip to see "an artist who has nothing to do with

tiger conservation," and Dr. Noonan became angry that they were questioning his authority and claimed the students "were trying to over throw him." *See* Pl. Ex. J, Whelan Dep., 129/2-22

**207.** Whelan testified that after Dr. Noonan's removal, Dr. Margulis openly complained about how much additional work she had to do and how all of the other professors in the ABEC Department were affected as well. *See* Pl. Ex. J, Whelan Dep., 185/16-186/19.

**208.** Whelan described how after she complained about Dr. Noonan's discriminatory misconduct, she felt it was "hostile in the ABEC Department" because the faculty exhibited an "attitude of why did you guys report him, this is an inconvenience for us and now we have so much more work to do," and for that reason, she focused her senior year on environmental studies. *See* Pl. Ex. J, Whelan Dep.,  184/4-185/10.

**209.** Whelan testified that she became the research student of another professor, with a plan to "get published in research for environmental studies," but the professor did not continue the research once "COVID hit," which "disrupted any research processes we had laid out[.]" *See* Pl. Ex. J, Whelan Dep.,  184/4-185/10.

**210.** Whelan testified that as a result of being subjected to Dr. Noonan's discriminatory misconduct, which she described as "very disheartening, disorienting, and the subsequent hostility in the ABEC Department, she "didn't feel comfortable going to any of the ABEC professors" for guidance or a recommendation letter, and she graduated "with no plan to apply to a graduate program because I no longer had any idea what I wanted to do professionally." *See* Pl. Ex. J, Whelan Dep., 182/19-183/22.

**211.** Whelan testified that she believed "Canisius failed us" by requiring the students to make a pod cast for the Project Tiger class, only to make the documentary footage available to them after the semester was over, when they would receive no credit and no funding to make the film, and they had to "move forward" with other school work. *See* Pl. Ex. J, Whelan Dep. 264/17-266/3

**212.** Whelan testified that in her senior year at Canisius, her mother told her she needed to start going to counseling because she developed an eating disorder, and suffered from severe depression and suicidal ideation, which she said was caused by "the loss of this professor [and] also the loss of this passion I had that was really fueling me as a student at Canisius." *See* Pl. Ex. J, Whelan Dep., 272/7-273/10.

**213.** Whelan testified that she chose to attend Canisius because of the ABEC Department, which, after her initial visit to the school as a prospective student, she viewed as a "cutting edge program" not available at other schools. *See* Pl. Ex. J, Whelan Dep., 64/1-69/6.

**214.** Whelan testified that she worshipped Dr. Noonan "like an idol" and wanted nothing more than to be like Dr. Noonan's former student, Dr. Suchak, another ABEC Department professor, and that she did everything to achieve that goal and "not rock the boat" so that Dr. Noonan would help her achieve what he helped Dr. Suchak achieve. *See* Pl. Ex. J, Whelan Dep., 99/19-101/19.

**Wood's Testimony Regarding Dr. Noonan's Sexual Harassment and Canisius' Response**

**215.** Wood provided a written complaint regarding Dr. Noonan's sexual harassment to Walleshauser before their one-on-one meeting, even though Wood testified that she "didn't have a great understanding of what, like what sexual harassment truly entailed at point[.]" *See* Pl. Ex. F, Wood Dep., 165/7-166/6; *see also* Wood written complaint, Pl. Ex. TT, Canisius 1586-87.

**216.** Wood's written complaint regarding Dr. Noonan's discriminatory misconduct included an opening paragraph where she explained that she attended Canisius because of Dr. Noonan, but she decided to come forward and complaint because "I can no longer ignore the degrading and toxic environment he creates for myself, my friends, and other students he interacts with." *See* Pl. Ex. TT Canisius 1586. Wood noted that her statement was not a complete description of Dr. Noonan's harassment and that "I have witnessed and heard of endless inappropriate and harmful actions carried out by him directed towards other students[.]" *See id.*

**217.** At her deposition, Wood described the pervasive nature of Dr. Noonan's discriminatory misconduct, which she believed she failed to capture in her written statement because of lack of direction from Walleshauser and the speed with which she was expected to produce it for Canisius:

> Looking back I would do more to stress how pervasive this behavior was. And I think I wrote it this way because Linda stressed that they needed like kind of specific instances. But it's difficult to pick out specific instances of like a serial predator. And, again, I think this provides a good snapshot, but I think it was something that I pulled together quickly and without much guidance as to what should be included.

Pl. Ex. F, Wood Dep., 170/20-171/9; *see also* Wood Dep., 138/3-12 (" this was constantly the nature of conversations with him . . . overly inappropriate, sexualized in nature, sharing way more than anyone should share with a student").

**218.** Wood's statement for Walleshauser regarding Dr. Noonan's discriminatory misconduct describes specific examples of Dr. Noonan's harassment under the following headings: "[l]ack of boundaries"; "[i]nappropriate touching"; and, "toxic masculinity." Pl. Ex. TT, Canisius 1586-87.

**219.** Under the "inappropriate touching" heading, Wood reported that Dr. Noonan "physically moved/covered my bra straps on numerous occasions"; "touched/played with my hair without asking"; "asked myself and another student to stretch his leg in our hotel room" in Uganda; "physically moves me by grabbing my arms rather than asking me to move." *See* Pl. Ex. TT, Canisius 1587.

**220.** Under the "toxic masculinity" heading, Wood reported in her written statement that Dr. Noonan "[h]as said I own your bodies" and "[y]ou are not allowed to cut your hair or alter your bodies for the duration of this project"; and "[h]as made me try on clothes and show them to him to get his approval." *See* Pl. Ex. TT, Canisius 1587.

**221.** Under the "lack of boundaries" heading, Wood reported that Dr. Noonan openly discussed his sexual relationship with a 30-year old girlfriend, who he brought on a Canisius trip to Canada

and openly engaged in "excess [] flirting/touching"; attempted to "assist" a student in Uganda insert a suppository, noting that Dr. Noonan said: "Some people have trouble with these [suppositories]. I can be a mature adult about this if you need help"; and stating that she brought laxatives to India and gave one to a friend, which resulted in Dr. Noonan "lectured me about needing his permission before interfering with anyone medically" even though "we're all adults." *See* Pl. Ex. TT, Canisius 1586.

222. Wood testified that the 30-year old girlfriend who Dr. Noonan brought on the Canada trip, was a Canisius graduate student, which she found "gross and disgusting," stating further "I don't think it's ever appropriate for a teacher to have a romantic or sexual relationship with a student." *See* Pl. Ex. F, Wood Dep., 99/5-103/5; 195/5-23.

223. In her statement, Wood also noted that Dr. Noonan's lack of boundaries manifested in him speaking "candidly to me about his relationship with the school administration and other ABEC professors." *See* Pl. Ex. TT, Canisius 1586.

224. At her deposition, Wood explained that on the Project Tiger India trip, Dr. Noonan admitted to Wood that he knew of "previous complaint that had been made against him" by "other professors and one student" who accused him of being "sexist" and questioned the "quality of his science." *See* Pl. Ex. F, Wood Dep., 132/16-133/17.

225. Wood testified that Dr. Noonan commented to her on "how silly it was that they would come up against him[,] that he was very close [to] President Hurley, and . . . he's untouchable." Pl. Ex. F, Wood Dep., 132/16-133/17.

226. During the same conversation, Wood testified that Dr. Noonan complained about the #MeToo Movement and how men like him were a victim of it:

> [Dr. Noonan] had talked about how good men, good men were being put on blast because people these days are so sensitive. And that, you know, implied to me that he was likening himself as one of those good men who was just getting complaints because people were too sensitive and not because they were merited.
>
> And [Dr. Noonan] specifically referenced Bill Cosby and how he didn't think what Bill Cosby did was that bad.

Pl. Ex. F, Wood Dep., 134/14-135/5.

227. Wood testified that she and the Project Tiger students continued to e-mail and meet with Dr. Noonan after they met with Walleshauser to complaint about his discriminatory misconduct on February 11, 2019 because no one from Canisius told them that they did not have to continue interacting with him, or provide to them any other instructions. *See* Pl. Ex. F, Wood Dep., 177/12-178/15; 186/8-187/18; 188/4-188/23.

228. Wood testified that Dr. Noonan took the Project Tiger students to Canada to visit an artist in February 2019, and she and other students felt "angry and stressed" because of "fear that he was going to know" about Canisius' investigation into his discriminatory misconduct. *See* Pl. Ex. F, Wood Dep., 175/21-176/22.

**229.**   Wood complained at her deposition about Canisius' disregard for the Project Tiger students who "had spent hundreds, again, collectively thousands of hours working on the film [but] [w]e were told we can't be told anything for legal reasons regarding the film [and Dr. Margulis and Walleshauser] never referred to anything that showed why or if it was true." *See* Pl. Ex. F, Wood Dep., 194/14-195/1.

**230.**   Wood testified that after Dr. Margulis took over the Project Tiger class, it was "ad hoc" and a" really a poor excuse for a class. . . .[I]t was very clear to us that when it came to continuing to complete this film and to complete our course work that it wasn't really have been, and it became an echo of what it was meant to be." *See* Pl. Ex. F, Wood Dep., 195/5-18; 196/9-20.

**231.**   Wood testified that no one from Canisius explained that she and the other students who came forward about Dr. Noonan's discriminatory misconduct could ask for accommodations, and she was afraid to many any inquiries because no one from Canisius approach her or the other students with "enthusiasm or warmth" after she complained about Dr. Noonan, and when the students asked for updates about Canisius' investigation into their complaints, those requests were "constantly shut down." *See* Pl. Ex. F, Wood Dep., 231/18-232/20.

**232.**   Wood testified that after she and the students came forward to complain about Dr. Noonan's discriminatory misconduct, no one told them they could access counseling on campus and ABEC faculty staff were unkind to them, which made her reluctant to ask for anything other than a one-day extension for one paper:

> We were never explicitly told that we could access the campus counseling or anything like that if we needed it.
>
> And above all else it was just this like big dirty thing that felt like an evil elephant in the room that no one would talk about. I knew that our professors were talking about us but never once did anyone say I'm so sorry you're going through this.

Pl. Ex. F, Wood Dep., 233/6-22.

**233.**   Wood testified that she learned more from the internships she had during college, which she obtained on her own merit, than from the classes she attended at Canisius taught by Dr. Noonan, and does not believe her degree has any value to her professionally. Pl. Ex. F, Wood Dep., 267/5-269/7.

**Engebrecht's Testimony Regarding Noonan's Sexual Harassment and Canisius' Response**

**234.**   Engebrecht provided a two-page, single-spaced written complaint to Walleshauser regarding Dr. Noonan's sexual harassment on February 13, 2019, which contains many specific examples of the discriminatory mistreatment she was subjected to over several years. *See* Pl. Ex. UU, Canisius 1631-34; Pl. Ex. D, Engebrecht Dep., 125/5-126/8.

**235.**   Engebrecht prefaced her "[l]ist of concerns" regarding Dr. Noonan's sexual harassment by informing Canisius that she and the other students who came forward with complaints "are his favorite and most trusted students (he likes to collect students and gain personal relationships with

them) . . . the relationship I thought we had. . . . was unique as a student-professor relationship. Now, I have figured out that it was nothing but toxic and manipulative and I am nervous to know what his intentions have been this entire time." *See* Pl. Ex. UU, Canisius 1633.

236. Engebrecht's complaint details how Dr. Noonan suggested he and Engebrecht could date one another when he noted to her, "we would be very compatible/soul mates/kindred spirits[.]" *See* Pl. Ex. UU, Canisius 1633.

237. Engebrecht testified that Dr. Noonan suggested he wanted to date her after she graduated from Canisius, such as by saying to her " we would climb mountains together and I would carry him up the mountain because his legs would be dead by then." *See* Pl. Ex. D, Engebrecht Dep., 118/9-18.

238. Engebrecht also noted that Dr. Noonan "frequently discusses his own dating life with me (also stating who I should and should not be in relationships with)" "including his sex life with a 30 year old, and asks for advice/if it is okay," "and asking about my dating life[.]" *See* Pl. Ex. UU, Canisius 1633.

239. Engebrecht noted that in India, "[w]hile describing in great detail his dating life to me and two other students on a car ride to Kanha [N]ational park, he used terms like 'I'd hit that' or the 30 year old he has been 'frequenting' in reference to women he is seeing." *See* Pl. Ex. UU, Canisius 1633.

240. Engebrecht also described how Dr. Noonan made comments about her body, including "that I am flat chested when discussing where to put microphones for the film[.]" *See* Pl. Ex. UU, Canisius 1633.

241. Engebrecht described how Dr. Noonan would "isolate individual students to talk with them about personal stuff without asking" and noted that on the way to India, he "pull[ed] me aside to ask if a mark on my neck is possibly related to me being pregnant." *See* Pl. Ex. UU.

242. Engebrecht's complaint corroborates the complaints of other students regarding Dr. Noonan's inappropriate comments about "own[ing]" students' bodies during the filming of footage for the Project Tiger and Project Wolf documentaries, and of his tendency to "touch[] us frequently" and to "braid and play with our hair" without permission. *See* Pl. Ex. UU.

243. In Engebrecht's complaint, she expressed how difficult it was to come forward about Dr. Noonan's sexual harassment because of the "power dynamic relationship," "and anyone who has been in some sort of abusive relationship will understand that," while also expressing her intense fear of reprisal from Dr. Noonan when she wrote, "we are putting ourselves at risk for more intense manipulation, verbal abuse, and targeted anger as soon as he finds out about this." *See* Pl. Ex. UU, Canisius 1634.

244. In Engebrecht's complaint, she raised the issue of the students' ownership rights to the Project Tiger film footage and "[w]hat happens to our 3 credit course?" *See* Pl. Ex. UU, Canisius 1634.

**245.** In her complaint, Engebrecht also expressed concern about having to see and interact with Dr. Noonan again and requested a "no-contact clause until the decision is made" by Canisius about how the college would respond to the student complaints regarding Dr. Noonan's misconduct. *See* Pl. Ex. UU, Canisius 1634.

**246.** At her deposition, Engebrecht testified that Canisius made the Project Tiger film footage available to Dr. Noonan before it became available to the students, like her, who worked on the project and that by the time they received it, at the end of the semester in June 2019, "at this point the project felt just like it didn't have any -- like it was just too late. They didn't give it to us soon enough for us to do anything with it." *See* Pl. Ex. D, Engebrecht Dep., 144/17-145/6; 158/3-159/4.

**247.** Engebrecht testified that her Canisius undergraduate degree is of no value because she does not qualify for any science-related employment opportunities beyond the entry-level lab assistant jobs she has had, which require only a high school degree. *See* Pl. Ex. D, Engebrecht Dep., 25/22-28/21.

**Boucher's Testimony Regarding Dr. Noonan's Sexual Harassment and Canisius' Response**

**248.** Boucher provided a written complaint to Walleshauser on February 13, 2019, which contains specific information about the sexual harassment and other discriminatory conduct Dr. Noonan subjected her to, which includes *inter alia*:

- "[c]onsistently speaks to me one on one about how I do not wear a bra on a day to day basis and is vocal about encouraging me in such behavior";
- "mentioned multiple times how he has dated students or has been approached by students and normalizes these instances 'it's not that weird'";
- "[a]sks for dating advice when one-on-one with female students";
- "[n]ormalizes dating people substantially younger than him and tells stories of his dating/ sexual encounters with women throughout his life";
- "he[] met my mother and told me afterwards 'if anything ever happens to your dad, let me know,' telling me he wants to date my mom"; and,
- "[e]xtremely over controlling and unable to accept suggestions. . . no matter how often he calls you smart."

*See* Pl. Ex. VV, Canisius 325-26.

**249.** Boucher also provided more context for some of Dr. Noonan's discriminatory conduct in response to an e-mail from Walleshauser on February 23, 2019 in which she described *inter alia* Dr. Noonan's insistence that women like Boucher and another student involved in the conversation get pregnant and have children right away, even though Boucher and the other student "were both pretty visually uncomfortable, and tried to argue that we're still very young and modern medicine is an amazing thing, we don't need to have kids at 20 for them to be healthy." *See* Pl. Ex. WW, Canisius 395.

**250.** In the follow-up e-mail to Walleshauser, Boucher also gave additional context regarding Dr. Noonan "asking for dating advice," which happened " many times," including on a trip to the Cleveland Zoo for his social org class spring 2018" when "[h]e asked us for advice about what

women liked these days, and . . . told us, unprompted, if [I] remember correctly, about a story from when he was younger about how he seduced a lifeguard at the beach[.]" *See* Pl. Ex. WW, Canisius 395.

251.    Boucher's written complaints regarding Dr. Noonan's sexual harassment demonstrates numerous instances of Dr. Noonan engaging in discussions about sex with Boucher and other students, which he called "girl talk" and involved "[t]alking about dating younger women a lot and then asking us about our, you know, romantic and sexual lives, you know, who are you dating, stuff like that." *See* Canisius 325-26; Pl. Ex. C, Boucher Dep., 77/7-78/15.

252.    Boucher testified that Dr. Noonan's pervasive sex talk with her and other students, which occurred "not just on the bus on the way to Cleveland, but throughout the entire Project Wolf trip it was brought up a lot" and when "I spent a lot of time with him alone at his lab editing and working on the video and he would talk about it then too." *See* Pl. Ex. C, Boucher Dep., 78/10-23.

253.    Boucher testified that after Dr. Margulis took over the Project Tiger class, she said there was "legal trouble" regarding the film footage, and did not discuss the film after the first meeting, insisting that the students make a podcast for their final project. *See* Pl. Ex. C, Boucher Dep., 212/5-214/22.

254.    Boucher testified that her intention in attending Canisius was to obtain a PhD in wildlife biology, and she described being part of the Canisius science scholars program, which provided a small group of students with information sessions and other resources to help them get into PhD programs. *See* Pl. Ex. C, Boucher Dep., 31/22-33/2.

255.    Boucher testified that she ultimately did not apply to a science-related PhD program in part because she did not develop good enough relationships with ABEC faculty after Dr. Noonan's removal and could not get good enough letters of recommendation. *See* Pl. Ex. C, Boucher Dep., 254/4-255/15.

256.    Boucher further testified that "I didn't think that a PhD was in the cards" anymore because "college was supposed to teach me about my career and I didn't get that" and she believes there are deficiencies in her "knowledge that I felt I was lacking." *See* Pl. Ex. C, Boucher Dep., 269/15-270/23.

257.    Boucher testified that after Dr. Noonan's removal, Dr. Margulis treated her "really coldly" and "I really struggled to feel like I could build relationships with people in the ABEC Department." Pl. Ex. C, Boucher Dep., 254/4-23. Boucher testified that she ultimately did not apply to a science-related PhD program in part because of the quality of the letters of recommendation from ABEC faculty she did receive. *See id.* 255/1-15.

258.    Moreover, two years after Dr. Noonan's removal, the first opportunity she had to interact with Dr. Margulis again after Project Tiger, Dr. Margulis refused to grant Boucher an accommodation that would have counted a 3-credit ABEC class toward Boucher's ABEC degree, and instead required her to take 18 credits during her final semester to be able to graduate on time, which cost Boucher additional tuition money and time. Pl. Ex. C, Boucher Dep., 250/4-252/8.

**Tuhovak's Testimony Regarding Dr. Noonan's Sexual Harassment and Canisius' Response**

**259.** Tuhovak testified that she only applied to colleges with animal behavior programs and chose to attend Canisius because she believed Dr. Noonan would help her achieve her dream of becoming a scientist like he did for Dr. Suchak. *See* Pl. Ex. E, Tuhovak Dep., 29/14-31/14; 65/20-69/4.

**260.** During a trip with Dr. Noonan and other students to Hawaii, Dr. Noonan photographed Tuhovak and the other students without their consent, including when they were diving into the ocean and Tuhovak's tankini flew up and exposed her breasts. *See* Pl. Ex. E, Tuhovak Dep.,90/12-107/8

**261.** Tuhovak testified that when she and Student F met with Dr. Hogan on February 5, 2019, they described for Dr. Hogan the "harassment and the ways where he screaming at us" and other instances of "sexual harassment," which made Dr. Hogan's "eyes go[] just really wide" and "that's when she really recommended that we go to the Title IX office[.]" Pl. Ex. E, Tuhovak Dep., 139/5-140/14.

**262.** Tuhovak specifically recalled telling Dr. Hogan about how Dr. Noonan liked to engage in "girl talk" during which he would ask students "sexual questions"; Dr. Noonan making sexual jokes about ejaculation when using pipettes in the lab; Dr. Noonan requiring students to "stretch his leg"; and, Dr. Noonan requiring that he thread microphones through students' shirts while filming. Pl. Ex. E, Tuhovak Dep., 156/5-158/7.

**263.** Tuhovak testified that when she met with Walleshauser, she informed her that Dr. Noonan required his research students like her to "stretch" his leg in the lab and that he would "make this groaning sound" that made her very uncomfortable. Pl. Ex. E, Tuhovak Dep., 144/5-146/11.

**264.** Tuhovak testified that in the Spring of 2019, after she met with Walleshauser regarding her complaints about Dr. Noonan's verbal abuse and other sexual harassment, Tuhovak requested accommodation from her political science professor in the form of an extension for a paper, and even though she explained that the requested was needed because she was involved in a Title IX proceeding, her political science professor, who is an attorney, denied the requested accommodation and took off half a grade on the paper. Pl. Ex. E, Tuhovak Dep., 210/14-212/22.

**265.** Tuhovak testified that the experience of having a requested accommodation denied by her political science professor discouraged her from asking for any other accommodations at Canisius again. Pl. Ex. E, Tuhiovak Dep., 213/17-214/12.

**266.** Tuhovak continued working with Dr. Noonan in his research lab and was subjected to sexual harassment, both after her March 2018 complaint to Dr. Margulis, and her complaints in early February 2019 to Dr. Hogan and Walleshauser. Pl. Ex. E, Tuhovak Dep., 130/11-137/11.

**267.**     Tuhovak testified she feared "the worst" about encountering Dr. Noonan after he was informed of the complaints raised by her and other students about his sexual harassment, because of "how volatile he was with us." Pl. Ex. E, Tuhovak Dep., 200/20-201/21.

**268.**     Tuhovak testified,  she gave up her childhood dream of becoming a scientist because the education she received at Canisius was "very poor" since "Dr. Noonan really focused more on . . . ways to sexually harass students . . . for his own titila[tion]" and not on teaching his students." Pl. Ex. E, Tuhovak Dep., 268/3-16.

**Additional Facts Regarding Canisius Response to Plaintiffs' Complaints in 2019**

**269.**     Dr. Hogan confirmed that Tuhovak complained to her that "HR should have contacted students prior to [the] first meeting [on February 21, 2019] with Mike [Noonan] to let them know they should not be in the lab." *See* Pl. Ex. A, Hogan Dep., 131/6-132/9.

**270.**     On February 12, 2019, Dr. Hogan e-mailed Dr. McCarthy, Dean Schaber and Walleshauser with a list of accommodations requested by Plaintiffs and the other students who came forward with complaints about Dr. Noonan sexual harassment, which included *inter alia* a no-contact order and access to video footage to allow Project Tiger students to "continue to work on the film." *See* Canisius 1643-44.

**271.**     Dr. Hogan also testified that Plaintiffs and other student complainants expressed concern about getting letters of recommendation and specifically requested accommodation on this issue. *See* Pl. Ex. A, Hogan Dep. 54/9-55/14.

**272.**     Dr. Hogan's notes confirm her "plan of action" included "protect[ing] current students" and "letter[s] of recommendation." *See* Canisius 587.

**273.**     Walleshauser admitted at her deposition that she never discussed accommodations with Plaintiffs and the other student complainants, including "specific accommodations that could be made available to them," and instead provided them with "general information and said if they needed support, to advise us." *See* Pl. Ex. G, Walleshauser Dep., 119/7-120/17.

**274.**     Walleshauser further testified that issues related to Project Tiger, recommendation letters and the academic "back up plan" for Plaintiffs and the other student complaints were designated for Dr. Margulis, Dean Schaber and Dr. McCarthy to resolve. *See* Pl. Ex. G, Walleshauser Dep., 107/18-111/5. For that reason, Walleshauser was "not sure" at her deposition even if the Project Tiger film was ever completed by Plaintiffs. *See id.,* 110/5-111/5.

**275.**     Canisius administrators were concerned that Dr. Noonan "clearly would be devastat[ed] to be removed from the college" so they made "sure he has access to counseling if need be," even after his removal from campus while on paid leave. *See* Pl. Ex. A, Hogan Dep., 86/15-87/2.