**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**SIERRA BOUCHER, LILY ENGEBRECHT,**
**NATASSIA TUHOVAK, HANNAH WHELAN,**
**and, CASSIDY WOOD,**

                              **PLAINTIFFS,**              **CASE NO. 1:22-cv-00381-CCR**


             **-against-**
                                                          **FIRST AMENDED COMPLAINT**

**TRUSTEES OF CANISIUS COLLEGE,**
                                                          **JURY TRIAL DEMANDED**
                              **DEFENDANTS.**
-------------------------------------------------------------------X

Plaintiffs Sierra Boucher, Lily Engebrecht, Natassia Tuhovak, Hannah Whelan and Cassidy Wood ("Plaintiffs"), by and through undersigned counsel, hereby complain about Defendant Trustees of Canisius College ("Canisius" or the "College") as follows:

## INTRODUCTION

1.      This is a professor-on-student sexual harassment case involving a serial sexual predator who was a tenured professor, and Canisius College's demonstrated deliberate indifference to numerous complaints, raised by or on behalf of many women students and others, regarding the discriminatory mistreatment they were subjected to by the professor, which the College did nothing to remedy, thereby condoning the sexual harassment and other gender-based mistreatment for many years.

2.      Michael Noonan worked at Canisius for forty (40) years and used his position as the Chair of the Animal Behavior, Ecology and Conservation (ABEC) Program within the Biology Department, and as the Director of the Canisius Ambassadors for Conservation (CAC), to condition mentorship and departmental support on a student's submission to his constant sexually suggestive behavior that regularly crossed the line of acceptable conduct, such as his demands,

during school trips abroad, to insert suppositories and enemas into students suffering from constipation, and to be present during emergency examinations of his students by doctors, when his presence was not requested or required.

3.    Noonan's sexual misconduct also included his constant engagement in sexually suggestive discourse, which included regular insistence on engaging in "girl talk" about his own dating history; his requests for hugs and his constant inappropriate touching of student's hair and clothing, including their bra straps and underwear; his unwanted inquiries about the sex lives of his students; and his numerous suggestions, made to each Plaintiff, that young women should be open to dating older men like Noonan.

4.    During Noonan's tenure at Canisius, the ABEC Program attracted the most student-applicants to the College annually.

5.    Under Noonan's leadership, the ABEC Program and the CAC Program attracted millions of dollars in private donor dollars and government-sponsored grants for the College.

6.    Canisius has known since at least 2014 about Noonan's discriminatory misconduct targeted at women students when a professor reported Noonan to the College's Title IX office.

7.    Since 2014, Canisius' supervisory faculty, administrators, officers, and employees (such agents, unless referred to by name or position, will hereinafter be referred to as "Canisius" or "the College") have received numerous complaints regarding sexual harassment and gender-based discrimination perpetuated by Noonan, and failed to adjudicate those complaints pursuant to the College's Sexual Harassment and Gender-Misconduct Policy.

8.    Canisius' administration included Noonan's wife, Debra Instone Noonan, who worked at the College as an Associate Dean and the Director of Assessment for the College of Arts and Sciences from 2005 until in or about 2015.

9.      Noonan and his wife divorced in or about 2015 and thereafter she left the College.

10.     In January and February 2019, eleven undergraduate students, including Plaintiffs, raised complaints about Noonan's harassing conduct.

11.     Elizabeth Hogan, who at that time served as the Co-Chair of the Biology Department at Canisius, learned from another Canisius professor that Noonan had subjected one of the women on his research team to sexual misconduct and that the student wanted to file a Title IX complaint against Noonan.

12.     Hogan's interview of that student led her to Tuhovak, who had previously raised complaints about Noonan's sexist, abusive behavior to Susan Margulis, the ABEC Program Chair, in 2018, which went unremedied.

13.     In an effort to end the intolerable conditions in which she and others were forced to work and study because of Noonan's illegal misconduct, Tuhovak also requested that Hogan provide her with guidance on how she should raise a Title IX complaint.

14.     Hogan referred these complaints to Canisius' Title IX officer in January 2019, who at the time was Linda Walleshauser. Walleshauser remains employed by the College as the Vice President of Human Resources to date.

15.     Tuhovak knew that other women had been subjected to the same sexual misconduct she suffered and urged them to come forward to complain about Noonan.

16.     In or about late January 2019 or early February 2019, Boucher, Engebrecht, Whelan and Wood joined several other women and went to the Title IX office to present a document they had compiled providing specific detail about Noonan's sexual harassment and gender-based misconduct, which included his unwanted insertion of himself into his student's medical situations, and his demands to insert suppositories and enemas into students; his unwanted sexualized

discussions about his private life and the private lives of his students; his unwanted touching; his controlling behavior; as well as his sexist comments about the proper role of women and men allegedly ruined by the #MeToo Movement, among other things.

17.     In response to the women who came to her office that day, Walleshauser alleged she would conduct an investigation, and assured Plaintiffs and the other women present that their voices would be heard during the process, and that they would be protected from retaliation and given support by Canisius.

18.     None of the things Walleshauser promised actually happened.

19.     At Canisius' insistence, Plaintiffs and the other women within the ABEC Program continued working for and studying under Noonan for four (4) weeks after they came forward with their Title IX complaints about him, all the time unaware as to whether Noonan had been notified of their claims, and fearing he would lash out at them once he did find out.

20.     Without warning, at the end of February 2019, the College removed Noonan from campus and relieved him of all teaching duties, prohibiting him from contacting anyone at Canisius until the completion of the alleged Title IX investigation.

21.     On April 26, 2019, Plaintiffs and the other women who came forward to complain about Noonan's misconduct met again with Walleshauser, Canisius' Title IX coordinator, to complain about the lack of information regarding the College's alleged investigation of Noonan.

22.     During that meeting, Walleshauser, promised Plaintiffs and the other women students present that they would be permitted to be part of the process once her investigation was complete. Walleshauser noted that Plaintiffs and the other complainants would be permitted to review and comment on her investigative report to the College, although she refused to provide

any specific overview of the College's Title IX process, which Plaintiffs and the other women complainants repeatedly asked for.

23.     Despite Walleshauser's promises, Canisius never issued an investigative report to Plaintiffs or shared with them any other information about their alleged Title IX investigative process regarding Noonan.

24.     On or about June 11, 2019, some of the Plaintiffs received an e-mail from Canisius informing them that Noonan retired on June 1, 2019, with no additional information regarding the cause for his retirement or the outcome of the alleged investigation into their claims of misconduct:

From: **Walleshauser, Linda M** <walleshl@canisius.edu>
Date: Tue, Jun 11, 2019 at 8:15 AM
Subject: Update
To: Wood, Cassidy M <wood26@canisius.edu>

**Good morning-I write to bring you up to date on the matters involving Dr. Noonan.  Effective June 1, 2019, Dr. Noonan has retired from the College, and he will not be returning to campus as a result of that retirement.  He also has resigned from any administrative positions held here at Canisius.**

**With respect to Project Tiger, you will be afforded access to the film or video work that was created, for use in creating your own finished work.  Should you wish to access this material, please let me know and I can see that appropriate arrangements are made.  Dr. Noonan also is editing the raw footage over the summer to create his own finished work, and you have the option of requesting that your names and images *not* be included in any of his finished work; if you elect this option, we will communicate with Dr. Noonan and inform him of your choice.  Please note that if you elect to have your names and images removed from Dr. Noonan's finished work, he will also need to remove reference to you in any credits listed in that finished work.**

**In closing, I want to thank you for alerting me to your concerns, and your willingness to meet with me to share the information you did.  As always, the College and I are here to provide any needed support.  Thank you again.**

25.     As a result of Canisius' failure to hold Noonan publicly accountable for his illegal conduct, Noonan now holds himself out as a retired professor.

26.     Noonan has moved to the West Coast where, upon information and belief, his is volunteering his time at a local high school where he has direct access to the students there.

27.     Each of the five Plaintiffs specifically attended Canisius College to obtain a degree from the ABEC Program because it is one of the country's first interdisciplinary courses of study combining the behavioral biology of animals, with issues relating to animal welfare, and wildlife conservation, with a focus on experiential learning in the field.

28.     Plaintiffs were instead sexually harassed and targeted for gender-based discriminatory abuse by the ABEC Program's founder and former Chair, and expected to tolerate increasing levels of sexual predation.

29.     After they complained about Noonan, the College retaliated against them by *inter alia* undermining their efforts to obtain footage of their travels for Project Tiger; failing to provide an instructor to support the completion of the Project Tiger film in a timely manner after Noonan was removed from campus; failing to provide third and fourth year students with mentors and advisors to replace Noonan, thereby depriving them of recommendation letters and information regarding graduation requirements; and, failing to provide Noonan's research students with viable ways to continue their research projects after Noonan was removed from campus.

30.     Plaintiffs now turn to this Court for appropriate relief to remedy Canisius' past wrongs and to force the College to enact meaningful reforms that will permit women students to engage in rigorous scientific study without fear of being sexually harassed, abused because of their gender or suffer retaliation that interferes with their education and post-collegiate life.

## THE PARTIES

31. Plaintiff Sierra Boucher is a natural person who at all relevant times resided in the State of New York.

32. Plaintiff Lily Engebrecht is a natural person who at all relevant times resided in the State of New York.

33. Plaintiff Natassia Tuhovak is a natural person who at all relevant times resided in the State of New York.

34. Plaintiff Hannah Whelan is a natural person who at all relevant times resided in the State of New York.

35. Plaintiff Cassidy Woods is a natural person who at all relevant times resided in the State of New York.

36. Defendant Canisius College is a not-for-profit corporation organized and existing under the laws of New York that maintains its principal place of business at 2001 Main Street, Buffalo, New York 14206, which is located in this District.

## JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims under Title IX present a federal question over which this Court has jurisdiction. Plaintiffs also assert common law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

38. This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Canisius College is domiciled in and conducts business within this District.

39. This Court is the proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Canisius is headquartered in this District and many of the unlawful practices

complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS**

40.     Canisius is a private college that offers undergraduate and graduate degree programs with a student enrollment of approximately 4000 students.

41.     Tuition, without room and board, cost approximately $31,000 for one year at Canisius in 2019, when Plaintiffs made formal Title IX complaints regarding Noonan.

42.     Noonan created a cult of personality at Canisius as a specialist in animal behavior and conservation, attracting significant grant and donor money to the school, despite having a mediocre record of research and published work.

43.     During the relevant time period, Noonan taught only three classes in the ABEC Program, all of which focused on the sexual behavior of mammals: Social Organization of Mammals; Sex Evolution; and Reproductive Biology.

44.     Over the last decade, Canisius has invested more than $47 million in the purchase and development of its Science Hall, the largest capital undertaking in the College's history. The Science Hall project includes 60,000 square feet of classroom, laboratory and office space on the second floor to house the Biology Department and the ABEC Program.

45.     Noonan founded the ABEC Program and acted as its Chair for many years.

46.     Noonan also served as the Director of the Canisius Ambassadors for Conservation (CAC), which "takes a select number of college students to distant locations to study wildlife and conservation issues, first-hand," according to Canisius' website. https://www.canisius.edu/news/conservation-expedition (last visited on May 19, 2022).

47.     Noonan used research and video footage from the CAC trips to develop short films with the assistance of his students. For example, with Canisius students, he wrote, produced and directed an award-winning film entitled, *Elephas Maximus: The biology and conservation of the Asian Elephant*, which won several awards including the Animal Behavior Society Film of the Year (non-commercial) and the Telley Award.

48.     Although Canisius has effectively scrubbed its website of information regarding its former tenured professor, Noonan, himself, maintains a website that demonstrates that the vast majority of his research students at the College, particularly in recent years, were young women. *See https://michaelnoonan.org/research-teams/* (last visited May 1, 2022). Of the one hundred and forty (140) research assistants appearing on Noonan's website, nineteen (19) are men.

49.     Noonan used CAC trips to spend unmonitored time away from the College with targeted students, like Plaintiffs, who were at all relevant times undergraduate students majoring in animal behavioral studies with the goal of obtaining a degree from the ABEC Program.

50.     Plaintiffs were part of a larger group of women who were ABEC majors and part of Noonan's select group of favorites, who were regularly invited to attend CAC trips within the United States and abroad.

51.     During the last CAC trip to India in January 2019, when Noonan and his team of students were to collect information and video footage for Project Tiger, a film intended to be about India's efforts to protect tigers and their natural habitat in the country, Noonan engaged in severely harassing conduct directed at individual students, and the group as a whole.

52.     Noonan's misconduct during the Project Tiger trip included his insistence on personally handling the medical needs of several students who complained about constipation. Rather than take them to a doctor immediately, Noonan went to a pharmacy and then hounded the

afflicted students, taking them away from the group for private conversations, during which he inferred their lives could be in danger and continually insisted that he, personally, administer the enemas and suppositories he obtained for them, using graphic detail to describe how he would insert the medication into their anuses.

53. Only when the afflicted students repeatedly rebuffed Noonan's efforts did he take them to obtain medical care from trained physicians, but insisted on being present in the examining room with them, despite the students' requests to only have a translator present.

54. During the Project Tiger trip, Noonan also continued to use the excuse of obtaining video footage to inappropriately touch the students who appeared on screen, such as by insisting that he thread the microphone wires through their clothing and attach the microphone packs to their bras and underwear, even though the students were able to do such tasks themselves.

55. In addition to this inappropriate conduct, Noonan also repeatedly lashed out at the students and their Indian guides throughout the Project Tiger trip. Noonan was dismissive of the ideas and the needs of the Canisius students during the trip. He was rude to the Indian tiger experts and other locals who agreed to be part of their film, particularly when their discussion turned to subjects that Noonan felt uncomfortable discussing, such as women's rights in India, a conversation that he interrupted and ended, which had engaged the students and their local guides.

56. Early in the Spring semester in 2019, Tuhovak learned that another student, Student 6, who also worked on Noonan's research team, had come forward to complain about his abusive conduct, and Tuhovak supported Walker by agreeing to report her own complaints about Noonan, which she conveyed to Hogan, then-Chair of Canisius' Biology Department.

57. After the Project Tiger trip, Boucher, Engebrecht, Whelan and Wood attended meetings with the other students who had previously attended CAC trips and/or studied under

Noonan, including Tuhovak. During those meetings, Plaintiffs and their ABEC Program colleagues began to realize that Noonan subjected all of them to the same kinds of sexual harassment and manipulative, abusive conduct.

58.     In addition to Student 6, during January and February 2019, Student 6, Tuhovak, Boucher, Engebrecht, Whelan and Wood, and five other students, reported Noonan's harassing misconduct to Canisius' administration, including its Title IX Coordinator.

59.     Each student who raised a complaint against Noonan in January and February 2019 provided a written complaint regarding his verbal abuse, inappropriate touching and other misconduct to the College's Title IX coordinator, Linda Walleshauser, or met with Walleshauser in person to report their complaint.

60.     Although Canisius' Sexual Harassment and Gender-Based Misconduct Policy defines a "formal complaint" as one made in writing, and signed by the complainant, Walleshauser never informed Plaintiffs, or the other women who complained about Noonan's gender-based misconduct, that they needed to sign their complaints.

61.     Although Plaintiffs, and the other students who came forward with them to complain about Noonan's sexual harassment to the College, repeatedly asked Walleshauser to explain Canisius' Title IX investigative and adjudicative process to them, she never provided any specific information and never directed them to review the Sexual Harassment and Gender-Based Misconduct Policy, itself.

62.     Each Plaintiff recalls conveying to Walleshauser that they would only share detailed information about Noonan's misconduct if the College guaranteed that they would never see Noonan again because they feared he would actively retaliate against them and do them harm.

63.     Although Walleshauser assured Plaintiffs, and the other students who came forward to complain about Noonan's misconduct, that the College took their concerns seriously, and that Canisius cared about what they had to say about Noonan, Canisius administrators' actions did not follow from Walleshauser's promises.

64.     For example, the College did not remove Noonan from campus for more than four weeks following the submission of eleven written and verbal complaints about Noonan's misconduct to Canisius.

65.     On April 26, 2019, Plaintiffs and the other students who raised complaints about Noonan met with Walleshauser to express their frustration because they had not received any updates on Canisius' alleged investigation into their complaints.

66.     Walleshauser continuously stated that she could not share any information about the investigation with the students because it was "confidential," although she assured them that they would have an opportunity to review her investigative report, and take part in the "process," but avoided describing what that meant.

67.     On or about June 11, 2019, Plaintiffs and the other students who complained about Noonan's sexual harassment and other gender-based misconduct received an e-mail from Walleshauser in which they were informed that Noonan "retired" effective June 1, 2019.

68.     After Noonan was removed from campus, Canisius made no immediate effort to obtain the footage in Noonan's possession for Project Tiger.

69.     Although Walleshauser said the Project Tiger footage was an issue in her investigation, she never elaborated on this, or explained why the College, which had funded the CAC trip to India, could not exert control over the footage shot by its students on that trip and provide it to Plaintiffs to enable them to complete the project.

70.     Canisius' failure to obtain the Project Tiger footage from Noonan left students like Boucher, Engebrecht, Whelan and Wood, who had worked hard on that project, and traveled all the way to India for the footage, with no ability to complete it as originally conceived.

71.     Margulis, the ABEC Program Chair, took over supervision of Project Tiger, but provided very little actual support to the students involved.

72.     Margulis failed to do anything to timely obtain the video footage from the trip from Noonan, claiming it was "too difficult" to figure out who owned the rights to it, but nevertheless insisted that the Project Tiger participants produce some tangible work product to demonstrate what they learned if they wanted to get credit for the class.

73.     Ultimately, Boucher, Engebrecht, Whelan, Wood and several other women involved in Project Tiger produced a series of podcasts regarding their experience in India, which was not the finished product they had expected to complete when they signed up for the program.

74.     In addition to providing no support to the students involved in Project Tiger, Canisius offered no support services to any of Noonan's students, including those on his research team and students involved in his other CAC projects, to ensure that they were able to continue the projects they started under the supervision of another professor.

75.     No on at Canisius conferred with Plaintiffs or any other complainants about whether Noonan's departure from the College affected their ability to obtain recommendation letters for graduate school or other post-collegiate professional pursuits.

76.     Similarly, no one at Canisius ever reached other to Plaintiffs, or any of the other women students who came forward to complain about Noonan, to inquire about their well-being and whether they required any mental health or other medical services, or anything else.

77.     Each woman who came forward about Noonan, including Plaintiffs, was left to cope with the resulting harm to her mental health and future educational and professional endeavors without any assistance from the College, discussed in more detail below.

78.     Shortly before this filing, Plaintiffs created a short montage of the footage they obtained from Canisius during the summer of 2019, after they could no longer harness the support of the College to make it into the educational film they had believed they would be developing and producing as members of the Project Tiger CAC program: *See* "The Migrant Tiger": https://www.youtube.com/watch?v=0R8wTodzDxQ (last visited May 1, 2022).

**SIERRA BOUCHER**

79.     From the time she matriculated as a student at Canisius, Boucher focused on getting into the ABEC Program, driven by a life-long interest in animal behavior and conservation issues.

80.     In the Fall of 2017, during her first year at the College, Boucher applied to and was accepted by Noonan for a CAC program called Project Wolf, which would entail several trips, including one to Colorado, and the development of a film about wolves and efforts to preserve their habitat in the American West.

81.     For Project Wolf, Noonan assigned to Boucher the role of videographer because she had more behind-the-camera experience than most other students.

82.     Throughout the time she studied under him, Noonan alternatively praised Boucher and undermined her, constantly swinging from one position to the other.

83.     For example, Noonan routinely referred to Boucher as "my daughter," using laudatory language to make her feel special and above the rest.

84.     However, Noonan also exhibited extremely controlling conduct, becoming verbally abusive whenever Boucher made suggestions of her own, or did anything that deviated in any way from Noonan's directives.

85.     Boucher tried to adapt to this hot and cold treatment because she believed that the opportunity to be mentored by "the amazing Dr. Noonan," as some referred to him on campus, would be an excellent start to her professional life.

86.     In or about the Spring of 2018, Boucher accompanied Noonan and several other students on a trip to the Cincinnati Zoo to obtain some footage of wolves for the Project Wolf film.

87.     On the bus to Cincinnati, Noonan regaled the students with tales of being romantically pursued by his own students.

88.     Boucher tried to remain uninvolved in the conversation until Noonan turned to her, seemingly out of the blue, and told her that "if anything ever happened to your Dad," he would be interested in romantically pursuing her mother. Noonan had previously met Boucher's mother at a Canisius event earlier that semester.

89.     Shocked by Noonan's comment about her own mother, Boucher became extremely uncomfortable and tried to avoid Noonan for the remainder of that trip.

90.     A few months later, Noonan asked Boucher to film Student 1's class presentation.

91.     Student 1 waited with Boucher and Noonan in an empty classroom before her presentation.

92.     Noonan used the time to quiz Student 1 about her relationship with her boyfriend, specifically asking if they had plans for marriage or kids in the future.

93.     Student 1, who was a junior at the time, suggested she was focused on obtaining her degree and working as a scientist in the future.

94.     Noonan ignored Student 1's remarks and proceeded to lecture her about the importance of having children at a young age.

95.     Although Boucher tried not to get involved in the conversation between Noonan and Student 1, she was very uncomfortable with Noonan's behavior, and his insistence that Student 1 focus on having children rather than her studies and her professional life.

96.     Despite Noonan's inappropriate behavior, Boucher wanted to be part of more CAC projects because she was interested in gaining more film credits for her resume.

97.     To increase her chances of being chosen for future CAC projects by Noonan, Boucher joined the film team and began to take classes on videography.

98.     During this time period, Noonan began to make inappropriate comments to Boucher about her appearance.

99.     For example, whenever Noonan and Boucher were out of earshot from others, he would comment on the fact that she did not wear a bra and encouraged her to continue this practice.

100.    However, Noonan also took it upon himself to instruct Boucher when he believed she should wear a bra, such as when they traveled for CAC projects.

101.    Noonan's constant monitoring of Boucher, and whether she was wearing a bra, made her feel very uncomfortable, although she tried to dismiss it as Noonan acting like a father-figure to her, and not something inappropriately sexual.

102.    However, Noonan also tried to engage with Boucher many times in conversations about dating, during which he told her about the many students who he had dated, or who had wanted to pursue romantic relationships with him in the past.

103.     Boucher felt uncomfortable discussing Noonan's personal life, and when she exhibited her discomfort, he implored her to understand that his practice of dating students "is not that weird!"

104.     Noonan also crossed boundaries when he persistently inquired about Boucher's private life. For example, when he merely observed Boucher talking to a male student involved in Project Wolf, Noonan inquired about the nature of their relationship, inferring that they were dating, which occurred the next time they were alone, in a Canisius-provided car during a CAC project trip.

105.     As a scholarship student, Boucher regularly attended a Canisius support group, which consisted of students interested in science and math.

106.     The professor who led the scholarship group, Andrew Stewart, would routinely remark on how "mean" he found Noonan and how he had observed Noonan be an "asshole" to other faculty.

107.     Many students present agreed with Stewart, claiming that Noonan treated them poorly, and only focused his attention on a few, select students.

108.     The comments by Stewart and the other scholarship students suggested to Boucher that Canisius knew about Noonan's inappropriate conduct, and because he was permitted to continue teaching at the College, Boucher believed that Canisius condoned Noonan's misbehavior.

109.     As a result, Boucher continued to repress how much Noonan's sexual misconduct bothered her.

110.     In or about the Fall of 2018, Noonan announced a new CAC project called Project Tiger, which would involve travel to India to document efforts to protect tigers and their habitat.

111.     Noonan chose only women students for Project Tiger, including Boucher.

112.     During the Project Tiger trip, Boucher observed Noonan engage in very aggressive behavior toward another student, Student 2. Whenever Student 2 raised her hand to contribute to the group discussion, he would ignore her or shoot down her ideas, suggesting her contributions were unintelligent and unwanted.

113.     Noonan's mistreatment of Student 2 was so severe that Boucher approached him about it, only to be told by Noonan that Student 2's contributions were inadequate and his mistreatment of her was warranted.

114.     Boucher observed Noonan engage in misconduct involving other students on the Project Tiger trip.

115.     For example, Boucher became aware that a few students complained about constipation. Rather than obtain immediate medical treatment for the women, Noonan took it upon himself to go to the pharmacy and get suppositories and other medication.

116.     Student 3, one of the Canisius women who felt sick, told Boucher and the other students on the trip that Noonan did not consult with her about what kind of product to get at the pharmacy. Student 3 said that Noonan later approached her with an enema, explained in detail how to use it, and then suggested he would help by inserting it for her.

117.     Later that day, Boucher was with Student 3 when Noonan approached them. Noonan told Boucher he wanted to discuss a private issue with Student 3 and that she should go to her room.

118.     Boucher refused to leave Student 3 alone with Noonan and insisted on staying for their conversation. Noonan became angry and told Boucher that it was a "gross subject," but Boucher would not leave Student 3 alone.

119.     Palpably angry, Noonan spoke briefly to Student 3 in vague terms about her stomach ailment and then quickly left.

120.     Boucher also confronted Noonan during an interview with an Indian man who had survived a tiger attack. During the interview, Noonan touched the interviewee's scars from the attack without first asking for permission. The man being touched by Noonan looked visibly uncomfortable. For this reason, Boucher refused to film a shot of Noonan touching the man's scars, which made Noonan livid. Noonan grabbed the camera from Boucher and took the shot himself.

121.     After the incident, Boucher tried to explain to Noonan that she did not understand why they needed footage of the man's scars and why taking the footage had made her so uncomfortable. Noonan refused to interact with her, telling Boucher it was not up to her to decide what would go into the film because he had overarching authority on the matter.

122.     After the Project Tiger trip, Boucher recalls a meeting with Walleshauser, the Title IX coordinator, during which she and other students conveyed that they would only share detailed information about Noonan's misconduct if the College guaranteed that they would never see Noonan again.

123.     Boucher feared that Noonan would actively retaliate against her and the other students if he found out they complained about his sexual misconduct.

124.     However, the College did not remove Noonan from campus right away, and for more than four weeks after Boucher submitted her formal complaint against Noonan to Canisius, she was forced to attend classes and meetings with him.

125.     The stress of not knowing when Noonan would be aware of her complaint about his sexual harassment to the College made Boucher very upset and scared.

126.     Boucher drank during the weekends to cope with her increasing anxiety and fear that Canisius would do nothing in response to the complaints she and others raised about Noonan.

127.     After Noonan was removed from campus, Canisius failed to timely obtain the footage in Noonan's possession for the Project Tiger film.

128.     As a result, Boucher was deprived of the promised opportunity to edit the Project Tiger film, which was going to be work paid by the College for the two semesters during the following year.

129.     The College never offered any other kind of support to Boucher after she complained about Noonan's misconduct.

130.     Although she knew she needed medical help to cope with the ongoing anxiety and depression she experienced before and after Noonan's removal from campus, and the reality that Project Tiger would never be completed, Boucher did not feel comfortable receiving care on campus in light of the College's response to her complaint about Noonan's sexual harassment.

131.     Boucher has been in the care of a therapist who is unaffiliated with Canisius, since April 2020.

132.     In addition, Boucher, was in danger of not being able to graduate on time because of Canisius' failure to replace Noonan as Boucher's academic advisor.

133.     With no one from the ABEC Program advising her, Boucher mistakenly did not take sufficient credits for her major to graduate with her class.

134.     Once Boucher became aware of this situation, she appealed to the ABEC Chair, Margulis, for an accommodation under the circumstances, asking for certain classes she had already completed to be counted as credits toward her ABEC major.

135. Margulis refused to accommodate Boucher, even though the College's own Sexual and Gender-Based Misconduct Policy explicitly recognizes academic accommodation for victims of sexual harassment and gender-based abuse like Boucher.

136. As a result, Boucher took eighteen (18) credits during her last semester at Canisius, when a full-class load is considered to be twelve credits (12), which took a toll on Boucher's overall mental and physical health.

137. Boucher continues to be affected by her experience with Canisius' failure to follow its own Sexual Harassment and Gender-based Misconduct Policy, and efforts by the College to retaliate against her and the other Plaintiffs for coming forward with their complaints about Noonan's sexual harassment and gender-based abuse.

138. For example, a while after she graduated, Boucher visited Tiff Nature Preserve with Student 4, a fellow alumnus of the College.

139. When Student 4 casually mentioned that they had previously seen Noonan's car parked at the nature preserve, Boucher experienced a panic attack and would only exit the car after an exhaustive search of the parking lot revealed that Noonan's car was not there.

140. Boucher's continues to suffer from depression and anxiety.

141. Boucher uses her regular therapeutic sessions to date to continue the process of articulating and unpacking her experience being abused by Noonan, and by Canisius, for failing to follow its own policy and adjudicate her complaint against him, and its retaliatory treatment of her after she came forward, which she initially suppressed and tried to burry.

**LILY ENGEBRECHT**

142. Engebrecht decided to attend Canisius because she believed she would be able to pursue her interest in ecology and conservation, and issues relating to social justice, which she views as being inextricably intertwined in today's world.

143. Early in her tenure as a student at the College, Engebrecht knew she would be an ABEC Program major, drawn by the CAC programs and Noonan's special projects, which involved taking students on experiential trips everywhere from Alaska to Antarctica.

144. During the 2017-2018 school year, Engebrecht took two classes with Noonan.

145. The one that stands out in her mind most is the class entitled "Sexual Evolution," during which Noonan solicited personal information about each student's sexual history in a survey, even though the class was supposed to focus on non-human animal behavior.

146. During a particularly disturbing Sexual Evolution class, Noonan declared during his lecture on "rape" in animals that "We humans rape!," and his further comments suggested that he believed "rape is natural" and "just a fact of life," which greatly upset Engebrecht.

147. Engebrecht was repulsed by Noonan's inappropriate behavior, but quickly compartmentalized it when he began to focus special attention on her, and Engebrecht became part of Noonan's group of favorite undergraduate students.

148. Engebrecht knew from talk on campus that Noonan's favorite students were the ones to participate in CAC programs and the ones who received graduate school recommendation letters from Noonan, which every ABEC Program major wanted but only a few, select received.

149. Engebrecht applied for Project Wolf and Project Tiger and got accepted to both CAC programs, which meant she traveled numerous times with Noonan, and met with him and other students involved in those projects on a weekly basis for several semesters.

150.     During that time, Engebrecht knew she was one of Noonan's favorites when he started to call her his "best friend," and told her many times "we would be very compatible," "we are soul mates," and "we are kindred spirits."

151.     While traveling for CAC projects, Noonan frequently discussed his own dating life with Engebrecht. He regularly confided in Engebrecht about his sex life as a young adult and his more current relationships, including one with a Canisius graduate student who he said he had been "frequenting" because, Noonan alleged, she pursued him.

152.     When discussing other women, Engebrecht recalls Noonan would tell her: "I'd hit that!," which was his way of saying he wanted to have sex a woman.

153.     During the summer of 2018, Engebrecht worked at the Buffalo Zoo as a student educator with another Canisius student.

154.     Noonan came to the Buffalo Zoo every day to "supervise" Engebrecht and her colleague.  However, Noonan's supervision generally involved touching Engebrecht's bra straps, and making other unnecessary adjustments to her clothing, while filming her and the other Canisius student without their permission.

155.     On many occasions, while leaving Buffalo Zoo after work, during the summer of 2018, Noonan would raise the subject of older men dating younger women, telling Engebrecht that age differences "did not matter" so long as the person was "of consenting age."

156.     Noonan also asked Engebrecht about her personal relationships, which included giving unsolicited advice to her about who she should and should not be dating.

157.     Although Noonan's discussion about personal subjects bothered her, he also praised Engebrecht's work teaching children about the ecosystem at the Buffalo Zoo, and wrote a

special recommendation for her, which helped Engebrecht obtain a sought-after internship at the Iroquois National Wildlife Refuge during the summer of 2018.

158.     After school resumed in the Fall of 2018, Engebrecht started to notice that Noonan touched her with great frequency, which always occurred when they were working together on preparations for a CAC trip or filming.

159.     For example, in preparation for a CAC trip to Florida, with Wood present, Noonan attached a microphone to Engebrecht's underwear, and remarked that Engebrecht is "flat-chested" and would not be able to hold the microphone pack in her bra, which made her feel humiliated.

160.     In addition to constantly touching Engebrecht's clothes, Noonan invaded her space on a regular basis by spontaneously braiding her hair.

161.     Before any CAC-related event was to be filmed, Noonan would tell Engebrecht and the other students who would appear on film that "I own your hair and your body," which meant that no one was not permitted to cut their hair or make any adjustments to the outfits they were forced to present to Noonan for pre-approval.

162.      Noonan insisted on endless sessions with the CAC students, where they would have to present what they intended to wear to each filmed event for his approval.

163.     Engebrecht wore an outfit on the CAC trip to Florida that Noonan did not pre-approve, and to punish her, Noonan did not focus the camera on her face during the interview that she and Wood conducted with Carole Baskin, who is the owner of a big cat sanctuary in Tampa.

164.     Engebrecht believes that Noonan's sexual and gender-based misconduct became more extreme immediately before and during the CAC trip to India in January 2019.

165.     At the airport, before boarding the plane to New Dehli, Noonan took Engebrecht aside and asked about a mark on her neck, and suggested the mark meant she was pregnant.

166.     When Engebrecht told Noonan that she was not pregnant, he insisted on knowing how she was so sure, and Engebrecht had to report to her professor that she could not be pregnant because she was menstruating at that time.

167.     Throughout the India trip, Engebrecht observed Noonan being disrespectful to other Canisius students, as well as to their Indian translators and interview subjects.

168.     During a confrontation Noonan had with Whelan and Student 3, which occurred in Engebrecht's hotel room and which she observed from the door because Noonan prevented her from entering, Engebrecht overheard Noonan urging Whelan and Student 3 to allow him to insert an enema into each of them to relieve constipation.

169.     At the door, Engebrecht also observed Whelan mouth "SOS," making it clear to Engebrecht that Noonan's insertion of himself into the situation was not wanted.

170.     Although Noonan prohibited her from entering, Engebrecht remained outside her hotel room and summoned other students to the door, because she feared that something bad might happen to Student 3 and Whelan.

171.     Engebrecht also observed Noonan show disrespect to interviewees, translators and others they encountered in India, such as by interrupting them, claiming he did not understand them when they were speaking English, and by otherwise being unkind and impatient.

172.     Noonan would summon Engebrecht to his hotel room to review pictures and video footage during the India trip a number of times. Although Engebrecht did not want to be alone with Noonan, she went along with his demands because she did not want to provoke him.

173.     However, during group meetings, Engebrecht and other students tried to confront Noonan about his misconduct, by telling him how uncomfortable they felt about the way he was treating them, and the various people in India trying to help them make the film.

174. Engebrecht observed that Noonan was unresponsive to this feedback and did not change his demeanor during the India trip.

175. Engebrecht joined the other women students who came forward to complain to Canisius about Noonan's sexual harassment and other misconduct in or about February 2019.

176. Although College administrators promised Engebrecht and the other women who came complained about Noonan that they would be given periodic updates on Canisius' investigation, Engebrecht recalls receiving no updates.

177. Engebrecht feared interacting with Noonan after she complained about him to Canisius.

178. Engebrecht suffered a severe anxiety attack one day on campus when she saw Noonan's office door open, after the College's Title IX coordinator, Walleshauser, said they had removed him from campus.

179. Engebrecht reported that she was having a panic attack to Malani Suchak, an associate professor in the ABEC Program, who sent Engebrecht home for the day.

180. No one from the College ever checked in on Engebrecht, either before or after her panic attack, to ensure that she was receiving the medical attention she needed.

181. Engebrecht coped for several months by herself and then began to attend regular therapy sessions on campus in the Fall of 2019, after it became apparent that Canisius wanted to sweep the whole issue of Noonan's misconduct under the rug by allowing him to retire, rather than face an investigation and adjudications of the claims against him for sexual misconduct in violation of the Sexual Harassment and Gender-Based Misconduct Policy.

182. Engebrecht began to attend talk therapy sessions with Alison Smith, who worked at the Canisius Student Health office, who treated her for depression and anxiety.

183.    College administrators retaliated against Engebrecht and the other women who came forward by doing nothing to ensure they would be able to complete Project Tiger film, an example of her academic achievements that Engebrecht hoped to be able to use to get into graduate school but could not because it was never completed.

184.    Engebrecht personally appealed to Margulis, the Chair of the ABEC Program, for assistance getting the Project Tiger footage so that she and the other students could make the film.

185.    In response, Margulis told Engebrecht it was "not worth" figuring out who owned the rights to the footage.

186.    Similarly, Canisius never made an effort to ensure that fourth-year students who came forward to complain about Noonan's sexual harassment, like Engebrecht, who also worked extensively with Noonan, and who were relying on him to write a recommendation letter for graduate school, had other options after he was allowed to retire by the College, in violation of the Sexual and Gender-Based Misconduct Policy.

187.    As a result of Canisius' retaliatory treatment, Engebrecht believes her prospects for being able to continue her studies in graduate school are dim, and she has put off applying to graduate programs on hold, perhaps indefinitely, which has affected her plans for her future.

188.    Moreover, Engebrecht continues to be treated for depression in the form of talk therapy, which she pays for out of pocket, because it is not covered by her health insurance.

**NATASSIA TUHOVAK**

189.    In the Fall of 2016, Tuhovak enrolled in the Social Organization of Mammals Lab, a class taught by Noonan that entailed travel to Colorado with Noonan and several other students in October 2016.

190.     Noonan brought a Canisius graduate student, Student 5, on the trip to Colorado and told the undergraduate students that she was there to help him chaperone, although Student 5 interacted with the students only minimally. After the trip, Tuhovak found out from other ABEC students that Noonan and Student 5 were romantically involved.

191.     During a bouldering lesson in Colorado, Noonan touched Tuhovak on her waist and behind, and she felt his gaze on her, all of which made her very uncomfortable.

192.     During the Social Organization of Mammals class, Noonan showed the class a video clip of a female and male orangutan engaging in a sex act. Throughout this video, Noonan kept on commenting that "Rape is natural for primates!"

193.     During the Social Organization of Mammals class, Noonan required all of the students to sleep in a white cotton t-shirt and bathe with unscented soap, which he provided. Students were instructed to put the shirts into a zip lock bag and to bring the shirts to the lab. During this class, Noonan directed all of the students to smell the shirts, and to rate which shirt smelled the best, and which smelled the worst, which shirts had "a male scent," and which had "a female scent." No obvious pedagogical point was ever made by Noonan during this exercise, although he did keep all of the shirts he collected from the students for himself.

194.     During the Social Organization of Mammals class, Noonan told the students that he and Margulis used to go on ABEC trips together, and that during those trips, Noonan would play "What Animal Am I?" with students, which required players to think of an animal and then act out the animal using charades.

195.     Noonan stated that because cetaceans do not have hair, it was disingenuous to point to hair to indicate when a student was trying to be a mammal, but he stressed that all mammals have mammary glands.

196.    Noonan also remarked that during a trip with Margulis, he was playing the game with students in the hotel's pool, and one of the students performing the charade pointed to her breasts, just as Margulis came to be with the group. Margulis told students that they should point to their hair when playing the game because pointing to their breasts was inappropriate.

197.    A few months later, in December 2016, Tuhovak applied for and was accepted to go on a CAC program that involved travel to Hawaii.

198.    No male students from Canisius went on the CAC trip to Hawaii with Noonan in December 2016.

199.    During that Hawaii trip, Noonan engaged Tuhovak and the other women students in discussions about what kind of guy they would like to date, which made Tuhovak uncomfortable and she tried to avoid personal conversations with Noonan going forward.

200.    During that trip, Noonan filmed Tuhovak and other Canisius students in their bathing suits without their consent, which included when Tuhovak jumped off a cliff into the ocean and her bathing suit top flew up, exposing her breasts.

201.    In Hawaii, Noonan insisted on holding Tuhovak's hand throughout a snorkeling session, claiming that she was a poor swimmer and he wanted to protect her, which he did rather than give her a life preserver.

202.    On the Hawaii trip, Noonan again engaged in numerous conversations with the students about their personal lives and romantic relationships. During one conversation, Noonan asked Tuhovak and the other students present whether it was inappropriate for him to date former Canisius students who he had personally taught.

203.    Tuhovak told Noonan that the conversation made her feel uncomfortable, but Noonan ignored her concerns, and kept on raising the topic of dating students throughout the trip.

204.     Although Noonan's conduct on the CAC trips during 2016 concerned Tuhovak, she declared herself to be an ABEC Program major and wanted to ingratiate herself with Noonan because it was known on campus that he afforded certain students with access to CAC programs and recommendation letters for graduate school.

205.     During the Social Organization of Mammals class, Noonan asked Tuhovak to be on his research team in front of the entire class after she had received the highest test score on the first exam.

206.     Tuhovak quickly observed that Noonan had a practice of announcing who received the highest test scores on exams, but only invited the women students with the best scores to work on his research team.

207.     Tuhovak needed to work to help make ends meet during her time at Canisius, and accepted Noonan's invitation to work on his research team, which is a paid position.

208.     Although Noonan presented the opportunity to be on his research team as an honor, during the two years that Tuhovak worked as his researcher, he subjected her to daily verbal and emotional abuse, and she learned very little about being a scientist.

209.     Noonan refused to teach Tuhovak and insisted that she follow his directions, which he issued to her continuously, about every single thing she was supposed to do in the lab.

210.     Noonan yelled at Tuhovak constantly, such as when she did not understand a vague instruction and paused to decipher his command. Even if she could follow his orders down to the last detail, Noonan would get mad and say that Tuhovak did not perform the task correctly.

211.     Noonan consistently told Tuhovak that she did not deserve to be on his research team because she was not smart enough and lacked the drive to be a researcher.

212. Noonan accused Tuhovak of lacking commitment to his research team even though she spent twenty (20) hours per week devoted to the one-credit class while juggling two other jobs and a full-course load.

213. Noonan regularly belittled Tuhovak in front of the other research students and used her as an example of what to avoid being if they wanted to be successful on his team.

214. For example, Noonan reprimanded Tuhovak in front of the other research students at Marineland one day when a few beluga whales popped their heads up and began spitting water at the group. Tuhovak jumped back in surprise, let out a startled yelp, and then playfully chastised the whales for spitting at her, which continued.

215. After a few minutes, Noonan pointed at Tuhovak and said no one should act like her, and that it was Tuhovak's "fault" that the whales kept on spitting at her because she was being reactive, which made Tuhovak ashamed and confused.

216. Prior to this incident, Noonan never provided any instruction to his research team on what was the proper way to interact with the animals they were studying if the animals wanted to interact with the students.

217. During the summer of 2017, Tuhovak applied for and was accepted to work in a CAC-funded program at the Buffalo Zoo, which was run by Noonan.

218. Tuhovak and another Canisius student performed a puppet show as part of their duties at the Buffalo Zoo.

219. Noonan wanted to the film puppet show and brought camera and sound equipment to record the video. While setting up, Noonan approached Tuhovak and started to put a microphone wire through her shirt without asking for permission. When Tuhovak said she could put the wire through her shirt herself, Noonan insisted that he needed to do it.

220.    The stage for the puppet show hid Tuhovak and her co-worker behind a curtain, making the hidden microphone that Noonan required he place through Tuhovak's shirt superfluous, a realization Tuhovak only came to after the incident.

221.    Throughout the summer of 2017, Noonan came on a regular basis to the Buffalo Zoo to allegedly supervise the Canisius students working there.

222.    During a visit, and subsequently at Canisius in his lab room, Noonan required Tuhovak to "stretch" his knee, which he made her do by straddling his leg to pull and massage it.

223.    Noonan explained to Tuhovak that after he had knee surgery in 2017, his doctor suggested that he perform different stretches.

224.    Noonan moaned when Tuhovak stretched his knee, which made her very uncomfortable, and after a few times, Tuhovak refused to stretch his knee again.

225.    During the Spring of 2018, Tuhovak signed up for Noonan's photography class.

226.    During one class, Noonan overheard Tuhovak talking to one of her friends about someone she had been dating, and started to pepper her with questions about that person.

227.    When Tuhovak said they met on a dating application, Noonan commented that "dating apps" were used for "hooking up," and insinuated that Tuhovak was having sex in front of everyone in the class, which made Tuhovak feel humiliated.

228.    During the photography class, Noonan drove his students around to different wildlife habitats.

229.    During those drives for the photography class, Noonan would discuss unrelated topics, such as the #MeToo Movement. Tuhovak heard Noonan comment that "the #MeToo Movement is scapegoating good men."

230. During the same conversation, Noonan discussed how Bill Cosby did nothing wrong and that the women who came forward against him were "simply looking for attention."

231. During the Fall of 2018, Noonan's research team studied beluga whale behavior three times a week starting at 6 a.m. at Marineland in Ontario, which is located close to Niagara Falls and the U.S.-Canadian border.

232. Noonan used a Canisius van to drive his research students to Marineland.

233. Tuhovak observed Noonan frequently bringing up the #MeToo movement on the van rides to Marineland, just as he did during the photography class.

234. During one of these rides to Marineland, Noonan claimed, again, that the #MeToo movement was targeting "good men."

235. Noonan then proceeded to ask each student to individually confirm that she had never been made to feel uncomfortable by him.

236. Noonan called on Tuhovak last and she reluctantly said "no" even though he frequently made her uncomfortable and invaded her personal space, even after Tuhovak would ask him to stop. But Tuhovak felt like she could not voice her true opinions because Noonan would object and yell at her, which he did to other students who expressed their opinions.

237. In or about late September 2018, Noonan and his research team arrived at Marineland to find that one of the whales was about to give birth. Noonan announced that the group would not return to campus until after the birth, which could take hours.

238. Tuhovak informed Noonan that she had a shift at another job later that day and could not spend the entire day at Marineland.

239. Noonan became angry with Tuhovak and told her she would have to find her own ride back to campus.

240.     Tuhovak and another Canisius student walked along the highway from Marineland to a gas station with WIFI to order an Uber car to take them back to the border, which they then crossed by foot.

241.     Once back on the U.S. side of the border, Tuhovak's seventy-five year old grandmother came with her car to drive Tuhovak and the other Canisius student back to campus, which was a half-an-hour drive away.

242.     Although it had been a harrowing experience to get back to campus from Marineland, Tuhovak was happy to have been spared another drive with Noonan, who consistently used the trips to Canada to ask the students present extremely personal questions about who they were dating or their dating preferences. Noonan constantly asked the women students present if they were interested in dating older men.

243.     In the Fall of 2018, Tuhovak could no longer accompany Noonan and the others on his research team to Marineland three times a week because of a class conflict.

244.     Although Noonan still engaged with Tuhovak in the lab to harass her, such as by coming to her computer terminal to start braiding her hair, a practice that he persisted in doing even though Tuhovak consistently told him not to touch her hair, his general demeanor toward her became more distant.

245.     During the Fall of 2018, Noonan would not give Tuhovak updates on the current team projects or important dates, limiting the sharing of that information to the research team members who drove up to Marineland with him each week.

246.     For an important research proposal, Noonan failed to inform Tuhovak about the due date in a timely manner. Tuhovak found out about the research proposal from one of her teammates and scrambled to get a draft done in time for Noonan to review before the deadline.

247. Although he provided samples to the other students, Noonan failed to provide to Tuhovak any sample research proposals or instruction, and Tuhovak completed a draft based on her best guess of what a proposal should entail.

248. Noonan, who was out of town and unavailable in the days leading up to the research proposal's deadline, had less than two days to review Tuhovak's draft application and give her feedback.

249. At their first meeting regarding her draft research proposal, Noonan chastised Tuhovak, commenting that her research topic was not worth pursuing and that her application was terribly written. Noonan also noted that he was "shocked" that Tuhovak had made it that far in her career with her alleged terrible writing skills, claiming that she was "lazy" and did not "show enough commitment" to his research team.

250. Noonan said that if Tuhovak did not fully revise her application, he would not want her on his research team anymore.

251. The next day, Noonan's treatment of Tuhovak was completely different. Noonan told Tuhovak that her research idea was "brilliant" and that she is "incredibly smart and talented."

252. Noonan then took Tuhovak's application and rewrote the entire document, without explaining to Tuhovak anything about why he was making certain edits, and never asked for her input about any of his changes.

253. After the tumultuous meetings with Noonan regarding her research application, Tuhovak met with the ABEC Chair, Susan Margulis, to complain about Noonan's verbal and emotional abuse and how it was affecting her mental health.

254.     Tuhovak told Margulis that she felt trapped because she believed she needed Noonan's recommendation letter to get into law school, and did not want to lose out on continuing her research project because of his mistreatment, which she could no longer tolerate.

255.     Margulis responded to Tuhovak's complaint, saying: "Well, what do you want me do about this situation? We all know he's difficult to work with. That's just the way he is!," referring to Noonan.

256.     Margulis further explained she could do nothing to stop Noonan's misconduct, and Tuhovak could either continue being miserable and remain on Noonan's research team, or risk losing her the chance to get a recommendation letter from Noonan for law school.

257.     Tuhovak wilted in the chair after Margulis said all of this to her, feeling extremely discouraged and unsupported by the College.

258.     In light of Margulis' refusal to intervene and the College's inaction in response to her complaint about Noonan's mistreatment in 2018, Tuhovak made the decision to remain on Noonan's research team because she felt she had no choice.

259.     To punish her for the class conflict with the Marineland schedule in the Fall of 2018, in the Fall of 2019, Noonan prevented Tuhovak from attending any other Marineland research trips, falsely claiming that there was no work for her to do even though other students were still allowed to go to Marineland to conduct their research.

260.     Early in the Spring semester of 2019, Tuhovak became aware of another student, Student 6, who complained to Elizabeth Hogan, the College's Biology Department Chair, at the recommendation of Daniel Haeusser, another professor in the Biology Department, about harassment she was subjected to while on Noonan's research team.

261.    Hogan subsequently learned from Haeusser, that Student 6's complaint about Noonan's inappropriate conduct, was echoed by other students.

262.    Hogan interviewed Student 6, who informed her that Tuhovak had experienced similar harassing conduct by Noonan.

263.    In or about January 2019, Tuhovak met with Hogan to discuss the verbal, emotional, and sexual harassment she experienced while working on Noonan's research team.

264.    During their meeting Tuhovak described many instances of Noonan's sexual harassment and gender-based abusive conduct, including but not limited to his insistence that Tuhovak "stretch his knee" and the moaning that ensued.

265.    Hogan, with a horrified look on her face, told Tuhovak that she had seen someone "stretch" Noonan's knee in his office, and she had assumed that the person was a health provider, not a Canisius student.

266.    After her meetings with Student 6 and Tuhovak, Hogan filed a report regarding Noonan's sexual harassment and gender-based misconduct with the College's Title IX coordinator, Linda Walleshauser.

267.    After Hogan reported the complaints about Noonan's misconduct, which were raised by Student 6 and Tuhovak, word began to spread on campus about an impending Title IX investigation, and nine other women students came forward to discuss their own experiences with Noonan's verbal and emotional abuse, and the sexual harassment they endured while taking Noonan's classes, including Boucher, Engebrecht, Whelan and Wood.

268.    When Tuhovak met one-on-one with the College's Title IX coordinator, Walleshauser framed her questions as accusations, questioning whether Tuhovak correctly

perceived Noonan's intentions, and whether it was possible Tuhovak could be mistaken about the sexual harassment he had subjected her.

269.    Walleshauser's demeanor throughout the interview with Tuhovak was extremely hostile and unsupportive. At the end of the meeting, Walleshauser directed Tuhovak to write a report regarding every inappropriate experience she had with Noonan, but Walleshauser's behavior was so off-putting that Tuhovak felt discouraged and never sent in a written statement because she did not believe the College would do anything about Noonan's misconduct.

270.    Walleshauser never followed up with Tuhovak and never asked her to submit any statement in writing with her signature, as was required by the College's Sexual Harassment and Gender-Based Misconduct Policy.

271.    Throughout the Spring of 2019, Tuhovak and the other students who complained about Noonan asked the Title IX coordinator repeatedly for updates about her alleged investigation and what the process would look like if the investigation suggested that Noonan had engaged in misconduct, and had to be adjudicated.

272.    Tuhovak does not recall Walleshauser providing any kind of overview of what a Title IX proceeding consisted of, and what a complaining student's role would be in that proceeding. The only thing Walleshauser would share that Tuhovak recalls is that she could not provide any information on the investigation because it was "confidential."

273.    No one at Canisius informed Tuhovak about what she should do if Noonan retaliated against her for complaining about his misconduct, even though the College permitted Noonan to remain on campus for months after Tuhovak complained in 2019.

274.    In addition, no one at the College ever inquired as to whether Tuhovak required any other assistance from Canisius after she complained about Noonan in 2019.

275. After Tuhovak complained about Noonan's sexual harassment and other abusive conduct, she learned that Paul Waldau, the former Director of the Canisius graduate program in anthrozoology, reported Noonan to Canisius' Title IX office in 2014 on behalf of a woman student in the graduate department.

276. Tuhovak continues to be affected by Canisius' failure to hold Noonan responsible for his illegal conduct, and the retaliatory manner in which the College treated her after she reported Noonan's misconduct to Walleshauser, the Title IX coordinator.

277. In addition to talk therapy, Tuhovak is in the care of a psychiatrist who is treating her for anxiety, depression and symptoms associated with Post-Traumatic Stress Disorder.

**HANNAH WHELAN**

278. Whelan believes in the intrinsic value of nature and the animal kingdom. She decided to attend Canisius in part because of the ABEC program, and ultimately decided to pursue a double major in animal behavior and environmental studies.

279. As an ABEC Program major, Whelan took her first class taught by Noonan in the Fall of 2017, which was entitled: "Sex, Evolution and Behavior."

280. During the Sex, Evolution and Behavior class, Noonan raised the topic of rape repeatedly, in multiple classes, despite the topic's irrelevance to the classroom discussion.

281. During one class, Noonan showed a video of an orangutan "raping" another orangutan and proclaimed, "Rape is natural!"

282. During another class, Noonan discussed how ducks "rape" one another.

283. During another class, Noonan, apropos of nothing, shared that he prevented a woman from being raped while traveling abroad.

284.     Noonan also required students like Whelan who took his "Sex, Evolution and Behavior" class to complete a survey focused on soliciting information about the students' personal and sex lives, which had nothing to do with a class about non-human animals.

285.     The survey included the following questions: "Have you ever been raped?"; "How many sexual partners have you had?"; "Have you ever had sexual relations with a relative?"; and, "Have you had sex with men and women?"

286.     Noonan made his students complete the survey by hand, using their non-dominant writing hand, to keep the results "anonymous."

287.     However, Noonan never shared with students that he intended to compile the data contained in the sex survey and present that information to the class, which numbered approximately twenty (20) students.

288.     With no regard for the students who truthfully shared information about traumatic events in their lives, Noonan reported to the class information such as how many students had reported being raped and that one student admitted to a sexual relationship with a family member.

289.     For Whelan, who had been sexually assaulted at Canisius during her first year at the school, Noonan's casual manner in discussing rape made her feel extremely uncomfortable.

290.     In part because of her sexual assault, and the traumatic first year she had at Canisius that she wanted to put behind her, Whelan repressed the bad feelings she had about Noonan's rape discussions after he announced that she had earned high marks on several exams and those in the class would be lucky to study with her.

291.     Whelan felt honored to be the focus of positive attention from Noonan and wanted to continue to impress him.

292.     In the Spring of 2018, Whelan applied for and was accepted to join Noonan and several other students on a CAC program trip to Colorado to study wolves, which was called "Project Wolf."

293.     Whelan noticed that during the Project Wolf trip, Noonan engaged in a pattern of behavior where he would humiliate her for asking a question, only to praise her about something else a short while later.

294.     Noonan's hot/cold behavior made Whelan feel very uncomfortable and drove her to reflexively do things to please Noonan.

295.     For example, during the Colorado trip, Noonan insisted on touching and styling Whelan's hair, which she felt uncomfortable with, but permitted because it pleased him.

296.     Whelan also noticed that Noonan took pictures of the students while they swam in hot springs at Yellowstone National Park.

297.     Although all of the students wore bathing suits, Whelan felt uncomfortable with Noonan's voyeurism, when he sat apart from the group to photograph them, but she dismissed his inappropriate behavior because she was grateful to have been selected for Project Wolf.

298.     During the Project Wolf trip, Noonan pulled Whelan aside one night when the group was star-gazing at the Rocky Mountain National Park, and told her: "You are a really special girl, you know that?" Noonan remarked on how smart Whelan was, that she was important to him, and that he was glad to have her in his group.

299.     Noonan's positive words about her made it possible for Whelan to dismiss his sexual misconduct as unimportant, or quirks in his personality, that she believed she could ignore.

300. After the Project Wolf trip, Noonan approached Whelan and a few other women, who went to Colorado with them, and said: "You name it and I'll take you there!," suggesting he would take them where in the world they wanted to go.

301. Noonan's generous offer made Whelan feel special, like she had potential to be a great scientist and conservationist, and she deserved to be whisked off anywhere in the world she wanted to go to study, and this made her ignore the unsettling realization that Noonan's offer to her and her friends meant that CAC trips were not open to all students equally.

302. In her senior year, Whelan applied for and was accepted to the CAC program, entitled "Project Tiger," which involved travel to India where the group would study and make a film about tigers and preservation of their habitat.

303. During the Project Tiger trip, Whelan noticed that Noonan engaged in very extreme hot and cold behavior.

304. For example, while they were at one hotel, Noonan screamed at Whelan for drying her sports bra on her balcony, telling her in front of the group, "You don't do this in a public place!," even though her hotel room balcony was not in a public place.

305. During the Project Tiger trip, and prior to the trip during preparations, Noonan told all of his students that "I own your hair and bodies," which meant Whelan and her fellow students were forbidden from cutting or dying their hair throughout the length of the project, and that Noonan could dictate what they wore.

306. Noonan commented every single time one of the women had a bra strap showing during Project Tiger, telling the students that it was "disrespectful," although he seemed very happy to constantly touch their bras straps and adjust their clothing.

307. When the group first arrived in India, Noonan wanted to "have a chat" with Whelan during which he told her that he had overheard others speaking and learned that she had problems with constipation while traveling.

308. Noonan insisted that Whelan keep him informed on when she defecated so that he could ensure she was "healthy" throughout the trip.

309. Noonan stressed that if Whelan needed anything to "help" the process, she could ask him and he would "provide what you need."

310. Embarrassed, Whelan told Noonan that she was ok, and that she had been in the situation before, and that she knew how to take care of herself.

311. The following morning, Noonan asked Whelan if she had pooped. Whelan told him, "Yes!" even though she had not, because she was extremely uncomfortable and confused about why this professor who she most admired was being such a creep.

312. A short while later the same day, Wood told Whelan about Noonan insisting on putting a suppository in for another student who went with Wood on a CAC trip to Uganda.

313. After Whelan heard this, alarms started going off in her head because she realized that Noonan's conduct could be motivated by some sort of infatuation and seemed to be part of a pattern of misbehavior toward young women at the College.

314. Wood gave both Whelan and Student 3 a laxative that day.

315. Noonan yelled and made a fuss when he learned that Wood gave Student 3 and Whelan laxatives that she brought with her on the trip.

316. Whelan observed Noonan approach Wood on the bus and scold her for giving out laxatives, telling Wood that "You have no right!" and it was "my job to make medical decisions" for everyone on the trip.

317.     Noonan also turned to Whelan, and proceeded to scold her for lying to him about whether she had "used the bathroom," commanding Whelan that she "must be fully transparent" about pooping, although she never complained to him about constipation and did not want to discuss the issue with him at all.

318.     Noonan insisted that Student 3's condition was dangerous because her colon could twist and she could die if the situation was not properly attended to.

319.     After a meal the same day, Noonan pulled Whelan aside and for the first time on the India trip, he began to praise her, calling her "brilliant" and "really mature." Then, Noonan told Whelan: "Our friend Student 3 is not feeling well and I know you know that. It is time to have a conversation about options and this could be an option for you too so come with me."

320.     Whelan returned to the hotel room she was sharing with Student 3, and told Student 3 what Wood had said about Noonan's response to the constipated student in Uganda, in an effort to warn Student 3 that Noonan may insist on performing inappropriate acts on them.

321.      Noonan joined Whelan and Student 3 a short while later, bringing with him an enema, suppositories and laxatives, which he laid out on a bed in their hotel room.

322.     Noonan went into detail about how to use each one, which neither Student 3 nor Whelan asked him to do.

323.     Student 3 told Noonan multiple times that she would be happy if he left her with the options he brought to the room so that she could  personally and privately decide which treatment she would use. Noonan countered Student 3 by saying he would "feel more comfortable" if she made the decision "now and here."

324.      Noonan also pushed Student 3 towards allowing him to administer the enema, saying that "at this point, laxatives and suppositories would be a waste of time," and that he was

"worried about the seriousness" of Student 3's condition, telling her that if she did not act soon, things could become "life-threatening."

325.    Although Noonan was generally a light-hearted person, prone to laughing and making jokes, in the hotel room with Student 3 and Whelan, he was intense and serious.

326.    Whelan told Noonan that Student 3 just needed some time to think about her choices in private, to which Noonan responded, "This information could be valuable to you too!"

327.    Noonan began explaining how things would go if he administered an enema. He turned to Whelan and said, "I'm not sure if you've had anything up your butt before, but it's tight up there." Noonan then laid down on the bed, demonstrating "how things would go," telling the women, "you'll lay on your side like this and I'll only have to see a little bit of butt . . . I have done this with other students before!"

328.    Noonan's persistent demands that he administer an enema made Whelan feel deeply uncomfortable and concerned for her own safety and that of Student 3.

329.    Noonan ultimately left the hotel room when Whelan and Student 3 repeated over and over that they needed space to choose privately what to do.

330.    The following morning Student 3 decided to seek medical care at a nearby hospital.

331.    Given Noonan's behavior, Whelan and the other students decided it was no longer okay for Student 3 to be alone with Noonan, and Whelan accompanied Student 3 to the hospital.

332.    At the hospital, Whelan asked to see a doctor because she believed she had a urinary tract infection and needed antibiotics.

333.    Before they drove to the hospital, Whelan pulled Noonan aside and told him directly that his behavior had crossed a boundary, violating the professor-student relationship, and that neither she nor any of the other students would agree to be alone with him again.

334.    Noonan responded that he did "not know what I could have said that would make you feel that way."

335.    Noonan continued to ignore appropriate boundaries when he insisted on going into the examination room at the hospital with Student 3 and Whalen, even though they did not want him to come, and he was present when both students were examined by the doctor, although he never asked for their consent to be present and served no purpose in the examination room.

336.    Noonan's renown on campus made Whelan reluctant to complain about his misconduct during the India trip because Canisius administrators constantly reinforced Noonan's image as a powerful faculty member.

337.    Moreover, when Whelan was a first year student, and was sexually assaulted by another student on campus, Canisius removed the student who assaulted her from campus for only a period of time, foreclosing the possibility that Whelan could continue her graduate studies at the College, which she believed was not fair.

338.    However, in or about February 2019, Whalen was one of the eleven women who went to Canisius' Title IX office to complain about Noonan's harassing, sexualized misconduct, notwithstanding her trepidation and her negative prior experience with the Title IX office.

339.    When Linda Walleshauser, the Title IX coordinator, interviewed Whelan in connection with her complaint about Noonan, Walleshauser framed her questions in such a way that Whelan believed that Walleshauser was trying to excuse Noonan's misconduct.

340.    For example, when Whelan reported to Walleshauser that Noonan insisted on administering an enema for Student 3, and was angry at Whelan and Student 3 for taking a laxative without informing him, Walleshauser questioned whether Noonan's inappropriate actions regarding his students' medical situation was motivated by some kind of legal obligation. Whelan

recalls Walleshauser incorrectly pointing out, "Didn't you sign something that said [Noonan] was medically responsible for you [during the Indian trip]?"

341. After reporting Noonan's misconduct to the Canisius' Title IX officer, Whelan went to the college's medical center for counseling where she was diagnosed with depression, anxiety and adjustment disorder.

342. During the Spring 2019 semester, Whelan had suicidal thoughts and began to take medication to treat her depression.

343. Canisius' lack of support for Whelan and the ten other women who came forward to complain about Noonan's sexual harassment and other gender-based misconduct discouraged Whelan from continuing her studies in animal behavior and conservation, and she no longer believes she wants to attend graduate school and become an academic as she determined she would during her time at the College.

344. Whelan was a third-year student when Noonan was removed from campus.

345. No one at Canisius helped her navigate a way toward finding another mentor within the ABEC Program during her final year, who could have helped her plan her post-collegiate life, such as by offering guidance about graduate programs in animal behavior and conservation, and by providing recommendation letters to support her application to graduate school.

346. Whelan is still in therapy and continues to cope with the painful experience of reporting Noonan's sexual harassment and other misconduct, the College's failure to timely remove him from campus, investigate and adjudicate those complaints pursuant to its Sexual Harassment and Gender-Based Misconduct policy, and the retaliatory treatment she and the other Plaintiffs suffered when their work on Project Tiger and on Noonan's research team was undermined by the College.

347. Whelan views Canisius' inaction, in the face of so many complaints about Noonan, and the College's decision to undermine the success of students like Whelan and the other Plaintiffs who came forward, like someone rubbing salt into a fresh wound.

348. Whelan still suffers from nightmares and other symptoms caused by Canisius' deliberate disregard for her and the other students who came forward to complain about Noonan.

349. Whelan depends on talk therapy and the support of other Plaintiffs, including Engebrecht and Wood, who have formed a mini-support group and tend to one another whenever anyone has a "Noonan nightmare," which still occurs on a regular basis.

## CASSIDY WOOD

350. Wood transferred to Canisius from Ohio State University after traveling to Buffalo to meet Noonan, and ABEC Program majors under his direction who were afforded what she always wanted – the opportunity to obtain hands-on experience as an animal behavior scientist.

351. Wood spent hours and hours with Noonan each week for three years, taking his classes, working on his research team, traveling with him to three continents, and working with him on films and other CAC projects.

352. During her second year at Canisius, Wood took Noonan's "Sex and Evolution" class, which he started off by issuing to each student a survey that sought information about the student's own sexual experiences and preferences. The survey's topics were not relevant to a class focused on non-human sexual relations.

353. Wood found the Sex and Evolution survey disturbing and heard from others students that Noonan was known for crossing the line, and being "a relic from another time," a "cooky old man" who could not help it but engage in sexual misconduct.

354. However, Wood had so many positive learning experiences because of Noonan at the beginning of her tenure at Canisius, particularly during CAC program trips. Those experiences encouraged her to ignore Noonan's misconduct for several years.

355. During her first CAC trip to British Columbia in 2017, Noonan brought a Canisius graduate student, Student 5, with whom he was romantically involved. He flirted with Student 5 and touched her in a romantic way in front of Canisius students throughout the trip.

356. Throughout a CAC trip to Florida with Wood and Engebrecht in 2018, Noonan wanted to engage in unending "girl talk," which meant listening to him talk about his loneliness; how he still "frequents" Student 5, the graduate student; and how he had been in sexual relationships with many young women as an older man.

357. During a CAC trip to Uganda in 2018, Wood's roommate, Student 7, suffered from digestive problems and asked Wood if she had any medication that could help.

358. Wood had nothing to help Student 7, who ultimately decided to go to Noonan for a laxative. Wood accompanied Student 7 to Noonan's room to ask for the laxative.

359. When Wood and Student 7 explained the situation to Noonan while standing in his hotel room doorway, Noonan told Wood to go back to her room because: "We've got this!"

360. When Student 7 returned to their hotel room, she told Wood that Noonan gave her a suppository and offered to "assist" her with it, saying, "Some people have trouble with these. I can be a mature adult about this if you need help."

361. During the Uganda trip, which occurred shortly after Noonan had knee surgery, he regularly asked Wood and other students to come to his hotel room to "stretch" and massage his knee, which involved them straddling his leg and pulling on it, during which Noonan moaned in a way that suggested he was deriving more than just physical relief from his students.

362.	During the India CAC trip in January 2019, Wood found Noonan's behavior to be controlling and degrading, worse than she had ever experienced it.

363.	In preparation for the India trip, Noonan told Wood and the other students on Project Tiger that "I own your bodies" and "You are not allowed to cut your hair or alter your body for the duration of this project."

364.	In addition, before the India trip, Noonan had Wood and other students who were going to appear on camera for their film, Project Tiger, try on the clothes they intended to wear for his evaluation and approval.

365.	While driving from the airport to the hotel after they landed in New Dehli, Noonan chatted with Wood, who sat in the front seat.

366.	As was his usual custom, Noonan wanted to talk about his romantic life and Wood's romantic partners, or the kinds of characteristics she looked for in the men she dated.

367.	These conversations always made Wood uncomfortable and her practice for coping was to provided little bits of information to Nooonan in the hope that he would get bored or distracted and move on to another topic before she revealed too much about her personal life.

368.	At some point during their conversation, Noonan shared with Wood that women students and staff had complained about his conduct in the past to the College, but Canisius never found a "significant violation" of the rules and nothing ever came of those complaints.

369.	Noonan told Wood this information because he explained that a staff member in the Biology Department had recently raised a complaint against him, which he said was based on that staff person's "misinterpretation of a situation," which the College accepted, dismissing the complaint.

370.     During the filming of Project Tiger in India, Noonan insisted on threading the microphone Wood used through her clothing to attach it to her underwear each time she needed one, and this permitted him to constantly touched her hair and clothing.

371.     Noonan constantly adjusted Wood's clothing and would make a fuss of hiding her bra straps for her, instead of merely directing her to make her own adjustments to her appearance.

372.     Wood did not complain about Noonan's touching. After many years of being unimpressed with Wood's work on his research team, Noonan suddenly began to treat Wood like she was smart and had important contributions to make to the team. Wood inferred this from Noonan's then-recent decisions allowing her to appear on camera in a number of CAC films, a position reserved for Noonan's most special students.

373.     When Wood was a member of his research team, Noonan criticized her for being "lazy" and unintelligent because she failed to memorize distinctive markings on a group of beluga whales at Marineland after only a few weeks of studying the mammals for the first time.

374.     This criticism, while baseless, motivated Wood to work very hard for Noonan in the hope that one day he would recognize her good work and reward her with a recommendation letter for graduate school or something else that signified she was worthy of having him as her mentor.

375.     To ensure that Noonan would not subject her to any unwanted medical assistance, Wood brought her own laxatives to India in 2019 when she joined seven (7) other Canisius women on the CAC trip with Noonan to make a film about tigers and local preservation efforts.

376.     Student 3, another Canisius student, knew that Wood had laxatives with her and asked for one to help her deal with a digestive ailment.

377.     When Noonan found out that Wood had given Student 3 a laxative, he pulled Wood aside and loudly lectured her that she needed his permission before she was permitted to help anyone with any medical issue.

378.     Wood was disgusted when she found out from Student 3 that Noonan had insisted that he should be the person to "help" her and Whelan, who both had digestive problems, by administering suppositories for them.

379.     Wood had seen this side of Noonan before. Although Noonan rarely admonished her anymore, Wood knew that Noonan could belittle and humiliate his students, or ignore them, when they did something he did not like.

380.     Wood noticed that Noonan reserved his most abusive behavior for male students.

381.     Noonan's tendency to treat women students better than their male counterparts was so obvious that some male students complained about getting lower grades and being passed over for CAC trips, but Canisius professors and administrators did nothing to stop it.

382.     Wood's younger brother, Student 8, who also attended Canisius, applied for the CAC trip to India, and made an excellent presentation to Noonan in support of his application, but Student 8 was not accepted for Project Tiger, along with every other male student who applied.

383.     Although Canisius administrators knew or should have known that Noonan was selecting only women students to be CAC project participants, no one from the College ever raised an issue about the gender make-up of CAC project groups.

384.     When Wood raised her complaint about Noonan's misconduct with Canisius, the Title IX administrator, Linda Walleshauser, responded to Wood's allegations regarding Noonan's inappropriate touching of her body and clothing by asking her in response to every allegation: "Did you tell [Noonan] that he made you feel uncomfortable?" and "Did you tell Noonan that he and

done something wrong?," which made Wood feel like she was to blame for Noonan's ongoing sexual misconduct, which he had engaged in at the College for many years.

385.    Walleshauser, Canisius' Title IX coordinator, never sent out any updates about if and when Noonan would be removed from campus after Wood and the other women students came forward to complain about his sexual harassment and gender-based discriminatory misconduct.

386.    One day during the Spring of 2019, Engebrecht had a severe anxiety attack when she believed she saw Noonan in the ABEC Lab Room, and texted Wood to warn her. Wood stayed away from campus that day to avoid any possible interaction with Noonan because she was so afraid he would retaliate against her.

387.    After Noonan was removed from campus, no one from Canisius reached out to Wood to inquire about her well-being. At that time, and throughout the remainder of her time at the College, Wood struggled for the first time in her academic career to get her work done.

388.    Wood graduated from Canisius without a recommendation letter to help her get into graduate school, and with no professor who offered any guidance to help her map out her post-collegiate life.

389.    Since she complained to Canisius about Noonan's misconduct, and the College lied about investigating her complaint, Wood has developed bruxism for the first time, which is unconscious teeth grinding, a condition she still suffers from to date.

390.    Wood also suffers from imposter syndrome in her professional life and connects that to the time she spent with Noonan, who made her feel smart and special.

391.    Now, Wood believes that Noonan's view of her was informed only by his desire to engage in sexualized talk and other inappropriate conduct at her expense, and she struggles to

remind herself that Noonan's abusive mistreatment does not diminish the fact that she is intelligent, capable and able to contribute to her community in a meaningful way.

392.    Additionally, Wood no longer sees a future for herself in academia, given her experience at Canisius, where she believes that many women students and professors before her, who were subjected to Noonan's misconduct, were too afraid to come forward, or who did come forward, only to have the College sweep their concerns under the rug. Wood no longer believes that the academic space is one in which she would like to work as a professional.

393.    Wood focuses on the symptoms caused by Canisius' deliberate indifference to her and the health of her fellow students, and the College's retaliatory undermining of her and the other Plaintiffs by failing to support their ability to finish the Project Tiger film and other research projects they started under Noonan's supervision, by engaging in weekly talk therapy to date.

394.    Wood has been diagnosed with trauma and stress-related disorder.

## COUNT I

### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681 *et seq.,* SEXUAL HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT

395.    Plaintiffs repeat and reallege each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

396.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

397.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Canisius College.

398. Title IX is enforceable through a private right of action.

399. Canisius has subjected Plaintiffs to a sexually hostile educational environment in violation of Title IX.

400. Canisius has discriminated against Plaintiffs by subjecting them to a sexually hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with the Plaintiffs' educational opportunities, undermining and detracting from their school experience at the College. Because of Canisius' failure to implement adequate procedures to detect, monitor, and correct this discrimination and hostile environment, Canisius has denied Plaintiffs their personal right to work and learn in an environment free of sexual harassment.

401. Canisius was on actual notice of the sexual harassment committed by Noonan and the hostile academic environment that the Plaintiffs and other students endured at Canisius during the relevant timeframe.

402. Canisius has demonstrated deliberate indifference by tolerating, condoning, ratifying, and/or engaging in the hostile work and educational environment and failing to take remedial action to stop it.

403. Because of Canisius' unlawful conduct, Plaintiffs have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

404. By reason of the continuous nature of Canisius' unlawful conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

405.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including damages for loss of educational opportunities caused by the discrimination, compensatory damages, attorneys' fees and costs, and other appropriate relief.

## COUNT TWO

### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681 *et seq.*, RETALIATION

406.    Plaintiffs repeat and reallege each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

407.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

408.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Canisius College.

409.    Title IX is enforceable through a private right of action.

410.    As the Supreme Court has made clear, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.* at 180.

411.    Canisius' Sexual Harassment and Gender-Based Misconduct Policy states that it "applies to all Canisius College Students, Employees and Third Parties, regardless of an individual's race, color, national origin, religion, creed, age, disability, sex, gender identity or

expression, sexual orientation, familial status, pregnancy, predisposing genetic characteristics, military status, domestic violence victim status, criminal conviction, or any other status protected by law."

412. Canisius' Sexual Harassment and Gender-Based Misconduct Policy further states in relevant part that the "College's prohibition against Sexual or Gender-Based Misconduct applies to incidents of any such alleged Misconduct, and any retaliation associated with it[.]"

413. Canisius violated its own Sexual Harassment and Gender-Based Misconduct Policy by undermining Plaintiffs' ability to complete classes and research projects that they were performing under Noonan's supervision at the time of his removal from campus by failing to afford Plaintiffs any supportive measures to ensure that they competed the work as originally envisioned.

414. Canisius' Sexual Harassment and Gender-Based Misconduct Policy states that "[s]upportive Measures, as noted, are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge. Supportive Measures can be available before or after the filing of a Formal Complaint, or where no Formal Complaint has been filed. The Title IX Coordinator is responsible for coordinating the effective implementation of Supportive Measures. Supportive Measures may include, but are not limited to, the following: Counseling; Extensions of deadlines or other course-related adjustments; Modifications of work or class schedules; Campus escort services; and Restrictions on contact between the parties (including 'No Contact Orders') . . . . and; Other Supportive Measures deemed appropriate by the Title IX Coordinator."

415. In the instant case, Plaintiffs made good faith reports to the College's Title IX coordinator in or about late January or early February 2019 regarding Noonan's sexual harassment

and gender-based misconduct during ABEC classes and trips, CAC programs, and during time spent with the students on his research team.

416.     Thereafter, Canisius retaliated against Plaintiffs by undermining their ability to complete Project Tiger, their research projects as part of Noonan's research team, and other educational experiences, which made their ability to graduate from Canisius in a timely manner more difficult and thwarted their efforts to apply to graduate school and become scientists and /or other members of a learned profession, which was their goal throughout their time at the College.

417.     By way of example, and not limitation:

    a.  Canisius retaliated against Plaintiffs by failing to investigate Plaintiffs' complaints about Noonan's sexual misconduct in accordance with its Sexual Harassment and Gender-Based Misconduct Policy;

    b.  Canisius retaliated against Plaintiffs by encouraging them to believe, after they reported Noonan's sexual misconduct, that they were to blame for his misbehavior;

    c.  Canisius retaliated against Plaintiffs by failing to remove Noonan from campus as soon as Plaintiffs and the other women students came forward with their complaints about his sexual misconduct, thereby creating an unsafe educational environment for them which lasted for months;

    d.  Canisius retaliated against Plaintiffs by failing to adjudicate Plaintiffs' complaints about Noonan's sexual misconduct in accordance with its Sexual Harassment and Gender-Based Misconduct Policy;

    e.  Canisius retaliated against Plaintiffs by depriving them of any supportive measures as defined in the College's Sexual Harassment and Gender-Based Misconduct Policy;

f. Canisius retaliated against Plaintiffs who worked on the Project Tiger project by failing to obtain the film footage shot in India and elsewhere until the summer of 2019, depriving Plaintiffs of the ability to harness the resources of the College to make the Project Tiger film as they intended when they signed up for the class;

g. Canisius retaliated against Plaintiffs by failing to ensure that their research projects, which were started under Noonan's supervision, came to completion by failing to assign new professors to take over Noonan's responsibilities to his research team;

h. Canisius retaliated against Plaintiffs by failing to assign new professors as Plaintiffs' ABEC Program advisors, which result in Plaintiffs being uninformed about *inter alia* graduation requirements, and Plaintiffs being unsupported and unable to find other professors from whom they could obtain recommendation letters for graduate school and other post-collegiate endeavors; and,

i. Canisius retaliated against Plaintiffs by failing to accommodate them, or provide medical or other supportive services for them, in any way after they reported Noonan's misconduct.

418. In doing so, Canisius punished Plaintiffs for filing complaints against Noonan, a professor whose classes and programs attracted the most potential student applicants, and hundreds of thousands of dollars in donor grant money.

419. Canisius therefore improperly retaliated against Plaintiffs in violation of Title IX.

420. This unlawful discrimination in violation of Title IX proximately caused Plaintiffs to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of post-collegiate professional opportunities, and other direct and consequential damages.

421.     Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including damages for loss of educational opportunities caused by the retaliation, compensatory damages, attorneys' fees and costs, and other appropriate relief.

## COUNT THREE

## BREACH OF CONTRACT

422.     Plaintiffs repeat and reallege each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

423.     At all times relevant hereto, a contractual relationship existed between Canisius and each Plaintiff by virtue of each Plaintiff's enrollment at the College as defined by and through Canisius' policies and procedures governing the student academics and discipline.

424.     Through the documents it publishes and provides to students, Canisius makes express contractual commitments to students involved in complaints brought pursuant to its Sexual Harassment and Gender-Based Misconduct Policy.

425.     New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook and other college policies and procedures become part of that contract. *See Carr v. St. John's Univ.,* 17 A.D.2d 632, 633, 231 N.Y.S.2d 410 (2d Dep't), *aff'd,* 12 N.Y.2d 802 (1962); *accord Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81, 93 (2d Cir. 2011).

426.     Implied in every contract is the covenant of good faith and fair dealing. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

427.     Based on the aforementioned alleged facts and circumstances, Canisius created express and implied contracts when it offered, and Plaintiffs accepted, admission to the College, and when Plaintiffs paid the required tuition, fees and expenses to attend.

428. Canisius breached its agreements with Plaintiffs by failing to investigate and adjudicate Plaintiffs' complaints against Noonan pursuant to the College's Sexual Harassment and Gender-Based Misconduct Policy, and when it retaliated against Plaintiffs for coming forward with their complaints by undermining their ability to successfully complete the classes and research projects that they were engaged in under Noonan's supervision when he was removed from the College.

429. By way of example, and not limitation:

    a. Canisius failed to investigate Plaintiffs' complaints about Noonan's sexual misconduct in accordance with its Sexual Harassment and Gender-Based Misconduct Policy;

    b. Canisius failed to remove Noonan from campus as soon as Plaintiffs and the other women students came forward with their complaints about his sexual misconduct, thereby creating an unsafe educational environment for them which lasted for more than four weeks;

    c. Canisius failed to adjudicate Plaintiffs' complaints about Noonan's sexual misconduct in accordance with its Sexual Harassment and Gender-Based Misconduct Policy;

    d. Canisius failed to protect Plaintiffs from retaliation, and in fact, retaliated against Plaintiffs from coming forward with their complaints about Noonan's sexual misconduct;

    e. Canisius retaliated against Plaintiffs by depriving them of any supportive measures as defined in the College's Sexual Harassment and Gender-Based Misconduct Policy;

f. Canisius retaliated against Plaintiffs who worked on the Project Tiger project by failing to obtain the film footage shot in India and elsewhere until the summer of 2019, depriving Plaintiffs of the ability to harness the resources of the College to make the Project Tiger film as they intended when they signed up for the class;

g. Canisius retaliated against Plaintiffs by failing to ensure that their research projects, which were started under Noonan's supervision, came to completion by failing to assign new professors to take over Noonan's responsibilities to his research team;

h. Canisius retaliated against Plaintiffs by failing to assign new professors as Plaintiffs' ABEC Program advisors, which result in Plaintiffs being uninformed about *inter alia* graduation requirements, and Plaintiffs being unsupported and unable to find other professors from whom they could obtain recommendation letters for graduate school and other post-collegiate endeavors; and,

i. Canisius retaliated against Plaintiffs by failing to accommodate them, or provide medical supportive services for them, in any way after they reported Noonan's misconduct.

430. Canisius further breached the implied covenant of good faith and fair dealing, in that it applied its policies in a discriminatory way and was improperly motivated by gender bias, political expedience, and institutional self-interest in preserving Noonan's reputation, and failed to ensure that Plaintiffs' educational experience at the College was unharmed.

431. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiffs have sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

432. Plaintiffs are entitled to all legal and equitable remedies available for violations Canisius' breaches of contact, including compensatory damages, attorneys' fees and costs, and other appropriate relief.

## JURY DEMAND

433. Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

A. Declare Defendant's conduct complained of herein to be in violation of Plaintiffs' rights as secured by the Title IX and New York common law;

B. Declare Defendant's acts and practices complained of herein to be willful violations of Title IX and New York common law;

C. Direct Defendant to make Plaintiffs whole for all damages incurred because of Defendant's illegal gender harassment, and gender discrimination in violation of Title IX and New York common law;

D. Direct Defendant to make Plaintiffs whole for all damages incurred because of Defendant's illegal retaliatory conduct in violation of Title IX and New York common law;

E. Direct Defendant to make Plaintiffs whole for all damages incurred because of Defendant's breach of its own policies and procedures in violation of New York common law;

F. Award Plaintiffs the costs of this action together with reasonable attorneys' fees;

G. Award Plaintiffs pre- and post-judgment interest;

H. Grant such further as the Court deems proper and necessary.

Dated: February 19, 2025

Respectfully submitted,

LAW OFFICE OF DANIELA NANAU, P.C.

DANIELA NANAU

89-03 Rutledge Avenue
Glendale, New York 11385
Telephone: (888) 404-4975
Facsimile: (718) 998-6916
E-Mail: dn@danielananau.com

ATTORNEYS FOR PLAINTIFFS