UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SIERRA BOUCHER, LILY ENGEBRECHT,
NATASSIA TUHOVAK, HANNAH WHELAN,
and CASSIDY WOOD,

                     Plaintiffs,

      -against-

TRUSTEES OF CANISIUS COLLEGE,

                Defendants.

Case No. 1:22-cv-00381-CCR

---

### CANISIUS UNIVERSITY'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Canisius University hereby submits the following response to the plaintiffs' Statement of Additional Material Facts. The responses below correspond to the numbered paragraphs in plaintiffs' Local Rule 56(a)(2) Statement.

| | Plaintiffs' Additional Material Facts (Dkt. 42-1) | The University's Response |
|---|---|---|
| | | |
| 155. | Dr. Hoffman testified she went to Walleshauser to discuss her prior complaints raised about Dr. Noonan's inappropriate touching in 2014 after she heard that Plaintiffs and other students complained about Dr. Noonan's discriminatory misconduct. Walleshauser informed Dr. Hoffman that Debra Winslow-Schaber, the former head of Canisius Human Resources, did not document her complaints about "Dr. Noonan hugging me without my consent and how he would treat me during my pregnancy." *See* Pl. Ex. BB, Hoffman Dec., ¶ 67. | **Disputed**. Dr. Hoffman did not raise concerns about "inappropriate touching" in 2014, and did not claim that Dr. Noonan engaged in "discriminatory misconduct." Dr. Hoffman met in 2014 with Jennifer Skowron and Deborah Winslow-Schaber from the Human Resources Department, and discussed Dr. Hoffman's claim that Dr. Noonan "sometimes" hugged her, and because Dr. Hoffman was pregnant she was concerned that Dr. Noonan might use her pregnancy as a reason to hug her or touch her stomach. She did not claim that Dr. Noonan actually touched her stomach or state that he had engaged in "inappropriate touching." Ex. 57 at Canisius 000430; Ex. BB, ¶¶ 15-20. |

| 156. | Dr. Hoffman found Winslow-Schaber's response to her complaints about Dr. Noonan's inappropriate touching "unhelpful" because it "demonstrated to me that she was not going to help me remedy the problem." *See* Pl. Ex. BB, Hoffman Dec., ¶22. Dr. Hoffman further testified that "I did not do anything else about Dr. Noonan's habit of hugging me because I was concerned that he would retaliate against me, or that by taking my complaint further, I would compromise my ability to become a tenured professor." *See id.,* ¶23. | **Undisputed** that Dr. Hoffman made these remarks.<br><br>The University notes that those remarks reflected Dr. Hoffman's opinion, and respectfully suggests that Dr. Hoffman's opinion is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
|---|---|---|
| 157. | Student A testified she initiated against litigation in New York State court in 2016 because Dr. Noonan falsely informed Canisius security that she was an animal rights terrorist from outside the College, which caused Canisius security to violently remove her from a lecture because he objected to her participation even though Noonan had invited her to attend. *See* Pl. Ex. JJ, Student A Dep., 32/2-42/16. | **Disputed**. Student A (identified in the University's submissions as Student 3) never testified that Dr. Noonan "falsely informed Canisius security that she was an animal rights terrorist," or that she was "violently" removed from the lecture. Ex. JJ at 32:2-42:16.<br><br>In addition, Student A's allegations as to her belief as to the cause of her arrest, or her removal from a lecture due to her disruptive behavior, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 158. | Terri Mangione, a former Title IX Coordinator at Canisius, informed Walleshauser in an e-mail, dated February 12, 2019, that Student A alleged in her 2016 lawsuit that "Dr. Noonan inappropriately touched another student." See Pl. Ex. KK; Pl. Ex. G, Walleshauser Dep., 46/15-47/23. As noted *infra* in Plaintiffs' Response to Fact No. 122, Student A testified that she complained to two deans in 2011 about Dr. Noonan simulated having sex with a student while on a trip to the Pittsburgh Zoo and Dr. Noonan commenting about kissing his students on trips during the first day of a class called Social Organization of Mammals. | The first sentence in paragraph 158 is **undisputed**.<br><br>The second sentence in paragraph 158 is **disputed** because Student A never testified that Dr. Noonan "simulated having sex" with a student while on a trip to the Pittsburgh Zoo. Ex. JJ at 26:18-27:16. Student A testified that on a bus ride to the Pittsburgh Zoo, she "was sitting across from" a non-party student, who was "laying down in the seat with her legs in the aisle." Ex. 12 at 14:16-15:3. Student A testified that Noonan "walked over to" the student and "took [the student's] legs and he put them up over her head[,]" which lasted about "five or ten seconds." Ex. 12 at 15:6-11. |
| 159. | Student A testified that during discovery she provided Canisius with information to support her allegations regarding Dr. Noonan's discriminatory misconduct, as alleged in her lawsuit in 2016, and she is not aware of any | **Undisputed** that Student A claimed she did not "receive . . . any documentation demonstrating that Dr. Noonan received discipline for his part in" her arrest at Canisius. Ex. JJ, 44:23-46:9. |

| | | |
|---|---|---|
| | discipline imposed on Dr. Noonan by Canisius. *See* Pl. Ex. JJ, Student A Dep., 44/23-46/9. | **Disputed**, however, that Student A claimed in her 2016 lawsuit that there had been "discriminatory misconduct" on Dr. Noonan's part when she was removed from the lecture by Canisius Public Safety officers. Her claim is that the Public Safety officers removed her for expressing her beliefs as to animal research. Ex. JJ at 32:2-46:9.<br><br>In addition, Student A's allegations as to her belief as to the cause of her arrest, the causes of her removal from the lecture, or her understanding as to whether Dr. Noonan was disciplined by the University, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 160. | For additional detailed information regarding Dr. Noonan's verbal and physical discriminatory harassment of Dr. Loughead, see Plaintiffs' Response to Fact Nos. 99-105.<br>Dr. Loughead testified that in 2014 or 2015, in response to her complaints about Dr. Noonan's harassment of Sister Pat, and the verbal and physical harassment she was subjected to by him in 2009 or 2010, Dean Erickson laughed, claimed to have a huge pile of complaints regarding Dr. Noonan's misconduct, and said nothing would happen because Dr. Noonan was too powerful:<br>    [Dr. Erickson] laughed, and she said, "We all know what Dr. Noonan is like, and you are not the first person to make a report against him." And I remember that she put her hands on her desk and went something like this, and she said, "There are complaints against this man this high. Nothing is going to happen to him. He's too powerful."<br>See Pl. Ex. B, Loughead Dep., 39/22-40/8. | **Disputed**. Dr. Loughead testified at deposition that in 2014 or 2015 she met with Dean Patricia Erickson, the former Dean of the College of Arts & Sciences, about a Faculty Senate meeting where Dr. Noonan was "unbelievably sadistic" and "cruel" to Sister Pat, a nun from the service-learning office, by "yelling at her." Ex. 13 at 26:4-27:21. Dr. Loughead did not testify that she met with Dean Erickson about "verbal and physical harassment she was subjected to by [Noonan] in 2009 or 2010." Ex. B at 39:5-21.<br><br>The balance of paragraph 160, regarding Dr. Loughead's account of what Dean Erickson stated, is hearsay not within any exception and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 161. | Dr. Loughead testified that she was "flabbergasted that the college would be aware of his behavior and not do something about it[.]" See Pl. Ex. B, Loughead Dep., 40/19-41/5. | **Undisputed** that Dr. Loughead's deposition testimony is accurately recounted in paragraph 161.<br><br>Dr. Loughead's opinion as to the University's actions or inactions, however, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |

| 162. | Dr. Loughead testified that Dr. Noonan's power on campus was related to the fact that at that time the ABEC Department "was the fastest growing major on our campus," and as a result, Dr. Noonan "pretty much got what he wanted from the president and the vice-president, and we all saw it." *See* Pl. Ex. B, Loughead Dep. 32/1-16. | **Undisputed** that Dr. Loughead's deposition testimony is accurately recounted in paragraph 162.<br><br>Dr. Loughead's opinion as to Dr. Noonan's influence at Canisius, however, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
|---|---|---|
| 163. | Dr. Loughead further testified that Dr. Noonan's power on campus was highlighted by the fact that Canisius senior administrators permitted Dr. Noonan to start the ABEC Department, and provided him significant funds even though "[t]hat's not the area of his expertise . . . they allowed him, frankly without qualifications really, to start this new major and this new program and to be the chair of it. And they gave him a lot of startup money to start this new program, and not a lot of us in a small college get money to start a new program." Pl. Ex. B, Loughead Dep., 32/17-33/8. | **Undisputed** that Dr. Loughead's deposition testimony is accurately recounted in paragraph 163.<br><br>Dr. Loughead's opinion as to Dr. Noonan's influence at Canisius, or her views as to his professional expertise, are immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 164. | Dr. Loughead testified that Dr. Noonan received money for trips from Canisius senior administration that was more than what other professors would get from the college for their projects. *See* Pl. Ex. B, Loughead Dep., 34/1-5. | **Undisputed** that Dr. Loughead's deposition testimony is accurately recounted in paragraph 164.<br><br>Dr. Loughead's speculation as to the monies made available to the ABEC Department (of which she never was a member) for student trips, or the comparative amount of funding made available to "other professors," is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 165. | Dr. Loughead testified that Dr. Noonan "was a terrible Faculty Senate Chair" who did not do his job, which was to represent "the will of the faculty" to Canisius senior administrators, and instead sold the faculty "short in order to stay on President Hurley's good side and to continue to get funding from [Hurley]" for himself." *See* | **Undisputed** that Dr. Loughead's deposition testimony is accurately recounted in paragraph 165.<br><br>Dr. Loughead's opinion as to effectiveness of Dr. Noonan as the Faculty Senate Chair, or the relationship he had with University leadership, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |

| | | |
|---|---|---|
| | Pl. Ex. B, Loughead Dep., 24/10-25/7; 46/1-47/10. | |
| 166. | Dr. Loughead's testimony regarding Dr. Noonan's position of power at Canisius is corroborated by testimony from Colleen O'Hara, who worked as the administrative assistant for the Canisius Biology Department from 2002 until 2020, *see* Declaration of Colleen O'Hara, Pl. Ex. LL, and the Declaration of Dr. Matthew Mitchell, a former tenured professor who worked in the Religion and Theological Studies Department and served on the faculty Senate when Dr. Noonan was Chair. *See* Declaration of Dr. Matthew Mitchell, dated October 10, 2024, Pl. Ex. MM. | **Undisputed** that both Ms. O'Hara and Dr. Mitchell were of the opinion that Dr. Noonan was in a "position of power" at Canisius, as reflected in the Declarations identified in paragraph 166. <br><br> Their opinions in this regard are immaterial to the issues in this case, and does not constitute evidence in admissible form; in addition, the content of those Declarations constitutes hearsay not within any exception, *see* text footnote 1, ¶ 204 at pp. 15-16, *infra*, as well as speculation with no foundation, and thus does not constitute evidence in admissible form. |
| 167. | Dr. Mitchell testified that "Dr. Noonan enjoyed access to funding and other privileges that no other faculty member at Canisius enjoyed that I am aware of, despite the fact that dropping enrollment affected every department at the College." *See* Pl. Ex. MM, Mitchell Dec., ¶18. | **Undisputed** that the cited portion of Dr. Mitchell's Declaration is accurately recounted in paragraph 167. <br><br> Dr. Mitchell's speculation as to the level of funding or privilege made available to Dr. Noonan (who was in the Religion and Theological Studies Department, which has no relation to the ABEC Department) is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 168. | Dr. Mitchell testified that while at Canisius, he "noticed that Dr. Noonan often appeared in photographs on the College's social media sites and in Canisius alumni publications, and the pictures were always of Dr. Noonan surrounded and embracing a large group of women students," and that the "photographs of Dr. Noonan with his women students always stood out to me as strange in that they depicted interactions between a professor and his students that was very different from the way I and my Department colleagues interacted with our students," which never involved seeking out hugs or otherwise touching students. *See* Pl. Ex. MM, Mitchell Dec., ¶¶29-31. | **Undisputed** that the quoted portion of Dr. Mitchell's Declaration is accurately recounted in paragraph 168. <br><br> Dr. Mitchell's opinion as to the manner in which Dr. Noonan and others were depicted in unspecified photographs in unnamed publications and unidentified social media sites, however, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 169. | Dr. Mitchell testified that he believes "that President Hurley and others in Canisius' | **Undisputed** that the cited portion of Dr. Mitchell's Declaration is accurately recounted in paragraph 169. |

| | | |
|---|---|---|
| | administration knew that Dr. Noonan's conduct with certain women students crossed the line, and . . . looked the other way because of ABEC's enrollment success and Dr. Noonan's assistance to President Hurley during Noonan's tenure as Faculty Senate Chair." *See* Pl. Ex. MM, Mitchell Dec., ¶32. | Dr. Mitchell's speculation as to what President Hurley or others knew with respect to Dr. Noonan, or what unspecified conduct with "certain [unnamed] women students" that crossed some unspecified "line," however, is without foundation, and does not constitute evidence in admissible form. |
| 170. | Similarly, Colleen O'Hara testified "Dr. Noonan was 'infamous' on campus for engaging in conduct that crossed the line" and "his behavior was condoned by Canisius leaders like President John Hurley" who "regularly praised Dr. Noonan because the ABEC program attracted many students, which made it a very profitable major for the College." Pl. Ex. LL, O'Hara Dec., ¶13. | **Undisputed** that the cited portions of Ms. O'Hara's Declaration are accurately recounted in paragraph 170.<br><br>Ms. O'Hara's speculation as to unspecified behaviors of Dr. Noonan that allegedly "crossed the line," as to President Hurley's purported condonation of those behaviors, and as to other rumors she recounted is hearsay not within any exception, is without foundation, and otherwise does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 171. | O'Hara testified that because she worked and earned her Master's Degree at Canisius, "[s]tudents would complain to me about Dr. Noonan because I was taking classes along side with them and I believe they often viewed me as a peer," and that [m]any ABEC students told me that they believed their professional future depended on maintaining a good relationship with Dr. Noonan even though he treated them badly, such as by yelling at them, by questioning their intelligence, or by harassing them with sexual comments." Pl. Ex. LL, O'Hara Dec., ¶¶4, 19, 23. | **Undisputed** that the quoted portions of Ms. O'Hara's Declaration are accurately recounted in paragraph 171.<br><br>Ms. O'Hara's recitation of comments purportedly made by unidentified students, about unspecified concerns and behaviors related to Dr. Noonan, constitutes inadmissible hearsay not within any exception, is without foundation, and otherwise does not constitute evidence in admissible form. |
| 172. | O'Hara testified that she encouraged students to report Dr. Noonan's sexual harassment to the Chair of the Biology Department but "none of the students felt anyone in a leadership role at Canisius would believe them or do anything to make the situation better." Pl. Ex. LL, O'Hara Dec., ¶ 25. | **Undisputed** that the quoted portions of Ms. O'Hara's Declaration are accurately recounted in paragraph 172.<br><br>Ms. O'Hara's speculation as to the beliefs and opinions of unspecified students is inadmissible hearsay not within any exception, is without foundation, and otherwise does not constitute evidence in admissible form. |
| 173. | Dr. Paul Waldau, who is an attorney and an educator working at the intersection of animal studies, law, ethics, religion, and cultural studies, worked at Canisius as the senior | **Undisputed** that Dr. Waldau worked at Canisius beginning in or around 2011, and that he claims to be an attorney and an educator working at the intersection of animal studies, law, ethics, religion, and cultural studies. |

| | | |
|---|---|---|
| | faculty for the Master of Science in Anthrozoology, starting in 2011. *See* Pl. Ex. NN, Declaration of Dr. Paul Waldau, Dated August 8, 2023, ¶¶ 3-9. | |
| 174. | In a Declaration submitted in this litigation, Dr. Waldau testified that Mary Fiorella, who worked as the ABEC program administrative assistant for many years, informed him "that a student [Student B] was asked by Dr. Noonan to show him her scar from recent heart surgery," and Dr. Waldau, himself, observed that "the student was very uncomfortable and upset" by Dr. Noonan's sexual misconduct. *See* Pl. Ex. NN, Waldau Dec., ¶¶ 22-23. | **Undisputed** that Dr. Waldau submitted a Declaration in this litigation, and that the quoted portions of that Declaration are correctly recited.<br><br>**Disputed** that a request to see a surgical scar constitutes "sexual misconduct," or that Dr. Waldau used that term in his Declaration. Ex. NN. |
| 175. | Dr. Waldau testified that he subsequently reported Dr. Noonan's sexual misconduct with Student B to Terri Mangione, who was then Canisius' Title IX Coordinator, during a telephone call on February 12, 2016. *See* Pl. Ex. NN, Waldau Dec., ¶¶ 27-30. | **Undisputed** that Dr. Waldau made a report on or about February 12, 2016 to Dean Mangione about Dr. Noonan's alleged request to see the surgical scar and that at that time Dean Mangione was the University's Title IX Coordinator.<br><br>**Disputed** that a request to see a surgical scar constitutes "sexual misconduct," or that Dr. Waldau reported it as such. Ex. NN. |
| 176. | Dr. Waldau testified that Mangione told him, "you're doing the right thing" by making the verbal Title IX report, in which he specifically identified Dr Noonan by name, but the complaint was never reduced to writing because no one ever asked Dr. Waldau to submit a written record of any kind. *See* Pl. Ex. NN, Waldau Dec., ¶¶31, 33. | **Undisputed**, except the reasons that Dr. Waldau did not reduce the report to writing reflect the operation of his mind, and are not known to the University or to plaintiffs. |
| 177. | Dr. Waldau testified that he "distinctly recall[ed] making the report to Ms. Mangione about Dr. Noonan's mistreatment" of Student B because "I wanted to ring his bell and call attention to the way he interacted with women at Canisius," although he is unaware of any action that Canisius took in response to his report to Mangione because "I did not think it was my place to inquire any further about the matter." *See* Pl. Ex. NN, Waldau Dec., ¶¶35; 37. | **Undisputed** that Dr. Waldau submitted a Declaration in this litigation, that the report he made to Dean Mangione involved Student B, and that the quoted portions of that Declaration are correctly recited.<br><br>The reasons Dr. Waldau made the report, or failed to make further inquiry, reflect the operation of his mind, and are not known to the University or to plaintiffs. |

| | | |
|---|---|---|
| 178. | Dr. Waldau's declaration demonstrates that in April 2015, he had a confrontation with Dr. Noonan regarding Dr. Noonan's inappropriate and unwanted hugging of women faculty members in the ABEC Department, including Dr. Christy Hoffman and Dr. Malini Suchak, who expressed to Dr. Noonan that they did not want to be hugged by him or engage in group hugs with him. *See* Waldau Dec., ¶¶ 13, 14, 18. | **Undisputed** that Dr. Waldau submitted a Declaration in this litigation, and that he claims to have told Dr. Noonan, in or around April 2015, that certain faculty members, including Dr. Suchak, did not wish to engage in group hugs. |
| 179. | In April 2015, Dr. Waldau testified that he told Dr. Noonan that the "conversations in the hall I had with other faculty colleagues had focused on his troubling failure to observe someone's wishes about being forced to join a group hug or to be hugged by him[.]" Pl. Ex. NN, Waldau Dec., ¶¶ 18-21. | **Undisputed** that Dr. Waldau submitted a Declaration in this litigation, that the quoted portions of the Declaration are correctly recited, and that Dr. Waldau claims to have told Dr. Noonan, in or around April 2015, that certain persons did not wish to join group hugs. |
| 180. | For additional information regarding complaints about Dr. Noonan raised by Dr. Russell and Dr. Suchak in 2017-18, *see* Plaintiffs' Responses to Fact Nos. 93-98. Walleshauser's notes from her meeting with Dr. Suchak on February 12, 2019 confirms Dr. Suchak's testimony that she first reported to Dr. Gill in 2017 her concerns regarding the "quality of [the] student experience on [Dr. Noonan's] trips," which included "[f]ilming students"; "[f]avoritism in selecting students," which "many students expressed concern [about]," and that Dr. Suchak also complained to Mangione, the Title IX Coordinator, regarding Dr. Noonan's "fitness test[s]" to exclude certain students from trips, with "[n]o follow up that [Dr. Suchak] was aware" of. *See* Pl. Ex. OO, Canisius 342. Both Dr. Suchak and Dr. Russell testified that Canisius did nothing to investigate or remedy their complaints about the quality of Dr. Noonan's student trips, his repeated selection of the same students for the trips, and his use of fitness tests to exclude LGBTQ students. *See* Pl. Ex. U, Russell Dep., 47/8-15; Pl. Ex. W, Suchak Dep., 49/7-50/23 | **Disputed in part.** The second sentence that purportedly summarizes Ms. Walleshauser's notes is not correctly summarized. The note actually states, "October 11, 2017-took notes-Dr. Gill regarding concerns regarding Dr. Noonan. Centered on quality of student experience on trips. Filming students expressed concerns." Ex. OO<br><br>The third sentence that purportedly summarizes Ms. Walleshauser's notes also is not correctly summarized. Dr. Russell testified, "I don't know" when asked about Dr. Gill's response to his and Dr. Suchak's "concerns about the quality of student trips and the misuse of funds[.]" Ex. U at 47:8-15. Dr. Suchak testified, "I don't know" when asked about "the follow-up" of her meetings with Dr. Gill and Dr. McCarthy. Ex. W at 49:7-50:23.<br><br>In addition, Dr. Russell and Dr. Suchak never testified that Dr. Noonan used fitness tests "to exclude LGBTQ students." Ex. U at 47:8-15; Ex. W at 49:7-50:23. Dr. Suchak testified, "[S]ome students were getting excluded from the trip because they couldn't pass the physical fitness test." Ex. W at 41:2-22. |

| 181. | Testimony from Student C, a Canisius graduate, corroborates the complaints raised by Dr. Suchak and Dr. Russell regarding Dr. Noonan's use of fitness requirements to exclude students from his trips. *See* Declaration of Student C, dated October 11, 2024, attached as Pl. Ex. PP. | **Undisputed** that Student C stated that she believed that Dr. Noonan used fitness requirements to exclude students from the trips he led.<br><br>Student C's speculation as to Dr. Noonan's motivation for considering fitness requirements in selecting students for trips where animals would be examined in the wild, however, is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
|---|---|---|
| 182. | Student C testified that she was an "out" queer student in the ABEC Department when she attended Canisius from 2014 to 2019. *See* Pl. Ex. PP, Student C Dec., ¶¶ 2-5. Student C testified that "Dr. Noonan required students to engage in intense physical fitness tests for some trips [and] for one trip to the Algonquin Provincial Park in Canada, Dr. Noonan told me once directly, "I don't think this trip is for you," to discourage me from applying, mentioning a strenuous physical test, which he said I would have to take and that I would be the only student who needs to take the physical test, even though it was not a prerequisite listed before signup." *See id, ¶¶* 2-5. | **Undisputed** that Student C testified as quoted.<br><br>Student C's speculation, however, as to the reasons that Dr. Noonan used physical fitness assessment measures as a factor in selecting trip participants, or Dr. Noonan's opinion as to whether she would be taken on a particular trip, are immaterial to the issues in this case, are without foundation, and do not constitute evidence in admissible form. |
| 183. | Student C testified that she discussed Dr. Noonan's inappropriate treatment with Dr. Russell, who is gay and "took me under his wing," "because Dr. Russell had been one of Dr. Noonan's students as an undergraduate student and told me he had been subjected to mistreatment by Dr. Noonan as a student, himself." *See* Pl. Ex. PP, Student C Dec., ¶¶ 26-27. Student C also testified that "[n]o ABEC faculty member even encouraged me to go to the Title IX office to complain about Dr. Noonan's treatment of me, [including his inappropriate] class comments, and his refusal to select me for trips and the Buffalo Zoo work-study through CAC." *See id,* ¶28. | **Disputed in part**. Student C testified, "I never discussed all of Dr. Noonan's inappropriate treatment of me with Dr. Russel[.]"<br><br>**Undisputed** that the remaining quoted portions of Student C's Declaration are accurately recounted in paragraph 183.<br><br>Student C's recitation of what Dr. Russell purportedly stated is hearsay not within any exception, and her opinion as to Dr. Noonan's selection of students for trips and work-study or his reasoning is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |

| | | |
|---|---|---|
| 184. | Dr. Suchak testified that she studied under Dr. Noonan as an undergraduate student at Canisius, which she attended from 2003 to 2007. *See* Pl. Ex. W, Suchak Dep., 24/7-25/3. | **Undisputed**. |
| 185. | Dr. Suchak testified kept a diary of the discriminatory harassment she was subjected to by Dr. Noonan in her first year working as a faculty member in the ABEC Department, which is a two-page single spaced document featuring twenty-five (25) different instances of harassment. *See* Pl. Ex. W, Suchak Dep., 16/3-17/12; 24/7-25/3. | **Disputed**. Dr. Suchak never testified that she experienced "discriminatory harassment" by Dr. Noonan in her first year working as a faculty member in the ABEC Department. Ex. W at 16:3-17:12. |
| 186. | Dr. Suchak testified that she kept the harassment log because she wanted "a running record of interactions that showed that [Dr. Noonan] was behaving in an overbearing and inappropriate way towards me." *See* Pl. Ex. W, Suchak Dep., 17/2-12. | **Disputed.** Dr. Suchak never testified that she kept a "harassment log." Ex. W at 17:2-12. The balance of paragraph 186 is correctly quoted from Dr. Suchak's testimony. |
| 187. | Dr. Suchak testified that she did not report Dr. Noonan's discriminatory mistreatment of her as a faculty member to Canisius until February 2019 because she read the sexual harassment policy as requiring affirmative sexual misconduct that occurred in secret, and what she experienced from Dr. Noonan was "a power move" because "I pushed back against him and it was a way that he was able to assert power over me. "*See* PL. Ex. W, Suchak Dep., 78/1-16. | **Disputed**. Dr. Suchak never testified that she experienced "discriminatory mistreatment" from Dr. Noonan, or that she "read the sexual harassment policy as requiring affirmative sexual misconduct that occurred in secret." Ex. W at 78:1-16.<br><br>Dr. Suchak testified, "When I started in 2013 and it started happening, I reviewed the policies and at the time I really could only find a sexual harassment policy, not a general harassment policy. And it was very clear to me that it was not sexual in nature and did not fall under that policy so I didn't feel that he was violating any policy that I could find." Ex. W at 78:1-16. |
| 188. | At her deposition, Dr. Margulis acknowledged that she is a mandatory reporter under the Canisius Title IX policy. *See* Pl. QQ (Canisius Sexual Misconduct Policy); Pl. Ex. GG, Margulis Dep., 26/19-27/5; 30/22-31/6. | **Undisputed**. |
| 189. | Before the meeting with Dr. Hogan and Walleshauser on January 28, 2019, Dr. Margulis, who at all relevant times was the | **Disputed**. The cited exhibit and excerpts from Dr. Margulis' deposition transcript do not show that the referenced document was emailed to Ms. Walleshauser, |

| | | |
|---|---|---|
| | Chair of the ABEC Department, e-mailed to Walleshauser a document entitled "DR. SUE MARGULIS — Notes on issues with M[ichael]N[oonan] (1/27/19)", which describes numerous complaints regarding Dr. Noonan's sexual harassment from students, which she never reported to Canisius' Title IX coordinator prior to that time. *See* Pl. Ex. EE; Pl. Ex. GG, Margulis Dep., 31/10-15; 64/1-18. | or that a meeting took place on January 28, 2019 between Dr. Hogan and Ms. Walleshauser. The cited exhibit and deposition excerpts also do not show that Dr. Margulis "never reported to Canisius' Title IX coordinator prior to that time." Ex. EE; Ex. GG at 31:10-15; 64:1-18. |
| 190. | At her deposition, Dr. Margulis confirmed that the student complaint memorialized under the point starting with "Fall 18" in her memorandum for Walleshauser reflected complaints raised to her by Student D. *See* Pl. Ex. GG, Margulis Dep., 65/17-66/5. | **Undisputed**. Canisius notes that the student referenced in paragraph 190 as Student D has been identified in the University's submissions as Student 2. |
| 191. | With regard to the Student D complaint regarding Dr. Noonan's comments in the Sex and Evolution class that "rape is natural," Dr. Margulis refused to say that such comments were inappropriate and insisted that his comments were "not inaccurate" two times during the course of her depositions. *See* Pl. Ex. GG, Margulis Dep., 44/23-46/14. | **Undisputed** that Dr. Margulis did not agree that Dr. Noonan's alleged comment in the Sex, Evolution, and Behavior course that "Rape is natural" was "inappropriate" in the context of that course, and that Dr. Margulis testified the comment was "not inaccurate." Dr. Noonan's alleged comments as reported by others is in all events hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 192. | Dr. Margulis further opined that Dr. Noonan's teaching style was problematic only for "some people" and "not to everyone." *See* Pl. Ex. GG, Margulis Dep.,46/4-14. | **Undisputed**. |
| 193. | Dr. Margulis also refused to answer under oath whether it was her "position that rape is natural, that [this] statement could be unobjectionable to some people?" *See* Pl. Ex. GG, Margulis Dep., 46/16-47/12. | **Disputed**. Dr. Margulis was asked at deposition, "So it's your position that rape is natural, that statement could be unobjectionable to some people?" Dr. Margulis responded, "I don't know the context in which it was used. I don't know whether he was referring to humans or non human[s]." She also responded, "I am not really sure how to answer that." Ex. GG at 46:16-47:12. |
| 194. | Dr. Margulis testified that she was prompted to write her memorandum for Walleshauser after Student E, a Project Tiger student who reported Dr. Noonan's discriminatory harassment of the students who went on the | **Disputed.** The cited exhibit and excerpts from Dr. Margulis' deposition transcript do not support the contention that "Dr. Margulis testified that she was prompted to write her memorandum for Walleshauser after Student E, a Project Tiger student who reported Dr. |

| | | |
|---|---|---|
| | India trip, which Margulis memorialized as follows:<br><br>January '19: "Project tiger' trip to India. Note that 6 students were only asked to pay $2000 for this trip and 2 students (film crew) $1000 each. That is, students contributed $14,000 for a trip whose total cost approached $50,000.<br><br>These students are to some extent "indebted" now (Noonan "owns" them) so whatever additional work or time he asks for, they are obligated to provide. His behavior in India was concerning (based on conversation with 1 student).<br><br>He was agitated and hostile to the students, and to the local staff. He expressed concern about his own health (sometimes indicating he felt faint) and generally did not eat during the trip. "the wildlife was great but Noonan was difficult" is something I've heard from several students. He apparently made >1 student cry.<br><br>PL. Ex. EE; Pl. Ex. GG, Margulis Dep., 66/6-67/11. | Noonan's discriminatory harassment of the students who went on the India trip." Ex. EE; Ex. GG at 66:6-67:11.<br><br>**Undisputed** that the balance of paragraph 194 accurately recounts the cited portions of Exhibit EE, which constitute the notes created by Dr. Margulis after her discussion with Student E. |
| 195. | Dr. Margulis admitted that she met with Tuhovak in March 2018 to discuss Tuhovak's complaints regarding Dr. Noonan's verbal abuse and other discriminatory harassment as a member of his research team but did not memorialize that conversation except with a calendar entry noting that Tuhovak came to her with "concerns." *See* Pl. Ex. GG, Margulis Dep., 38/13-40/21; Pl. Ex. EE. | **Disputed in part**. Dr. Margulis testified she met with Natassia Tuhovak on March 13, 2018. Ex. GG at 40:2-21. However, Dr. Margulis never testified that she met with Ms. Tuhovak to discuss Dr. Noonan's "verbal abuse and other discriminatory harassment as a member of his research team." Dr. Margulis testified that she "memorialize[d]" her meeting with Tuhovak "[W]hen I tried to summarize events" for Ms. Walleshauser in a January 27, 2019 summary list. Ex. GG at 38:13-40:21; *see also* Ex. EE. |
| 196. | Dr. Margulis admitted that she incorrectly reported to Walleshauser in her memorandum that Tuhovak raised her complaints about Dr. Noonan's verbal abuse and other discriminatory harassment in March 2018, and not in January 2019 as it appears in her | **Unsupported**. Plaintiffs cite page 69 of Exhibit GG, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Paragraph 196 is thus not supported by admissible evidence. |

| | | |
|---|---|---|
| | January 27, 2019 summary. *See* Pl. Ex. GG, Margulis Dep., 69/12-21; *cf.* Pl. Ex. EE. | In all events, however, the meeting with Ms. Tuhovak occurred in March 2018. Ex. D. |
| 197. | Dr. Margulis admitted that her response to Tuhovak's complaints about Dr. Noonan's harassment and discriminatory abuse was to leave his research time. *See* Pl. Ex. GG, Margulis Dep., 70/10-71/11. | **Disputed in part**. Dr. Margulis never testified that she met with Ms. Tuhovak to discuss Dr. Noonan's "harassment and discriminatory abuse." Ex. GG at 38:13-40:21.<br><br>**Undisputed** that Dr. Margulis advised Ms. Tuhovak to leave Dr. Noonan's research team. Ex. GG at 70:16-22. |
| 198. | Dr. Margulis claimed that Tuhovak's "[r]esearch was not very important given her career path," but then admitted that she never discussed with Tuhovak what Tuhovak's opinion was and whether Tuhovak "didn't want to complete the research." *See* Pl. Ex. GG, Margulis Dep., 70/4-71/19. | **Disputed in part**. Dr. Margulis never testified that she discussed with Ms. Tuhovak what Tuhovak's opinion was, and whether Tuhovak 'didn't want to complete the research.'" Ex. GG at 70:4-71:19.<br><br>**Undisputed** that the balance of paragraph 198 accurately recounts the quoted excerpt from Dr. Margulis' transcript. |
| 199. | Dr. Margulis confirmed she met again with Walleshauser on February 12, 2019 to inform her that Plaintiffs and the other students with whom Walleshauser met on February 11, 2019 were "going to the news" to complain about Dr. Noonan's discriminatory misconduct. *See* Pl. RR; *See* Pl. Ex. GG, Margulis Dep., Margulis Dep., 94/5-96/2. | **Undisputed.** While Dr. Margulis never testified that she informed Ms. Walleshauser on February 12, 2019 that students were "going to the news to complain about Dr. Noonan's discriminatory misconduct," she testified, "I don't recall, but I assume if that's written there, that I probably did." Ex. GG at 95:5-9. |
| 200. | Deborah Owens, who is the current Canisius Title IX Coordinator, testified that Canisius' Title IX Policy in effect from May 8, 2017 to 2020, when it was modified, did not require a student to agree to an investigation of an alleged harasser for the College to take action, and that the decision whether to investigate a complaint about sexual harassment was to be driven by the "Title IX coordinator" who "would review [the complaint] and make an assessment of any risk of harm to the individual who chose not to report and/or to the broader college community and would | **Undisputed**. |

| | | |
|---|---|---|
| | take steps necessary to address those risks." *See* Pl. Ex. SS, Owens Dep., 36/8-39/17; *see also* Canisius Sexual Misconduct, Domestic Violence, Dating Violence and Stalking Policy, Pl. Ex. QQ, at Canisius 16. | |
| 201. | Canisius' Sexual Misconduct policy does not require a complainant to report sexual harassment complaints to the Title IX coordinator and does not require a complainant to provide the College with a written complaint:<br><br>The college urges persons who believe they have been victims of Sexual or Gender-Based Misconduct to address their situation by reporting to the College or to local law enforcement. Individuals are strongly encouraged to speak with someone on campus or off campus, regardless of their choices to report or not to report the alleged violation to the college or law enforcement, so as to ensure they receive all necessary support. Persons who believe they have been victims of Sexual or Gender-Based Misconduct have the right to make a report to campus security, local law enforcement, and/or state police, or choose not to report; to report the incident to Canisius or not to report; and to receive assistance and resources from the college. Retaliation against an individual who brings a good faith report, participates in an investigation, or pursues a criminal charge is prohibited, and will not be tolerated by the college.<br>See Canisius Sexual Misconduct, Domestic Violence, Dating Violence and Stalking Policy, Pl. Ex. QQ, at Canisius 16. | **Disputed in part**. The quoted excerpt from the University's Sexual Misconduct, Domestic Violence, Dating Violence, and Stalking Policy does not state that sexual harassment complaints need not be reported to the Title IX coordinator, or that complainants are not required to provide Canisius with a written complaint.<br><br>**Undisputed** that the balance of paragraph 201 is an accurately quoted excerpt from the referenced Policy. |
| 202. | Whelan testified that she did not believe that Dr. Noonan's interest in her being constipated in India related to his concern for her well-being. Rather, Whelan testified that Dr. Noonan was "obsessed with the idea that I was constipated," which was part of a "greater pattern of him grooming us and getting us to trust him . . . so that then he could then get us | **Disputed.** Ms. Whelan testified, "I understood very clearly that he wanted me to believe that he was concerned about my constipation." Ex. J at 119:12-18. Noonan also sent a contemporaneous email, dated January 7, 2019, to Patricia Creahan, APRN, a nurse practitioner and the Director of the Canisius Student Health Service, reflecting his concern about the constipation and abdominal pain of a student who |

| | | |
|---|---|---|
| | close enough to sexually exploit us as students." *See* Pl. Ex. J, Whelan Dep., 117/1-121/2. | ultimately was taken to a medical center in rural India for treatment. *See* Ex. 64, submitted herewith.<br><br>**Undisputed** that Ms. Whelan's deposition testimony is accurately recounted in the second sentence of paragraph 202.<br><br>Ms. Whelan's speculation as to the motivation for Dr. Noonan's actions is without foundation, and otherwise does not constitute evidence in admissible form. |
| 203. | Whelan testified that she informed Walleshauser on February 11, 2019 that when Dr. Noonan became "obsessed with the idea that I was constipated," a "red flag went off immediately" in her mind because Wood had informed her before the Project Tiger India trip that Dr. Noonan had tried to convince another student with constipation to allow him to inert a suppository into her anus on a trip to Uganda in 2018. *See* Pl. Ex. J, Whelan Dep., 210/13-211/7; Pl. Ex. K at Canisius 314. | **Undisputed** that the cited portions of Exhibit K and Ms. Whelan's deposition testimony are accurately recounted in paragraph 203.<br><br>Ms. Whelan's contentions as to comments purportedly made by an unidentified student to Ms. Wood, who then purportedly reported them to Whelan, is double hearsay not within any exceptions, and Whelan's speculation as to the motivations for the actions of Dr. Noonan is without foundation, and otherwise does not constitute evidence in admissible form. |
| 204. | Whelan testified regarding additional sexual harassment she and others were subjected to by Dr. Noonan, which included making comments like "I own your bodies"; making comments about Plaintiffs' breast sizes, including they some were "flat-chested" or "we had too much cleavage"; touching Plaintiffs' bra straps and encouraging them to wear specific undergarments; requiring students to meet at the end of the day during trips in their pajamas; asking Engebrecht if she was pregnant; discussing whether he should be able to date younger women; and, asking | **Disputed in part**. Plaintiffs cite pages 230-233 of Ms. Whelan's deposition transcript, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus, there is no evidentiary support for the proposition that Dr. Noonan asked Ms. Engebrecht if she was pregnant, discussed whether he should be able to date younger women, or asked students about their relationships and sex lives.<br><br>In all events, Ms. Whelan's testimony as to statements purportedly made by Dr. Noonan is hearsay not within any exception, and therefore does not constitute evidence in admissible form.[1] |

---

[1] Testimony by students, faculty, and other third parties summarizing statements allegedly made by Noonan, or other nonparties, are hearsay to which no applicable exception applies. *Saud v. DePaul Univ.*, 2024 U.S. Dist. LEXIS 221111, at *5-6 (N.D. Il. Dec. 6, 2024) (Title IX Coordinator's notes and reports summarizing the statements of university administrators and students were hearsay and inadmissible). Dr. Noonan's purported statements do not fall within the hearsay exception for admissions of a party opponent under Rule 801(2) of the Federal Rules of Evidence because Dr. Noonan is not a party to the instant action. Furthermore, his alleged statements are not admissible because he was a university employee during or prior to 2019. The Supreme Court has admonished that Title IX liability cannot be based on theories of respondeat superior or constructive notice. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)

| | | |
|---|---|---|
| | students, including Whelan and the other Plaintiffs, about their relationships and sex lives. *See* Pl. Ex. J, Whelan Dep., 138/3-139/8; 165/12-167/9 230/1- 233/22. | |
| 205. | Whelan testified that after the trip to India, Dr. Noonan insisted that the Project Tiger students travel with him to Canada to interview a wildlife artist who did nothing relating to tiger conservation and it was just another example of Dr. Noonan monopolizing their time, which occurred either shortly before or after the February 11, 2019 meeting with Walleshauser. *See* Pl. Ex. J, Whelan Dep., 126/15-128/2. | **Disputed in part.** Ms. Whelan did not testify that the interview with the wildlife artist occurred "shortly before or after" the February 11, 2019 meeting. Whelan testified, "[I]t was sometime after we all decided to report him . . . it could have been after we actually reported him to Title IX or after we all decided to report him to Title IX." Ex. J at 127:12-21.<br><br>**Undisputed** that the balance of paragraph 205 accurately recounts Whelan's deposition testimony.<br><br>Ms. Whelan's speculation as to the motivation for Dr. Noonan seeking to have students interview the wildlife artist is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 206. | Whelan testified that during the trip to Canada with Dr. Noonan in February 2019, the Project Tiger students questioned the value of the trip to see "an artist who has nothing to do with tiger conservation", and Dr. Noonan became angry that they were questioning his authority and claimed the students "were trying to over throw him". *See* Pl. Ex., J, Whelan Dep., 129/2-22. | **Disputed in part**. Ms. Whelan never testified that the trip to Canada with Dr. Noonan occurred in "February 2019." Ex. J at 129:2-22.<br><br>**Undisputed** that the balance of paragraph 206 accurately cites Ms. Whelan's deposition testimony. |
| 207. | Whelan testified that after Dr. Noonan's removal, Dr. Margulis openly complained about how much additional work she had to do and how all of the other professors in the ABEC Department were affected as well. *See* Pl. Ex. J, Whelan Dep., 185/16-186/19. | **Disputed.** Ms. Whelan never testified that Dr. Margulis "openly complained" about "additional work she had to do" after Dr. Noonan's suspension. Whelan testified that in her opinion Dr. Margulis' "attitude was very inconvenienced," and that Dr. Margulis said that "other professors in the department were also going to have to teach his course." Ex. J at 185:16-186:19. |

(it would "frustrate the purposes" of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice without actual notice to a school district official).

|  |  | Ms. Whelan's speculation as to the "attitude" of Dr. Margulis is without foundation, and does not constitute evidence in admissible form. |
|---|---|---|
| 208. | Whelan described how after she complained about Dr. Noonan's discriminatory misconduct, she felt it was "hostile in the ABEC Department" because the faculty exhibited an "attitude of why did you guys report him, this is an inconvenience for us and now we have so much more work to do," and for that reason, she focused her senior year on environmental studies. *See* Pl. Ex. J, Whelan Dep., 184/4-185/10. | **Undisputed** that paragraph 208 accurately cites Ms. Whelan's deposition testimony.<br><br>Ms. Whelan's speculation as to the beliefs and opinions of unspecified faculty members, or what she "felt" with respect to the attitude of those faculty members, are without foundation, and otherwise do not constitute evidence in admissible form. |
| 209. | Whelan testified that she became the research student of another professor, with a plan to "get published in research for environmental studies," but the professor did not continue the research once "COVID hit," which "disrupted any research processes we had laid out[.]" *See* Pl. Ex. J, Whelan Dep., 184/4-185/10. | **Undisputed** that paragraph 209 accurately cites Ms. Whelan's deposition testimony. |
| 210. | Whelan testified that as a result of being subjected to Dr. Noonan's discriminatory misconduct, which she described as "very disheartening, disorienting, and the subsequent hostility in the ABEC Department, she "didn't feel comfortable going to any of the ABEC professors" for guidance or a recommendation letter, and she graduated "with no plan to apply to a graduate program because I no longer had any idea what I wanted to do professionally." *See* Pl. Ex. J, Whelan Dep., 182/19-183/22. | **Disputed in part**. Ms. Whelan never testified that Dr. Noonan subjected her to "discriminatory misconduct." Ex. J at 182:19-183:22.<br><br>**Undisputed** that the balance of paragraph 210 accurately recounts Ms. Whelan's deposition testimony.<br><br>Ms. Whelan's opinion about the purported "hostility" of unspecified members of the ABEC Department is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 211. | Whelan testified that she believed "Canisius failed us" by requiring the students to make a pod cast for the Project Tiger class, only to make the documentary footage available to them after the semester was over, when they would receive no credit and no funding to make the film, and they had to "move forward" with other school work. *See* Pl. Ex. J, Whelan Dep. 264/17-266/3. | **Undisputed** that Ms. Whelan's deposition testimony is accurately recounted in paragraph 211.<br><br>Ms. Whelan's belief with respect to the purported "failures" of the University is immaterial to the issues in this case, is speculative and does not constitute evidence in admissible form. |

17

| | | |
|---|---|---|
| 212. | Whelan testified that in her senior year at Canisius, her mother told her she needed to start going to counseling because she developed an eating disorder, and suffered from severe depression and suicidal ideation, which she said was caused by "the loss of this professor [and] also the loss of this passion I had that was really fueling me as a student at Canisius." *See* Pl. Ex. J, Whelan Dep., 272/7-273/10. | **Undisputed** that Ms. Whelan's deposition testimony is accurately recounted in paragraph 212.<br><br>Ms. Whelan's testimony as to what her mother purportedly stated is hearsay not within any exception, and does not constitute evidence in admissible form. |
| 213. | Whelan testified that she chose to attend Canisius because of the ABEC Department, which, after her initial visit to the school as a prospective student, she viewed as a "cutting edge program" not available at other schools. *See* Pl. Ex. J, Whelan Dep., 64/1-69/6. | **Undisputed** that Ms. Whelan's deposition testimony is accurately recounted in paragraph 213. The University<br><br>Ms. Whelan's reasons for attending Canisius reflect the operation of her mind, and are unknown to the University. |
| 214. | Whelan testified that she worshipped Dr. Noonan "like an idol" and wanted nothing more than to be like Dr. Noonan's former student, Dr. Suchak, another ABEC Department professor, and that she did everything to achieve that goal and "not rock the boat" so that Dr. Noonan would help her achieve what he helped Dr. Suchak achieve. *See* Pl. Ex. J, Whelan Dep., 99/19-101/19. | **Undisputed** that Ms. Whelan's deposition testimony is accurately recounted in paragraph 214.<br><br>Ms. Whelan's opinion of Dr. Noonan and/or Dr. Suchak reflect the operation of her mind, and are unknown to the University. |
| 215. | Wood provided a written complaint regarding Dr. Noonan's sexual harassment to Walleshauser before their one-on-one meeting, even though Wood testified that she "didn't have a great understanding of what, like what sexual harassment truly entailed at point[.]" *See* Pl. Ex. F, Wood Dep., 165/7-166/6; *see also* Wood written complaint, Pl. Ex. TT, Canisius 1586-87. | **Undisputed** that Ms. Wood provided a written statement to Ms. Walleshauser before their one-on-one meeting, and that the quoted portion of paragraph 215 accurately reflect her deposition testimony. |
| 216. | Wood's written complaint regarding Dr. Noonan's discriminatory misconduct included an opening paragraph where she explained that she attended Canisius because of Dr. Noonan, but she decided to come forward and complaint because "I can no longer ignore the degrading and toxic environment he creates for myself, my friends, and other students he | **Disputed in part.** Ms. Wood's statement does not employ the term "discriminatory misconduct," nor does it note that her written statement was "not a complete description of Dr. Noonan's harassment." Ex. TT.<br><br>**Undisputed** that the balance of paragraph 216 accurately recounts the referenced content of Ms. Wood's written statement. |

| | | |
|---|---|---|
| | interacts with." *See* Pl. Ex. TT Canisius 1586. Wood noted that her statement was not a complete description of Dr. Noonan's harassment and that "I have witnessed and heard of endless inappropriate and harmful actions carried out by him directed towards other students[.]" *See id.* | |
| 217. | At her deposition, Wood described the pervasive nature of Dr. Noonan's discriminatory misconduct, which she believed she failed to capture in her written statement because of lack of direction from Walleshauser and the speed with which she was expected to produce it for Canisius: | **Disputed in part**. Ms. Wood did not testify that Dr. Noonan engaged in "discriminatory misconduct." Ex. F at 170:20-171:9. |
| | Looking back I would do more to stress how pervasive this behavior was. And I think I wrote it this way because Linda stressed that they needed like kind of specific instances. But it's difficult to pick out specific instances of like a serial predator. And, again, I think this provides a good snapshot, but I think it was something that I pulled together quickly and without much guidance as to what should be included. | **Undisputed** that Ms. Wood's testimony is accurately quoted in the balance of paragraph 217. |
| | Pl. Ex. F, Wood Dep., 170/20-171/9; see also Wood Dep., 138/3-12 (" this was constantly the nature of conversations with him . . . overly inappropriate, sexualized in nature, sharing way more than anyone should share with a student" | |
| 218. | Wood's statement for Walleshauser regarding Dr. Noonan's discriminatory misconduct describes specific examples of Dr. Noonan's harassment under the following headings: "[l]ack of boundaries"; "[i]nappropriate touching"; and, "toxic masculinity." Pl. Ex. TT, Canisius 1586-87. | **Disputed in part**. Ms. Wood's written statement does not assert that Dr. Noonan engaged in "discriminatory misconduct." Ex. TT.<br><br>**Undisputed** that the balance of paragraph 218 accurately recounts the quoted portions of Ms. Wood's written statement. |
| 219. | Under the "inappropriate touching" heading, Wood reported that Dr. Noonan "physically moved/covered my bra straps on numerous | **Undisputed** that excerpts of Ms. Wood's written statement are accurately quoted in paragraph 219. |

| | | |
|---|---|---|
| | occasions"; "touched/played with my hair without asking"; "asked myself and another student to stretch his leg in our hotel room" in Uganda; "physically moves me by grabbing my arms rather than asking me to move." *See* Pl. Ex. TT, Canisius 1587. | |
| 220. | Under the "toxic masculinity" heading, Wood reported in her written statement that Dr. Noonan "[h]as said I own your bodies" and "[y]ou are not allowed to cut your hair or alter your bodies for the duration of this project"; and "[h]as made me try on clothes and show them to him to get his approval." *See* Pl. Ex. TT, Canisius 1587. | **Undisputed** that excerpts of Ms. Wood's written statement are accurately quoted in paragraph 220. |
| 221. | Under the "lack of boundaries" heading, Wood reported that Dr. Noonan openly discussed his sexual relationship with a 30-year old girlfriend, who he brought on a Canisius trip to Canada and openly engaged in "excess [] flirting/touching"; attempted to "assist" a student in Uganda insert a suppository, noting that Dr. Noonan said: "Some people have trouble with these [suppositories]. I can be a mature adult about this if you need help"; and stating that she brought laxatives to India and gave one to a friend, which resulted in Dr. Noonan "lectured me about needing his permission before interfering with anyone medically" even though "we're all adults." *See* Pl. Ex. TT, Canisius 1586. | **Disputed in part**. Ms. Wood's written statement does not assert that Dr. Noonan "openly discussed his sexual relationship with a 30-year-old girlfriend." It states, "Has talked numerous times about his 30-yar-old ex-girlfriend, who he still 'frequents.'" Ex. TT.<br><br>**Undisputed** that the balance of paragraph 221 accurately recounts the quoted portions of Ms. Wood's written statement. |
| 222. | Wood testified that the 30-year old girlfriend who Dr. Noonan brought on the Canada trip, was a Canisius graduate student, which she found "gross and disgusting," stating further "I don't think it's ever appropriate for a teacher to have a romantic or sexual relationship with a student." *See* Pl. Ex. F, Wood Dep., 99/5-103/5; 195/5-23. | **Disputed in part**. Ms. Wood did not testify that the "30-year-old" individual was Dr. Noonan's "girlfriend." Wood testified that she heard from a student that Dr. Noonan and the 30-year-old had "a more than professional relationship. But, again, I heard it secondhand." Ex. F at 99:5-103:5.<br><br>**Undisputed** that the balance of paragraph 222 includes quoted portions of Ms. Wood's deposition testimony.<br><br>The comments purportedly made to Ms. Wood by another student, including comments allegedly ascribed to Dr. |

| | | Noonan by that student, are hearsay not within any exception, *see* text footnote 1, ¶ 204 at pp. 15-16, *infra*, and portions of the statement reflecting Ms. Wood's opinion are immaterial to the issues in this case, and without foundation. In all events, this information does not constitute evidence in admissible form. |
|---|---|---|
| 223. | In her statement, Wood also noted that Dr. Noonan's lack of boundaries manifested in him speaking "candidly to me about his relationship with the school administration and other ABEC professors." *See* Pl. Ex. TT, Canisius 1586. | **Undisputed** that Ms. Wood's deposition testimony is accurately quoted in paragraph 223.<br><br>Ms. Wood's testimony about Dr. Noonan's statements is hearsay not within any exception, and therefore does not constitute evidence in admissible form, *see* text footnote 1, ¶ 204 at pp. 15-16, *infra*, and Ms. Wood's account of her understanding of Dr. Noonan's "relationship with the school administration and other ABEC professors" is immaterial to the issues in this case. |
| 224. | At her deposition, Wood explained that on the Project Tiger India trip, Dr. Noonan admitted to Wood that he knew of "previous complaint that had been made against him" by "other professors and one student" who accused him of being "sexist" and questioned the "quality of his science." *See* Pl. Ex. F, Wood Dep., 132/16-133/17. | **Disputed in part**. Ms. Wood did not testify that Dr. Noonan "admitted" that "other professors and one student" made a "complaint" against him for being "sexist." Wood testified that "[S]omeone accused him of being sexist." Ex. F at 132:16-134:13. She did not identify this purported complainant, or any person to whom the accusation purportedly was made. *Id.*<br><br>**Undisputed** that Ms. Wood testified, "And then with the other one it was complaints about the quality of his science and, you know, what he did with rats at the university[.]" Ex. F at 134:8-13.<br><br>In addition, Ms. Wood's account of what Dr. Noonan stated to her is hearsay not within any exception, and does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 225. | Wood testified that Dr. Noonan commented to her on "how silly it was that they would come up against him[,] that he was very close [to] President Hurley, and . . . he's untouchable." Pl. Ex. F, Wood Dep., 132/16-133/17. | **Undisputed** that Ms. Wood's testimony is accurately quoted in paragraph 225.<br><br>Ms. Wood's account of what Dr. Noonan stated is hearsay not within any exception, and does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 226. | During the same conversation, Wood testified that Dr. Noonan complained about the #MeToo Movement and how men like him were a victim of it: | **Disputed in part**. Ms. Wood did not testify that Dr. Noonan "complained" about the "#Me Too Movement." Ex. F at 134:14-135:5. |

| | | |
|---|---|---|
| | [Dr. Noonan] had talked about how good men, good men were being put on blast because people these days are so sensitive. And that, you know, implied to me that he was likening himself as one of those good men who was just getting complaints because people were too sensitive and not because they were merited.<br><br>And [Dr. Noonan] specifically referenced Bill Cosby and how he didn't think what Bill Cosby did was that bad.<br>Pl. Ex. F, Wood Dep., 134/14-1351/5. | **Undisputed** that the balance of paragraph 226 quotes from Ms. Wood's deposition testimony.<br><br>Ms. Wood's account of what Dr. Noonan purportedly stated is hearsay not within any exception, does not constitute evidence in admissible form not within any exception, and in all events is immaterial to the issues in this case. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 227. | Wood testified that she and the Project Tiger students continued to e-mail and meet with Dr. Noonan after they met with Walleshauser to complaint about his discriminatory misconduct on February 11, 2019 because no one from Canisius told them that they did not have to continue interacting with him, or provide to them any other instructions. *See* Pl. Ex. F, Wood Dep., 177/12-178/15; 186/8-187/18; 188/4-188/23. | **Disputed**. Ms. Wood did not testify that she and the Project Tiger students continued to "meet with Dr. Noonan after they met with Walleshauser." Ex. F at 177:12-178:15; 186:8-187:18; 188:4-188:23.<br><br>Ms. Wood speculated, "I feel like I continued to engage with" Dr. Noonan after February 11, 2019. Ex. F at 177:12-17. She also testified, "[W]e would constantly be dropping by his office. He would e-mail us and expect us to drop by. We were e-mailing constantly, so that's my memory of the engagement." Ex. F at 177:12-178:15.<br><br>Ms. Wood was asked directly, "Did you ever speak with [Dr. Noonan] after February 11, 2019" and responded, "I don't know. He called us all the time. I couldn't tell you whether I did or didn't." Ex. F at 186:8-11. |
| 228. | Wood testified that Dr. Noonan took the Project Tiger students to Canada to visit an artist in February 2019, and she and other students felt "angry and stressed" because of "fear that he was going to know" about Canisius' investigation into his discriminatory misconduct. *See* Pl. Ex. F, Wood Dep., 175/21-176/22. | **Disputed in part**. Ms. Wood did not testify that she felt concerns about "Canisius' investigation into [Dr. Noonan's] discriminatory misconduct." She testified that she remembered feeling stressed about "the fear that [Noonan] was going to know that like a report, something was imminent in terms of his behavior." Ex. 175:21-176:22. |
| 229. | Wood complained at her deposition about Canisius' disregard for the Project Tiger students who "had spent hundreds, again, collectively thousands of hours working on the film [but] [w]e were told we can't be told anything for legal reasons regarding the film | **Unsupported**. Plaintiffs cite pages 194 and 195 of Exhibit F, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Paragraph 229 is thus unsupported by admissible evidence. |

| | | |
|---|---|---|
| | [and Dr. Margulis and Walleshauser] never referred to anything that showed why or if it was true." *See* Pl. Ex. F, Wood Dep., 194/14-195/1. | |
| 230. | Wood testified that after Dr. Margulis took over the Project Tiger class, it was "ad hoc" and a" really a poor excuse for a class. . . .[I]t was very clear to us that when it came to continuing to complete this film and to complete our course work that it wasn't really have been, and it became an echo of what it was meant to be." *See* Pl. Ex. F, Wood Dep., 195/5-18; 196/9-20. | **Unsupported**. Plaintiffs cite page 195 of Exhibit F, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus, there is no evidentiary support that Ms. Wood testified the Project Tiger course was a "really poor excuse for a class . . . [I]t was very clear to us that when it came to continuing to complete this film and to complete our course work that it wasn't really have been, and it became an echo of what it was meant to be." |
| | | **Undisputed** that Ms. Wood testified that the Project Tiger course was "ad hoc." |
| | | In all events, Ms. Wood's opinion as to the quality of the Project Tiger course in all events is immaterial to the issues in this case, is without foundation, and does not constitute evidence in admissible form. |
| 231. | Wood testified that no one from Canisius explained that she and the other students who came forward about Dr. Noonan's discriminatory misconduct could ask for accommodations, and she was afraid to many any inquiries because no one from Canisius approach her or the other students with "enthusiasm or warmth" after she complained about Dr. Noonan, and when the students asked for updates about Canisius' investigation into their complaints, those requests were "constantly shut down." *See* Pl. Ex. F, Wood Dep., 231/18-232/20. | **Disputed in part**. Ms. Wood never testified that "no one from Canisius explained that she and the other students who came forward about Dr. Noonan's discriminatory misconduct could ask for accommodations." Wood was asked at her deposition, "Did you ask for any personal supports or accommodations during or after February 2019?" Wood responded, "No, I did not. I never felt like—I didn't know what to ask for and I didn't feel like if I did that it would be met with—met with any enthusiasm or warmth." Ex. F at 231:18-232:20. |
| | | **Undisputed** that the balance of paragraph 231 accurately cites Ms. Wood's deposition testimony. |
| | | Ms. Wood's belief that she would not be met with "enthusiasm or warmth" and her belief that update requests were "constantly shut down" in some unidentified manner are immaterial to the issues in this case, and reflects speculation without foundation that does not constitute evidence in admissible form. |
| 232. | Wood testified that after she and the students came forward to complain about Dr. Noonan's discriminatory misconduct, no one told them | **Disputed in part**. Ms. Wood did not testify that Dr. Noonan engaged in "discriminatory misconduct," that the ABEC faculty and staff were "unkind," or that she |

| | | |
|---|---|---|
| | they could access counseling on campus and ABEC faculty staff were unkind to them, which made her reluctant to ask for anything other than a one-day extension for one paper:<br><br>We were never explicitly told that we could access the campus counseling or anything like that if we needed it.<br><br>And above all else it was just this like big dirty thing that felt like an evil elephant in the room that no one would talk about. I knew that our professors were talking about us but never once did anyone say I'm so sorry you're going through this. Pl. Ex. F, Wood Dep., 233/6-22. | was "reluctant to ask for anything other than a one-day extension for a paper." Ex. F at 233:6-22.<br><br>Ms. Wood testified, "I knew that our professors were talking about us but never once did anyone say I'm so sorry you're going through this. Yeah, so it was—I didn't feel like anyone in the faculty or the Title IX Office would be receptive or supportive." Ex. F at 233:6-22.<br><br>**Undisputed** that the balance of paragraph 232 accurately quotes from Ms. Wood's deposition testimony.<br><br>Ms. Wood's belief there was "an evil elephant in the room," and her speculation that unidentified professors were "talking about" plaintiffs and that persons on the faculty or in the Title IX Office would not be "receptive or supportive" of plaintiffs are without foundation, and otherwise do not constitute evidence in admissible form. |
| 233. | Wood testified that she learned more from the internships she had during college, which she obtained on her own merit, than from the classes she attended at Canisius taught by Dr. Noonan, and does not believe her degree has any value to her professionally. Pl. Ex. F, Wood Dep., 267/5-269/7. | **Undisputed** that paragraph 233 accurately recounts Ms. Wood's deposition testimony.<br><br>Ms. Wood's opinions about the relative value of internships, her course work and her Canisius degree are immaterial to the issues in this case, are without foundation, and therefore does not constitute evidence in admissible form. |
| 234. | Engebrecht provided a two-page, single-spaced written complaint to Walleshauser regarding Dr. Noonan's sexual harassment on February 13, 2019, which contains many specific examples of the discriminatory mistreatment she was subjected to over several years. *See* Pl. Ex. UU, Canisius 1631-34; Pl. Ex. D, Engebrecht Dep., 125/5-126/8. | **Disputed in part**. Ms. Engebrecht's written statement to Ms. Walleshauser does not state that Dr. Noonan engaged in "sexual harassment" or "discriminatory mistreatment." Ex. UU.<br><br>**Undisputed** that Ms. Engebrecht provided Ms. Walleshauser a two-page, single-spaced written statement about Dr. Noonan on or about February 13, 2019. |
| 235. | Engebrecht prefaced her "[1]ist of concerns" regarding Dr. Noonan's sexual harassment by informing Canisius that she and the other students who came forward with complaints "are his favorite and most trusted students (he likes to collect students and gain personal relationships with them) . . . the relationship I thought we had. . . . was unique as a student- | **Disputed in part**. Ms. Engebrecht's written statement to Ms. Walleshauser does not state that Dr. Noonan engaged in "sexual harassment." Ex. UU.<br><br>**Undisputed** that the quoted portions of Ms. Engebrecht's written statement are accurately recounted in paragraph 235. |

| | | |
|---|---|---|
| | professor relationship. Now, I have figured out that it was nothing but toxic and manipulative and I am nervous to know what his intentions have been this entire time." *See* Pl. Ex. UU, Canisius 1633. | Ms. Engebrecht's beliefs as to Dr. Noonan's views as to his relationships with students, or his motivations, are speculative, without foundation, and otherwise do not constitute evidence in admissible form. |
| 236. | Engebrecht's complaint details how Dr. Noonan suggested he and Engebrecht could date one another when he noted to her, "we would be very compatible/soul mates/kindred spirits[.]" *See* Pl. Ex. UU, Canisius 1633. | **Disputed in part**. Ms. Engebrecht's written statement to Ms. Walleshauser does not state that "Dr. Noonan suggested he and Engebrecht could date one another." Engebrecht's written statement reflects that Dr. Noonan "said that 'if we were the same age, we would be very compatible/soul mates/kindred spirits." Ex. UU.

**Undisputed** that the balance of paragraph 236 accurately recounts a quotation from Ms. Engebrecht's written statement.

Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her is hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 237. | Engebrecht testified that Dr. Noonan suggested he wanted to date her after she graduated from Canisius, such as by saying to her " we would climb mountains together and I would carry him up the mountain because his legs would be dead by then." *See* Pl. Ex. D, Engebrecht Dep., 118/9-18. | **Disputed in part**. Ms. Engebrecht did not testify that Dr. Noonan "suggested he wanted to date her after she graduated from Canisius." Engebrecht was asked at her deposition, "Did Dr. Noonan ever ask you out on a date?" Engebrecht responded, "Not in a very direct way. He said that we would climb mountains together and I would carry him up the mountain because his legs would be dead by then." Ex. D at 118:9-18.

**Undisputed** that the quotation in paragraph 237 accurately cites Ms. Engebrecht's deposition testimony.

Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her is hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 238. | Engebrecht also noted that Dr. Noonan "frequently discusses his own dating life with me (also stating who I should and should not be in relationships with)" "including his sex life with a 30 year old, and asks for advice/if it is okay," "and asking about my dating life[.]" *See* Pl. Ex. UU, Canisius 1633. | **Undisputed** that the content quoted from Ms. Engebrecht's written statement to Ms. Walleshauser is accurately cited in paragraph 238.

Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her is hearsay not within any exception, and therefore does not constitute evidence in |

| | | admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
|---|---|---|
| 239. | Engebrecht noted that in India, "[w]hile describing in great detail his dating life to me and two other students on a car ride to Kanha [N]ational park, he used terms like `I'd hit that' or the 30 year old he has been `frequenting' in reference to women he is seeing." *See* Pl. Ex. UU, Canisius 1633. | **Undisputed** that the content quoted from Ms. Engebrecht's written statement to Ms. Walleshauser is accurately cited in paragraph 239.<br><br>Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her is hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 240. | Engebrecht also described how Dr. Noonan made comments about her body, including "that I am flat chested when discussing where to put microphones for the film[.]" *See* Pl. Ex. UU, Canisius 1633. | **Undisputed** that the content quoted from Ms. Engebrecht's written statement to Ms. Walleshauser is accurately cited in paragraph 240.<br><br>Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her is hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 241. | Engebrecht described how Dr. Noonan would "isolate individual students to talk with them about personal stuff without asking" and noted that on the way to India, he "pull[ed] me aside to ask if a mark on my neck is possibly related to me being pregnant." *See* Pl. Ex. UU. | **Undisputed** that the content quoted from Ms. Engebrecht's written statement to Ms. Walleshauser is accurately cited in paragraph 241.<br><br>Ms. Engebrecht's contentions as to the content of Dr. Noonan's statement to her about the mark on her neck is hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 242. | Engebrecht's complaint corroborates the complaints of other students regarding Dr. Noonan's inappropriate comments about "own[ing]" students' bodies during the filming of footage for the Project Tiger and Project Wolf documentaries, and of his tendency to "touch[] us frequently" and to "braid and play with our hair" without permission. *See* Pl. Ex. UU. | **Disputed in part**. The quoted content cited in paragraph 242 accurately recounts Ms. Engebrecht's written statement to Ms. Walleshauser, but the University disputes the contention that this constitutes "corroboration."<br><br>Ms. Engebrecht's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore do not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 243. | In Engebrecht's complaint, she expressed how difficult it was to come forward about Dr. Noonan's sexual harassment because of the "power dynamic relationship," "and anyone who has been in some sort of abusive | **Disputed in part**. Ms. Engebrecht's written statement does not state that Dr. Noonan's behavior was "sexual harassment," or that she experienced "intense fear of reprisal." Ex. UU. |

| | | |
|---|---|---|
| | relationship will understand that," while also expressing her intense fear of reprisal from Dr. Noonan when she wrote, "we are putting ourselves at risk for more intense manipulation, verbal abuse, and targeted anger as soon as he finds out about this." *See* Pl. Ex. UU, Canisius 1634. | **Undisputed** that the quoted excerpts from Ms. Engebrecht's written statement are accurately recounted in the balance of paragraph 243.<br><br>Ms. Engebrecht's beliefs and opinions are speculative, without foundation and do not constitute evidence in admissible form. |
| 244. | In Engebrecht's complaint, she raised the issue of the students' ownership rights to the Project Tiger film footage and "[w]hat happens to our 3 credit course?" *See* Pl. Ex. UU, Canisius 1634. | **Undisputed** that the cited portion of Ms. Engebrecht's written statement to Ms. Walleshauser is accurately recounted in paragraph 244. |
| 245. | In her complaint, Engebrecht also expressed concern about having to see and interact with Dr. Noonan again and requested a "no-contact clause until the decision is made" by Canisius about how the college would respond to the student complaints regarding Dr. Noonan's misconduct. *See* Pl. Ex. UU, Canisius 1634. | **Undisputed** that the cited portion of Ms. Engebrecht's written statement to Ms. Walleshauser is accurately recounted in paragraph 245. |
| 246. | At her deposition, Engebrecht testified that Canisius made the Project Tiger film footage available to Dr. Noonan before it became available to the students, like her, who worked on the project and that by the time they received it, at the end of the semester in June 2019, "at this point the project felt just like it didn't have any -- like it was just too late. They didn't give it to us soon enough for us to do anything with it." *See* Pl. Ex. D, Engebrecht Dep., 144/17-145/6; 158/3-159/4. | **Disputed in part**. Ms. Engebrecht never testified that "Canisius made the Project Tiger film footage available to Dr. Noonan before it became available to the students." Engebrecht testified, "I remember them asking us if we were okay with being in the footage that was available to Dr. Noonan, but I don't remember having access to the footage." Ex. D at 144:17-145:6.<br><br>**Undisputed** that the balance of paragraph 246 accurately recounts Ms. Engebrecht's written statement to Ms. Walleshauser. |
| 247. | Engebrecht testified that her Canisius undergraduate degree is of no value because she does not qualify for any science-related employment opportunities beyond the entry-level lab assistant jobs she has had, which require only a high school degree. *See* Pl. Ex. D, Engebrecht Dep., 25/22-28/21. | **Disputed**. Ms. Engebrecht never testified that her Canisius undergraduate degree was of no value "because she does not qualify for any science-related employment opportunities beyond the entry-level lab assistant jobs she has had, which require only a high school degree." Engebrecht testified that she does not think her Canisius degree is of any value, and that her job as a clinical lab assistant at Roswell Park "was not high paying and didn't require my bio degree actually. It was actually graded as a high school GED level job, so I was hoping to move into another position, but I didn't qualify for any." Ex. D at 25:22-28:21; 201:12-17. |

| | | Ms. Engebrecht's opinion as to the value of her undergraduate degree is speculative, without foundation, and does not constitute evidence in admissible form. |
|---|---|---|
| 248. | Boucher provided a written complaint to Walleshauser on February 13, 2019, which contains specific information about the sexual harassment and other discriminatory conduct Dr. Noonan subjected her to, which includes *inter alia:*<br>• "*[c]onsistently* speaks to me one on one about how I do not wear a bra on a day to day basis and is vocal about encouraging me in such behavior";<br>• "mentioned multiple times how he has dated students or has been approached by students and normalizes these instances `it's not that weird'";<br>• "[a]sks for dating advice when one-on-one with female students";<br>• "[n]ormalizes dating people substantially younger than him and tells stories of his dating/ sexual encounters with women throughout his life";<br>• "he[] met my mother and told me afterwards `if anything ever happens to your dad, let me know,' telling me he wants to date my mom"; and,<br>• "[e]xtremely over controlling and unable to accept suggestions. . . no matter how often he calls you smart."<br>*See* Pl. Ex. VV, Canisius 325-26. | **Disputed in part**. Ms. Boucher's written statement to Ms. Walleshauser does not assert that Dr. Noonan's behavior was "sexual harassment" or "discriminatory conduct." Ex. VV.<br><br>**Undisputed** that Ms. Boucher provided her written statement to Ms. Walleshauser on February 13, 2019, and that the quoted excerpts in paragraph 248 accurately recount the content of Boucher's written statement.<br><br>Ms. Boucher's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore do not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 249. | Boucher also provided more context for some of Dr. Noonan's discriminatory conduct in response to an e-mail from Walleshauser on February 23, 2019 in which she described *inter alia* Dr. Noonan's insistence that women like Boucher and another student involved in the conversation get pregnant and have children right away, even though Boucher and the other student "were both pretty visually uncomfortable, and tried to argue that we're still very young and modern medicine is an amazing | **Disputed in part**. Ms. Boucher's email dated February 23, 2019 never described Dr. Noonan's conduct as "discriminatory."<br><br>**Undisputed** that the balance of paragraph 249, reflecting Ms. Boucher's account of discussions with Dr. Noonan about pregnancy, accurately recounts the content of Boucher's February 23, 2019 email to Ms. Walleshauser. |

| | | |
|---|---|---|
| | thing, we don't need to have kids at 20 for them to be healthy." *See* Pl. Ex. WW, Canisius 395. | Ms. Boucher's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore do not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 250. | In the follow-up e-mail to Walleshauser, Boucher also gave additional context regarding Dr. Noonan "asking for dating advice," which happened " many times," including on a trip to the Cleveland Zoo for his social org class spring 2018" when "[h]e asked us for advice about what women liked these days, and . . . told us, unprompted, if [I] remember correctly, about a story from when he was younger about how he seduced a lifeguard at the beach[.]" *See* Pl. Ex. WW, Canisius 395. | **Undisputed** that the substance of Ms. Boucher's email to Ms. Walleshauser, dated February 23, 2019, is accurately recounted in paragraph 250.<br><br>Ms. Boucher's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore does not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 251. | Boucher's written complaints regarding Dr. Noonan's sexual harassment demonstrates numerous instances of Dr. Noonan engaging in discussions about sex with Boucher and other students, which he called "girl talk" and involved "[t]alking about dating younger women a lot and then asking us about our, you know, romantic and sexual lives, you know, who are you dating, stuff like that." *See* Canisius 325-26; Pl. Ex. C, Boucher Dep., 77/7-78/15. | **Disputed in part**. Ms. Boucher's written statement to Ms. Walleshauser (Ex. VV) and her February 23, 2019 email to Ms. Walleshauser (Ex. WW) never describe Dr. Noonan's behavior as "sexual harassment" and do not state that Dr. Noonan "engaged in discussions about sex."<br><br>**Undisputed** that Ms. Boucher testified that "[T]here was a lot of girl talk," and that the balance of paragraph 251 accurately recounts Boucher's deposition testimony. Ex. C at 77:7-78:15.<br><br>Ms. Boucher's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore do not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 252. | Boucher testified that Dr. Noonan's pervasive sex talk with her and other students, which occurred "not just on the bus on the way to Cleveland, but throughout the entire Project Wolf trip it was brought up a lot" and when "I spent a lot of time with him alone at his lab editing and working on the video and he would talk about it then too." *See* Pl. Ex. C, Boucher Dep., 78/10-23. | **Disputed in part**. Ms. Boucher never testified that Dr. Noonan engaged in "pervasive sex talk with her and other students." Ex. C at 78:10-23.<br><br>**Undisputed** that the quoted excerpts from Ms. Boucher's deposition testimony are accurately recounted in paragraph 252.<br><br>Ms. Boucher's contentions as to the content of Dr. Noonan's statements to her or others are hearsay not within any exception, and therefore do not constitute |

| | | |
|---|---|---|
| | | evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 253. | Boucher testified that after Dr. Margulis took over the Project Tiger class, she said there was "legal trouble" regarding the film footage, and did not discuss the film after the first meeting, insisting that the students make a podcast for their final project. *See* Pl. Ex. C, Boucher Dep., 212/5-214/22. | **Disputed in part.** Ms. Boucher never testified that Dr. Margulis "did not discuss the film after the first meeting" or that Dr. Margulis "insisted" that the students make a podcast for their final project. Ex. C at 212:5-214:22. Dr. Margulis also confirmed, in an email sent to (among others) Boucher, that "the idea of podcasts [was] gaining momentum" amongst the Project Tiger students. Ex. 19.

Ms. Boucher was asked at deposition, "Did Dr. Margulis explain to you why she did not feel that a film could be produced?" Boucher responded, "No. The only conversation that she had with us about it was that there was some sort of legal trouble that wasn't described to us in any specificity as to why we could not have the film at that time. But she didn't discuss why the film couldn't be produced at all past that class period." Ex. C at 213:9-19.

Ms. Boucher also testified that Dr. Margulis "suggested" that we make a podcast[.]" Ex. C at 214:2-7.

**Undisputed** that Ms. Boucher testified that Dr. Margulis stated "there was some sort of legal trouble" as to why the students could not produce a film. Ex. C at 213:9-19.

Ms. Boucher's contentions as to the content of Dr. Margulis's statements to her or others are hearsay not within any exception, and therefore do not constitute evidence in admissible form. *See* text footnote 1, ¶ 204 at pp. 15-16, *infra*. |
| 254. | Boucher testified that her intention in attending Canisius was to obtain a PhD in wildlife biology, and she described being part of the Canisius science scholars program, which provided a small group of students with information sessions and other resources to help them get into PhD programs. *See* Pl. Ex. C, Boucher Dep., 31/22-33/2. | **Disputed in part**. Paragraph 254 cites to page 33 of Exhibit C, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus there is no evidentiary support for the proposition that Ms. Boucher's "intention in attending Canisius was to obtain a Ph. D in wildlife biology." Ex. C at 31:22-33:2.

**Undisputed** that Ms. Boucher testified that she participated in the "science scholars program" which was a "program designed to mentor ABEC and biology students who intended to go on to Ph.D programs." Ex C at 31:22-33:2. |

| | | |
|---|---|---|
| 255. | Boucher testified that she ultimately did not apply to a science-related PhD program in part because she did not develop good enough relationships with ABEC faculty after Dr. Noonan's removal and could not get good enough letters of recommendation. *See* Pl. Ex. C, Boucher Dep., 254/4-255/15. | **Unsupported**. Paragraph 255 cites pages 254 and 255 of Exhibit C, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus, there is no support for the proposition stated in paragraph 255.<br><br>In all events, Ms. Boucher's reasoning for deciding not to apply to a science-related PhD program are immaterial to the issues on this motion, and her belief as to the quality of her relationships with the ABEC faculty members are without foundation and do not constitute evidence in admissible form. |
| 256. | Boucher further testified that "I didn't think that a PhD was in the cards" anymore because "college was supposed to teach me about my career and I didn't get that" and she believes there are deficiencies in her "knowledge that I felt I was lacking." *See* Pl. Ex. C, Boucher Dep., 269/15-270/23. | **Unsupported**. Paragraph 256 cites pages 269 and 270 of Exhibit C, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus there is no support for the proposition stated in paragraph 256.<br><br>In all events, Ms. Boucher's belief about reasons she might not be accepted into programs she never applied for are speculative, without foundation and do not constitute evidence in admissible form. |
| 257. | Boucher testified that after Dr. Noonan's removal, Dr. Margulis treated her "really coldly" and "I really struggled to feel like I could build relationships with people in the ABEC Department." Pl. Ex. C, Boucher Dep., 254/4-23. Boucher testified that she ultimately did not apply to a science-related PhD program in part because of the quality of the letters of recommendation from ABEC faculty she did receive. *See id.* 255/1-15. | **Unsupported**. Paragraph 257 cites to pages 254 and 255 of Exhibit C, which are not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus there is no support for the proposition in paragraph 257.<br><br>In all events, Ms. Boucher's belief about the quality of her relationships with ABEC faculty members (including Dr. Margulis), and the reasons she might not be accepted into programs she never applied for, are speculative, without foundation and do not constitute evidence in admissible form. |
| 258. | Moreover, two years after Dr. Noonan's removal, the first opportunity she had to interact with Dr. Margulis again after Project Tiger, Dr. Margulis refused to grant Boucher an accommodation that would have counted a 3-credit ABEC class toward Boucher's ABEC degree, and instead required her to take 18 credits during her final semester to be able to graduate on time, which | **Unsupported**. Paragraph 258 cites to pages 251 and 252 of Exhibit C, which are not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus, there is no support for the proposition in paragraph 258.<br><br>Furthermore, it is incorrect that the "first opportunity [Ms. Boucher] had to interact with Dr. Margulis again after Project Tiger" was "two years after Dr. Noonan's |

| | | |
|---|---|---|
| | cost Boucher additional tuition money and time. Pl. Ex. C, Boucher Dep., 250/4-252/8. | removal." It is also incorrect that Dr. Margulis "refused to grant Boucher an accommodation that would have counted a 3-credit ABEC class toward Boucher's ABEC degree." |
| | | Ms. Boucher and Dr. Margulis corresponded via email on October 21 and 22, 2020 about Boucher's "ABEC credit question." Dr. Margulis wrote to Boucher, "Since you are only short 1 credit, I would be willing to make an exception and count one semester of Science Scholars seminar towards ABEC. That should make all the difference, will it not?" Boucher responded, "Thank you so much again, I really appreciate the exception." *See* Exhibit 24. |
| 259. | Tuhovak testified that she only applied to colleges with animal behavior programs and chose to attend Canisius because she believed Dr. Noonan would help her achieve her dream of becoming a scientist like he did for Dr. Suchak. *See* Pl. Ex. E, Tuhovak Dep., 29/14-31/14; 65/20-69/4. | **Unsupported in part**. Paragraph 259 cites pages 66, 67, and 68 of Exhibit E, which is not included in plaintiffs' submissions, or otherwise part of the Record on this motion. Thus, there is no support for the proposition in paragraph 259 that Ms. Tuhovak "chose to attend Canisius because she believed Dr. Noonan would help her achieve her dream of becoming a scientist like he did for Dr. Suchak." |
| | | **Undisputed** that Ms. Tuhovak testified that she "only applied to colleges with animal behavior programs." |
| 260. | During a trip with Dr. Noonan and other students to Hawaii, Dr. Noonan photographed Tuhovak and the other students without their consent, including when they were diving into the ocean and Tuhovak's tankini flew up and exposed her breasts. See Pl. Ex. E, Tuhovak Dep.,90/12-107/8. | **Disputed in part**. Ms. Tuhovak did not testify that Dr. Noonan "photographed" Tuhovak's "breasts." Tuhovak testified, "When I was cliff diving . . . my top flew up when I was jumping off and I remember putting it down as quickly as possible and—and feeling very uncomfortable because I look up and Dr. Noonan is still filming. And I just thought maybe he didn't see, maybe—maybe he didn't—maybe he didn't even see, it was all the bubbles." Ex. E at 95:18-96:5. |
| 261. | Tuhovak testified that when she and Student F met with Dr. Hogan on February 5, 2019, they described for Dr. Hogan the "harassment and the ways where he screaming at us" and other instances of "sexual harassment," which made Dr. Hogan's "eyes go[] just really wide" and "that's when she really recommended that we go to the Title IX office[.]" Pl. Ex. E, Tuhovak Dep., 139/5-140/14 | **Undisputed** that Ms. Tuhovak's deposition testimony is accurately recounted in paragraph 261. |

| 262. | Tuhovak specifically recalled telling Dr. Hogan about how Dr. Noonan liked to engage in "girl talk" during which he would ask students "sexual questions"; Dr. Noonan making sexual jokes about ejaculation when using pipettes in the lab; Dr. Noonan requiring students to "stretch his leg"; and, Dr. Noonan requiring that he thread microphones through students' shirts while filming. Pl. Ex. E, Tuhovak Dep., 156/5-158/7. | **Undisputed** that Ms. Tuhovak's deposition testimony is accurately recounted in paragraph 262. |
|---|---|---|
| 263. | Tuhovak testified that when she met with Walleshauser, she informed her that Dr. Noonan required his research students like her to "stretch" his leg in the lab and that he would "make this groaning sound" that made her very uncomfortable. Pl. Ex. E, Tuhovak Dep., 144/5-146/11. | **Undisputed** that Ms.Tuhovak's deposition testimony is accurately recounted in paragraph 263. |
| 264. | Tuhovak testified that in the Spring of 2019, after she met with Walleshauser regarding her complaints about Dr. Noonan's verbal abuse and other sexual harassment, Tuhovak requested accommodation from her political science professor in the form of an extension for a paper, and even though she explained that the requested extension was needed because she was involved in a Title IX proceeding, her political science professor, who is an attorney, denied the requested accommodation and took off half a grade on the paper. Pl. Ex. E, Tuhovak Dep., 210/14-212/22. | **Disputed in part**. Ms. Tuhovak testified that she said to Dr. Klump, her political science professor, "I said, you know, the Title IX investigation is going on, this is what's kind of happening. I'm sorry that this is late, can I—can I get [a paper] to you at a later date or like later tonight? And he said yes, but I'm still docking a half letter grade off for being late regardless of the reason." Ex. E at 212:15-22. Tuhovak further testified that she received an "A minus, maybe B plus" on the paper. Ex. E at 213:10-16. And she received an "A" for the course. Ex. E at 213:14-16; Ex. 41 at Canisius 06872.<br><br>**Undisputed** that Ms. Tuhovak discussed Dr. Noonan's conduct with Ms. Walleshauser in 2019, and that her political science professor was an attorney. |
| 265. | Tuhovak testified that the experience of having a requested accommodation denied by her political science professor discouraged her from asking for any other accommodations at Canisius again. Pl. Ex. E, Tuhovak Dep., 213/17-214/12. | **Disputed**. Ms. Tuhovak did not testify that "having a requested accommodation denied by her political science professor discouraged her from asking for any other accommodations at Canisius again."<br><br>Ms. Tuhovak testified, "I didn't even really know that there were mainly accommodations especially after, you know, Professor Klump still—like he—he's an attorney and I thought, okay, well, if he's still taking—taking letter grades off of my paper, then I likely don't have that right." Ex. E at 213:17-214:4. |

| 266. | Tuhovak continued working with Dr. Noonan in his research lab and was subjected to sexual harassment, both after her March 2018 complaint to Dr. Margulis, and her complaints in early February 2019 to Dr. Hogan and Walleshauser. Pl. Ex. E, Tuhovak Dep., 130/11-137/11. | **Disputed**. Ms. Tuhovak never testified that she "was subjected to sexual harassment, both after her March 2018 complaint to Dr. Margulis, and her complaints in early February 2019 to Dr. Hogan and Ms. Walleshauser." Ex. E.<br><br>Ms. Tuhovak testified that after she met with Dr. Margulis on March 13, 2018, "I got to a point where I felt like the school was not going to help me and I had to just succumb to the realization that—that I was going to go through another year of—of abuse and harassment. And the best way I could just think of it was just to put my head down and try to distance myself as much as possible from Dr. Noonan and hope that he didn't continue to yell at me and harass me, come up to my—come up to my computer and start braiding my hair. I was hopeful that like he wouldn't make me stretch his knee even though I've always told him no. Like I had to –I had to mentally prepare myself that that was going to be the rest of my year." Ex. E at 130:22-131:16. |
|---|---|---|
| 267. | Tuhovak testified she feared "the worst" about encountering Dr. Noonan after he was informed of the complaints raised by her and other students about his sexual harassment, because of "how volatile he was with us." Pl. Ex. E, Tuhovak Dep., 200/20-201/21. | **Disputed in part**. Ms. Tuhovak did not testify that she "feared 'the worst' about encountering Dr. Noonan after he was informed of the complaints raised by her and other students about his sexual harassment."<br><br>Ms. Tuhovak testified, "[W]ith that anxiety and fear being so high of not knowing how he would react, I assumed the worst." Ex. E at 202:17-203:1.<br><br>Ms. Tuhovak's belief with respect to how Dr. Noonan might behave is immaterial to the issues in this case, is without foundation and does not constitute evidence in admissible form. |
| 268. | Tuhovak testified, she gave up her childhood dream of becoming a scientist because the education she received at Canisius was "very poor" since "Dr. Noonan really focused more on . . . ways to sexually harass students . . . for his own titila[tion]" and not on teaching his students." Pl. Ex. E, Tuhovak Dep., 268/3-16. | **Disputed**. Ms. Tuhovak never testified that she "gave up her childhood dream of becoming a scientist," or that "the education she received at Canisius was very poor." Ex. E.<br><br>Ms. Tuhovak testified, "I think in regards to any of the classes that I took with Dr. Noonan and any—any knowledge that I had—that I could have potentially had to do research, that education was very poor. Dr. Noonan really focused more on—on how he could include ways to sexually harass students and make them |

| | | |
|---|---|---|
| | | uncomfortable and—you know, for his own titillization I guess." Ex. E at 268:3-16.<br><br>Ms. Tuhovak's opinion of the quality of her Canisius education, and her speculation as to the motivation of Dr. Noonan, are immaterial to the issues in this case, are without foundation, and do not constitute evidence in admissible form. |
| 269. | Dr. Hogan confirmed that Tuhovak complained to her that "HR should have contacted students prior to [the] first meeting [on February 21, 2019] with Mike [Noonan] to let them know they should not be in the lab." *See* Pl. Ex. A, Hogan Dep., 131/6-132/9. | **Disputed**. Dr. Hogan was asked at deposition, "It seems like this note says HR should have contacted students prior to first meeting with [Dr. Noonan] to let them know that they should not be in the lab?" Dr. Hogan responded, "Yes, to let them know when they should not be in the lab." Ex. A at 132:4-11.<br><br>Dr. Hogan also testified that Ms. Tuhovak "was definitely upset that she didn't know about the meeting ahead of time." Ex. A at 132:18-19.<br><br>Ms. Tuhovak never claimed that she was in the lab on February 21, 2019, and she never saw Dr. Noonan in the lab, or anywhere else, on or after February 21. Ex. E at 182:6-21. |
| 270. | On February 12, 2019, Dr. Hogan e-mailed Dr. McCarthy, Dean Schaber and Walleshauser with a list of accommodations requested by Plaintiffs and the other students who came forward with complaints about Dr. Noonan sexual harassment, which included *inter alia* a no-contact order and access to video footage to allow Project Tiger students to "continue to work on the film." *See* Canisius 1643 -44. | **Disputed in part**. Dr. Hogan's February 12, 2019 email does not state that it is a "list of accommodations requested by Plaintiffs and other students who came forward with complaints about Dr. Noonan's sexual harassment." Ex. R.<br><br>Dr. Hogan's February 12, 2019 email states, "I met with one of the students who does research with Dr. Noonan—she shared with me a number of concerns that students have about this situation." The listed concerns included, "Requesting a non-contact clause," "film footage from Project India," "CEEP/work study students," and "Backup of data." Ex. R.<br><br>**Undisputed** that Dr. Hogan sent a February 12, 2019 email to Dr. McCarthy, Dean Schaber, and Ms. Walleshauser. |
| 271. | Dr. Hogan also testified that Plaintiffs and other student complainants expressed concern about getting letters of recommendation and | **Disputed**. Dr. Hogan never testified that "plaintiffs and other student complainants expressed concern about getting letters of recommendation and specifically |

| | | |
|---|---|---|
| | specifically requested accommodation on this issue. *See* Pl. Ex. A, Hogan Dep. 54/9-55/14. | requested accommodation on this issue." Ex. A at 54:9-55:14. |
| 272. | Dr. Hogan's notes confirm her "plan of action" included "protect[Ing] current students" and "letter[s] of recommendation." *See* Canisius 587. | **Undisputed** that paragraph 272 accurately quotes from Dr. Hogan's handwritten notes. Ex. H at Canisius 00587. |
| 273. | Walleshauser admitted at her deposition that she never discussed accommodations with Plaintiffs and the other student complainants, including "specific accommodations that could be made available to them," and instead provided them with "general information and said if they needed support, to advise us." *See* Pl. Ex. G, Walleshauser Dep., 119/7-120/17. | **Disputed in part**. Ms. Walleshauser did not testify that she "never discussed accommodations with Plaintiffs and the other student complainants." Ex. G at 119:7-120:17.<br><br>Ms. Walleshauser testified, "I asked them through every meeting and email if they needed anything, to ask, and that we as—as the college were—were here to support them."<br><br>**Undisputed** that Ms. Walleshauser also testified, "I gave them general information and said if they needed any support, to—to advise us." Ex. G at 120:6-17. |
| 274. | Walleshauser further testified that issues related to Project Tiger, recommendation letters and the academic "back up plan" for Plaintiffs and the other student complaints were designated for Dr. Margulis, Dean Schaber and Dr. McCarthy to resolve. *See* Pl. Ex. G, Walleshauser Dep., 107/18-111/5. For that reason, Walleshauser was "not sure" at her deposition even if the Project Tiger film was ever completed by Plaintiffs. *See id.,* 110/5-111/5. | **Disputed in part**. Ms. Walleshauser never testified about "recommendation letters." Ex. G.<br><br>Ms. Walleshauser was asked at her deposition, "So with regard to addressing a backup plan for all area class, research team, work-study students, and Project Tiger, who was ultimately responsible for that?" Ms. Walleshauser responded, "That would have been Dr. Sue Margulis, Dr. Liz Hogan, and Dr. Peter Schaber, who was the dean, and all of this would have been reviewed and discussed under the advisement of the vice-president, Dr. Margaret McCarthy." Ex. G at 109:1-9.<br><br>Ms. Walleshauser was also asked, "So you don't know one way or the other if they made the Project Tiger documentary during the spring of 2019, correct?" Ms. Walleshauser responded, "Correct, I'm not certain." Ex. G at 111:2-5. |
| 275. | Canisius administrators were concerned that Dr. Noonan "clearly would be devastated[ed] to be removed from the college" so they made "sure he has access to counseling if need be," even after | **Undisputed** that Dr. Hogan's deposition testimony is accurately recounted in paragraph 275. |

| | |
|---|---|
| his removal from campus while on paid leave. *See* Pl. Ex. A, Hogan Dep., 86/15-87/2. | |

Dated: March 10, 2025                              **HODGSON RUSS LLP**


                                                   By: /s/ Thomas S. D'Antonio
                                                           Thomas S. D'Antonio
                                                           Christine M. Naassana

                                                   1800 Bausch & Lomb Place
                                                   Rochester, NY 14604
                                                   585.454.0700

                                                   *Attorneys for defendant Canisius University*