UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

SIERRA BOUCHER, LILY ENGEBRECHT,  )
NATASSIA TUHOVAK, HANNAH          )
WHELAN, and CASSIDY WOOD,         )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )      Case No. 1:22-cv-00381
                                  )
TRUSTEES OF CANISIUS COLLEGE,     )
                                  )
          Defendant.              )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART THE COLLEGE'S MOTION**
**FOR SUMMARY JUDGMENT**
(Doc. 33)

Plaintiffs Sierra Boucher, Lily Engebrecht, Natassia Tuhovak, Hannah Whelan, and Cassidy Wood (collectively, "Plaintiffs") brought this action against Trustees of Canisius College (the "College") alleging causes of action for violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, for sexual harassment/hostile educational environment (Count I), gender discrimination (Count II), and retaliation (Count III). Plaintiffs also assert breach of contract (Count IV), estoppel and reliance (Count V), and negligent retention and supervision (Count VI).[1] On December 16, 2024, the College filed a motion for summary judgment on Plaintiffs' remaining claims. (Doc. 33.) On February 6, 2025, Plaintiffs opposed the motion, (Doc. 36), and the College filed a reply on March 10, 2025. (Doc. 51.)

Plaintiffs are represented by Daniela Elizabeth Nanau, Esq. The College is represented by Thomas S. D'Antonio, Esq., and Christine Marie Naassana, Esq.

---

[1] Plaintiffs have withdrawn Count V. *See* Doc. 10 at 27 n.2. The court has dismissed Counts II and VI. *See* Doc. 15 at 24.

I.    **Whether the Court Should Deem the College's Statement of Undisputed Material Facts Admitted.**

Pursuant to Western District of New York Local Rule 56, a party opposing summary judgment

> [S]hall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. Each such statement must be followed by citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Federal Rule of Civil Procedure 56(c)(1)(A).

W.D.N.Y. Loc. R. Civ. P. 56(a)(2) (emphasis omitted).

Collectively, the parties have submitted over 125 pages of fact, most of which are single-spaced, far beyond what is necessary for this case. In addition, Plaintiffs seek to include facts regarding Dr. Michael Noonan's alleged bad behavior generally, even if it is unrelated to their claims and there is no viable claim that it constitutes sexual harassment.[2] This information is not "material" and shall be disregarded. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") (citation omitted).

The College further argues that in responding to its Statement of Undisputed Material Facts ("SUMF"), Plaintiffs' Statement of Disputed Material Facts ("SDMF") includes "assertions and propositions that do not contravene the articulated fact at issue[,]" (Doc. 51-1 at 1), and that, as a result, the court should deem the portions of the College's SUMF admitted. The court agrees.

In response to the College's SUMF, Plaintiffs submitted a SDMF and a Statement of Additional Material Facts ("SAMF"). In their SDMF, in some instances, Plaintiffs dispute the College's SUMF by providing additional, non-responsive facts. "[A]dditional facts do not belong in . . . the response to a movant's statement of material facts." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 326 (N.D.N.Y. 2021). Western District of New York Local Rule 56(a)(2) "instructs the non-movant to include these 'additional material

---

[2] To the extent that a fact alleges hostility based on gender, it will be considered.

facts' separately from the admissions or denials that make up a non-movant's response to the movant's statement of facts." *Id.* The purpose of Local Rule 56 "is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) (citations omitted). This purpose is defeated when the parties do not follow applicable Local Rules intended to winnow the facts and allow a reviewing court to easily determine whether a fact is disputed.

District courts, "have broad discretion to determine whether to overlook a party's failure to comply with Local Rule 56[][.]" *Sec. & Exch. Comm'n v. Genovese*, 553 F. Supp. 3d 24, 32 n.1 (S.D.N.Y. 2021) (citing *Holtz*, 258 F. 3d at 73). Here, unless a factual assertion is disputed by responsive record evidence, it will not be deemed to identify a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record[.]"). To the extent that Plaintiffs dispute the College's SUMF with immaterial, non-responsive facts, the College's facts will be deemed admitted. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion[.]"). Any other approach rewards a party for non-compliance with the Federal Rules of Civil Procedure and this court's Local Rules.

## II.    Whether Plaintiffs' SDMF and SAMF Incorporate Facts Based on Inadmissible Evidence.

The College challenges certain facts in Plaintiffs' SDMF and SAMF because they allegedly rely on inadmissible evidence, particularly hearsay. To oppose the College's motion for summary judgment, Plaintiffs must rely on "evidence that will be presented in an admissible form *at trial*." *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (emphasis supplied); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) ("[The non-moving party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial.") (internal citations omitted). Accordingly,

3

if evidence is not presented in an admissible form at the summary judgment phase but may be presented in an admissible form at trial, a court may consider it. *See, e.g., Brunette v. City of Burlington*, 2018 WL 4146598, at *21 (D. Vt. Aug. 30, 2018) ("While the content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, 'the material may be presented in a form that would not, in itself, be admissible at trial.'") (citation omitted); *Gade v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 7306433, at *16 (D. Vt. Nov. 19, 2015) ("Based upon the undisputed facts, the [expert] report is admissible for the limited purpose of demonstrating that, pre-lawsuit, State Farm consulted with an expert witness in the course of analyzing [the p]laintiff's 2008 [uninsured motorist] claim."). The court will therefore proceed on this basis and will not exclude evidence on hearsay grounds unless there is no likelihood that it could be admitted at trial.

## III.    Undisputed Facts.

### A.    The Parties.

Michael Noonan, Ph.D., was a tenured faculty member at the College, where he taught for approximately forty years. He has a background in psychology and began his career at the College in the Psychiatry Department. In 2009, the Animal Behavior and Ecological Conservation ("ABEC") Department was established, in which Dr. Noonan was a professor from its establishment through 2019.

Plaintiffs were enrolled at the College during the relevant 2018-2019 academic year. Plaintiff Sierra Boucher enrolled as a freshman at the College in the fall of 2017. Ms. Boucher double majored in ABEC and digital media arts with a concentration in film. In May 2021, she graduated *magna cum laude* from the College with a 3.73 cumulative GPA.

Plaintiff Lily Engebrecht enrolled as a freshman at the College in the fall of 2016, where she majored in ABEC and biology with a minor in conservation. Ms. Engebrecht graduated *cum laude* from the College in May 2020, with a 3.55 cumulative GPA. Malini Suchak, Ph.D., a professor in the ABEC Department, served as Ms. Engebrecht's advisor.

Plaintiff Natassia Tuhovak enrolled as a freshman at the College in the fall of 2015. Ms. Tuhovak graduated *summa cum laude* in May of 2019 with a 3.89 cumulative GPA with a triple major in ABEC, political science, and communication studies. Ms. Tuhovak's academic advisor was also Dr. Suchak.

Plaintiff Hannah Whelan enrolled as a freshman at the College in the fall of 2016, where she majored in ABEC and environmental studies with a minor in English. In May 2020, Ms. Whelan graduated with *summa cum laude* honors and a 3.94 cumulative GPA. Joshua Russell, Ph.D., a professor in the ABEC Department, served as Ms. Whelan's ABEC advisor.

Plaintiff Cassidy Wood enrolled in the College in the spring of 2017 as a transfer student. Ms. Wood majored in ABEC with minors in anthrozoology, psychology, and sociology. In May 2020, she graduated *cum laude* from the College with a 3.55 cumulative GPA. Dr. Suchak served as her advisor.

### B.     The College's Title IX Policy.

The College's Title IX Policy states in relevant part:

The [C]ollege urges persons who believe they have been victims of Sexual or Gender-Based Misconduct to address their situation by reporting to the College or to local law enforcement. Individuals are strongly encouraged to speak with someone on campus or off campus, regardless of their choices to report or not to report the alleged violation to the [C]ollege or law enforcement, so as to ensure they receive all necessary support. Persons who believe they have been victims of Sexual or Gender-Based Misconduct have the right to make a report to campus security, local law enforcement, and/or state police, or choose not to report; to report the incident to [the College] or not to report; and to receive assistance and resources from the [C]ollege. Retaliation against an individual who brings a good faith report, participates in an investigation, or pursues a criminal charge is prohibited, and will not be tolerated by the [C]ollege.

\* \* \*

If a Reporting Individual does not wish for their name to be shared, does not wish for an investigation to take place, or does not want a formal resolution to be pursued, the Reporting Individual may make such a request to the Title IX Coordinator, who will evaluate that request in light of the duty to ensure the safety of the campus and comply with federal law. In cases indicating pattern, plan, premeditation, threat, weapons[,] and/or

violence, the [C]ollege will likely be unable to honor a request. In cases where the Reporting Individual requests privacy and the circumstances allow the [C]ollege to honor that request, the [C]ollege will offer interim supports and remedies to the Reporting Individual and the community, but will not otherwise pursue formal action. When a Reporting Individual makes a non-confidential report to the [C]ollege, she or he has the right to expect the [C]ollege to institute proceedings to resolve the matter promptly, fairly, and impartially from the initial investigation to the final result. Retaliation will not be tolerated.

(Doc. 43-4 at 17, 19.)

C.    **The Project Tiger Trip to India.**

During the Spring 2019 semester, the College offered a three-credit course, "ABEC 490: Canisius Ambassadors for Conservation," ("CAC"), which was taught by Dr. Noonan and included a trip to India for students to observe and document tiger conservation efforts and produce a documentary called "Project Tiger" to reflect their research. (Doc. 33-67 at 4, ¶ 16.) Dr. Noonan and eight female students, including Ms. Boucher, Ms. Engebrecht, Ms. Whelan, and Ms. Wood, were part of Project Tiger. While the parties do not clarify the exact timeline of the trip to India, it is undisputed that the trip concluded on January 13, 2019.

During the trip to India, the students did not have working cell phones, nor did they have access to computers or the internet. In the course of the trip, none of the students contacted any staff at the College or any other individuals with concerns pertaining to Dr. Noonan, although it is not clear that they had an ability to do so.

D.    **The February 11, 2019 Meeting.**

On February 5, 2019, Ms. Tuhovak and an unidentified student met with Dr. Elizabeth Hogan, the College's Chair of the Biology Department, and reported Dr. Noonan's "sexual harassment[,]" and Dr. Hogan "recommended that [they] go to the Title IX office[.]" (Doc. 38-5 at 47:6, 47:11-12.) On Thursday, February 7, 2019, Ms. Tuhovak sent an email to Linda Walleshauser, the College's Title IX Coordinator, requesting to meet with her "in order to 'discuss some concerns' [Ms.] Tuhovak was having with 'a professor.'" (Doc. 33-67 at 3, ¶ 10) (citation omitted). Ms. Tuhovak neither identified the professor nor specified her concerns in her email. Ms. Walleshauser

6

was away from the College on February 7, 2019, but she responded to Ms. Tuhovak within six minutes of receiving the email, and they scheduled a meeting for 8:00 a.m. on Monday, February 11, 2019 (the "February 11 Meeting"), which was the first day Ms. Walleshauser would be back on campus.

On February 8, 2019, Ms. Tuhovak emailed Ms. Walleshauser to inform her that some additional unidentified students wished to join the February 11 Meeting. On February 11, 2019, Ms. Walleshauser met with a group of female students (the "Complaining Students"), including Plaintiffs, who expressed concerns regarding Dr. Noonan's behavior during the course of the Project Tiger trip to India in January 2019. In the meeting, the Complaining Students also expressed their concerns regarding Dr. Noonan more generally. Ms. Walleshauser requested that the Complaining Students submit written statements detailing their concerns.

The following day, Dr. Hogan sent Ms. Walleshauser an email stating that she "met with one of the students who does research with Dr. Noonan[, and] [the student] shared with [her] a number of concerns that students have about this situation." (Doc. 39-8 at 2.) In relevant part, Dr. Hogan's email relayed that the Complaining Students were requesting a "no-contact clause[,]" explaining that "[t]he students (involved with either research or Project [Tiger]) continue to be worried about retaliation. They believe that telling Dr. Noonan not to retaliate will be ineffective. They are requesting a no-contact clause between Dr. Noonan and themselves for a specified period of time after he is informed of their allegations." *Id.* (emphasis omitted).

### E.    Individual Meetings and Written Statements.

Between February 11 and February 13, 2019, Ms. Walleshauser held individual meetings with each of the Complaining Students. Thereafter, Ms. Boucher, Ms. Engebrecht, Ms. Wood, and Ms. Whelan submitted their statements on or before February 13, 2019. Ms. Tuhovak did not provide a written statement.

Ms. Wood's written statement stated in relevant part:

**Lack of Boundaries**

7

- Has talked numerous times about this [thirty]-year-old ex-girlfriend, who he still "frequents." This included him talking about telling his daughters about his relationship, and their reactions (this was in a group setting). He later asked me personally if this discussion made people uncomfortable. He took the girl in question on the CAC British Columbia trip (2017) and myself and other students witnessed an excess of flirting/touchiness.

- Has regularly spoken candidly to me about his relationship with the school administration and other ABEC professors.

- On the CAC Uganda (2018) trip, my roommate was constipated and neither of us had any laxatives. She finally got to the point where she felt the need to ask Dr. Noonan for a laxative and asked me to accompany her to his room to ask. When he answered the door and she told him the situation, he told me to go back downstairs because "[w]e've got this." When my roommate came downstairs a few minutes later, she was laughing and told me that the laxative he gave her was a suppository. She then told me that he offered to "assist" her with it, saying "[s]ome people have trouble with these. I can be a mature adult about this if you need help."

- On the Project Tiger trip, I brought laxatives because of my previous experience . . . . One of the girls on the trip was constipated and asked me if she could take some of my laxatives. Because she is my friend, and we are all adults, I said yes – no questions asked. Dr. Noonan later found this out and lectured me about needing his permission before interfering with anyone medically.

* * *

**Inappropriate Touching**

- He hates when bra straps are showing and has physically moved/covered my bra straps on numerous occasions.

- Has touched/played with my hair without asking.

- Regularly physically moves me by grabbing my arms rather than asking me to move.

- He asked myself and another student to stretch his leg in our hotel room on the CAC Uganda Trip (2018)[.]

**Toxic Masculinity**

- Has said "I own your bodies[,]" [a]nd "[y]ou are not allowed
  to cut your hair or alter your body for the duration of [Project
  Tiger]." . . .

- Has made me try on clothes and show them to him to get his
  "approval."

(Doc. 43-7 at 2-3) (emphasis in original).

Ms. Engebrecht provided a written statement raising the following complaints
about Dr. Noonan:

- [M]anipulative in that he always explained things as "every
  professor does this[,]"[] or "I am like your father[,]"[] etc.

- [T]ouching us frequently when he wants to have us stand in a certain
  position or show[] us something, very unnecessary. Also[, he] would
  braid and play with our hair.

- [S]aid that "if we were the same age, we would be very
  compatible/soul mates/kindred spirits[.]"

- [F]requently discusses his own dating life with me (also stating who
  I should and should not be in relationships with) and asking about
  my dating life, including his sex life with a [thirty-]year[-]old, and
  asks for advice/if it is okay.

- While describing in great detail his dating life to me and two other
  students on a car ride to Kanha [N]ational [P]ark, he used terms like
  "I'd hit that" or the [thirty-]year[-]old he has been "frequenting" in
  reference to women he is seeing.

- [H]e told me that I am flat[-]chested when discussing where to put
  microphones for the film[.]

- [H]e will isolate individual students to talk with them about personal
  stuff without asking[, s]uch as pulling me aside to ask if a mark on
  my neck is possibly related to me being pregnant.

- [I]s not open to any sort of other opinion[.] [H]e will get mad at us if
  we suggest something that [he] does not agree with . . . [,] [i].e.[,]
  discussing fundraiser ideas for a school in India we wanted to donate
  to. He was so angry at us for suggesting to do a school supply drive
  in the library that he got immediately mad[] [and] said[,] "[W]ell, I
  was excited about this[,] but clearly we have different opinions[.] I
  am disappointed that this won't work out."

- He told us once the film started that "I own your hair and
  bodies[,]"[] both [during] Project Wolf . . . and Project Tiger[.] . . .

9

- Between his attitude and strange comments throughout the trip, we decided to respectfully talk with him in one of our meetings (three times) halfway through the trip. We mentioned how we felt uncomfortable with the way he was talking to some of us and how he was handling interviews and interactions we had with people in India. He was unresponsive and did not change. Multiple people individually spoke with him about issues that were occurring throughout the trip in order to not bombard him (I did not, aside from trying to encourage him that we are here for him and want to help in any way that we can)[.]

(Doc. 43-8 at 4-5.)

In her written statement, Ms. Boucher raised the following concerns about Dr. Noonan:

Consistently speaks to me one[-]on[-]one about how I do not wear a bra on a day[-]to[-]day basis and is vocal about encouraging me in such behavior[.]

Had mentioned multiple times how he has dated students or has been approached by students and normalizes these instances[, stating,] "[I]t's not that weird[.]"

Calls me his daughter – praises you and uses language that makes you feel as if you are special and above the rest[;] therefor[e,] you work longer and harder hours for no outside motivation other than you feel as if you are special[.]

Asks people to help with medical situations – i[.]e[.,] bending hurt knee and changing bandages[.] [N]ormalizes the behavior so you feel as if [it is] strange to not help your "friend[.]"

Once he[] met my mother and told me afterwards[,] "[I]f anything ever happens to your dad, let me know[,]" telling me he wants to DATE MY MOM[.] . . .

Is protective over his female students – a [man] dropped me off at the van before we took a trip (a student which [Dr. Noonan] also knows well and should know is a very good guy)[,] and [Dr. Noonan] was very suspicious that we were together at all[,] asked to know what we were doing beforehand, and expressed disbelief at my honest answer.

\* \* \*

Asks for dating advice when one-on-one with female students[.]

Normalizes dating people SUBSTANTIALLY younger than him and tells stories of his dating/sexual encounters with women throughout his life[.]

10

Has expressed to me multiple times that I need to hurry up and get pregnant because it's better to do so earlier in life[.]

Extremely over controlling and unable to accept suggestions. No liberties may be taken without consulting him first, no matter how often he calls you smart. . . .

Takes any problems in his life out on students, questioning our loyalty and stating that he feels [that] something [is] wrong with the group[.]

(Doc. 43-9 at 2-3) (emphasis in original).

### F.    Previous Complaints About Dr. Noonan.

In 2008 or 2009, Dr. Tanya Loughead, a Philosophy Professor, met with Dr. George Boger, the Chair of the Philosophy Department, concerning an interaction with Dr. Noonan where he yelled at her and threw a handful of pens and pencils at her. Dr. Loughead did not inform anyone else of the incident nor file a complaint. In or about 2014 or 2015, Dr. Loughead reiterated concerns regarding Dr. Noonan yelling at Sister Pat, a nun employed by the College, and repeated those concerns to Dr. Patricia Erickson, the former Dean of the College of Arts and Sciences.

In or about 2011, an unidentified student ("Student 1") reported concerns regarding Dr. Noonan's behavior to two unidentified faculty members at the College, who Student 1 claims were Deans.[3] Student 1 reported that "on a bus ride to the Pittsburgh Zoo as part of [Dr. Noonan's Social Organization of Mammals course and lab], she 'was sitting across from' a non-party student, who was 'laying down in the seat with her legs in the aisle[,]'" when "[Dr.] Noonan 'walked over to' the student and 'took the student's legs and he put them up over her head,' which lasted about 'five or ten seconds.'" (Doc. 33-67 at 19, ¶¶ 120-121) (citations and brackets omitted).[4] Student 1 testified that she also complained to the two alleged Deans about "Dr. Noonan

---

[3] In her deposition, Student 1 testified that she spoke with "two different [College] officials and both of them, I believe, were [D]eans. One was a male and one was a female." (Doc. 41-5 at 19:13-16.)

[4] As Plaintiffs detail in their SAMF, Student 1 also testified about her arrest at the College for protesting Dr. Noonan's treatment of rats and her prior lawsuit against the College. These facts are not material.

commenting about kissing his students on trips during the first day of class[.]" (Doc. 42-1 at 28, ¶ 158.)

In 2014, Dr. Christy Hoffman, a faculty member in the ABEC Department, met with Jennifer Skowron, the Assistant Director of Human Resources ("HR"), to discuss Dr. Noonan's behavior. Dr. Hoffman expressed that Dr. Noonan sometimes hugged her, which made her uncomfortable. Because she was pregnant at the time, Dr. Hoffman expressed concern that Dr. Noonan might use that as a reason to touch her stomach. Dr. Hoffman did not indicate that Dr. Noonan had touched her stomach previously. Although Dr. Hoffman raised these concerns because she had witnessed Dr. Noonan touch the stomach of a pregnant colleague and had heard him make statements about touching pregnant people, she did not relay that information to Ms. Skowron. Ms. Skowron reported Dr. Hoffman's complaint to the Head of HR, Deborah Winslow-Schaber, who explained to Dr. Hoffman that "'some people just hug others to show their happiness for them' and asked [Dr. Hoffman] if [she] had ever asked Dr. Noonan not to hug [her]." (Doc. 40-8 at 4, ¶ 21.)

On or about February 11, 2016, Mary Fiorella, an administrative assistant in the ABEC Department, told Dr. Paul Waldau, an Associate Professor, that Dr. Noonan asked an unidentified student "to show him her scar from recent heart surgery."[5] (Doc. 43-1 at

---

[5] As the College points out, Dr. Waldau's affidavit contains triple hearsay. *See Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.") (citations omitted); *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) ("[H]earsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [an] affidavit.") (alteration adopted) (internal quotation marks and citations omitted). Plaintiffs argue that "what [Ms.] Fiorella told Dr. Waldau about Dr. Noonan's harassment of [the student], which prompted him to make a complaint to the Title IX coordinator, is subject to the state of mind exception to the hearsay rule, which allows statements informing a person's state of mind as evidence." (Doc. 36 at 10 n.7) (citation omitted). The court considers the statement because it is possible that, at trial, the statement may not be offered for its truth but for notice. *See* Fed. R. Evid. 801 ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice.") (citations omitted).

4, ¶ 22.) Dr. Waldau reported "what Ms. Fiorella had told [him] and [his] observations of the student[]" to Ms. Mangione, the College's former Title IX Coordinator. *Id.* at 5, ¶ 30.

In 2017, Dr. Suchak and Dr. Russell, who were both faculty members in the ABEC Department, met with Dr. Elizabeth Gill, the Dean of the College of Arts and Sciences at the time, to discuss Dr. Noonan's behavior. The issues raised primarily concerned a trip that Dr. Noonan led with four students to Antarctica. Dr. Suchak and Dr. Russell expressed concern that Dr. Noonan was misusing funds, implementing physical fitness tests as a prerequisite to joining trips, and providing poor experiences due to his aloofness. They reported that Dr. Noonan's physical fitness tests were "pretty rigorous relative to the actual needed physicality of the trip." (Doc. 40-3 at 41:11-13.) "The students who participated on the Antarctica trip . . . never 'complained about any inappropriate conduct by Dr. Noonan that was sexual in nature." (Doc. 33-67 at 16, ¶ 95) (alteration adopted) (citation omitted).

On March 13, 2018, Ms. Tuhovak met with Dr. Susan Margulis, the Chair of the ABEC Department, to discuss Dr. Noonan. Ms. Tuhovak cannot recall whether she used the words "verbal harassment" during the meeting but concedes that she did not use the words "sex discrimination" or "sexual harassment." After the meeting, Ms. Tuhovak did not leave Dr. Noonan's research team and remained on it until his suspension in February 2019.

On December 12, 2018, Dr. Margulis met with an unidentified student ("Student 2") who complained about Dr. Noonan's Sex, Evolution, and Behavior course, stating that Dr. Noonan engaged in inappropriate behavior by, among other things, conducting a survey which asked students how many people they have had sexual intercourse with and whether they had ever been sexually assaulted. Thereafter, Dr. Noonan shared each student's survey answers with the class without warning, which resulted in "outing" some LGBTQ students. On another occasion, Student 2 reported that Dr. Noonan asked the class to comment on the attractiveness of photos of men.

On January 25, 2019, an unidentified student ("Student 3"), who was a research assistant for Dr. Noonan, met with Dr. Hogan and advised that "she decided to stop doing

research with [Dr.] Noonan, described conversations with him that left her in tears, and expressed concern that he would not write her a letter of recommendation for veterinarian school because she left his research team." (Doc. 33-67 at 5, ¶ 20) (citations omitted). Dr. Hogan advised Student 3 that she could contact Ms. Walleshauser directly to report her complaint. That same day, on January 25, 2019, Dr. Hogan informed Ms. Walleshauser of Student 3's concerns. This "was the first time any student had raised concerns with Dr. Hogan about Dr. Noonan." *Id.* at ¶ 22.

On February 7, 2019, Ms. Walleshauser received an anonymous bias report complaining of Dr. Noonan's "allegedly 'sexist' behavior, [which was] filed through the College's confidential reporting tool." *Id.* at 5, ¶ 18 (citation omitted). After the February 11 Meeting, Ms. Walleshauser received another anonymous bias report on February 12, 2019.

### G.    Dr. Noonan's Suspension and Retirement.

On February 11, 2019, Ms. Walleshauser met with senior College officials, including Margaret McCarthy, Ph.D., the College's Vice President for Academic Affairs, and Peter Schaber, Ph.D., the Dean of the College of Arts and Sciences, to discuss the Complaining Students' reports. Dr. Hogan and Dr. Margulis also attended the meeting.

On the morning of February 15, 2019, Ms. Walleshauser sent an email to the Complaining Students advising that "[t]he investigation of Dr. Noonan is ongoing. We expect the process to be completed next Thursday ([February 21, 2019]). I will be sending you an email on Thursday with information on the outcome. In the meantime, if you have any concerns, let me know." (Doc. 33-50 at 2.) That afternoon, on February 15, 2019, Ms. Whelan sent Ms. Walleshauser an email, asking, "Do you know when you will be meeting with Dr. Noonan yet? Also, is there any particular reason he wasn't spoken with before going on another trip with students? I hope I am not out of line[;] I just feel that the level of concern we expressed isn't being taken quite seriously enough." (Doc. 33-67 at 7, ¶ 35) (internal quotation marks omitted) (quoting Doc. 33-51 at 4). Ms. Walleshauser responded as follows:

> Dr. Noonan is traveling but not with students and won't be back until next
> Thursday [February 21, 2019]. I can assure you that these concerns have
> been taken seriously and Dr. Hogan will be following up with you all
> immediately following on the 21st. Please call me if you have any other
> concerns.

*Id.* at 8, ¶ 36 (internal quotation marks omitted) (quoting Doc. 33-51 at 3). Ms. Whelan
replied:

> That is a relief, and also I am very sorry. I should have clarified that for
> myself before emailing you. Thank you for getting back to me so quickly. I
> hope you can understand my concern when hearing (clearly a rumor) that
> he was with students.

> Thank you for everything you have done. Is there any[ ]way that we can
> meet as a group on Wednesday [February 20]? Everyone has questions they
> would like to talk through about what to expect after speaking with Dr.
> Noonan on Thursday.

(Doc. 33-51 at 3.) Ms. Walleshauser responded: "I understand and no need for apologies.
I know that this has been difficult and stressful for all of you. It will be best to wait to
meet again until the investigation is completed on [February] 21." *Id.* at 2.

On the morning of February 21, 2019, Ms. Walleshauser and Dr. McCarthy met
with Dr. Noonan and notified him that "he was being suspended [with pay], effective
immediately and for an indefinite period, and that he was prohibited from communicating
with students during his suspension." (Doc. 33-67 at 8, ¶ 40) (citations omitted). They
also "reminded [him] that retaliation was prohibited, and any acts of retaliation would
merit disciplinary action, up to and including immediate termination." *Id.* at ¶ 41
(citations omitted). During the meeting, Ms. Walleshauser and Dr. McCarthy provided
Dr. Noonan with a suspension letter which states:

> This letter is to inform you that you are being suspended with pay, effective
> immediately and until further notice, as the investigation into student
> complaints of your statements and conduct continues. Please be advised
> that you are not permitted to communicate with students. You are not
> permitted to travel with students or to be in any direct contact with them
> during this suspension. If the need arises, you may communicate with
> members of the campus community through your department chairs, Drs.
> Sue Margulis and Liz Hogan, by phone.

Please note that retaliation is prohibited and anyone who engages in such retaliation will be subject to disciplinary action, up to and including immediate termination. For your information and as a reminder, I quote here the language from the Anti-Discrimination and Harassment Policy: *Retaliation means any action taken against a person who has filed a complaint under the College's policy, or who has participated in or cooperated with an investigation.*

(Doc. 33-52) (emphasis in original). Following the meeting, the College locked Dr. Noonan out of his College-affiliated email address and online accounts, and Dr. Hogan and Dr. Margulis monitored emails sent to Dr. Noonan.

Also on February 21, 2019, Dr. Hogan notified the Complaining Students that "[t]he interview with Dr. Noonan has concluded. Dr. Noonan is on leave from the [C]ollege at this time. He has been advised that any retaliation is not acceptable." (Doc. 33-67 at 9, ¶ 45) (citations and internal quotation marks omitted). Dr. Hogan's email also advised the students "to contact Dr. Margulis, Ms. Walleshauser, or Dr. Hogan if any contact with [Dr.] Noonan occurred," and provided their phone numbers. *Id.* at ¶ 46 (citations omitted). Dr. Hogan's email invited the students to "meet with either Dr. Margulis or [Dr. Hogan] to discuss how to proceed with [their] research projects and/or work on the documentaries." *Id.* at ¶ 47 (internal quotation marks and citations omitted). On the same day, February 21, 2019, Ms. Walleshauser emailed the Complaining Students, reiterating that "[a]s you have been advised by Dr. Hogan, Dr. Noonan is on a leave at this time and is to have no interaction with students during this time. Retaliation of any sort will not be accepted and should be reported immediately." *Id.* at ¶ 48 (internal quotation marks omitted) (quoting Doc. 33-54).

During the continued investigation of Dr. Noonan, on February 22, 2019, and March 14, 2019, Ms. Walleshauser followed up with Ms. Boucher and Ms. Wood to ask additional clarifying questions. On February 28, 2019, Ms. Walleshauser met individually with and collected statements from four of the College's faculty members, Dr. Hoffman, Dr. Margulis, Dr. Russell, and Dr. Suchak, regarding Dr. Noonan's conduct.

On March 13, 2019, Ms. Walleshauser met with Dr. Noonan for a second time to review additional allegations that had been raised by Dr. Hoffman, Dr. Margulis, Dr.

Russell, and Dr. Suchak. The following day, on March 14, 2019, Ms. Walleshauser emailed the Complaining Students and provided the following update of the College's investigation:

> [P]rior to your upcoming break, I wanted to touch base with you to advise you that the investigation is still in progress related to Dr. Noonan. We are working diligently to complete this investigation[;] however, [we] need to assure that we take the time necessary to conduct a thorough investigation. I assure you that I will provide you with an update at the conclusion of this process. I hope that you enjoy your break and return well rested. In the meantime, please don't hesitate to contact me with any questions.

(Doc. 33-60 at 5.) About a month later, on April 15, 2019, Ms. Wood, on behalf of the Complaining Students, emailed Ms. Walleshauser:

> I am reaching out on behalf of the girls on the Project Tiger team to request a meeting in the upcoming week, after Easter Break. Due to the lack of updates, we have all felt extremely in the dark throughout the process concerning our speaking out about Dr. Noonan[] and would like an opportunity to voice our frustrations and have them addressed.

(Doc. 40-4 at 2.) The Complaining Students requested a meeting on April 22, 2019, and Ms. Walleshauser held a meeting with them on April 26, 2019. After the group meeting, Ms. Walleshauser sent weekly email updates to the Complaining Students on April 29, May 6, May 13, May 20, May 28, and June 11, 2019.

After negotiations, the College and Dr. Noonan executed a separation agreement, and Dr. Noonan retired, effective as of June 1, 2019. Pursuant to the separation agreement, the College paid Dr. Noonan approximately $133,000. In her final email update on June 11, 2019, Ms. Walleshauser informed the Complaining Students that Dr. Noonan "had retired from [the College][] and that he would not be returning to the campus as a result of his retirement." (Doc. 33-67 at 14, ¶ 85.)

**H.    The College's Response to Dr. Noonan's Suspension and Retirement.**

Plaintiffs did not see, speak to, or have any contact with Dr. Noonan after his suspension on February 21, 2019. On February 21, 2019, Dr. Margulis notified the students in Dr. Noonan's Social Organization of Mammals course that she would take over the lecture portion of the course and that she and Dr. Suchak would both oversee the

lab portion of the course. That same day, Dr. Margulis emailed Dr. Noonan's research team to notify the students of his suspension. Dr. Margulis emailed the Project Tiger students informing them of Dr. Noonan's suspension and stated that "[i]n order to ensure that your work can continue, I'd like to meet with you soon to discuss your progress. Please let me know if you have a set meeting time, and I will do my best to adjust my schedule accordingly." *Id.* at 11, ¶ 62 (internal quotation marks and citation omitted).

Dr. Margulis assigned Dr. Hoffman to assist Dr. Noonan's research students with data analysis and presentations for an upcoming event. By February 26, 2019, Dr. Margulis had met individually with each of Dr. Noonan's research students.

Dr. Margulis took over supervision of the Project Tiger course, with the assistance of Dr. Russell.[6] Dr. Margulis and Dr. Russell did not have the requisite skills to edit and complete a video documentary with the Project Tiger film footage from the trip to India, and Dr. Margulis was also worried about the ownership of the Project Tiger footage. As a result, Plaintiffs were not provided access to the film footage until after Dr. Noonan's retirement. Instead, Dr. Margulis suggested that the Project Tiger students create a series of educational podcasts regarding their experience, which resulted in a student-produced podcast series titled "Canisius Conservation Conversations." *Id.* at 12, ¶ 69 (internal quotation marks and citations omitted). After the conclusion of the podcast series, on May 14, 2019, Ms. Boucher emailed Dr. McCarthy stating "[w]e really enjoyed making the podcast, and I'm so glad to be able to share our amazing experience, thanks to [the] College, with others." (Doc. 33-22 at 2.) Dr. Margulis offered Ms. Boucher a position as a "host and engineer of additional ABEC Department podcasts[]" for the following academic year. (Doc. 33-67 at 13, ¶ 72) (citations omitted).

In Ms. Walleshauser's June 11, 2019 email, wherein she advised the Complaining Students of Dr. Noonan's retirement, she also "informed the Project Tiger students that they would be afforded access to the Project Tiger video footage, telling them, 'Should you wish to access this material, please let me know and I can see that appropriate

---

[6] To the extent that Dr. Russell's precise involvement in supervising the Project Tiger course is disputed, the dispute is immaterial.

arrangements are made.'" *Id.* at 14, ¶ 85 (citations omitted). Ms. Boucher responded, stating, "Thank you for your help along this process. We really appreciate the work you and [the] College have put in regarding our concerns. I would like to access the footage, if possible[,] over the summer. I am so excited to be able to work on this film. Thank you." (Doc. 33-63 at 2.) Ms. Boucher is the only Plaintiff who chose to access the Project Tiger video footage.

At the conclusion of the Spring 2019 semester, all Plaintiffs earned the applicable three credits and an "A" in the Project Tiger course.[7] Ms. Tuhovak also earned the applicable one credit for her participation on Dr. Noonan's research team. Plaintiffs' GPAs for the Spring 2019 semester ranged from 3.81 to 4.0.

After Dr Noonan's suspension, Ms. Wood requested a one-day extension for a paper, which her professor granted. Ms. Tuhovak also requested an extension for a paper from a Political Science professor, citing the investigation of Dr. Noonan as the reason for the delay. In response, her professor agreed to allow the late submission but reduced the paper by half a letter grade. Ms. Tuhovak received either an "A-" or "B+" on the paper and an "A" in the course.

With regard to Plaintiffs' future opportunities, Dr. Suchak told Ms. Engebrecht that "she was 'happy to serve as a reference' in support of [Ms.] Engebrecht's post-graduation job applications[,]" but Ms. Engebrecht did not ask an ABEC or Biology faculty member for a letter of recommendation. (Doc. 33-67 at 21, ¶ 140) (citation omitted). Dr. Suchak served as a reference for Ms. Tuhovak's summer internship applications in 2020, and both Dr. Suchak and another professor at the College served as references for Ms. Tuhovak's application to the Oregon State Bar in 2022. Ms. Whelan

---

[7] Although Plaintiffs point out that Ms. Engebrecht's, Ms. Whelan's, and Ms. Wood's transcripts designate the Tiger Project course as incomplete, the College clarifies that this is because those Plaintiffs retook the course: "[P]laintiffs' transcripts plainly state, 'An (I) listed at the end of the course will indicate that a course has been repeated and included in the GPA calculation.' Ms. Engebrecht, Ms. Whelan, and Ms. Wood thus have an 'I' next to [the Project Tiger course] because they completed [the Project Tiger course] in previous semesters." (Doc. 51-1 at 11-12, ¶ 73) (internal citation omitted).

graduated from the College as anticipated in the Spring of 2020, but she did not seek advice or assistance from her ABEC advisor, Dr. Russell, for postgraduate opportunities. Ms. Wood conducted research with Dr. Russell in the Fall 2019 semester, and her advisor for her senior capstone was Dr. Margulis. Dr. Russell also provided Ms. Wood with feedback on a portion of her postgraduation job application. Dr. Margulis agreed to write a letter of recommendation and serve as a reference for Ms. Boucher for her summer internship applications. Another faculty member wrote Ms. Boucher a letter of recommendation which she used for applications to various programs, internships, and fellowships. Dr. Suchak wrote Ms. Boucher a letter of recommendation which she used for applications to numerous master's degree programs.

As Ms. Boucher was entering her final semester before her anticipated graduation, she realized she made a mistake in her graduation credit calculation and contacted Dr. Margulis for assistance. Ms. Boucher sent the following email to Dr. Margulis on October 21, 2020:

> I have a question about ABEC credits. Right now I need [seven] more ABEC elective credits to graduate. With my required [digital arts media ("DMA")] classes for my double major, this means I will need to take [nineteen] credits next semester to finish.
>
> Part of why I have this many ABEC electives credits left was because last fall I took Anthrozoology [('Anzo')], mistakenly believing it was an ABEC elective. When I registered in the spring semester previous, I didn't have an ABEC advisor at the time, as Dr. Noonan was in the process of leaving, and so I got my info[rmation] from my DMA advisor. Unfortunately[,] this led to me mistaking Anzo for an ABEC elective. While I understand this is my mistake, if I could get Anzo counted as an ABEC elective[,] it would allow me to take the normal credit amount next semester, saving me a lot of money. Is there any way, under my circumstances, we could count [Anzo] as an ABEC elective credit?

(Doc. 33-25 at 4.) Dr. Margulis responded on the same day, stating, in relevant part:

> Others have asked me to do that in the past, [] [and] my answer has always been no. Don't assume every course in a department counts toward the major – that often isn't the case in most majors.

> Since you are only short [one] credit, I would be willing to make an
> exception and count one semester of Science Scholars [S]eminar toward
> ABEC. That should make the difference, will it not?
>
> In general, you know you can always come to any of us in the [ABEC
> D]epartment for advising.

*Id.* at 3. Ms. Boucher ended up resolving the issue by taking one course that would

provide both capstone and DMA credits and did not accept Dr. Margulis's proposed

resolution.

## IV.    Disputed Facts.

In the March 13, 2018 meeting between Dr. Margulis and Ms. Tuhovak, according

to Dr. Margulis, Ms. Tuhovak "shared . . . that being on [Dr.] Noonan's research team

was 'taking too much of her time'" and "that she 'wanted to leave [his] research team

because she was too overwhelmed [with schoolwork as a triple major]'" but "she was

concerned about how [he] would react." (Doc. 33-67 at 17, ¶¶ 107-08) (citations

omitted). Ms. Tuhovak characterized the meeting as follows:

> I told Dr. Margulis that . . . I was not doing well mentally going into the
> research lab every day, I didn't think I could take it much longer, and I felt
> trapped because I couldn't leave the research team without losing the
> opportunity to get a recommendation letter from [Dr.] Noonan. And then . .
> . miss out on my research project . . . and getting that research credit.

(Doc. 38-5 at 34:15-35:2.) Ms. Tuhovak testified that she told Dr. Margulis that Dr.

Noonan had yelled and screamed at her. Dr. Margulis testified that she gave Ms. Tuhovak

the following advice: "[A] lot of students leave research teams. [Dr. Noonan] probably

wouldn't be happy. He might yell, but to just tell him that she doesn't have the time . . .

to put into it." (Doc. 33-9 at 5:5-8.) Ms. Tuhovak testified that Dr. Margulis responded by

stating, "[W]hat do you want me to do about this? That's just the way he is[;] you know

he's difficult to work with." (Doc. 38-5 at 35:4-6.)

Concerning Student 1's report of Dr. Noonan holding a student's legs up on the

bus ride to the Pittsburgh Zoo, the parties dispute whether Student 1 described the event

to the alleged Deans as Dr. Noonan "simulat[ing] having sex" with the student. (Doc. 51-

2 at 2, ¶ 158) (internal quotation marks and citation omitted).

An unidentified LGBTQ student ("Student 4") claims that, at some point when she attended the College from 2014 to 2019, "Dr. Noonan required students to engage in intense physical fitness tests for some trips that involved activities like swimming and snorkeling, and he would post the physical requirements before students signed up to be considered for the trip." (Doc. 43-3 at 6, ¶ 38.) For one trip in particular, "Dr. Noonan told [Student 4] . . . , 'I don't think this trip is for you,' trying to discourage [her] from applying, mentioning a strenuous physical test, which he said [she] would have to take and that [she] would be the only student who needs to take the physical test, even though it was not a prerequisite listed before sign[-]up." *Id.* at ¶ 39. Plaintiffs assert that Student 4 "discussed Dr. Noonan's inappropriate treatment with Dr. Russel[l]," (Doc. 42-1 at 32, ¶ 183), while the College contends that Student 4 "never discussed all of Dr. Noonan's inappropriate treatment . . . with Dr. Russel[l]." (Doc. 51-2 at 9, ¶ 183) (alteration adopted) (internal quotation marks omitted).

Plaintiffs contend that Dr. Margulis met with Dr. Hogan and Ms. Walleshauser on January 28, 2019, to discuss student complaints about Dr. Noonan "which [Dr. Margulis] never reported to [the College's] Title IX coordinator prior to that time." (Doc. 42-1 at 33, ¶ 189.) The College counters that Plaintiffs' "cited exhibit and excerpts . . . do not show that the referenced document was emailed to Ms. Walleshauser, or that a meeting took place on January 28, 2019[,] between Dr. Hogan and Ms. Walleshauser[]" and "also do not show that Dr. Margulis 'never reported to [the College's] Title IX coordinator prior to that time.'" (Doc. 51-2 at 10-11, ¶ 189) (citations omitted).[8]

_____

[8] In her document for the January 28, 2019 meeting, Dr. Margulis notes, in relevant part:

- Students have occasionally indicated that they simply do not want to take another class with [Dr. Noonan] after taking [one] class[.] . . .
- Fall [']18: [S]tudent came to talk to me about things going on in Sex[,] Evolution[,] and Behavior. [Dr. Noonan] often does an anonymous survey about sexual partners; apparently he excludes LGBTQ students from survey summaries. More concerning, he apparently spent a significant portion of a class showing pictures of men and asking students to rate them, oftentimes calling out the LGBTQ students for their opinions.
- January '19: "Project [T]iger" trip to India. Note that [six] students were only asked to pay $2[,]000 for this trip and [two] students . . . $1[,]000 each. That

Plaintiffs contest the College's assertion that the film footage compiled during the Project Tiger trip to India was Dr. Noonan's property. Dr. Margulis testified that the footage "belonged to [Dr.] Noonan because course material 'is property of the professor.'" (Doc. 33-67 at 12, ¶ 68) (citations omitted). In a March 6, 2019 email from Dr. Margulis to Dr. McCarthy, Dr. Margulis stated: "I am uncomfortable with them using any of the video (even if the [C]ollege does technically own it) and feel podcasts would be a better way to go." (Doc. 42-1 at 13, at ¶ 68) (internal quotation marks omitted) (alteration adopted) (quoting Doc. 39-10 at 2).

## V.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the

---

is, students contributed $14,000 for a trip whose total cost approached $50,000. These students are to some extent "indebted" now ([Dr.] Noonan "owns" them)[,] so whatever additional work or time he asks for, they are obligated to provide. His behavior in India was concerning (based on conversation with [one] student). He was agitated and hostile to the students[] and to the local staff. He expressed concern about his own health (sometimes indicating he felt faint) and generally did not eat during the trip. "[T]he wildlife was great[,] but [Dr.] Noonan was difficult" is something I've heard from several students. He apparently made [more than one] student cry.

- January '19: [O]ne of [Dr. Noonan's] research students came to talk to me because she wanted to leave his research team – taking too much of her time. . . . Hearsay, but I was informed that he responded with yelling and hostility.
- Other: Not sure when this occurred (this is hearsay[;] I was not told this directly, but I imagine it may have been on the India trip), [Dr. Noonan] asked students to help him with his PT, which apparently means pushing on his legs. Most students said no, but one student (on his research team) agreed to do it.
- I believe that students, particularly those on his research team, feel obligated and unable to say no . . . .
- Ongoing pattern of risk-taking behavior on trips[.] . . .
- Asking to see a student's scar or bruises[.]
- . . . [H]e advised a trans student not to apply for a trip because she wouldn't pass the fitness test[.] . . .

(Doc. 40-11 at 2.)

23

governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). Not all disputed issues of fact, however, are material, *see Anderson*, 477 U.S. at 248, or preclude summary judgment. *See id.* at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks

omitted). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

**B.    Whether the College Is Entitled to Summary Judgment on Plaintiffs' Title IX Hostile Educational Environment Claim (Count I).**

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX applies to all public and private educational institutions that receive federal funding, including the College. *See Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 696 (W.D.N.Y. 2021). Federal courts have long recognized a private right of action under Title IX, *see Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) ("[T]his Court has recognized an implied private right of action" under Title IX); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 749-50 (2d Cir. 2003) ("The Supreme Court has recognized an implied private right of action under Title IX[.]"), and interpret the statute "by looking to . . . caselaw interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994).

"[S]exual harassment is a form of discrimination" prohibited by Title IX. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999). A plaintiff may base his or her sexual harassment Title IX claim "under either an official action theory or a deliberate indifference theory." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1094 (2d Cir. 2024) (citations omitted).

An official action theory, also known as a pre-assault or pre-harassment claim, imposes "Title IX liability based on a [school]'s response to a general problem of sexual misconduct on campus[.]" *Roskin-Frazee v. Columbia Univ.*, 2018 WL 6523721, at *5 (S.D.N.Y. Nov. 26, 2018); *see also Barlow v. Washington*, 2022 WL 2256318, at *1 (9th Cir. June 23, 2022) ("For a pre-assault claim . . . the focus is on whether the [school] maintained an official or de facto policy of deliberate indifference to reports of sexual misconduct or an obvious risk of sexual misconduct.") (citation omitted). A deliberate indifference theory, also known as a post-assault or post-harassment claim, imposes Title IX liability based on a school's inadequate response to "a plaintiff's specific instance(s)

of harassment[.]" *Roskin-Frazee*, 2018 WL 6523721, at *5; *see also Barlow*, 2022 WL
2256318, at *1 ("For [a post-assault claim], the focus is on whether the [school]
responded with deliberate indifference to an instance of harassment of which the [school]
had actual knowledge."). Plaintiffs assert a Title IX hostile educational environment
claim under both theories.[9] The College argues both theories fail as a matter of law.

The College argues that Plaintiffs' pre-assault theory fails because the faculty and
student complaints regarding Dr. Noonan prior to the February 11 Meeting did not
involve sexual misconduct. It contends that Plaintiffs' post-assault theory fails because its
response to Plaintiffs' complaints was not clearly unreasonable. For these reasons, it
requests summary judgment on Plaintiffs' Title IX hostile educational environment
claims.

### 1.      Plaintiffs' Pre-Assault Claim.

Plaintiffs argue that the College is liable for violating Title IX under a pre-assault
theory because "[t]here is ample evidence from which a jury can conclude that [the
College] had an official policy of deliberate indifference to complaints about Dr.
Noonan's sexual harassment of students." (Doc. 36 at 24.) In a seminal case on official
policy liability under Title IX, *Simpson v. University of Colorado Boulder*, 500 F.3d 1170
(10th Cir. 2007), the Tenth Circuit held that a defendant could be liable for violating Title
IX through an "official policy, which may be a policy of deliberate indifference to
providing adequate training or guidance that is obviously necessary for implementation
of a specific program or policy of the recipient." *Id.* at 1178. Although "[t]he Second
Circuit has not addressed the 'pre-assault' Title IX claim or the 'official policy' theory of

---

[9] Plaintiffs' Complaint does not specify the theories for their Title IX hostile educational
environment claims. In their opposition to the College's motion for summary judgment,
Plaintiffs assert that they "bring pre-harassment claims under an official action theory[,]" (Doc.
36 at 22), but they advance arguments for their Title IX hostile educational environment claims
under a post-assault theory as well. *See, e.g.*, Doc. 36 at 22, 29 (arguing that "[A] Reasonable
Jury Can Find that [the College] Had [an] 'Official Policy' of Deliberate Indifference to
Complaints Regarding Dr. Noonan's Sexual Harassment For Years[,]" which is the pre-assault
theory, and that "[A] Reasonable Jury Can Find [the College's] Untimely Response to Plaintiffs'
2019 Complaints Demonstrates Deliberate Indifference[,]" which is the post-assault theory).

liability[,]" this district "ha[s] found *Simpson* persuasive for the premise that a [school]'s official policy of deliberate indifference can establish Title IX liability." *Posso*, 518 F. Supp. 3d at 699 (citations omitted). To establish a pre-assault claim, a plaintiff must prove the following:

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school."

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020) (alterations adopted) (footnote omitted) (quoting *Davis*, 526 U.S. at 650).

The College argues that Plaintiffs' pre-assault claim fails because the issues raised regarding Dr. Noonan's conduct prior to the February 11 Meeting were not sexual in nature. "Generally, cases that hold a school responsible for pre-assault deliberate indifference involve actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators." *Tubbs v. Stony Brook Univ.*, 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016) (collecting cases). To sustain a pre-assault claim, "'[t]he prior harassment about which the school had knowledge must have been sufficiently similar to the harassment about which the plaintiff complains' in the federal lawsuit." *Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist.*, 2018 WL 2100605, at *22 (W.D.N.Y. May 7, 2018) (alterations adopted) (quoting *Wyler v. Connecticut State Univ. Sys.*, 100 F. Supp. 3d 182, 190 (D. Conn. 2015)).

In the context of a pre-assault claim, courts in the Second Circuit have found:

> Title IX liability does not attach simply because a school "should have known" about sexual abuse, and actual notice also requires more than a simple report of inappropriate conduct by a teacher. Clearly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach, and at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which [the] plaintiff's legal claim is based.

*Id.* (emphasis omitted) (quoting *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005)).

Plaintiffs allege that the College had actual knowledge of numerous instances of Dr. Noonan's misconduct in the years prior to 2019 which "is evidence from which a reasonable jury can conclude there was an 'obvious' risk that a future Title IX violation would occur, and [the College's] failure to remedy eight years' worth of prior complaints amounted to an official policy of deliberate indifference." (Doc. 36 at 24.) Some of Dr. Noonan's reported misconduct over the years, however, did not involve or relate to sexual harassment.

For example, Dr. Loughead reported that Dr. Noonan had yelled and thrown pencils at her and that Dr. Noonan had yelled at Sister Pat, and Dr. Suchak and Dr. Russell reported that Dr. Noonan was misusing funds and students were having generally poor experiences on his trips. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) (finding that parents reporting a teacher's inappropriate class commentary to the school "was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student[]"); *see also E. Irondequoit Cent. Sch. Dist.*, 2018 WL 2100605, at *22 (finding that knowledge of bus driver's crime of endangering the welfare of a child, without additional facts of the crime, did not give the school knowledge of his sexual misconduct). Similarly, although the nature of Ms. Tuhovak's complaints to Dr. Margulis is disputed, Ms. Tuhovak cannot recall whether she used the words "verbal harassment," and she concedes she did not use the phrases "sex discrimination" or "sexual harassment." *See Tesoriero*, 382 F. Supp. 2d at 397 ("[A]ctual notice . . . 'requires more than a simple report of inappropriate conduct by a teacher.'") (internal citations omitted). In essence, she complained that Dr. Noonan was, at times, unpleasant and stress-inducing.

On the other hand, the reports of Student 1, 2, 3, and 4, as well as the complaints of Drs. Waldau and Hoffman, collectively, in the light most favorable to Plaintiffs, provided the College with notice that Dr. Noonan had engaged in intrusive inquiries into his students' sex lives, asked students to rate males based on their appearance, bragged

about kissing his students, engaged in physical and allegedly sexualized touching of a student on a bus, either engaged in or was perceived as a threat to engage in inappropriate viewing or touching of a student's chest area, and engaged in unwelcomed hugging of a colleague. Spanning the years from 2011 to 2018, the incidents were reported to either a faculty member at the College, a Dean, or the Title IX Coordinators at the time, making Dr. Noonan's heightened risk of sexual harassment known arguably known to the College to a degree and extent that presents a genuine issue of material fact for trial.[10]

Plaintiffs rely on *Posso*, 518 F. Supp. 3d 688, to argue that all of Dr. Noonan's reported conduct, even if "lesser harassment" than sexual harassment, "put the College on notice of the 'heightened risk' [that] Dr. Noonan posed[.]" (Doc. 36 at 27) (internal quotation marks omitted). In *Posso*, three plaintiffs brought a Title IX pre-assault claim against their university due to sexual assaults that they suffered by their male counterparts on the swim team. *Posso*, 518 F. Supp. 3d at 692-93. The university sought to dismiss a plaintiff's pre-assault claim, arguing that they "did not have actual knowledge of the risk of sexual assault by a male swimmer" because the reports of his conduct involved "lesser harassment" of physical and verbal harassment and thus "did not involve 'overtly sexual conduct.'" *Id.* at 700 (internal quotation marks omitted).

The *Posso* court rejected the university's argument and denied dismissal, reasoning that the verbal harassment "undoubtedly was overtly sexual conduct" because the male swimmers called female swimmers "[t]he names 'slut,' 'cunt,' and 'pussy[,]'"

---

[10] *Compare Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 87 (D. Mass. 2023) (denying dismissal of the plaintiffs' pre-assault claim because the complaint alleged that "over the course of many years, students and others repeatedly complained of sexual harassment and abuse by professors in the Anthropology Department to Harvard administrators, department heads[,] and the Title IX Office," and thus "the risk of continuing harassment arising out of these alleged circumstances would have been obvious[]") (internal quotation marks omitted), *with Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 491 (S.D.N.Y. 2023) (dismissing the plaintiff's pre-assault Title IX claim because the complaint "do[es] not indicate that [the alleged harasser] himself, or a student similarly situated to [the alleged harasser]—for instance, a member of the varsity athletic team—presented a clear risk to [the plaintiff] or other female students[]"), *and Doe v. Texas A&M Univ.*, 634 F. Supp. 3d 365, 377 (S.D. Tex. 2022) (dismissing a Title IX pre-assault claim because the plaintiffs "[did] not allege that [the school's] staff received reports of sexual misconduct").

"'rank[ed]' female swimmers by physical appearance[,]" and "[c]omment[ed] on female swimmers' bodies[,]," which were all a "way for male swimmers to objectify, demean, and sexualize female swimmers." *Id.* (alteration adopted). The court also found that the male swimmers' physical harassment was gender-based because "[b]iting someone can be . . . overtly sexual conduct" and "holding a female swimmer's head under the water until she 'struggled to breathe' . . . demonstrates male swimmers' willingness to use physical force to exert power and control over female swimmers[.]" *Id.*

Viewing the undisputed as well as disputed evidence in the light most favorable to Plaintiffs, a reasonable jury could similarly find the reports of Dr. Noonan's inappropriate sexual conduct either constituted actual sexual harassment or evidenced a substantial risk of sexual harassment because it "involve[d] 'overtly sexual conduct." *Id.* For example, the factual dispute as to whether Student 1 reported that Dr. Noonan "simulated having sex" with a student, (Doc. 51-2 at 2, ¶ 158) (internal quotation marks and citation omitted), when he lifted the student's legs on the bus must be viewed in Plaintiffs' favor and because this was allegedly reported to two of the College's Deans, a reasonable jury could find the College had notice of "the kind of harassment upon which [Plaintiffs'] legal claim is based." *E. Irondequoit Cent. Sch. Dist.*, 2018 WL 2100605, at *22 (quoting *Tesoriero*, 382 F. Supp. 2d at 397) (emphasis omitted).

Insofar as the College argues that certain reports cannot be credited, it is not the court's role to weigh the strength and credibility of the evidence. "Whether complaints 'unsubstantiated by corroborating evidence . . .' did or should have put a school [ ] on notice of a teacher's substantial risk to students 'is usually a question for the jury.'" *Tesoriero*, 382 F. Supp. 2d at 397 (citation omitted).

*Simpson* is again instructive. There, the plaintiffs brought a Title IX hostile educational environment claim against their university after they were allegedly sexually harassed and assaulted by the university's football recruits. 500 F.3d at 1173. The alleged assaults resulted from a university-sanctioned, "player-host" football recruiting program, which paired male recruits with female ambassadors. *Id.* The Tenth Circuit denied the university's motion for summary judgment, ruling that a reasonable jury could find for

the plaintiffs on their pre-assault claims because "[a] jury could infer that 'the need for more or different training of player-hosts was so obvious, and the inadequacy so likely to result in Title IX violations, that [the football coach] could reasonably be said to have been deliberately indifferent to the need." *Id.* at 1184-85 (alterations adopted). In so ruling, the *Simpson* court observed:

> [B]y the time of the assaults on [the p]laintiffs, (1) [the football coach] . . . had general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts; (2) [the football coach] knew that such assaults had indeed occurred during [university] recruiting visits; (3) [the football coach] nevertheless maintained an unsupervised player-host program to show high-school recruits "a good time"; and (4) [the football coach] knew, both because of incidents reported to him and because of his own unsupportive attitude, that there had been no change in atmosphere since 1997 (when [a] prior assault occurred) that would make such misconduct less likely[.]

*Id.* at 1184; *see also Kane v. Loyola Univ. of Chi.*, 2024 WL 1157396, at *9 (N.D. Ill. Mar. 18, 2024) (denying a motion to dismiss a Title IX pre-assault claim because the complaint "indicate[d] that the [school] failed to adequately respond to complaints of sexual assault on at least ten separate occasions[,]" which is sufficient to "adequately allege[] a policy or practice of deliberate indifference[]").

Despite its knowledge of Dr. Noonan's prior conduct involving touching students and faculty and inquiring into students' sexual habits and experiences, the College allowed Dr. Noonan to continue taking students on international trips where students did not have access to computers, cell phones, or the internet and where Dr. Noonan was able to control the students' activities and engaged in conduct they deemed inappropriate and sexually motivated. Based on this evidence, a reasonable jury could find that the College maintained an official policy of deliberate indifference by enabling Dr. Noonan's access to students in off-campus settings that provided him with numerous opportunities to engage in sexual harassment.

Because there are genuine disputes of material fact that preclude judgment as a matter of law in the College's favor, the court DENIES the College's motion for

31

summary judgment on Plaintiffs' pre-assault Title IX hostile educational environment claim.

### 2.    Plaintiffs' Post-Assault Claim.

Plaintiffs argue that the College is liable for violating Title IX under a post-assault theory because the College "acted with deliberate indifference to Plaintiffs' complaints about Dr. Noonan's sexual harassment in 2019." (Doc. 36 at 29.) To sustain a Title IX post-assault claim of sexual harassment, a plaintiff must establish that (1) "a federally funded recipient is" (2) "deliberately indifferent to sexual harassment," (3) "of which they have actual knowledge," (4) "that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 665 (S.D.N.Y. 2020) (alterations adopted) (quoting *Davis*, 526 U.S. at 650). "[This] deliberate indifference standard outlined by the Supreme Court in *Davis v. Monroe County Board of Education* is a narrow one." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (citation omitted).

As the Second Circuit has observed: "A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment. A failure to respond, a response that 'only follows after a lengthy and unjustified delay,' and a response that 'amounts to deliberate indifference to discrimination,' have all been found inadequate." *Id.* at 666 (alteration adopted) (internal citations omitted). "A defendant acts with deliberate indifference for Title IX purposes 'when the defendant's response to known discrimination is *clearly* unreasonable in light of the known circumstances.'" *Posso*, 518 F. Supp. 3d at 697 (emphasis in original) (quoting *Roskin-Frazee*, 2018 WL 6523721, at *4). Deliberate indifference "is a fairly high standard[,]" *Karasek*, 956 F.3d at 1105, which is not satisfied by mere negligence. *Posso*, 518 F. Supp. 3d at 697. Plaintiffs must establish that the College's deliberate indifference "amounted to 'an official decision . . . not to remedy' the discrimination." *Karasek*, 956 F.3d at 1105 (alteration in original) (quoting *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006)).

The College argues that its response to Plaintiffs' complaints about Dr. Noonan's

alleged sexual harassment on the Project Tiger trip and elsewhere was not "[c]learly [u]nreasonable" because "[i]mmediately after students voiced their concerns about [Dr.] Noonan, [it] secured [Plaintiffs'] written statements, []interviewed them all[,]" and suspended Dr. Noonan to "ensur[e] he had no student contact as the investigation proceeded." (Doc. 33-68 at 13) (emphasis omitted). Plaintiffs counter that "[e]ven though [the College's] top administrators had actual knowledge of the student complaints regarding Dr. Noonan's sexual harassment, they waited for weeks to act." (Doc. 36 at 15.)

"A school's delayed response constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a 'deliberate attempt to sabotage [the p]laintiff's complaint or its orderly resolution.'" *JD1 v. Canisius Coll.*, 2022 WL 2308902, at *13 (W.D.N.Y. June 27, 2022) (alteration in original) (citation omitted). "[T]he reasonableness of a delayed investigation depends heavily upon the surrounding circumstances, including the school's actions throughout the delay." *Id.* (alteration in original) (internal quotation marks and citation omitted). "The body of applicable case law indicates that a [school] receiving reports of possible teacher-to-student sexual harassment does not act with deliberate indifference where he or she promptly investigates, institutes corrective measures, and subsequently continues to monitor the situation." *Tesoriero*, 382 F. Supp. 2d at 399 (citations omitted).[11]

---

[11] *Compare Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 611 (E.D.N.Y. 2012) (holding the department of education's response to discovering a sexual relationship between a teacher and a student was not deliberately indifferent because the principal "immediately took steps to commence an investigation[,]" and "[w]hen the investigation, which was conducted two days later, confirmed . . . an illegal sexual relationship . . . , [the principal] immediately instituted remedial measures . . . by removing [the teacher] from the school, relieving him of his teaching responsibilities, and transferring him to a location at which he would not have any interaction with children[]"), *and Morin v. Fordham Univ.*, 2022 WL 4586042, at *8 (S.D.N.Y. Sept. 28, 2022) (finding the school was not deliberately indifferent and granting it summary judgment on the plaintiff's Title IX claim because it "(1) promptly suspended [the harassing professor] without pay and placed him under a no-contact directive with [the p]laintiff; (2) conducted an investigation, including multiple interviews of . . . students and faculty; and (3) as a result of the investigation, terminated [the harassing professor][]"), *with Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012) (affirming the district court's denial of summary judgment because, "although the [school d]istrict disciplined many of the students who harassed [the

Viewing the evidence in the light most favorable to Plaintiffs, the College had actual knowledge of Dr. Noonan's alleged sexual harassment of Plaintiffs as of February 5, 2019, when Ms. Tuhovak met with Dr. Hoffman to report Dr. Noonan's alleged sexual harassment. Dr. Hoffman was an ABEC faculty member, which is sufficient to satisfy *Gebser*'s requirement that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination[.]" *Gebser*, 524 U.S. at 290; *see also Folkes v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.*, 214 F. Supp. 2d 273, 282 (E.D.N.Y. 2002) ("The court will assume, for the purposes of this motion [for summary judgment], that both professors had actual authority to redress the discrimination, thus satisfying the *Gebser* standard regarding notice to an individual with actual authority.").

After Ms. Tuhovak and Dr. Hoffman met, Ms. Tuhovak asked Ms. Walleshauser to schedule a meeting two days later on February 7, 2019. In her email to Ms. Walleshauser, Ms. Tuhovak never identified Dr. Noonan by name nor specified the nature of his alleged misconduct but merely asserted that she had some "concerns" with "a professor[.]" (Doc. 33-49 at 3.) Ms. Walleshauser was out of town at the time but scheduled a meeting with Ms. Tuhovak for the morning of the first day she returned to campus. After learning of Plaintiffs' complaints regarding Dr. Noonan's alleged sexual harassment at the February 11 Meeting, Ms. Walleshauser immediately began an investigation. She requested that each of the Plaintiffs submit written statements detailing their experiences with Dr. Noonan and held individual meetings with each of them between February 11 and February 13, 2019. The same day as the February 11 Meeting, Ms. Walleshauser also met with senior officials of the College to discuss Plaintiffs' claims.

---

victim]," that remedy was inadequate and "it dragged its feet before implementing any non-disciplinary remedial action—a delay of a year or more[]"), *and Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F.Supp.2d 226, 235 (D. Conn. 2009) (denying a motion for summary judgment because "the evidence presented could permit a finding that the [school]'s response was unreasonably delayed so as to constitute deliberate indifference[]" due to its six-month delay in disciplining or removing the sexual harasser from the victim's class).

Ten days after Ms. Walleshauser received Plaintiffs' written statements about Dr. Noonan, on February 21, 2019, the College suspended him and prohibited him from having any contact with not only Plaintiffs but the entire student body. Notably, this was the remedy the Complaining Students sought according to Dr. Hogan's February 9, 2019 email to Ms. Walleshauser. Thereafter, Ms. Walleshauser continued her investigation for four additional months until June 1, 2019, when Dr. Noonan retired from the College. Throughout the investigation and leading up to Dr. Noonan's retirement, Ms. Walleshauser provided updates to Plaintiffs regarding its progress. Various faculty members took over Dr. Noonan's teaching responsibilities and assisted Plaintiffs with their summer or postgraduate opportunities. The College therefore "promptly investigate[d], institute[d] corrective measures, and subsequently continue[d] to monitor the situation" and was not deliberately indifferent as a matter of law. *Tesoriero*, 382 F. Supp. 2d at 399 (citations omitted).

Any delay between Dr. Hoffman receiving notice of Dr. Noonan's sexual harassment on February 5, 2019, and the College suspending Dr. Noonan on February 21, 2019, was not "lengthy and unjustified" so as to rise to the level of deliberate indifference. *Zeno*, 702 F.3d at 666 (internal quotation marks omitted); *see also Doe v. Hobart & William Smith Colls.*, 2021 WL 751272, at *7-8 (W.D.N.Y. Jan. 25, 2021) (finding there was "no evidence of delay or inaction sufficient to support a claim of deliberate indifference[]" when "[l]ess than two weeks passed between the time plaintiff approached the Title IX office and the commencement of the investigation" and "[t]he entire process from initial disclosure to scheduling of the disciplinary hearing occurred within four months[]"); *see also Doe v. Syracuse Univ.*, 2023 WL 7391653, at *2 (2d Cir. Nov. 8, 2023) ("[T]he 'approximately one[-]week' delay" between the [school] obtaining notice of the assault and notifying the police "was not 'lengthy and unjustified.' The district court correctly recognized that much longer delays have not been found to be clearly unreasonable.").

The College's remedial measures in response to Dr. Noonan's alleged sexual harassment cannot be deemed deliberately indifferent as a matter of law. It is undisputed

that after Dr. Noonan's suspension on February 21, 2019, Plaintiffs did not see, speak to, or have any contact with him again, and he never returned to the College as a professor. *See Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 611 (E.D.N.Y. 2012) (finding the department of education's response to discovering a relationship between a teacher and a minor student was not deliberately indifferent because "[the teacher] never returned to [the high school] or taught another [New York City Department of Education] class again[]"). Plaintiffs' objection to the College's decisions to "put Dr. Noonan on paid leave during [the] semester-long investigation, permit[] [him] to resign, pa[y] him $133,000 pursuant to a separation agreement, and allow[] him to take video editing equipment," (Doc. 36 at 33), does not rise to deliberate indifference because "victims do not have a right to specific remedial measures." *Zeno*, 702 F.3d at 666 (citing *Davis*, 526 U.S. at 648). As the Supreme Court has stated, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648 (citation omitted); *see also Zeno*, 702 F.3d at 666 ("[A] court must accord sufficient deference to the decisions of school disciplinarians.") (citations omitted*)*; *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 642 (E.D.N.Y. 2013) (noting "a school district's ability to use discretion in disciplining its students[]") (citation omitted).

Moreover, Plaintiffs do not identify any harm that they suffered because the College's remedial measures were not as punitive as they might have wished. A school may not be liable under Title IX "unless its deliberate indifference 'subjects' its students to harassment[;] *i.e.*, at a minimum, causes students to undergo harassment or makes them liable or vulnerable to it." *Davis*, 526 U.S. at 630 (alteration adopted). Because the College's remedial measures were prompt and comprehensive, Plaintiffs faced no further risk of sexual harassment by Dr. Noonan ten days after they met with Ms. Walleshauser to advise her of their complaints. *See Romero*, 839 F. Supp. 2d at 610.

For the foregoing reasons, the court GRANTS the College's motion for summary judgment on Plaintiffs' post-assault Title IX hostile educational environment claim.

**C.     Whether the College Is Entitled to Summary Judgment on Plaintiffs'
Title IX Retaliation Claim (Count III).**

In *Jackson v. Birmingham Board of Education*, the Supreme Court held that Title
IX incudes a private right of action for retaliation. 544 U.S. 167, 171 (2005). "[A]
plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by
showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the
protected activity; (3) adverse school-related action; and (4) a causal connection between
the protected activity and the adverse action." *Papelino v. Albany Coll. of Pharmacy of
Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

Plaintiffs argue that the College retaliated against them because (1) Ms.
Walleshauser "did not educate Plaintiffs to request accommodation"; (2) "ABEC faculty
treated them in a 'hostile' and 'cold' manner after Dr. Noonan's removal"; and (3) the
College "withheld the Project Tiger film footage from [Plaintiffs] throughout the [s]pring
of 2019, while it was negotiating Dr. Noonan's separation agreement, and then permitted
him to use the footage and video equipment to work on his own version of the
documentary during the summer of 2019." (Doc. 36 at 35-36.)

Title IX retaliation claims are subject to the *McDonnell Douglas* burden-shifting
framework. *Papelino*, 633 F.3d at 91-92. "To establish a *prima facie* case of retaliation
under . . . Title IX, 'a plaintiff must show that a reasonable person would have found the
challenged action materially adverse, which . . . means it well might have dissuaded a
reasonable person from making or supporting a complaint." *Yeshiva Univ.*, 703 F. Supp.
3d at 495 (alterations adopted) (quoting *Fincher v. Depository Tr. & Clearing Corp.*, 604
F.3d 712, 721 (2d Cir. 2010)). "Once a plaintiff establishes a *prima facie* case, the burden
shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.
After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that
the articulated reasons are pretextual." *Papelino*, 633 F.3d at 92 (citing *McDonnell
Douglas Corp. v. Green*, 411 U.S. 792, 802, 804-05 (1973) (internal citation omitted)).
Plaintiffs must show that "a retaliatory motive play[ed] a part" in the adverse action.
*Sarah Lawrence Coll.*, 453 F. Supp. 3d at 667 (alteration in original) (quoting *Papelino*,

633 F.3d at 92).

Plaintiffs argue they suffered adverse action because Ms. Walleshauser failed to inform them of available accommodations as Title IX claimants. It is undisputed, however, that Ms. Walleshauser provided Plaintiffs with general information regarding available accommodations and told them that they should advise the Title IX office if they needed support. Plaintiffs also do not dispute that they were aware that accommodations existed and, in certain cases, received them.

Plaintiffs next argue that they suffered retaliation because the College's faculty members treated them in a "cold" and "hostile" manner after reporting Dr. Noonan. In *Bailey v. New York Law School*, the Second Circuit rejected a similar argument and granted the defendants summary judgment on a Title IX retaliation claim:

> [The plaintiff] fails to establish that [the d]efendants-[a]ppellees took any adverse action against her for complaining about her male classmate. Regarding [the plaintiff's] effort to transfer from [the New York Law School], the record reflects that [a school official] met with [the plaintiff] at least twice and offered significant aid to assist her with the transfer process, including reviewing her personal statement. Although [the plaintiff] received a poor grade (a D+) in [the relevant class] in the fall 2015 term, the evidence shows that the grade was warranted based on [the plaintiff's] anonymous exam answers, that it was not the lowest grade given in the course, and that [the professor] had *raised* her grade from a D to a D+ after learning her identity.

2021 WL 5500078, at *2 (2d Cir. Nov. 24, 2021) (emphasis in original).

A subjective opinion that a response was "cold" and "hostile" is no substitute for evidence of retaliatory treatment. *See Ellis v. Univ. of Rochester*, 2024 WL 493504, at *32 (W.D.N.Y. Feb. 8, 2024) (granting a defendant summary judgment on a Title IX retaliation claim because plaintiff's contentions of retaliation were based on "his opinion, not evidence[]"). Shortly after the College suspended Dr. Noonan, it reassigned Plaintiffs' ABEC mentors, and various faculty members provided Plaintiffs with letters of recommendation and references when requested. No Plaintiff complained about the adequacy of their accommodations at the time. All Plaintiffs obtained above-average grades for the Spring 2019 semester and graduated on time from the College with

academic honors. After asserting their Title IX complaints, Ms. Wood, Ms. Boucher, and Ms. Tuhovak were granted their respective accommodations.

To the extent that Plaintiffs claim that the College retaliated by withholding the Project Tiger video footage from them throughout the Spring 2019 semester while permitting Dr. Noonan to use the footage, it is undisputed that the College released the Project Tiger footage to Plaintiffs at the same time as it released it to Dr. Noonan. Only one Plaintiff accessed that footage when Plaintiffs were permitted to do so.

Although the question of whether Dr. Noonan owned the Project Tiger footage is disputed, it is undisputed that Dr. Margulis withheld the footage from Plaintiffs due to concerns surrounding its ownership as course material. Plaintiffs fail to present any evidence rebutting this legitimate, non-discriminatory reason. Dr. Margulis's suggestion that Plaintiffs alternatively create the Project Tiger podcasts supports the conclusion that the College's reasons for withholding the footage were not pretextual. *See Shalom v. Hunter Coll. of City Univ. of New York*, 645 F. App'x 60, 63 (2d Cir. 2016) (affirming the district court's grant of summary judgment for the defendant on a Title IX retaliation claim because "[the plaintiff] fail[ed] to show that [the] defendant's legitimate, non-discriminatory reason for her grade—various supervisors' notation of [the plaintiff's] deficient performance—was pretextual[]").

Finally, Plaintiffs point to no act or omission by the College which deterred them from making or supporting a future complaint of sexual harassment. *See Yeshiva Univ.*, 703 F. Supp. 3d at 495. Plaintiffs also fail to adduce any evidence of retaliatory motive. Far from demonstrating retaliatory motive, the College acted swiftly, reasonably, and aggressively to mitigate Plaintiffs' harm.

For the foregoing reasons, the court GRANTS the College's motion for summary judgment on Plaintiffs' Title IX retaliation claim.

### D.    Whether Plaintiffs Can Recover Emotional Distress Damages for Their Title IX Claims.

The College argues that in light of the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, Plaintiffs may not recover emotional distress damages

for their Title IX claims. The *Cummings* court held that "emotional distress damages are not recoverable under the [Rehabilitation Act and the Patient Protection and Affordable Care Act.]" 596 U.S. 212, 230 (2022). "While the Second Circuit Court of Appeals has not yet considered this issue, most courts interpreting the issue post-*Cummings* have found that plaintiffs are precluded from recovering emotional distress and punitive damages under Title IX." *Gordon v. Niagara Wheatfield Cent. Sch. Dist.*, 2023 WL 6520216, at *6 (W.D.N.Y. Aug. 22, 2023) (collecting cases). The court agrees with the majority approach. Plaintiffs therefore cannot recover damages for emotional distress for their Title IX claims, and those claims are DISMISSED.

**E.    Whether the College Is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim (Count IV).**

"Under New York law, an implied contract is formed when a university accepts a student for enrollment[.]" *Papelino*, 633 F.3d at 93 (citing *Carr v. St. John's Univ.*, 231 N.Y.S.2d 410, 413 (App. Div. 1962)). "The terms of the implied contract are 'contained in the university's bulletins, circulars[,] and regulations made available to the student[,]'" *id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (App. Div. 1987)), and "[t]he essence of the implied contract is that an academic institution must act in good faith in its dealings with its students." *Olsson v. Bd. of Higher Ed.*, 402 N.E.2d 1150, 1153 (N.Y. 1980).

To establish a breach of contract claim, a plaintiff must show: "(1) the formation of a contract, (2) the plaintiff's performance of his or her obligations thereunder, (3) the defendant's failure to perform its obligations, and (4) resulting damages to the plaintiff." *Posso*, 518 F. Supp. 3d at 703 (citation omitted).

To establish a breach of an implied enrollment contract, "a student must identify 'specifically designated and discrete promises.'" *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (citation omitted); *see also Jones v. Trs. of Union Coll.*, 937 N.Y.S.2d 475, 477 (App. Div. 2012) (finding the lower court "properly determined that [the] plaintiff's failure to identify the specific terms of the implied

contract that he claims were violated by the [c]ollege—such as an internal rule, regulation[,] or code—[was] fatal to his [breach of contract] claim") (citations omitted).

"A university's general policy statements, rules, or guidelines about fair and equal treatment cannot support a breach of contract claim." *Posso*, 518 F. Supp. 3d at 704 (citation omitted). "[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted." *Nungesser*, 169 F. Supp. 3d at 369 (alteration in original) (internal quotation marks omitted) (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)).

In this court's March 17, 2023 Opinion and Order granting in part and denying in part the College's motion to dismiss, the court noted that "Plaintiffs identify a number of 'general statements of adherence' to antidiscrimination laws in the College's Sexual Harassment and Gender-Based Misconduct Policy, which do not support a breach of contract claim[.]" (Doc. 15 at 22) (alteration adopted) (internal citations omitted). The court therefore dismissed Plaintiffs' breach of contract claim except for Plaintiffs' allegation that the College breached the following provision: "'Title IX Coordinator is responsible for coordinating the effective implementation of Supportive Measures,' which may include 'counseling; extensions of deadlines or other course-related adjustments; modifications of work or class schedules; campus escort services; [] restrictions on contact between the parties[;] and[] other Supportive Measures deemed appropriate by the Title IX Coordinator.'" *Id.* (alterations adopted) (citation omitted). At the pleading stage, the court found Plaintiffs alleged a plausible claim for relief.

The College argues that Plaintiffs cannot establish that it failed to provide them with any supportive measures because the record "firmly establishes that [it] afforded [P]laintiffs a host of supportive measures" and Plaintiffs do not identify "a supportive measure that [they] requested[] or that was denied [them] after such a request." (Doc. 33-68 at 30.) Plaintiffs contend that "[a] reasonable jury could find that [the College] maintained an 'official policy' of deliberate inference to complaints about Dr. Noonan's sexual harassment for many years" and "breached its implied duty of good faith to

41

Plaintiffs by *inter alia* failing to investigate complaints of sexual harassment regarding Dr. Noonan[.]" (Doc. 36 at 39-40.) The College counters that Plaintiffs' argument fails because "[a]s a matter of law, students cannot maintain breach of contract claims against a university based solely on the implied covenant of good faith." (Doc. 51 at 18) (citations omitted).

In their opposition, Plaintiffs fail to present arguments supporting their claim that the College breached a contractual obligation to provide supportive measures. Instead, Plaintiffs have recharacterized their claim as a violation of the implied duty of good faith. Although an enrollment contract contains an implied promise that the institution will "act in good faith in its dealing with its students[,]" *Papelino*, 633 F.3d at 93 (internal quotation marks and citation omitted), "[u]nder ample New York precedent, a student cannot maintain a breach of contract claim against a university based solely on the implied covenant of 'good faith[.]'" *Evans v. Columbia Univ. in the City of N.Y.*, 2015 WL 1730097, at *4 (S.D.N.Y. Apr. 13, 2015) (citations omitted); *see also Posso*, 518 F. Supp. 3d at 703-04 ("A student may sue [his or] her college or university for a breach of an implied contract in certain situations. To do so, however, a student must state when and how the defendant breached the specific contractual promise.") (alteration adopted) (internal quotation marks and citations omitted). Plaintiffs' breach of contract claim, which is now based solely on an assertion that the College breached the implied duty of good faith, therefore fails as a matter of law. Even in its original formulation, Plaintiffs have failed to establish that the College breached a specific contractual obligation that caused their harm.

For the reasons stated above, the court GRANTS the College's motion for summary judgment on Plaintiffs' breach of contract claim.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART the College's motion for summary judgment on Plaintiffs' post-assault Title IX sexual harassment/hostile educational environment claim (Count I), Title IX retaliation claim (Count III), and breach of contract claim (Count IV) and DENIES IN PART the College's motion for summary judgment on Plaintiffs' pre-assault Title IX sexual harassment/hostile educational environment claim (Count I). (Doc. 33.)

SO ORDERED.

Dated this _11th_ day of December, 2025.

Christina Reiss, District Judge
United States District Court